14-16840

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**JEFF SILVESTER, BRANDON COMBS, THE CALGUNS FOUNDATION, INC., a non-profit organization, and THE SECOND AMENDMENT FOUNDATION, INC., a non-profit organization,**

Plaintiffs-Appellees,

**v.**

**KAMALA HARRIS, Attorney General of California (in her official and individual capacities),**

Defendant-Appellant.

---

On Appeal from the United States District Court
for the Eastern District of California

No. 1:11-cv-02137-AWI-SKO
The Honorable Anthony W. Ishii, Judge

## OPENING BRIEF OF DEFENDANT-APPELLANT

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
MARK R. BECKINGTON
Supervising Deputy Attorney
General
PETER H. CHANG
Deputy Attorney General

JONATHAN M. EISENBERG
Deputy Attorney General
State Bar No. 184162
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (213) 897-6505
 Fax: (213) 897-5775
 Jonathan.Eisenberg@doj.ca.gov
*Attorneys for Defendant-Appellant*
*Kamala D. Harris, Attorney General of*
*the State of California*

## TABLE OF CONTENTS

**Page**

Introduction ................................................................................ 1

Jurisdictional statement ............................................................. 3

Statement of issues .................................................................... 5

Statement of the case ................................................................ 6

    I.    Statement of facts ................................................. 6

        A.    History of the Waiting-Period Laws .............................. 6

        B.    Rationales for the Waiting-Period Laws ....................... 9

            1.    Background checks on prospective firearm purchasers ........................................................... 9

                a.    The computerized component ................... 9

                b.    The component requiring manual review ...................................................... 10

                c.    Straw-purchase investigations .................. 11

            2.    The cooling-off effect ........................................ 12

    II.    Procedural history ................................................. 14

Summary of argument ............................................................. 20

Standard of review ................................................................... 22

Legal standards for second amendment analysis ..................... 23

Argument ................................................................................. 26

    I.    The Waiting-Period Laws do not burden the Second Amendment and therefore do not warrant heightened scrutiny ................................................................. 26

        A.    The Waiting-Period laws fall outside the scope of the Second Amendment as historically understood ...... 27

            1.    The Waiting-Period Laws have analogues from the Founding Era of the United States ....... 28

i

# TABLE OF CONTENTS
## (continued)

Page

2. Voters in the Founding Era accepted delays in acquiring firearms............................................. 29

B. The Waiting-Period Laws fall into two of the Supreme Court's categories of presumptively lawful firearm regulations.............................................. 31

   1. The Waiting-Period Laws are presumptively lawful conditions or qualifications on the commercial sale of firearms ................................ 33

   2. The Waiting-Period Laws facilitate the prohibition on firearm acquisition by felons and the mentally ill and are thus lawful ............. 34

C. The Waiting-Period Laws are presumptively lawful because they are longstanding ............................ 35

II. The Waiting-Period Laws survive heightened Second Amendment scrutiny ................................................ 39

A. The Waiting-Period Laws warrant intermediate, not strict, scrutiny ......................................... 39

   1. The Waiting-Period Laws do not destroy the Second Amendment right................................... 40

   2. The Waiting-Period Laws do not come close to the core of the Second Amendment right....... 41

   3. The Waiting-Period Laws do not severely burden the Second Amendment right................. 41

B. The Waiting-Period Laws survive intermediate scrutiny........................................................ 45

   1. The Waiting-Period Laws serve an important interest in maintaining public safety.................................................. 45

   2. The Waiting-Period Laws reasonably fit with the public-safety objective ......................... 46

# TABLE OF CONTENTS
## (continued)

Page

a. Appellant proffered sufficient evidence of the a reasonable fit ............... 46

b. The District Court erred in rejecting Appellant's evidence of the fit ................ 50

c. The District Court relied on clearly erroneous findings of fact in holding that there is not a reasonable fit ............... 54

    (1) The District Court clearly erred in finding facts about California's firearm-transaction database ........................................... 55

    (2) The District Court clearly erred in finding facts about California's concealed-carry firearm laws ................................... 57

    (3) The District Court clearly erred in finding facts about certificates of eligibility ................ 59

d. The District Court made other clearly erroneous, material findings of fact and conclusions of law ............................ 59

III. The District Court did not afford Appellant sufficient time to comply with the judgment ......................................... 61

Conclusion ...................................................................... 63

Statement of Related Cases ........................................................ 66

Statement of Primary Authority ................................................... 67

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abramski v. United States*
__ *U.S.* __, 134 S. Ct. 2259 (2014) .............................................. 11, 60

*ACORN v. Bysiewicz*
413 F. Supp. 2d 119 (D. Conn. 2005) ............................................ 53

*Alliance for the Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011) ........................................................ 22

*Burdick v. Takushi*
504 U.S. 428 (1992) ......................................................................... 53

*Burns v. Fortson*
410 U.S. 686 (1973) ......................................................................... 53

*City of Los Angeles v. Alameda Books, Inc.*
535 U.S. 425 (2002) ..................................................................... 51-52

*District of Columbia v. Heller*
554 U.S. 570 (2008) ................................................................ passim

*Doe v. Wilmington Housing Auth.*
880 F. Supp. 2d 513 (D. Del. 2012) ............................................... 52

*Fyock v. City of Sunnyvale*
__ F.3d __, 2015 WL 897747 (9th Cir. Mar. 4, 2015) .............. passim

*Jackson v. City and Cnty. of San Francisco*
746 F.3d 953 (9th Cir. 2014) ..................................................... passim

*Kachalsky v. Cnty. of Westchester*
701 F.3d 81 (2d Cir. 2012) ............................................................. 28

*Kwong v. Bloomberg*
723 F.3d 160 (2d Cir. 2013) ........................................................... 38

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Lee v. City of Los Angeles*
    250 F.3d 668 (9th Cir. 2001) ........................................................... 29

*Lockyer v. Mirant Corp.*
    398 F.3d 1098 (9th Cir. 2005) ........................................................ 25

*McDonald v. City of Chicago*
    561 U.S. 742 (2010) ......................................................................... 46

*National Rifle Ass'n of Am., Inc. v. McCraw*
    719 F.3d 338 (5th Cir. 2013) ........................................................... 43

*Peńa v. Lindley*
    No. 2:09–CV–01185–KJM–CKD, 2015 WL 854694 (E.D. Cal.
    Feb. 26, 2015) .................................................................................... 33

*People v. Bickston*
    91 Cal. App. 3d Supp. 29 (Cal. App. Super. Ct. 1979) .................. 6, 7

*People v. Flores*
    169 Cal. App. 4th 568 (2008) .......................................................... 45

*Peruta v. Cnty. of San Diego*
    742 F.3d 1144 (9th Cir. 2014) ................................................... passim

*Reed v. Town of Gilbert*
    707 F.3d 1057 (9th Cir. 2013) ......................................................... 50

*Rosario v. Rockefeller*
    410 U.S. 752 (1973) ......................................................................... 43

*Silvester v. Harris*
    41 F. Supp. 3d 927 (E.D. Cal. 2014) ......................................... passim

*So. Cal. Gas Co. v. City of Santa Ana*
    336 F.3d 885 (9th Cir. 2003) ........................................................... 25

v

# TABLE OF AUTHORITIES
## (continued)

**Page**

*United States v. Chovan*
    735 F.3d 1127 (9th Cir. 2013) .................................................... passim

*Sullivan v. City of Augusta*
    511 F.3d 16 (1st Cir. 2007) ................................................. 54

*United States v. Carter*
    750 F.3d 462 (4th Cir. 2014) ........................................... 24

*United States v. Rene E.*
    583 F.3d 8 (1st Cir. 2009) ................................................. 30

*United States v. Tomsha-Miguel*
    766 F.3d 1041 (9th Cir. 2014) .................................. 46, 50

*United States v. Vongxay*
    594 F.3d 1111 (9th Cir. 2009) ........................................ 32

*Zablocki v. Redhail*
    434 U.S. 374 (1978) ......................................................... 53

**STATUTES**

1923 Cal. Stat., Ch. 339 .................................................... 6

28 U.S.C. § 158(d) ............................................................ 33

28 U.S.C. § 1291 .............................................................. 4

28 U.S.C. § 1331 .............................................................. 3

Cal. Fam. Code § 2320(a) .................................................. 34

Cal. Penal Code § 26815 .................................................... 1

Cal. Penal Code § 27105 .................................................... 4

Cal. Penal Code § 27110 .................................................. 45

# TABLE OF AUTHORITIES
## (continued)

Page

Cal. Penal Code § 27125.........................................................................45

Cal. Penal Code § 27540.......................................................................... 1

Cal. Penal Code § 27705......................................................................... 4

Cal. Penal Code § 27725.........................................................................45

Cal. Penal Code § 28220......................................................................... 7

N.C. Gen. Stat. § 14-1402.......................................................................37

Neb. Rev. Stat. § 69-2403.......................................................................37

N.J. Rev. Stat. § 2C:58-3.........................................................................37

Pub. L. 103–159, 107 Stat. 1536 ............................................................36

## CONSTITUTIONAL PROVISIONS

U.S. Const., Amend. I...................................................................... 51, 52

U.S. Const., Amend. II......................................................................passim

U.S. Const., Amend. XIV ............................................................ 4, 15, 53

## COURT RULES

Fed. R. Civ. P. 52(a)(6)........................................................................ 22

Fed. R. Civ. P. 59(e) ............................................................................. 4

Fed. R. App. P. 4(a)(1)(A) ....................................................................4-5

Fed. R. App. P. 4(a)(4)(B)(ii) ................................................................ 4

# TABLE OF AUTHORITIES
## (continued)

**Page**

OTHER AUTHORITIES

Michael J. Daponde, *New Residents and Collectors Must Register Their Out-of-state Handguns: Making a (Government) List and Checking it Twice*, 29 McGeorge L.J. 539 (Spring 1998) ................. 9

Charles V. Imlay, *The Uniform Firearms Act*, 12 Amer. Bar Ass'n J. 767 (1926) ........................................................................................... 36

Wade Maxwell Rhyne, Note, *United States v. Emerson and the Second Amendment*, 28 Hastings Const. L. Q. 505 (Winter 2001) ... 38

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Survey of State Procedures Related to Firearm Sales, 1996* (Sept. 1997) ................................................................... 36

U.S. Department of the Treasury, Bureau of Alcohol, Tobacco, Firearms and Explosives, *State Laws and Published Ordinances – Firearms, 31st Edition* (2011) ......................................................... 37

Frederick E. Vars, *Putting Arms at Arm's Length: Precommitment Against Suicide*, The University of Alabama School of Law Working Paper (Sept. 2014) ............................................................ 13

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443 (2009) ......................................................... 52

Sam B. Warner, *Uniform Pistol Act*, 29 J. of Crim. Law and Criminology 529 (1938) ................................................................... 36

**INTRODUCTION**

In this firearm regulation case, the District Court partly invalidated California's "Waiting-Period Laws" for firearm purchases under the Second Amendment.[1]  Because these longstanding statutes serve California's important interest in maintaining public safety by reducing firearm violence, Appellant Kamala D. Harris, Attorney General of the State of California ("Appellant"), respectfully requests that this Court reverse the lower court's ruling and uphold the Waiting-Period Laws.

The Waiting-Period Laws mandate a 10-day delay between a prospective firearm purchaser's required application to the California Department of Justice's Bureau of Firearms ("BOF") for approval of the purchase, and, if the application is approved, delivery/receipt of the firearm. The Waiting-Period Laws help to keep firearms out of the hands of people— such as felons, violent misdemeanants, people subject to restraining orders, and the mentally ill—most apt to abuse the weapons, by providing BOF with the time needed to complete a background check on each prospective firearm purchaser, for each transaction, blocking any illegal firearm

---

[1] California Penal Code §§ 26815 and 27540.  For purposes of the present lawsuit, the two laws are similar and thus have been treated as a single statute.  The full text of each law is in the Statement of Primary Authority appendix beginning on page 67, *infra*.

1

transaction from being consummated. The Waiting-Period Laws also create a "cooling-off" period, which can help to prevent an impulsive act of firearm violence.

The Waiting-Period Laws do not impose a burden of constitutional significance on the Second Amendment right as historically understood, because the statutes do not prohibit, but merely delay, for a relatively short time, lawful firearm transactions and subsequent possession and use of the firearms. Even if the Waiting-Period Laws are found to implicate the Second Amendment right, the statutes survive appropriate heightened scrutiny, intermediate scrutiny, because the statutes reasonably fit with California's important interest in maintain public safety by reducing firearm violence.

After a bench trial, the District Court ruled that certain groups of people experienced with firearms, such people sometimes referred to as "subsequent purchasers," no longer have to go through the full 10-day waiting period.[2] This ruling was based on an initial erroneous conclusion

_____

[2] As defined by the District Court, a subsequent purchaser who does not have to go through the waiting period is a prospective firearm purchaser who has (1) a transaction for at least one prior firearm acquisition listed in the person's name in California's Automated Firearms System database ("AFS"), or (2) a valid license to carry a concealed weapon (a "CCW

(continued…)

that a 10-day delay in acquiring a firearm is a burden of constitutional significance, such that the Waiting-Period Laws warrant heightened Second Amendment scrutiny. The District Court further erred by rejecting Appellant's sufficient presentation of evidence demonstrating the reasonable fit between the Waiting-Period Laws and California's public-safety objective.

The District Court's mandatory injunction will require costly and complicated modifications to BOF's partly automated, partly manual background check system. Yet, after ordering Appellant to make the changes, the District Court denied (without prejudice) Appellant's motion for sufficient time to make the changes. Even if this Court affirms the District Court's ruling, this Court should require the District Court to give Appellant more time to comply with the injunction.

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 (federal question). In the lower court, the case proceeded on the theory that the Waiting-Period Laws, which Appellant

---

(…continued)

permit"), or (3) both a transaction for at least one prior firearm acquisition listed in the person's name in AFS and a firearms "certificate of eligibility" ("COE").

administers and enforces, violate the Second and Fourteenth Amendments in certain circumstances.[3]

This Court has appellate jurisdiction over this case pursuant to 28 U.S.C. § 1291 (final judgment of district court). The District Court issued a final judgment partly invaliding the Waiting-Period Laws under the Second Amendment (and did not reach the Fourteenth Amendment issue). It is that judgment, which disposed of all claims of all parties, which Appellant appeals. Appellant also appeals the District Court's denial of the motion to alter or to amend that judgment.

The District Court's final judgment in this case was issued on August 25, 2014. Appellant's September 24, 2014, notice of appeal was timely pursuant to Federal Rule of Appellate Procedure ("FRAP") 4(a)(1)(A).

Meanwhile, on September 22, 2014, Appellant moved the District Court under Federal Rule of Civil Procedure 59(e) to alter or amend the judgment to enlarge the amount of time for Appellant to comply with the permanent injunction. On November 20, 2014, the District Court denied

---

[3] By legislative design, not every prospective purchaser of firearms in California must go through the waiting period. The Waiting-Period Laws have multiple statutory exemptions affecting various groups of people, such as gunsmiths repairing or servicing firearms. Cal. Penal Code §§ 27105, 27705. The exemptions were the subject of an equal protection challenge in the court below, but are not at issue in this appeal.

that motion without prejudice. Appellant's December 19, 2014, notice of appeal of the denial of that motion was timely pursuant to FRAP 4(a)(1)(A) and FRAP 4(a)(4)(B)(ii).

The present appeal is from the District Court's final judgment, and the denial of a motion to alter or to amend that judgment, disposing of all parties' claims.

## STATEMENT OF ISSUES

1.    Is it a violation of the Second Amendment for California to require a 10-day waiting period between a prospective firearm purchaser's application to BOF for approval of the transaction, and, if the application is approved, delivery/receipt of the firearm, where the prospective firearm purchaser has at least one other firearm listed in that person's name in BOF's firearm-transaction database, and/or has a valid permit to carry a concealed firearm in public in California?

2.    If the answer to the previous question is yes, did the District Court err in affording Appellant only 180 days to modify BOF's system for processing background checks, to comply with the associated injunction?

//

//

5

# STATEMENT OF THE CASE

## I. STATEMENT OF FACTS

### A. History of the Waiting-Period Laws

California has had a waiting-period statute for firearm purchases continuously since 1923. EOR 222-223. The California Legislature enacted the first version of these laws as part of a broader handgun regulatory scheme, which included a prohibition on convicted felons owning or possessing handguns. *Id.* The original waiting period for handgun purchases was one day. *Id.* Although there is no formal legislative history for the 1923 iteration of the Waiting-Period Laws, one California court discerns that the intent of the one-day waiting period "was to provide at least an overnight cooling off period." *People v. Bickston*, 91 Cal. App. 3d Supp. 29 (Cal. App. Super. Ct. 1979).

In 1955, the California Legislature extended the waiting period to three days. EOR 227-229. Although the legislative history for that amendment does not reflect why it was enacted, a letter in the legislative history of the 1975 amendment (discussed below) indicates that the 1950s-era three-day waiting period was justified as a "72-hour 'cooling off' period." *See* Exh. A to Appellant's Motion to Take Judicial Notice ("MTTJN"; submitted herewith) at AG000360-61. It also appears that the waiting period was

lengthened to permit law enforcement authorities time to complete

background checks on prospective firearm purchasers, in advance of the

purchases.  EOR 250.[4]

In 1965, the California Legislature extended the waiting period to five

days.  EOR 246-50.  This change was made because three days was

insufficient time to complete a background check; five days seemed more

appropriate.  EOR 250; *see also* EOR 243.  According to *Bickston*:

> Five persons testifying at the [1964 California
> Legislature] hearing [on the bill that become the law
> changing the waiting period to five days] . . .
> commented that the Department of Justice needed more
> time to identify prospective purchasers.  Two other
> witnesses recalled that [the Waiting-Period Laws were]
> originally enacted to cool people off.  There was no
> testimony negating a "cooling off" intent.

91 Cal. App. 3d Supp. at 32 (footnote omitted).

In 1975, the California Legislature extended the waiting period to 15

days.  See EOR 239-45.  The legislative history for that amendment reflects

that the proponents of the change believed that five days was too little time

---

[4] See California Penal Code section 28220 regarding background
checks generally.

7

to complete a background check; 15 days was needed. *See* EOR 242-45.[5] A letter in the legislative history indicates further that "[t]he waiting period was intended to be a 'cool off' period." Exh. A to MTTJN at AG000376.

In 1995, the California Legislature reduced the waiting period to 10 days. See EOR 234. The legislative history for that amendment reflects that the California Legislature understood that BOF's development of computer technology for background checks would cause them to be expedited and thereby would allow for a shorter waiting period without jeopardizing public safety. *See* EOR 234-35, 238. The legislative history also restates the two longstanding justifications for waiting-period laws: "One is the need to allow time for the Department of Justice to do background checks. Another is the desire to provide a 'cooling off' period, especially for handgun sales." EOR 235.

In sum, over the decades, the California Legislature has experimented with different amounts of time (1, 3, 5, 10, and 15 days) for the waiting period and settled on 10 days as the appropriate amount of time consistent with maintaining public safety.

---

[5] California's background checks now look at multiple potentially "prohibiting events," not just felony convictions, for each prospective firearm purchaser.

### B.   Rationales for the Waiting-Period Laws

As just described, the Waiting-Period Laws have long had two public-safety justifications.  The first justification centers on the time needed for law enforcement authorities to process a prospective firearm purchaser's background check in advance of the purchase.  The second justification is the cooling-off rationale, i.e., allowing time for possible violent impulses in a person to pass away before that person obtains a new firearm.  *See also* Michael J. Daponde, *New Residents and Collectors Must Register Their Out-of-state Handguns:  Making a (Government) List and Checking it Twice*, 29 McGeorge L.J. 539, 547 (Spring 1998) (describing and defending these two justifications).

### 1.   Background Checks on Prospective Firearm Purchasers

#### a.   The Computerized Component

Each year, BOF processes up to nearly one million "Dealer Record of Sale" ("DROS") applications for firearm purchases,  and thus conducts about a million background checks annually.[6]  *Silvester v. Harris* ("*Silvester Judgment*"), 41 F. Supp. 3d 927, 953 (E.D. Cal. 2014).  For each DROS

---

[6] One DROS application could cover multiple firearms to be obtained in a single transaction.

9

application, the processing begins with automated searching of multiple state and federal databases, including but not limited to the Automated Criminal History System ("ACHS") and the California Restraining and Protective Order System ("CARPOS"), for evidence of "prohibiting events" or incidents, such as felony convictions, restraining orders, mental health holds, and the like, which would legally disqualify the applicant from obtaining a firearm. *Id*. at 947-52. As of the time of trial, only about 20 percent of DROS applications completed the automated part of the processing with zero "hits," or items requiring further review, and were "auto-approved." *Id*. at 950, 953, 964-65. A person whose DROS application is auto-approved still has to go through the 10-day waiting period, in case, as sometimes happens, someone like a psychiatrist promptly contacts BOF with new information about the person that may disqualify him or her from obtaining a firearm. *Id*. at 954.

### b.    The Component Requiring Manual Review

The vast majority of DROS applications are not auto-approved and require manual processing by BOF's Criminal Intelligence Specialist ("CIS") Analysts to confirm (1) identity matches between prospective gun purchasers and purported background information about them in the different databases, and (2) the accuracy and completeness of the database

10

records of potential prohibiting events, among other things. *Silvester Judgment*, 41 F. Supp. 3d at 947-54.

Because numerous people at numerous government agencies in multiple jurisdictions across California and other states are continually submitting records into the relevant databases, inevitably many records have gaps and/or mistakes. *Silvester Judgment*, 41 F. Supp. 3d at 947-54.  For example, many times the ACHS database contains a record of an arrest but not the disposition of the arrest. *Id*. at 951.  In that situation, a CIS Analyst must track down extra information to make that record accurate and complete, through such time-consuming methods as telephone calls to law enforcement officers or court employees who may be far away as well as not immediately available to assist with the work. *Id*. at 951-52.  It is "fairly routine" that such work takes longer than a day. *Id*. at 951, 953.

Moreover, "[t]here is always a backlog of DROS applications in the electronic DROS applications queue for background checks . . . ." *Silvester Judgment*, 41 F. Supp. 3d at 953.  Often, a CIS Analyst will not review a DROS application requiring manual review until several days after the DROS application is first received by BOF's computer systems. *Id*.  Where a DROS application has been awaiting processing by a CIS Analyst for a few days, the CIS Analyst upon accessing the application will re-run or

11

"refresh" the computerized part of the background check, making sure that the information is up-to-date, so as to catch any late-entered or late-modified records of criminal convictions or other prohibiting events such as mental health holds. *Id.*

### c. Straw-Purchase Investigations

Another component of a small number of background checks requires extensive involvement of peace officers. BOF special agents monitor gun shows and inspect gun dealers for instances of unlawful "straw purchases" of firearms and then, if necessary, institute corrective law enforcement actions.[7] *Silvester Judgment*, 41 F. Supp. 3d at 955-56. It often takes special agents many days to complete their investigations, to obtain search warrants, and then to intercept the straw-purchased firearms before they get into prohibited people's hands. *Id*. at 956. As BOF Special Agent Supervisor Blake Graham testified at trial, without the 10-day waiting period, many more straw purchases would be completed, and the firearms would have to be retrieved from the prohibited (and, likely, dangerous) people. EOR 136:8-137:12. For reasons of public safety and peace-officer

---

[7] A straw purchaser is "a person who buys a gun on someone else's behalf while falsely claiming that it is for himself" or herself. *Abramski v. United States*, __ U.S. __, __, 134 S. Ct. 2259, 2263 (2014). Straw purchases are illegal. *Silvester Judgment*, 41 F. Supp. 3d at 956.

safety, it is much better to intercept a firearm before it reaches a prohibited person, as compared to trying to retrieve a firearm already in the hands of a prohibited person.  EOR 137:13-138:5.

### 2.    The Cooling-off Effect

The cooling-off effect in reducing homicides and suicides is partly based on common sense.  If a person with a violent impulse cannot obtain a working firearm immediately, then there is an increased chance that the impulse will pass and the anticipated act of violence will not take place.

Scientific studies confirm that people who purchase firearms are at a high risk of committing suicide-by-firearm in the first week after purchase. *See* EOR 270 ("The rate of suicide by firearm among handgun purchasers was greatest immediately after purchase and declined thereafter.")  The reason is that "suicide is often an impulsive final act by a vulnerable individual who may or may not exhibit the features of an impulsive personality."  EOR 251; *accord id*. at 252; *see also* EOR 263.  Significantly, it is well-established that waiting-period laws correlate with reductions in suicides by elderly people.  *See* EOR 253-55; EOR 279; *see also* Frederick E. Vars, *Putting Arms at Arm's Length:  Precommitment Against Suicide*, The University of Alabama School of Law Working Paper (Sept. 2014) at 13-14 (available online at

13

http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2500291) (summarizing studies, some finding correlation and others not, and noting probable flaw in one study purporting not to find correlation).

Therefore, multiple public-health scientists have advocated the waiting period as a viable method to reduce incidence of suicide-by-firearms. *See, e.g.*, EOR 256 ("These findings suggest that the shift away from waiting periods could increase the firearm suicide rate (and potentially the overall suicide rate) among older US citizens."); *cf.* EOR 253 ("Uniform restrictions preventing immediate access to a gun can allow time for a 'cooling off' period during which the suicidal impulse may pass."; *see also* EOR 263 (similar).

## II. PROCEDURAL HISTORY

In December 2011, Appellees, two individuals, Jeff Silvester ("Silvester") and Brandon Combs ("Combs"), and two firearm-rights organizations, The Calguns Foundation, Inc., and The Second Amendment Foundation, Inc., initiated the present lawsuit with a complaint filed in the

federal trial court in Fresno, California.[8]  In February 2012, Appellees filed a first amended complaint, which remained the operative complaint.

Appellees mounted against the Waiting-Period Laws both a facial challenge (later abandoned) and an as-applied challenge, under the Second Amendment and the Fourteenth Amendment, with one cause of action stated under each of the amendments.  EOR 318, ¶ 1, 328-29.  Appellees contended that "[t]en days to allow the Department of Justice to investigate prospective purchasers and to allow repeat purchasers to cool off is an infringement on the purchaser's fundamental right to keep and bear arms in their [sic] home."  EOR 325, ¶ 49.

Nonetheless, Appellees never sought preliminary injunctive relief.  Moreover, Appellees did not object to background checks of prospective firearm purchasers, which checks are unassailably important for public safety, although Appellees asserted that Appellant could complete most background checks essentially instantaneously.  *See* EOR 325-326, ¶¶ 50-54.  Furthermore, Appellees contended, cooling-off periods serve no rational purpose for prospective firearm purchasers who previously have acquired firearms or obtained related permits.  *See* EOR 325 ¶ 50.

---

[8] A third individual plaintiff was named in the complaint but withdrew from the case before trial.

In the fall of 2013, Appellant moved for summary judgment herein, arguing that a 10-day waiting period, even for so-called subsequent purchasers, does not impose a burden of constitutional significance on the Second Amendment, and is well-justified as allowing time for a background check of, and cooling off by, the prospective firearm purchaser. *See Silvester v. Harris* (*Silvester MSJ*), No. 1:11–CV–2137 AWI SAB, 2013 WL 6415670 at *2-*3 (N.D. Cal. Dec. 9, 2013). Appellees opposed the motion, arguing, in part, that a 10-day waiting period "can no longer be justified in light of the virtually instantaneous electronic and mental health background checks available to (and used by) the DOJ." (Trial Ct. Dkt. 32 (Plfs.' Opp. to Def.'s Mtn. for Summ. J.) at 2:4-2:6.) On December 9, 2013, the District Court denied the motion for summary judgment, concluding that Appellant had "presented insufficient evidence to justify the actual 10-day [waiting] period." *Silvester MSJ*, 2013 WL 6415670 at *5.

During the March 2014 trial proceedings, Appellant called as witnesses five senior BOF employees, who provided undisputed evidence about California's background check system, including evidence that implementing an instant background check system in California would result each year in extra firearms being placed in the hands of hundreds or thousands of extra prohibited persons, such as violent felons and people with

16

serious mental illnesses. EOR 115:6-121:9, 124:21-25; 192:6-14; 214; 215; 220. Separate from the live presentation of evidence, Appellant relied on the judicial notice process to present evidence, some of which items the District Court admitted, about the cooling-off effect of waiting-period laws; there was no contrary evidence presented.

On August 25, 2014, the District Court ruled that the Waiting-Period Laws violate the Second Amendment as applied "to those persons who already lawfully possess a firearm as confirmed by AFS [the Automated Firearms System], to those who possess a valid CCW [Carry Concealed Weapon] license, and to those who possess both a valid COE [Certificate of Eligibility] and a firearm as confirmed by the AFS system." *Silvester Judgment*, 41 F. Supp. 3d at 934. According to the District Court, the Waiting-Period Laws burden the Second Amendment by:

> . . . prohibit[ing] every person who purchases a firearm from taking possession of that firearm for a minimum of 10 days. One cannot exercise the right to keep and bear arms without actually possessing a firearm. The purchased firearm cannot be used by the purchaser for any purpose for at least 10 days. Also, in some cases, due to additional costs and disruptions to schedules, the 10-day waiting period may cause individuals to forego the exercise of their Second Amendment right to keep and bear arms.

*Id*. at 962-63 (citation omitted).

17

The District Court found that Appellant had demonstrated that the Waiting-Period Laws relate to California's "important interests" in "keeping firearms out of the hands of prohibited individuals." *Silvester Judgment*, 41 F. Supp. 3d at 964.

However, according to the District Court, the Waiting-Period Laws did not reasonably fit with those interests, with respect to the above-described subsequent purchasers, and so Appellant could not constitutionally enforce the 10-day waiting period on new firearm acquisitions as to people who fell into one or more of the three above-identified subsequent-purchaser groups. *Silvester Judgment*, 41 F. Supp. 3d at 964-70.

More specifically, the District Court found, regarding a person who has a firearm listed in his or her name in AFS, "this indicates a history of responsible gun ownership," warranting release of a newly purchased firearm as soon as the person passes a background check. *Silvester Judgment*, 41 F. Supp. 3d at 966. Regarding a person who has a CCW permit, the District Court held that "[t]he nature and unique requirements of CCW license holders are such that it is unlikely that CCW license holders would engage in impulsive acts of violence," again warranting release of a newly purchased firearm as soon as the person passes a background check. *Id*. at 966-70. Regarding a person who has a COE, the District Court

18

acknowledged that "a COE in and of itself only establishes that a person passed the background check one other time in the past," such that release of a newly purchased firearm to that person as soon as he or she passes the background check is warranted only if the person meets one or both of the other criteria (regarding AFS and CCW permits). *Id*. at 970-71.

Although the District Court affirmed Appellant's authorization to perform background checks on all prospective California firearm purchasers, Appellant was ordered to modify the process substantially. *Silvester Judgment*, 41 F. Supp. 3d at 971-72. That is because, for subsequent purchasers, the judgment replaces the 10-day waiting period with a variable waiting period—tied to how long the background check takes—of between approximately a minute or an hour and 10 days (or potentially longer, if the background check is not completed in 10 days, as sometimes happens). *Id*. As part of the background check, Appellant will now have to determine if the prospective firearm purchaser has a firearm listed in that person's name in AFS, or has a CCW permit, or has both a firearm listed in that person's name in AFS and a COE, and, if so, then "[i]f the []standard background check for such an individual is completed and approved before 10-days [sic], Defendant shall immediately release the firearm for delivery to such individual and shall not wait the full 10-days [sic]." *Id*. at *972 (emphasis

19

added). In other words, a firearm must be released to a subsequent purchaser on whatever day, 1 through 10, that the person passes the background check, without regard to a cooling-off break, a straw-purchase investigation, or possible new information coming in to BOF during the 10-day period.

The District Court afforded Appellant 180 days to modify the background check procedures "to comply fully and in good faith with this order." *Silvester Judgment*, 41 F. Supp. 3d at 972. However, it would likely take Appellant more than 180 days to secure funding from the California Legislature to pay for the work and to retain an appropriate vendor, and an additional six months minimum to implement the technologically difficult changes to BOF's pertinent computer systems and databases. EOR 83, ¶ 15; EOR 87, ¶¶ 17-18. Accordingly, before appealing this matter, Appellant moved the District Court for more time to comply with the judgment. The District Court denied the motion, albeit leaving open the possibility that Appellant might be able to obtain a deadline extension at some time in the future, depending on the circumstances. EOR 65-66.

## SUMMARY OF ARGUMENT

As prescribed by *Chovan v. United States*, 735 F.3d 1127 (9th Cir. 2013), *Peruta v. Cnty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014), *Jackson*

20

*v. City and Cnty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014), and *Fyock v. City of Sunnyvale*, __ F.3d __, 2015 WL 897747 (9th Cir. Mar. 4, 2015), for Second Amendment cases in the Ninth Circuit, there is a two-step inquiry which "(1) asks whether the challenged law burdens conduct protected by the Second Amendment and[,] (2) if so, directs courts to apply an appropriate level of scrutiny." *Jackson*, 746 F.3d at 960 (quoting *Chovan*, 735 F.3d at 1136 (internal punctuation omitted)).

Proper analysis under this two-part framework should have validated the Waiting-Period Laws. However, the District Court erred at both steps of the analysis.

Under the "burden" step of the analysis, this Court should find that Appellant established, by undisputed evidence of the historical understanding of the Second Amendment, that the Waiting-Period Laws do not impose a burden of constitutional significance on the Second Amendment right. Moreover, the Waiting-Period Laws fall into two categories of firearm regulations that the Supreme Court has deemed presumptively lawful. Finally, the 90-year-old age of the Waiting-Period Laws furthers bolsters their status as constitutional. There is no burden here of constitutional significance.

21

This Court need not reach the "scrutiny" step of the analysis, but if the Court does reach that step, then the Court should find that the Waiting-Period Laws impose such a minor burden on the Second Amendment right as to warrant intermediate scrutiny, as opposed to strict scrutiny. As for applying intermediate scrutiny to the Waiting-Period Laws, there is no dispute from Appellees, and the District Court agreed, that California has an important public-safety objective for the statutes. This Court should conclude that there is a reasonable fit between the Waiting-Period Laws and that objective, as reflected in Appellant's presentation of a supportive mix of legislative history, empirical evidence, witness testimony, and common sense. Therefore, the Waiting-Period Laws should survive this Court's intermediate scrutiny.

If this Court instead affirms the District Court's substantive ruling, this Court nonetheless should order the District Court to give Appellant more time to comply with the mandatory injunction.

## STANDARD OF REVIEW

This Court reviews constitutional challenges to statutes, like the present case's Second Amendment claim, *de novo*. *Chovan*, 735 F.3d at 1131. However, a trial court's findings of fact—such as were made in the present case, which was tried to the bench—are subject to the "clearly erroneous"

standard of review. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); Fed. R. Civ. P. 52(a)(6).

## LEGAL STANDARDS FOR SECOND AMENDMENT ANALYSIS

For Second Amendment cases in the Ninth Circuit, as noted above, there is a two-step analysis consisting of the burden step and then the scrutiny step. *Jackson*, 746 F.3d at 960.

Under the burden step of the Second Amendment inquiry, a court must determine "whether the challenged law burdens conduct protected by the Second Amendment, based on a historical understanding of the scope of the Second Amendment right, or whether the law falls within a well-defined and limited category of prohibitions that have been historically unprotected." *Jackson*, 746 F.3d at 960.

If the challenged law does burden protected conduct, then, under the scrutiny step of the Second Amendment inquiry, when ascertaining the appropriate level of scrutiny, a court must consider (1) how close the challenged law comes to the core of the Second Amendment, and (2) the severity of the law's burden on that right. *Jackson*, 746 F.3d at 960-61. A law that imposes such a severe restriction on the core right of self-defense, specifically in the home, that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny. *Id*. at 961.

23

A law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny. *Chovan,* 735 F.3d at 1138. "By contrast, if a challenged law does not implicate a core Second Amendment right, or does not place a substantial burden on the Second Amendment right, we may apply intermediate scrutiny." *Jackson*, 746 F.3d at 961. (emphasis added).

"Although courts have used various terminology to describe the intermediate scrutiny standard, all forms of the standard require (1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective." *Chovan*, 735 F.3d at 1139. Notably, the fit between the regulation and the harm being addressed need be only reasonable, not perfect. *United States v. Carter*, 750 F.3d 462, 464 (4th Cir. 2014). The challenged law will achieve a reasonable fit with the government's stated objective and the regulation at issue, if the proponent of the law presents "any evidence reasonably believed to be relevant" to substantiate the objective. *Fyock*, 2015 WL 897747 at *7 (citing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S 41, 52 (1986)).

Also, the challenged law need not be the least restrictive means of achieving the governmental interest, to survive intermediate scrutiny.

24

*Fyock*, 2015 WL 897747 at *6. The challenged law needs just to promote a "substantial government interest that would be achieved less effectively absent the regulation." *Id.*

"[T]his two-step inquiry reflects the Supreme Court's holding . . . that, while the Second Amendment protects an individual right to keep and bear arms, 'the scope of that right is not unlimited.'" *Chovan*, 735 F.3d at 1133 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). "[A]s nearly every other authority on the Second Amendment has recognized, regulation of the right to bear arms is not only legitimate but quite appropriate." *Peruta*, 742 F.3d at 1178 (emphasis in original).

Judicial restraint and respect for comity are appropriate in the context of a federal court's review of a state's law manifesting the police power, as the Waiting-Period Laws do. Police power is the authority of a state and its political subdivisions to impose restraints on private rights as necessary for the general welfare, including health, morals, and safety. *Cf. Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1107 (9th Cir. 2005) (discussing enforcement of "police power" laws affecting "health, welfare, morals, and safety" in context of bankruptcy proceedings). Police power justifies strong but reasonable regulation in constitutionally protected areas of conduct. *Cf. So. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003)

(observing that states have leeway to exercise police powers even in face of Contracts Clause of Constitution).

## ARGUMENT

The Waiting-Period Laws should be upheld at the first step of Second Amendment analysis, and the statutes also would pass heightened scrutiny under the second step of the analysis. The District Court erred at each step of that inquiry, and accordingly the final judgment invalidating the Waiting-Period Laws as applied should be reversed.

## I. THE WAITING-PERIOD LAWS DO NOT BURDEN THE SECOND AMENDMENT AND THEREFORE DO NOT WARRANT HEIGHTENED SCRUTINY

Although the Waiting-Period Laws inconvenience people in acquiring firearms, there is no burden on the core Second Amendment right warranting heightened scrutiny. Three separate justifications presented to the District Court, each one well-grounded in fact and law, support that conclusion. Accordingly, the present case could and should have been resolved in Appellant's favor at the first step, the burden step, of Second Amendment analysis.

26

### A.  The Waiting-Period Laws Fall Outside the Scope of the Second Amendment as Historically Understood

First, Appellant demonstrated with undisputed evidence from historical sources that the Waiting-Period Laws fall outside the scope of the Second Amendment, as understood by the voters on the ratification of the Constitution.  *See Chovan*, 735 F.3d at 1137 (describing requisite historical analysis in Second Amendment cases); *Jackson*, 746 F.3d at 960 (same). The District Court erred in rejecting Appellant's historical evidence and subjecting the Waiting-Period Laws to heightened constitutional scrutiny.

The District Court's specific error came in the implicit holding that there are only two types of relevant evidence from history—(1) whether waiting period laws existed in the United States in the late 18th century through the early 19th century, i.e., the Founding Era, and (2) whether voters in that time period believed that waiting-period laws implicated the Second Amendment.  *Silvester Judgment*, 41 F. Supp. 3d at 936-38, 945, 962.  By a request for judicial notice, Appellant presented undisputed evidence that, because of analogous laws and the conditions of daily life in the Founding Era, voters in that era would not have objected to the Waiting-Period Laws as unconstitutional.  This evidence, while not addressing waiting periods directly, was undisputed, was probative, and should have been considered.

27

1. **The Waiting-Period Laws Have Analogues from the Founding Era of the United States**

In the Founding Era, it was generally accepted that there could be times when the government lawfully could *temporarily* deprive law-abiding people from having possession or making use of their firearms. For example, "[b]y 1785, New York had enacted laws regulating *when* and where firearms could be used, as well as restricting the storage of gun powder." *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 84 (2d Cir. 2012) (citing Act of Apr. 22, 1785, ch. 81, 1785 Laws of N.Y. 152; Act of Apr. 13, 1784, ch. 28, 1784 Laws of N.Y. 627 (emphasis added)). See also the firearm "impressment" laws, by which the government temporarily impressed private firearms into military service, in times of public danger. *See* MTTJN, Exh. C at IX, 12, 13, 113-14; and Exh. D 54-55. In sum, governmental temporal restrictions on the use of firearms were historically understood to be acceptable under the Second Amendment, meaning that the analogous Waiting Period Laws likely would also have been accepted at that time.

In attempting to discern the historical understanding of the Second Amendment, the District Court focused too narrowly on "firearm waiting period laws that may have existed between 1790 and 1840." *Silvester*

28

*Judgment*, 41 F. Supp. 3d at 937. There does not have to be a perfect Founding Era analogue for a current firearm regulation, for that modern law to avoid invalidation under the Second Amendment. *Fyock*, 2015 WL 897747 at *4.

It follows that, in refusing to take judicial notice of the impressment laws on relevance grounds (*Silvester Judgment*, 41 F. Supp. 3d at 937-38), the District Court abused its discretion. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (describing abuse of discretion standard of review).

This Court should reverse that erroneous decision of the District Court, as requested in the accompanying motion to take judicial notice, credit Appellant's uncontradicted presentation regarding the impressment laws, and conclude that the Waiting-Period Laws fall outside the scope of the Second Amendment.

### 2. Voters in the Founding Era Accepted Delays in Acquiring Firearms

Moreover, the relevant inquiry here considers not just what firearm laws existed circa 1791, but also, and more precisely, how citizens eligible to vote on the ratification of the Second Amendment conceived of the scope of the Second Amendment right. *See Heller*, 554 U.S. at 576 (holding that

in interpreting Second Amendment's text, courts should try to assume
outlook of Americans who voted on ratification of Bill of Rights in 1791);
*id*. at 614 (giving narrow justification for reviewing post-Civil War
discussions of Second Amendment to help to establish its meaning; "they do
not provide as much insight into [the Second Amendment's] original
meaning . . . [y]et . . . their understanding of the origins and continuing
significance of the Amendment is instructive"); *id.* at 634-35
("Constitutional rights are enshrined with the scope they were understood to
have when the people adopted them . . . ."); *see also United States v. Rene
E.*, 583 F.3d 8, 15-16 (1st Cir. 2009) (encouraging, in Second Amendment
history analysis, review of broad array of sources of history, beyond just
laws in existence in Founding Era).

According to undisputed historical evidence that Appellant presented
by a request for judicial notice, throughout the Founding Era, there was no
expectation or, apparently, desire that ordinary people should be able to
acquire firearms for private use essentially instantaneously. *See, generally,*
Exh. B to MTTJN. As this Court and the Seventh Circuit have
acknowledged in Second Amendment cases, the pace of life was much
slower and commerce was less bustling in the Founding Era. "At the time of
the Second Amendment's enactment, the familiar image that 'bear arms'

30

would have painted is one of an eighteenth-century frontiersman, who 'from time to time would leave his home to obtain supplies from the nearest trading post . . . .'" *Peruta*, 742 F.3d at 1152 (emphasis added; some internal punctuation omitted) (citing *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012)).  The relative difficulty in acquiring firearms was a fact of life back then.  *See* Exh. B to MTTJN at xv, 6-9, 19, 212-15.  Most people lived on isolated family farms, a day's horseback ride away from the nearest store, which may or may not have carried firearms and which store was typically closed during the entire harvest season.  *See* Exh. B to MTTJN at xv, 6-9, 19, 212-15, and 262-65.  Given this built-in, natural waiting period of up to several months for firearm acquisition, it is virtually impossible to imagine that our arms-bearing ancestors had expectations and desires that would compel them to pursue a lawsuit like the present case, aimed at being able to obtain firearms a mere day or a few days earlier than otherwise.

It follows that, in refusing to take judicial notice of this history evidence on relevance grounds (*Silvester Judgment*, 41 F. Supp. 3d at 937), the District Court once again abused its discretion.

This Court should reverse that erroneous decision of the District Court, as requested in the accompanying motion to take judicial notice, credit Appellant's uncontradicted presentation regarding the impressment laws,

and conclude that the Waiting-Period Laws fall outside the scope of the Second Amendment.

In sum, the Second Amendment, as historically understood, does not apply to the Waiting-Period Laws, and it was therefore reversible error for the District Court to hold otherwise and to apply heightened scrutiny to those laws.

### B. The Waiting-Period Laws Fall into Two of the Supreme Court's Categories of Presumptively Lawful Firearm Regulations

Second, the Waiting-Period Laws fall within at least two categories of longstanding firearm regulatory measures—(1) laws imposing conditions and qualifications on the commercial sale of arms, and (2) prohibitions on the possession of firearms by felons and the mentally ill—that the Supreme Court, in *Heller*, specifically said should be spared from "doubt" as to their legality.  554 U.S. at 625-27; *United States v. Vongxay*, 594 F.3d 1111, 1115, 1117 (9th Cir. 2009) (holding that *Heller*'s list identifies laws that do not implicate the Second Amendment).

//

//

//

//

### 1. The Waiting-Period Laws Are Presumptively Lawful Conditions or Qualifications on the Commercial Sale of Firearms

The Waiting-Period Laws impose not prohibitions but 10-day delays on the commercial sale of firearms in California.[9] To purchase a firearm in California, by statute, the buyer must pass a background check and wait out the 10-day waiting period. Therefore, the Waiting-Period Laws are commercial conditions or qualifications on firearm transactions and rank among *Heller*'s presumptively lawful "commercial conditions" laws. *See* 554 U.S. at 626-27; *see also Peña v. Lindley*, No. 2:09–CV–01185–KJM–CKD, 2015 WL 854694 at *1, *10-*14 (E.D. Cal. Feb. 26, 2015) (holding that California statute prohibiting manufacture, sale, gifting, or lending of certain handguns, yet leaving California's firearm marketplace robust, is presumptively lawful per *Heller*).

Statutory waiting periods are not unique to the context of firearm acquisition; there are legally imposed waiting periods in connection with other important conduct, as well. For example, the National Labor Relations Act contains a provision forbidding strikes or lock-outs for 60-day periods, if certain pre-conditions occur. *See* 28 U.S.C. § 158(d). For another

---

[9] Indeed, the delays apply to all lawful firearm transactions in California.

example, a California resident faces a six-month waiting period for a divorce. *See* Cal. Fam. Code § 2320(a).

In sum, the District Court should have categorized the Waiting-Period Laws as presumptively lawful "commercial conditions" laws, and summarily upheld them under the Second Amendment.

### 2. The Waiting-Period Laws Facilitate the Prohibition on Firearm Acquisition by Felons and the Mentally Ill and Are Thus Lawful

The Waiting-Period Laws afford time for background checks and straw-purchase investigations of prospective firearms purchasers, for the specific purpose of facilitating the prohibitions on the possession of firearms by felons and the mentally ill. If a background check of a DROS application reveals one of these (or other) prohibiting events, then the applicant is denied the applied-for firearm. The Waiting-Period Laws provide enough time for the background check and any straw-purchase investigation to be completed. *Heller* expressly approves of laws prohibiting firearm possession by felons and the mentally ill, *see* 554 U.S. at 626, and therefore *Heller* sanctions the Waiting-Period Laws, which facilitate the enforcement of those prohibitions.

//

34

### C. The Waiting-Period Laws Are Presumptively Lawful Because they Are Longstanding

Third, by virtue of being more than 90 years old, and representative of numerous other firearm waiting-period laws, the Waiting-Period Laws must also be seen as "longstanding" under *Heller*—and for that reason, as well, presumptively lawful. 554 U.S. at 626. *Fyock* elaborates on the meaning of "longstanding" here: "[E]arly twentieth century regulations might . . . demonstrate a history of longstanding regulation if their historical prevalence and significance is properly developed in the record." 2015 WL 897747 at *4.

In rejecting the Waiting-Period Laws as not longstanding, the District Court took it as a negative that "currently only ten states impose a waiting period between the time of purchase and the time of delivery of a firearm. Waiting period laws . . . are not common now." *Silvester Judgment*, 41 F. Supp. 3d at 945. However, 10 states is a significant fraction (20 percent) of all states, and reflects fairly widespread acceptance of waiting-period laws. And there are many other relevant facts about the continuity and significance of waiting-period laws in U.S. history:

- Since the early 20th century at the latest, many states have enforced laws requiring prospective firearm purchasers to have

35

purchase licenses, which are akin to waiting periods in temporarily

delaying people from obtaining firearms. *See* Charles V. Imlay, *The*

*Uniform Firearms Act*, 12 Amer. Bar Ass'n J. 767, 768 (1926).

- In 1938, 11 states plus the District of Columbia had waiting

periods—of up to seven days—for handgun purchases. Sam B.

Warner, *Uniform Pistol Act*, 29 J. of Crim. Law and Criminology 529,

547-48 nn.43, 44 (1938) (citing laws). Additionally, in Texas, it was

illegal to sell a handgun to a person who was known to be in the heat

of passion. *Id*. at 548 n.44 (citing Texas Penal Code, article 489a).

- In 1996, 18 states had their own waiting periods for firearm

purchases. U.S. Department of Justice, Office of Justice Programs,

Bureau of Justice Statistics, Survey of State Procedures Related to

Firearm Sales, 1996 ("*Survey of State Procedures*") at 63-65 (Sept.

1997) (available online at http://bjs.gov/content/pub/pdf/ssprfs96.pdf).

Moreover, during this time, *every* state had to abide by the federal

five-day waiting period ("Brady Act"; Pub. L. 103–159, 107 Stat.

1536), unless the state had an exemption for having an independent

system of at least equivalent efficacy. *Survey of State Procedures* at

v. *And see* Exh. E to MTTJN.

36

- Many localities in the United States have their own waiting periods for firearm purchases. The localities include Hartford, CT; Broward County, FL; Miami-Dade County, FL; Las Vegas, NV; Cincinnati, OH  *See* U.S. Department of Treasury, Bureau of Alcohol, Tobacco, Firearms and Explosives, *State Laws and Published Ordinances – Firearm*s, *31st Edition* at 109-10, 136-40, 299, 304-05, 377-79 (2011) (available online at https://www.atf.gov/files/publications/download/p/atf-p-5300-5-31st-editiion/2010-2011-atf-book-final.pdf). *And see* Exh. F to MTTJN.

- Presently, many states require some form of earlier-acquired permit to purchase a firearm, or at least a handgun. *See, e.g.*, N.C. Gen. Stat. § 14-1402; Neb. Rev. Stat. § 69-2403; N.J. Rev. Stat. § 2C:58-3.

- Over all those years since 1923, the Waiting-Period Laws have mandated delays varying in only two respects, the length of the waiting period in a narrow range of one day to 15 days, and whether the delays apply to long guns. *See supra* at 6-8.

- As far as Appellant is aware, never before the present case has a waiting-period law been challenged as unconstitutional.

37

In sum, waiting-period laws (especially when added to purchase-permit requirements, which are sisters of the waiting-period laws) must be seen as common, prevalent, and significant in U.S. history continuously since the early 20th century—and therefore longstanding and presumptively lawful under *Heller* and *Fyock*.

Because Appellees failed to show any constitutionally cognizable burden on the Second Amendment right caused by the Waiting-Period Laws, the Second Amendment claim should have been deemed to fail at the first step of the two-step inquiry. *Cf. Kwong v. Bloomberg,* 723 F.3d 160, 166-67 (2d Cir. 2013) (rejecting Second Amendment challenge to $340 handgun license fees in part because plaintiffs were able to pay fees, obtain licenses); *see also* Wade Maxwell Rhyne, Note, *United States v. Emerson and the Second Amendment*, 28 Hastings Const. L. Q. 505, 538 (Winter 2001) (asserting that a "14-day waiting period waiting period for a background check could hardly be said to materially frustrate a lawful use of a firearm. Especially when the citizen has notice of the existence of such a waiting period."). The District Court's contrary holding warrants reversal.

//

//

38

**II.  THE WAITING-PERIOD LAWS SURVIVE HEIGHTENED SECOND AMENDMENT SCRUTINY**

Assuming *arguendo* that the Court moves on to the second step—the scrutiny step—of Second Amendment analysis in the present case, the Court should conclude that the Waiting-Period Laws impose at most a minor burden on the Second Amendment and therefore warrant intermediate, not strict, scrutiny.  There is no dispute that California has an important objective, maintaining public safety by reducing firearm violence, for the Waiting-Period Laws.  Appellant made a sufficient evidentiary showing, a mix of legislative history, empirical evidence, witness testimony, and common-sense argument, of the reasonable fit between the Waiting-Period Laws and that important objective.  Therefore, this Court should uphold the Waiting-Period Laws at the second step of the two-part inquiry, if the second step is reached.

### A.   The Waiting-Period Laws Warrant Intermediate, Not Strict, Scrutiny

Only intermediate scrutiny, if any heightened scrutiny, is appropriate for the Waiting-Period Laws.  On this topic, *Jackson* teaches as follows:

> A law that imposes such a severe restriction on the core right of self-defense that it amounts to a *destruction* of the Second Amendment right is unconstitutional under any level of scrutiny.  By contrast, if a challenged law does not implicate a core Second Amendment right, or

> does not place a substantial burden on the Second
> Amendment right, we may apply intermediate scrutiny.

746 F.3d at 961 (quoting *Heller*, 554 U.S. at 629) (emphasis in original).

*Fyock* teaches further that a firearm regulation challenged under the Second Amendment should receive intermediate, as opposed to strict, scrutiny if the regulation *either* does not implicate a core Second Amendment right, *or* does not place a substantial burden on the Second Amendment right. 2015 WL 897747 at *5 (citing *Jackson*, 746 F.3d at 964).

### 1. The Waiting-Period Laws Do Not Destroy the Second Amendment Right

As to possible destruction of the Second Amendment right, it is indisputable that the Waiting-Period Laws do not destroy the Second Amendment right. Silvester and Combs admit that they have had personal firearms at all relevant times during this case. EOR 95:7-12; EOR 103:22-104:7. This is because the Waiting-Period Laws do not prohibit, but just delay for 10 days, lawful firearm transactions. By merely delaying firearm transactions, the Waiting-Period Laws contrast with the prohibition-type laws at issue in *Chovan*, 735 F.3d at 1129 (lifetime prohibition on firearm possession for person convicted of misdemeanor domestic violence) and *Jackson*, 746 F.3d at 958 (prohibition on sale of "hollow-point" bullets). Given that those prohibition-type laws were not considered destructive of

40

the Second Amendment right, the Waiting-Period Laws, with just their short delays, should similarly receive relatively benign scrutiny.

### 2. The Waiting-Period Laws Do Not Come Close to the Core of the Second Amendment Right

The Waiting-Period Laws do not come close to implicating the core of the Second Amendment right and thus warrant intermediate, not strict, scrutiny. That core, despite being a subject of considerable debate, has never been interpreted as including a right to obtain a firearm (including a second or subsequent firearm) as quickly as possible. *Cf. Heller*, 554 U.S. at 595, 626 ("[T]he right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."). Yet this is what Appellees are effectively demanding. For that reason alone, the Court should reject strict scrutiny and apply intermediate scrutiny.

### 3. The Waiting-Period Laws Do Not Severely Burden the Second Amendment Right

Regarding the severity of the burden on the Second Amendment right, especially as to subsequent purchasers, the Waiting-Period Laws impose at most a minor burden on the right. The lack of any implication of a Second Amendment violation is most fully revealed by the undisputed fact that Silvester and Combs, the two individual plaintiffs in the court below, have had multiple personal firearms each at all relevant times with the Waiting-

41

Period Laws in effect, and would not have been prohibited (but rather only delayed) by the Waiting-Period Laws in acquiring more firearms during the course of the litigation (assuming that Silvester and Combs have remained legally eligible to possess firearms). EOR 95:7-95:12; EOR 103:22-104:7. Indeed, Combs was able to acquire 50-plus firearms in a five-year period, with the Waiting-Period Laws in effect. EOR 103:22-104:7.

While there is inconvenience associated with obtaining firearms in compliance with the Waiting-Period Laws, there is no true burden. The personal situation of Silvester illustrates the truth of that assertion. He lives just two miles from a firearm dealer and drives his automobile by that store on his regular business commute. EOR 94:14-91:15. If Silvester purchases a firearm through that dealer, the Waiting-Period Laws require a 10-day delay on pick-up, necessitating a later trip to the dealer. But it is a small burden on Silvester, and little strain on his automobile, to have to make a second trip of two miles to pick up an extra firearm that he applied to purchase 10 days before. Moreover, Silvester's proximity to a firearm dealer is not atypical; there are approximately 1,800 licensed firearm dealers in California. EOR 141:23-142:3. Appellees have not shown more than a *de minimis* burden on the Second Amendment right here.

42

Notably, the Fifth Circuit has held that Texas statutes prohibiting people under 21 years old from carrying concealed handguns in public do not impose a substantial burden on the Second Amendment right, because the restriction of up to several *years* of time is still temporary, ending when each person turns 21 years old. *See National Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 348 (5th Cir. 2013) (emphasizing that "the restriction here has only a temporary effect"). Compared with that scenario, a 10-day delay is *de minimis*. *Cf. Rosario v. Rockefeller*, 410 U.S. 752, 757 (1973) (contrasting elections laws which prohibit certain classes of people from voting with advance registration requirement that "merely imposed a time deadline on . . . enrollment"). For this separate and independent reason, then, the Waiting-Period Laws warrant intermediate as opposed to strict scrutiny.

It should also be recognized that, with the District Court's injunction, for which Appellees advocated, the vast majority of subsequent purchasers in California will *still* have to take two trips to their firearm dealers to complete their transactions, because, as explained above, around 80 percent of background checks will still not be completed on the first day that the DROS application is submitted. Indeed, it is virtually certain that, under the District Court's injunction, whereby BOF will have to make for each DROS

43

application three *extra* data queries, there will be uncovered even *more* erroneous records requiring CIS Analyst review. That means that the percentage of auto-approvals will drop even lower, and even more than 80 percent of firearm purchasers will have to make two trips to their firearm dealers to get their firearms.

Nor does the delay aspect of the Waiting-Period Laws impose a serious burden on the Second Amendment right, because there are multiple legal ways to acquire firearms without going through the 10-day waiting period. For example, Silvester has received firearms legally without going through the waiting period. One time, Silvester received a firearm from his father, without going through the 10-day waiting period. EOR 97:5-97:11. Silvester also borrowed a firearm from a friend without being subject to the waiting period. EOR 100:2-100:5. As Silvester's experience exemplifies, with the Waiting-Period Laws in place, people in California can legally transfer firearms to their family members, or borrow firearms from family members or friends for less than 30 days at a time, without going through the DROS process or the waiting period. EOR 127:22-127:25; EOR 133:17-133:20.

Finally, the Waiting-Period Laws' multiple statutory exemptions—e.g., for dealer-to-dealer transfers in advance of sales to consumers (Cal. Penal

44

Code §§ 27110, 27125, 27725)—lighten any burden even more, by minimizing the number of people subject to the delay. *See Chovan*, 735 F.3d at 1138 (holding that exceptions to lifetime federal ban on firearm prohibition by domestic violence misdemeanants lighten Second Amendment burden of ban); *People v. Flores*, 169 Cal. App. 4th 568, 576-77 (2008) (finding exceptions to California's open-carry firearms regulations support the constitutionality of the law, by tailoring it).[10]

In sum, intermediate, not strict, scrutiny is appropriate here.

## B. The Waiting-Period Laws Survive Intermediate Scrutiny

### 1. The Waiting-Period Laws Serve an Important Interest in Maintaining Public Safety

The District Court correctly conducted the first part of intermediate scrutiny, regarding the significance of the governmental purpose behind the challenged law. It is "self-evident," as well as clearly evident in the legislative history, and not disputed here, that the Waiting-Period Laws have

---

[10] Appellees have further complained of the inconvenience of the outside window of 30 days to retrieve a firearm, before the transaction is cancelled because the background check is considered stale. *See Silvester Judgment*, 41 F. Supp. 3d at 944, 952. The 30-day window is not part of the Waiting-Period Laws being challenged here. In any event, Appellees' complaints about the outside window fail to establish a constitutionally cognizable burden on the Second Amendment right, for the same reasons already given above.

an important and indeed compelling objective of keeping firearms away from people likely to misuse them, thereby minimizing firearm violence. *Silvester Judgment*, 41 F. Supp. 3d at 964; *see also Chovan*, 735 F.3d at 1139 (recognizing "self-evident" significance of governmental objective of preventing domestic gun violence); *accord Fyock*, 2015 WL 897747 at *7.

### 2. The Waiting-Period Laws Reasonably Fit with the Public-Safety Objective

#### a. Appellant Proffered Sufficient Evidence Of a Reasonable Fit

There is a reasonable fit between the Waiting-Period Laws and the public-safety objective because the 10-day waiting period is: (a), as detailed above, the product of decades of legislative experimentation and fine-honing (which *McDonald v. City of Chicago*, 561 U.S. 742, 784 (2010), endorses legislatures to undertake), (b) not too long, i.e., not "substantially overbroad" (*cf. United States v. Tomsha-Miguel*, 766 F.3d 1041, 1049 (9th Cir. 2014)), and (c) sufficiently supported by a mix of legislative history, scientific studies, witness testimony, and common sense "reasonably believed to be relevant to substantiate [the Waiting-Period Law's] important interests." *Fyock*, 2015 WL 897747 at *7 (quoting *Playtime Theaters*, 475 U.S. at 52.)

Regarding the cooling-off justification for the Waiting-Period Laws generally, Appellant showed (as summarized at pp. 13-14, *supra*) that

waiting periods have been found to reduce instances of suicide-by-firearm among elderly people and thus overall suicides by elderly people. Common sense suggests that the effect will hold true for homicides, as well. Even Appellees conceded that a 10-day waiting period "may have a deterrent effect on impulsive suicides or homicides." Trial Ct. Dkt. 91 (Plf.'s Findings and Orders After Bench Trial) at 21:9-21:22.

Regarding the cooling-off justification for the Waiting-Period Laws as applied to subsequent purchasers, Appellant offered many items of persuasive evidence. As multiple BOF employees testified, waiting-period laws tend to inhibit firearm violence even by people who at one time in the past were known to have firearms. A person's firearms may be broken, loaned out, lost, stolen, or lacking in ammunition. EOR 95:19-96:10, 108:20-108:22. Also, a gun owner or his or her family member could surrender his or her firearms to law enforcement authorities while the gun owner seeks mental health treatment, and BOF via its databases would not necessarily know of the situation. EOR 188:22-189:3.[11] Additionally, a person who already owns firearms may choose to acquire new or additional firearms to commit acts of violence more effectively or heinously. EOR

---

[11] Silvester admitted at trial that one or more of his guns was sometimes unavailable for him to use. EOR 95:18-96:10.

146:1-23. Just like first-time firearm buyers, the people in these situations could not commit acts of firearm violence (or could commit only less deadly acts of firearm violence) without new firearms, making it worthwhile for Appellant to delay delivering firearms to all people subject to the Waiting-Period Laws; even for subsequent purchasers, a cooling-off period continues to serve the important public-safety objective of delaying access to firearms until a possible violent impulse can pass.[12]

Also, as Appellant cited, two Harvard School of Public Health researchers wrote, "Suicidal individuals are often ambivalent about killing themselves, and the risk period is transient. Reducing the availability of lethal instruments during this period may prevent suicide." EOR 263. Notably, the scholars spoke of "reducing," not necessarily "eliminating," the availability of lethal instruments, implying that there is a public-safety benefit to keeping extra firearms away from suicidal people who may have other firearms.

---

[12] Appellant should not be required to quantify the cooling-off effect here, much less establish that *every* violent impulse is quashed, and every homicide or suicide forestalled, because of the waiting period. The Waiting-Period Laws do not have to be perfectly effective to be constitutional. *See Fyock*, 2015 WL 897747 at *7 (accepting City of Sunnyvale's justification for firearm law that it merely "may decrease" firearm violence).

Regarding the background-check justification for the Waiting-Period Laws, there is (and can be) no dispute with Appellant's contention that background checks for all firearm transactions are important public-safety precautions. And as the District Court found, as Appellant had presented, "BOF employees believe that 10 days is a sufficient period of time in which to complete the background check." *Silvester Judgment*, 41 F. Supp. 3d at 954. As noted above, the 10-day period also affords CIS Analysts time to re-run certain background checks to make sure that they are based on the most up-to-date information. Yet, under the District Court's judgment, there can be no longer be any refresher of the background check information for any auto-approved DROS application. This safeguard could be especially important in an instance in which a person who just became subject to a restraining order or was just released from a mental hospital seeks to acquire a firearm right afterward, before the courts, law enforcement authorities, or mental health facilities input the new prohibiting information about this person into the relevant databases, to be discovered by a CIS Analyst. EOR 111:8-112:15.

//

//

49

### b. The District Court Erred in Rejecting Appellant's Evidence of the Fit

In rejecting Appellant's case for the reasonableness of the fit between the Waiting-Period Laws and the public-safety objective, the District Court erred by requiring essentially a *perfect* fit, leading inevitably but incorrectly to the invalidation of the statues.

For example, the District Court faulted Appellant for not supplying evidence that waiting periods of precisely 10 days (as opposed to, e.g., eight days or 12 days) are optimal. *Silvester Judgment*, 41 F. Supp. 3d at 969. There are no known studies addressing such fine shadings, and it was error for the District Court to require such specific information to validate the Waiting-Period Laws. So long as the statutory 10-day waiting period is not "substantially overbroad" (*cf. Tomsha-Miguel*, 766 F.3d at 1049; *Reed v. Town of Gilbert*, 707 F.3d 1057, 1074 n.16 (9th Cir. 2013)), the waiting period does not have to be as short as possible to be constitutional.

Likewise, the District Court faulted Appellant for not proffering medical-research studies focusing on how waiting periods affect, in particular, people who already have firearms. *Silvester Judgment*, 41 F. Supp. 3d at 969. It was unreasonable for the District Court to require such particularized evidence to justify the Waiting-Period Laws, instead of

accepting the proffered studies in conjunction with the testimony of BOF employees about the beneficial effects of the 10-day waiting period on people who have purchased firearms before (summarized above at pp. 47-49).

A case from the First Amendment pornography context illustrates how the District Court could and should have applied intermediate scrutiny to reach the conclusion that the Waiting-Period Laws pass such scrutiny. In *City of Los Angeles v. Alameda Books, Inc*., 535 U.S. 425 (2002), the Supreme Court ruled that a city ordinance that barred individual adult establishments from simultaneously (a) selling sexually oriented books and other products over the counter and (b) hosting booths in which customers could view erotic videos on a pay-per-view basis was adequately supported by a city study of adult establishments that concluded that concentrations of adult businesses are associated with higher rates of crime in surrounding communities. See *id*. at 431-32, 443. The study was obviously not directly on-point with respect to the ordinance, but the Supreme Court ruled that "a municipality may rely on any evidence that is 'reasonably believed to be relevant' for demonstrating a connection" between the challenged law and the governmental objective behind the law. *Id*. at 438. The plurality opinion's critique of the dissenting opinion is telling here: "In effect, [the

51

dissent] asks the city to demonstrate, not merely by appeal to common sense, that its ordinance will successfully lower crime. Our cases have never required that municipalities make such a showing . . . ." *Id.* at 439.

The District Court here made the same mistake by demanding scientific proof that the Waiting-Period Laws reduce firearm violence, instead of accepting that a reasonable legislature could believe in such a consequence of the law based on competent evidence, and upholding the laws on that basis.[13]

Notably, analogous waiting periods affecting First Amendment rights and other personal rights have been repeatedly upheld by courts:

- The Supreme Court has upheld a statutory waiting period of up to 50 days between when a person registers to vote in a jurisdiction and is allowed to vote there. *See, e.g.*, *Burns v. Fortson*, 410 U.S. 686, 687 (1973); *see also ACORN v. Bysiewicz*, 413 F. Supp. 2d 119, 121

---

[13] *See also Doe v. Wilmington Housing Auth.,* 880 F. Supp. 513 (D. Del. 2012) (similar); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1465-70 (2009) (observing that "scientific proof" of both gun-rights and gun-control theories "is very hard to get"; therefore, requiring "some substantial scientific proof to show that a [firearm] law will indeed substantially reduce crime and injury" is tantamount to applying strict scrutiny to, and almost certainly will lead to invalidation of, the law).

(D. Conn. 2005) (upholding Connecticut's requirement that prospective voters for non-presidential offices register to vote at least seven days before election).

- For another example, the right to marry is fundamental, but "reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship" are not subject to the "rigorous scrutiny" that is applied to laws that "interfere directly and substantially with the right to marry." *Zablocki v. Redhail*, 434 U.S. 374, 386-87 (1978).

- The right to vote is also fundamental, but "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

- Exercise of the right to hold a protest march may legally be delayed for several days by a legitimate requirement of a parade permit. *See Sullivan v. City of Augusta*, 511 F.3d 16, 38-39 (1st Cir. 2007) (collecting cases).

In short, the 10-day pause on new firearm acquisitions imposed by the Waiting Period Laws is eminently reasonable and well within constitutional bounds.

### c. The District Court Relied on Clearly Erroneous Findings of Fact in Holding that There Is Not a Reasonable Fit

In concluding that the Waiting-Period Laws violate the Second Amendment because of the alleged lack of a reasonable fit with the public-safety objective, the District Court relied on numerous unsupported and thus clearly erroneous findings of fact. These errors led the District Court to impose an injunction unsupported by fact or law.

As noted above, the District Court ordered Appellant to change California's background check procedures to make three additional queries for each DROS applicant, to see if the person falls within one or more of three categories of people whom the District Court has ordered exempted from any waiting period beyond the time needed to complete a background check. *Silvester Judgment*, 41 F. Supp. 3d at 971-72. The extra queries check to see if the DROS applicant already [1] has a firearm listed in the person's name in AFS, [2] possesses a valid CCW permit, and/or [3] possesses both [A] a valid COE and [B] a firearm as confirmed by AFS. *Id.*

54

However, the District Court relied on clearly erroneous findings of fact in holding that it violates the Second Amendment to apply the Waiting-Period Laws to people who fit into those categories.

### (1)　The District Court Clearly Erred in Finding Facts About California's Firearm-Transaction Database

First, the District Court mistakenly ruled as if AFS is, in effect, a firearm registry, such that any person whose name is associated with a firearm transaction listed in that database must be assumed actually to possess the firearm presently, and that possession demonstrates "responsible gun ownership" justifying an exemption from the 10-day waiting period. *Silvester Judgment*, 41 F. Supp. 3d at 966.

In developing this position, the District Court rationalized that "law enforcement officers view the AFS database as reliable" and so it should be treated as the equivalent of a reliable gun registry. *Silvester Judgment*, 41 F. Supp. 3d at 966. Yet there is insufficient, if any, support for that finding of fact, as shown immediately below.

The District Court cited the trial testimony of BOF Special Agent Supervisor Blake Graham to the effect that law enforcement officers access AFS in real time on patrol. EOR 155:3-155:20. However, Graham's full testimony showed that "probably dozens of times" during criminal

55

investigations he, personally, has found that a person who is listed in the AFS system as having a firearm does not have the firearm. EOR 155:20-156:8. Graham further testified that some California district attorney offices will not seek a search warrant on a crime suspect who is prohibited by law from possessing a firearm, if the warrant would be based solely on an AFS entry that the suspect purchased a firearm in the last six months. EOR 150:23-152:7. There was no contrary evidence on this topic. Therefore, the undisputed evidence is that law enforcement officers and at least some district attorneys in California consider the data in AFS to be *un*reliable for indicating whether a person currently possesses a firearm, directly contrary to the District Court's finding.

Additionally, the District Court cited the following trial testimony of BOF Assistant Bureau Chief Steven Buford stressing the limitations of AFS:

> AFS, again, it's a leads database. So it doesn't mean just because it says that, there's a firearm in that house. It doesn't mean there's an actual firearm in the house. We don't have a registration process in California. It's a lead, so it's possible. It alerts the officer to be a little bit more cautious potentially, because potentially, there could be a firearm there.

EOR 130:15-130:21.

That testimony undercuts rather than bolsters the notion that AFS is a reliable source of current information about firearm ownership and possession in California.

Relatedly, the District Court made an erroneous summation-type finding of fact: "If a person already possess [sic] a firearm, then that person will generally have access to that firearm and may commit impulsive acts of violence with it." *Silvester Judgement*, 41 F. Supp. 3d at 965. Once again, the trial record does not support that finding.

### (2) The District Court Clearly Erred in Finding Facts About California's Concealed-Carry Firearm Laws

Second, the District Court made unsupported determinations that people with CCW licenses have certain positive personality traits such that there is no public-safety benefit in making them go through the waiting period. *See Silvester Judgment*, 41 F. Supp. 3d at 968-70.

The District Court's support for this position was merely a restatement of the statutory outline of the requirements ("good cause," completion of a firearm training test) for people to obtain CCW permits. *Silvester Judgment*, 41 F. Supp. 3d at 969. Without having received, or cited, any evidence of how law enforcement officers actually interpret, apply, or administer those requirements in issuing or withholding CCW permits, the District Court

57

determined, "The nature and requirements of CCW licenses are such that it is unlikely that CCW license holders would engage in acts of impulsive violence." *Id.* Also: "Safe handling practices could cause a gun owner to be more reflective and deliberate about using a firearm." *Id*. Also: "[A] CCW license strongly indicates that a CCW license holder is unlikely to engage in a straw purchase." *Id*.

There is no evidentiary basis for finding that CCW permit holders are unlikely to be violently impulsive, or are likely to be deliberative and reflective about firearm use, or are unlikely to engage in straw purchases. Nonetheless, the District Court, in the final judgment, essentially inserted new language into California statutory law to link the CCW permit law with the Waiting-Period Laws, such that a person's possession of a CCW permit now causes that person to be exempt from the 10-day waiting period. The California Legislature has never made that link, and neither should a court.

Moreover, the District Court's unsupported assumptions about CCW permit holders apparently are based on a misunderstanding that the "good cause" requirement for obtaining such a permit is a substantial hurdle in the process. Before *Peruta*, it was possible that different sheriffs and police chiefs could have different standards for "good cause," 742 F.3d at 1148, whereby some law enforcement jurisdictions could have been essentially

58

"shall issue" jurisdictions for CCW permits, and other law enforcement jurisdictions could have imposed greater restrictions. But the *Peruta* opinion has relaxed the good-cause requirement statewide, so that it is now met by any person who indicates a generalized desire to have a firearm for self-defense purposes. *Id.* at 1148-49, 1168-73, 1178-79. Although the *Peruta* opinion may be vacated and the matter reheard in this Court, the present status of *Peruta* reveals a flaw in the District Court's findings of fact as to CCW permit holders and the related injunction.

### (3) The District Court Clearly Erred in Finding Facts About Certificates of Eligibility

The extra background check query that is most flawed considers whether the applicant has a COE. *See Silvester Judgment*, 41 F. Supp. 3d at 970-71. The District Court explained that it "*cannot* hold that the 10-day waiting period as applied to those who merely hold a valid COE violates the Second Amendment." *Id*. at 970 (emphasis added). Yet a COE check was ordered for the processing of every DROS application. *Id.* at 971, 972. Given the lack of a Second Amendment violation in requiring that a person with just a COE go through the 10-day waiting period, this Court should not require Appellant to modify the background check system to look for COEs for each DROS applicant.

59

### d. The District Court Made Other Clearly Erroneous, Material Findings of Fact and Conclusions of Law

The District Court's judgment compromises two other public-safety features of the Waiting-Period Laws, yet lacks factual or legal justifications for these outcomes.

First, by ordering the release of firearms to people in the above-identified groups as soon as they pass their background checks, instead of permitting the full 10-day wait, the District Court made in effect a public-policy judgment, not a constitutional judgment, that the extra time is unnecessary for public safety. The District Court's rationale was that California has a database containing records for some people in California who are believed to be armed yet are prohibited from having firearms:

> If disqualifying information arises about an individual who has already taken possession of a newly purchased firearm, California has in place the [Armed Prohibited Persons System], which is designed to retrieve such firearms from prohibited persons. The APPS system acts as a safety net for individuals who have been previously approved to possess a firearm, but who later become prohibited.

*Silvester Judgment*, 41 F. Supp. 3d at 965. However, the only on-point evidence from trial, the undisputed testimony of Graham, was that APPS is incomplete, containing records for only a fraction of the people in California

who are believed to be armed yet are prohibited from having firearms, and that it is preferable from a public-safety perspective to prevent a prohibited person from obtaining a firearm than to have to take away a firearm wrongfully released to a prohibited person. EOR 137:13-138:5. In short, there is no evidentiary basis or policy rationale, let alone constitutional imperative, for modifying the Waiting-Period Laws to eliminate the full 10-day waiting period.

Second, the District Court's injunction, by modifying the Waiting-Period Laws, could lead to an unfortunate unintended consequence. It is reasonable to assume that, under the final judgment, there will emerge a certain group of subsequent purchasers who are routinely auto-approved for firearm purchases, and thus are able to obtain firearms very quickly. These people likely will come to recognize their "favored" status in firearm transactions. They will have natural incentives to become straw purchasers for the many other people who, even though legally permitted to obtain firearms, otherwise would have to wait at least several days for CIS Analysts to conduct their background checks manually and approve the purchases. There likely will be an increase in the number of illicit straw purchases, and California will have ever-less accurate and complete records about which people purchased which firearms. *See Abramski*, 134 S.Ct. at 2269 ("[T]he

61

[federal background check] statute's record-keeping provisions would serve little purpose if the records kept were of nominal rather than real buyers.")

## III. THE DISTRICT COURT DID NOT AFFORD APPELLANT SUFFICIENT TIME TO COMPLY WITH THE JUDGMENT

The District Court granted Appellant six months to comply with the injunction. *Silvester Judgment*, 41 F. Supp. 3d at 971. Prior to obtaining a stay of the judgment from this Court (the District Court having denied that request), BOF took the steps that could be taken before actually making significant changes to the BOF computer systems or expending large amounts of money not yet available, as detailed in the declarations of BOF Chief Stephen J. Lindley and Marc St. Pierre, a BOF information technology director. Chief Lindley's declaration shows that full compliance with the injunction would require BOF to (1) obtain an additional budgetary appropriation from the California Legislature, (2) hire and to train a significant number of new employees to do extra processing of all DROS applications for three new categories of information (whether the processing is manual or computer-aided), and (3) (a) reassign in-house IT experts working on other critical projects, or (b) hire and to train an outside vendor, to modify the relevant computer systems—all expensive and time-consuming propositions. EOR 82, ¶ 11- EOR 83, ¶ 16. BOF IT Director St.

Pierre estimated that, to comply with the judgment, Appellant must modify at least seven separate data systems, which would take a vendor, working closely with Appellant's IT staff, at least six months to complete. EOR 86-87, ¶¶ 8, 18. Finally, the money to pay for all this work must come from the California Legislature, which is not a party to this case and is not subject to Appellant's control.

For all the reasons given above, the Court should reverse the District Court's final judgment. But if the Court upholds that judgment, and the case returns to the District Court, with the stay lifted, Appellant and BOF would, basically from square one, confront the onerous task of complying with the judgment. Six months' total time would not permit Appellant to complete the job. Appellant would need approximately one year to comply with the judgment, contingent on a sufficient appropriation from the California Legislature. Therefore, if the District Court's final judgment is upheld on the merits, the District Court's denial of Appellant's request for the extra time should nonetheless be reversed.

## CONCLUSION

The Waiting-Period Laws have served California's public-safety objectives well for more than 90 years. These laws do not prohibit any person legally entitled to have a firearm from obtaining a firearm or even

63

many, many firearms. California has a thriving market for the sale and transfer of firearms to private parties. Meanwhile, it is certainly true that California could achieve its public-safety objectives only less effectively in the absence of the Waiting Period Laws. And the injunction that Appellees achieved here is unsupported by the facts or law and may well lead to more public-safety problems stemming from too-quick releases of firearms for delivery/receipt. Accordingly, Appellant respectfully requests that this Court reverse the judgment of the court below, and uphold the Waiting-

//

//

//

//

//

//

//

//

//

//

//

//

Period Laws under the first and/or second part of Second Amendment analysis.

Dated:  March 25, 2015          Respectfully submitted,

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
MARK R. BECKINGTON
Supervising Deputy Attorney General
PETER H. CHANG
Deputy Attorney General



/s/ Jonathan M. Eisenberg
JONATHAN M. EISENBERG
Deputy Attorney General
*Attorneys for Defendant-Appellant Kamala D. Harris, Attorney General of the State of California*

14-16840

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**JEFF SILVESTER, BRANDON COMBS, THE CALGUNS FOUNDATION, INC., a non-profit organization, and THE SECOND AMENDMENT FOUNDATION, INC., a non-profit organization,**

Plaintiffs,

**v.**

**KAMALA HARRIS, Attorney General of California (in her official and individual capacities),**

Defendants.

---

## STATEMENT OF RELATED CASES

To the best of our knowledge, there are no related cases.

Dated:  March 25, 2015                    Respectfully Submitted,

/s/ Jonathan M. Eisenberg_____

JONATHAN M. EISENBERG
Deputy Attorney General
*Attorney for Defendant-Appellant Kamala D. Harris, Attorney General of the State of California*

66

14-16840

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**JEFF SILVESTER, BRANDON COMBS, THE CALGUNS FOUNDATION, INC., a non-profit organization, and THE SECOND AMENDMENT FOUNDATION, INC., a non-profit organization,**

Plaintiffs-Appellees,

**v.**

**KAMALA D. HARRIS, Attorney General of the State of California (in her official capacity),**

Defendant-Appellant.

## STATEMENT OF PRIMARY AUTHORITY|

(1)  The Second Amendment states as follows:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

(2)  California Penal Code section 26815 states as follows:

No firearm shall be delivered:
(a) Within 10 days of the application to purchase, or, after notice by the [D]epartment [of Justice] pursuant to Section 28220, within 10 days of the submission to the [D]epartment [of Justice] of any correction to the application, or within 10 days of the submission to the [D]epartment [of Justice] of any fee required pursuant to Section 28225, whichever is later.

(b) Unless unloaded and securely wrapped or unloaded and in a locked container.

(c) Unless the purchaser, transferee, or person being loaned the firearm presents clear evidence of the person's identity and age to the [firearm] dealer.

(d) Whenever the [firearm] dealer is notified by the Department of Justice that the person is prohibited by state or federal law from processing, owning, purchasing, or receiving a firearm. The [firearm] dealer shall make available to the person in the prohibited class a prohibited notice and transfer form, provided by the [D]epartment [of Justice], stating that the person is prohibited from owning or possessing a firearm, and that the person may obtain from the [D]epartment [of Justice] the reason for the prohibition.

(3)   California Penal Code section 27540 states as follows:

A [firearm] dealer, whether or not acting pursuant to Chapter 5 (commencing with Section 28050), shall not deliver a firearm to a person, as follows:

(a) Within 10 days of the application to purchase, or, after notice by the [D]epartment [of Justice] pursuant to Section 28220, within 10 days of the submission to the [D]epartment [of Justice] of any correction to the application, or within 10 days of the submission to the department of any fee required pursuant to Section 28225, whichever is later.

(b) Unless unloaded and securely wrapped or unloaded and in a locked container.

(c) Unless the purchaser, transferee, or person being loaned the firearm presents clear evidence of the person's identity and age to the [firearm] dealer.

(d) Whenever the [firearm] dealer is notified by the Department of Justice that the person is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm.

(e) A handgun shall not be delivered unless the purchaser, transferee, or person being loaned the handgun presents a

handgun safety certificate. Commencing January 1, 2015, any firearm, including a handgun, shall not be delivered unless the purchaser, transferee, or person being loaned the firearm presents a firearm safety certificate to the [firearm] dealer, except that in the case of a handgun, an unexpired handgun safety certificate may be presented.

(f) A handgun shall not be delivered whenever the [firearm] dealer is notified by the Department of Justice that within the preceding 30-day period the purchaser has made another application to purchase a handgun and that the previous application to purchase involved none of the entities specified in subdivision (b) of Section 27535.

Dated:  March 25, 2015              Respectfully Submitted,


                                    /s/ Jonathan M. Eisenberg
                                    JONATHAN M. EISENBERG
                                    Deputy Attorney General
                                    *Attorney for Defendant-Appellant Kamala D. Harris, Attorney General of the State of California*

69

# CERTIFICATE OF COMPLIANCE
## PURSUANT TO FED.R.APP.P 32(a)(7)(C) AND CIRCUIT RULE 32-1
## FOR 14-16840

I certify that, pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached opening brief is:

| X | Proportionately spaced, has a typeface of 14 points or more and contains 13,020 words (opening, answering and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words |

or is

| | Monospaced, has 10.5 or fewer characters per inch and contains _____ words or ____ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words or 1,300 lines of text; reply briefs must not exceed 7,000 words or 650 lines of text). |

Dated: March 25, 2015          Respectfully Submitted,


/s/ Jonathan M. Eisenberg_____
JONATHAN M. EISENBERG
Deputy Attorney General
*Attorneys for Defendant-Appellant Kamala D. Harris, Attorney General of the State of California*