14-16840

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

---

**JEFF SILVESTER, BRANDON COMBS, THE CALGUNS FOUNDATION, INC., a non-profit organization, and THE SECOND AMENDMENT FOUNDATION, INC., a non-profit organization,**

Plaintiffs-Appellees,

**v.**

**KAMALA D. HARRIS, Attorney General of California (in her official and individual capacities),**

Defendant-Appellant.

---

On Appeal from the United States District Court
for the Eastern District of California

No. 1:11-cv-02137-AWI-SKO
The Honorable Anthony W. Ishii, Judge

## DEFENDANT-APPELLANT'S
## EXCERPTS OF RECORD
## VOLUME 1

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
MARK R. BECKINGTON
Supervising Deputy Attorney
General
PETER H. CHANG
Deputy Attorney General

JONATHAN M. EISENBERG
Deputy Attorney General
State Bar No. 184162
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013
  Telephone: (213) 897-6505
  Fax: (213) 897-5775
  Email: jonathan.eisenberg@doj.ca.gov
*Attorneys for Defendant-Appellant*
*Kamala D. Harris, Attorney General of*
*the State of California*

# INDEX

## VOLUME 1:

| File Date | Document | Page Nos. |
|---|---|---|
| 8/25/14 | District Court Findings of Fact and Conclusions of Law | 1-56 |
| 11/20/14 | District Court Order on Defendant's Motion to Stay and Motion to Alter Judgment | 57-66 |

## VOLUME 2:

| File Date | Document | Page Nos. |
|---|---|---|
| 12/19/14 | Amended Notice of Appeal | 67-68 |
| 11/24/15 | Appellant's Notice to Ninth Circuit of Ruling on Motion to Amend Judgment and Statement of Intent to Prosecute Appeal | 69-70 |
| 10/7/14 | Order Granting Appellant's Motion to Hold Appeal in Abeyance | 71-72 |
| 9/24/14 | Notice of Appeal | 73-76 |
| 11/3/14 | Supplemental Declaration of Stephen J. Findley in Support of Defendant's Motion to Alter or Amend Judgment | 77-79 |
| 9/22/14 | Declaration of Stephen J. Lindley in Support of Defendant's Motion to Alter or Amend Judgment | 80-83 |
| 9/22/14 | Declaration of Marc St. Pierre in Support of Defendant's Motion to Alter or Amend Judgment | 84-88 |
| 8/25/14 | Entry of Judgment | 89 |
| 6/30/14 | "Ready Reference" Table | 90-91 |
| 3/26/14 | Excerpt of Reporter's Transcript of Proceedings (Day 1) | 92-105 |
| 3/27/14 | Excerpt of Reporter's Transcript of Proceedings (Day 2) | 106-147 |
| 3/28/14 | Excerpt of Reporter's Transcript of Proceedings (Day 3) | 148-193 |
| 3/19/14 | Combs' Certificate of Eligibility (Pls. Exh. 4) | 209-210 |
| 3/19/14 | Silvester License to Carry (Pls. Exh. 5) | 211-212 |
| 3/19/14 | Summary Dealer Records of Sale Statistics (Def. Exh. AA) | 213 |
| 3/19/14 | Dealer Records of Sale Monthly Statistics for 2012 (Def. Exh. AO) | 214 |
| 3/19/14 | Dealer Records of Sale Monthly Statistics for 2013 | 215 |

i

| File Date | Document | Page Nos. |
|-----------|----------|-----------|
| | (Def. Exh. AP) | |
| 3/19/14 | NICS Operation 2011 (Def. Exh. BO) | 216-220 |
| 3/19/14 | Bureau of Firearms DROS Processing Flow Diagram (Def. Exh. CB) | 221 |
| 3/19/14 | Assem. Bill No. 263 (1923 Reg. Sess.) c. 339 (Def. Exh. CD) | 222-223 |
| 3/19/14 | Assem. Bill No. 1919 (1952-53 Reg. Sess.) c. 36 (Def. Exh. CE) | 224-226 |
| 3/19/14 | Assem. Bill No. 3508 (1954-55 Reg. Sess.) c. 1521 (Def. Exh. CF) | 227-229 |
| 3/19/14 | Sen. Bill No. 671 (1995-96 Reg. Sess.) (Def. Exh. CG) | 230-238 |
| 3/19/14 | Assem. Bill No. 1441 (1974-75 Reg. Sess.) (Def. Exh. CH) | 239-245 |
| 3/19/14 | Assem. Bill No. 1564 (1964-65 Reg. Sess.) (Def. Exh. CI) | 246-250 |
| 3/19/14 | Lewiecki and Miller, Suicide, Guns, and Public Policy, American Journal of Public Health (2013) (Def. Exh. DG) | 251-253 |
| 3/19/14 | Ludwig and Cook, Homicide and Suicide Rates Associated with Implementation of the Brady Handgun Violence Prevention Act, Journal of the American Medical Association (2000) (Def. Exh. DH) | 254-256 |
| 3/19/14 | Peterson, et al., Self-Inflicted Gunshot Wounds: Lethality of Method Versus Intent, American Journal of Psychiatry (1985) (Def. Exh. DS) | 257-260 |
| 3/19/14 | Miller and Hemenway, The Relationship Between Firearms and Suicide: A Review of the Literature, Aggression and Violent Behavior (1998) (Def. Exh. DT) | 261-267 |
| 3/19/14 | Wintemute, et al., Mortality Among Recent Purchasers of Handguns, New England Journal of Medicine (2003) (Def. Exh. DV) | 268-270 |
| 3/19/14 | Brent, Firearms and Suicide, Annals New York Academy of Sciences (2001) (Def. Exh. DW) | 271-277 |
| 3/19/14 | Hahn, et al., Firearms Laws and the Reduction of Violence: A Systematic Review, American Journal of Preventive Medicine (2005) (Def. Exh. DX) | 278-280 |
| 2/14/14 | Final Pretrial Order (Dkt. 48) | 280-306 |
| 3/14/14 | Answer to First Amended Complaint (Dkt. 11) | 307-316 |

| File Date | Document | Page Nos. |
|---|---|---|
| 2/24/14 | First Amended Complaint (Dkt. 10) | 317-329 |
| | Trial Court Civil Docket Sheet | 330-339 |

1

2

3

4 **UNITED STATES DISTRICT COURT**

5 **EASTERN DISTRICT OF CALIFORNIA**

6

7 **JEFF SILVESTER, et al.,**

**CASE NO. 1:11-CV-2137 AWI SAB**

8 **Plaintiffs**

9 **v.**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

10 **KAMALA HARRIS, Attorney General of California, and DOES 1 to 20,**

11

12 **Defendants**

13

14      This case deals with the constitutionality of various firearms related statutes.  Plaintiffs

15 challenge the 10-day waiting period imposed by California Penal Code § 26815(a)[1] and §

16 27540(a),[2] and approximately 18 categories of exemptions to the waiting period found in Penal

17 Code § 26000 *et seq.* and § 27000 *et seq.* Plaintiffs contend that the 18 exemptions violate the

18 Equal Protection Clause of the Fourteenth Amendment.  Plaintiffs contend that the 10-day waiting

19 periods violate the Second Amendment.  Specifically, Plaintiffs contend that the 10-day waiting

20 periods violate the Second Amendment as applied to those who already lawfully possess a firearm

21 as confirmed in the Automated Firearms System ("AFS"), to those who possess a valid Carry

22 Concealed Weapon ("CCW") license, and to those who possess a valid Certificate of Eligibility

23 ("COE").  See Doc. No. 91 at 29:23-30:8.  Plaintiffs do not challenge the 10-day waiting period on

24

25 ---

[1] Penal Code § 26815(a) reads in pertinent part:  "A dealer . . . shall not deliver a firearm to a person, as follows:  (a)
26 Within 10 days of the application to purchase, or, after notice by the department pursuant to Section 28220, within 10 days of the submission to the department of any correction to the application, or within 10 days of the submission of any fee required pursuant to Section 28225, whichever is later."

27 [2] Penal Code § 27540(a) reads:  "No firearm shall be delivered:  (a) Within 10 days of the application to purchase, or,
28 after notice by the department pursuant to Section 28220, within 10 days of the submission to the department of any correction to the application, or within 10 days of the submission of any fee required pursuant to Section 28225."

1   a facial basis, do not challenge the waiting period laws as applied to first time firearms purchasers,

2   and do not challenge the requirement that firearm purchasers pass a background check.  See Doc.

3   Nos. 91 at 17:13-15; 93 at 3:1-3; 98 at 16:10-15; and 105 at 7:6-8, 13:17-20.

4          In March 2014, the Court conducted a bench trial in this matter.  The Court has now taken

5   live testimony, deposition testimony, and numerous exhibits.  The parties have completed all

6   briefing and made their final arguments.  Given the nature of the challenges made, the Court

7   emphasizes that it is expressing no opinion on the constitutionality of the 10-day waiting period in

8   general or as applied to first time California firearms purchasers.

9          After considering the evidence and the arguments, the Court concludes that Penal Code §

10  26815(a) and § 27540(a)'s 10-day waiting periods impermissibly violate the Second Amendment

11  as applied to those persons who already lawfully possess a firearm as confirmed by the AFS, to

12  those who possess a valid CCW license, and to those who possess both a valid COE and a firearm

13  as confirmed by the AFS system, if the background check on these individuals is completed and

14  approved prior to the expiration of 10 days.  Because of the Court's resolution of the Second

15  Amendment issue, the Court need not reach the Fourteenth Amendment challenges.

16

17  **I.       REQUEST FOR JUDICIAL NOTICE**

18          *Parties' Positions*

19          Defendant requested that the Court take judicial notice of various exhibits.  Defendant

20  argued that each of the exhibits could be judicially noticed as legislative facts because such facts

21  are relevant to the justification for the statutes at issue, the court's legal reasoning, and to the

22  decision making process.

23          Plaintiffs objected and argued that it was unclear how Defendant intended to use the

24  information in the exhibits.  Plaintiffs recognized the distinction between adjudicative facts and

25  legislative facts, but contended that they could not determine the admissibility of the exhibits

26  without further clarification.  However, relevancy, hearsay, and contestability issues in general

27  with Defendant's exhibits make judicial notice under Rule 201 improper.  Further, as part of

28  supplemental briefing, Plaintiffs stated that once specific portions of exhibits were identified by

1   Defendant in her proposed findings of fact and conclusions of law, Plaintiffs would then make

2   arguments in their June 30, 2014 responsive briefing as to those specific exhibits.

3       *Discussion*

4       At the end of the last day of trial testimony, and upon the parties' agreement, the Court

5   ordered the parties to include and to cite to specific proposed exhibits and portions of proposed

6   exhibits as part of their proposed findings of fact and conclusions of law. See Trial Tr. at 526:9-

7   533:13. The parties were permitted to file responsive briefing and objections to the proposed

8   findings, including evidentiary objections to any evidence that was included in the proposed

9   findings and the subject of Defendant's motion for judicial notice. See id. The Court would then

10  make evidentiary rulings based on the briefing and the proposed findings of fact and conclusions

11  of law. See id. This framework was primarily meant to address the exhibits in Defendant's

12  request for judicial notice. The framework was designed to provide the Court and the parties with

13  a method of determining how and for what purpose an exhibit was being used. Defendant's

14  proposed findings of fact and conclusions of law comply with the Court's order. In fact,

15  Defendant helpfully submitted binders with the exhibits and the specific excerpts that were cited in

16  her proposed findings. Nevertheless, as part of Defendant's June 30, 2014 responsive briefing,

17  Defendant defended and addressed exhibits that were part of the request for judicial notice, but

18  were not included in her proposed findings.

19      If Defendant did not cite an exhibit or portion of an exhibit in her proposed findings and

20  conclusions, then Defendant did not sufficiently rely upon such evidence. There was an

21  inadequate demonstration of how such evidence was intended to be used and/or how the evidence

22  is relevant. The Court will not comb through the hundreds of pages of proposed exhibits and

23  make rulings if an exhibit is not actually cited and specifically relied upon by a party. Cf. Hargis

24  v. Access Capital Funding, LLC, 674 F.3d 783, 792-93 (8th Cir. 2012) (courts need not take

25  judicial notice of irrelevant evidence); Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885,

26  889 (9th Cir. 2003) (in summary judgment context court is not required to examine the entire file

27  when specific evidence was not adequately identified); Charles v. Daley, 749 F.2d 452, 463 (7th

28  Cir. 1984) (courts need not take judicial notice of irrelevant evidence); Rodriguez v. Bear Stearns

1  Cos., 2009 U.S. Dist. LEXIS 31525, *34 (D. Conn. Apr. 14, 2009) (courts need not take judicial

2  notice of cumulative evidence).

3        Accordingly, the Court will limit its discussion and consideration to the exhibits and

4  excerpts that were actually cited by Defendant in her proposed findings.  Those exhibits are

5  Defendant's Exhibits CD through CI, DG, DH, DM, DQ, DS, DT, DV, DW, DX, EC, EJ, EK, and

6  GN.  All other exhibits that were included in Defendant's March 24, 2014 request for judicial

7  notice (Doc. No. 78), but that were not cited in Defendant's proposed findings of fact and

8  conclusions of law, will not be considered by the Court.

9        The Defense exhibits at issue fall into one of four general categories – legislative history,

10  history books, professional journal articles, and a newspaper article.  The Court will examine each

11  category of exhibits separately.

12        1.     Legislative Histories

13        The Ninth Circuit has approved of taking judicial notice of legislative history.  Association

14  des Eleveurs de Canards et D'oies du Quebec v. Harris, 729 F.3d 937, 945 n.2 (9th Cir. 2013);

15  Chaker v. Crogan, 428 F.3d 1215, 1223 n.8 (9th Cir. 2005); see also Korematsu v. United States,

16  584 F.Supp. 1406, 1414 (N.D. Cal. 1984).  Defendant has limited the portions of legislative

17  history that she wishes the Court to consider.  In their June 30 responsive briefing, Plaintiffs did

18  not address these specific portions of legislative history.  The Court finds that the identified

19  portions of legislative history are relevant and probative.  Therefore, the Court will grant

20  Defendant's motion with respect to the identified excerpts of legislative history.

21        Therefore, the Court takes judicial notice of the following portions of Exhibit CD:  Cover

22  & p. 701.  The Court takes judicial notice of the following portions of Exhibit CE:  Cover & p.

23  657.  The Court takes judicial notice of the following portions of Exhibit CF:  Cover & pp. 2799,

24  2800. Exhibit CG:  Bates Numbers AG000008, AG000026, AG000052 through AG000055, and

25  AG000059 through AG000061.  The Court takes judicial notice of the following portions of

26  Exhibit CH:  Bates Numbers AG000231 through AG000233, AG000297 through AG000298,

27  AG000343 through AG000344.  The Court takes judicial notice of the following portions of

28  Exhibit CI:  Bates Numbers AG000399 through AG000402, and AG000468.

2.      Category 2 – History Books

In their June 30, 2014 responsive briefing, Plaintiffs did not make any evidentiary arguments regarding the specific excerpts from Defendant's history books.  Regardless, the Court has conducted an independent evaluation of the excerpts submitted.

Exhibit EC consists of excerpts from a book by Jack Larkin, *The Reshaping of Everyday Life: 1790-1840* (Harper Perennial 1988).  The excerpts from this book deal with the nature of life in America from 1790 to 1840.  Defendant seeks to admit these excerpts in order to demonstrate that, given the nature of the way of life between 1790 and 1840, most people would have been unable to readily obtain firearms.  Because the geographic and economic conditions did not lend themselves to a person being able to immediately purchase and possess a firearm, Defendant contends that the citizens of 1790 and 1840 would have no quarrel with a government imposed waiting period before obtaining firearms.  See Doc. No. 88 at ¶¶ 29-34, G.

Although it appears that Exhibit EC is the type of historical work that has been consulted in cases such as *McDonald*, *Heller*, and *Peruta*, the information contained in Exhibit EC is not particularly relevant to this case.  Exhibit EC appears to be a generalized historical text that touches on many aspects of the American life as it existed between 1790 and 1840.  What Exhibit EC excerpts do not contain is any information regarding firearm waiting period laws that may have existed between 1790 and 1840, or information regarding the understanding of the Second Amendment during this timeframe.  It is that type of information, not American life in general or the economic and geographic conditions of the time, that are relevant.  "The Constitution structures the National Government, confines its actions, and, in regard to certain individual liberties and other specified matters, confines the actions of the States."  Edmonson v. Leesville Concrete Co., 500 U.S. 614, 619 (1991).  "[T]he constitutional right to bear arms restricts the actions of only the federal or state governments or their political subdivisions, not private actors."  Florida Retail Fed'n, Inc. v. Attorney Gen. of Fla., 576 F.Supp.2d 1281 (N.D. Fla. 2008).  That naturally-occurring non-governmental forces may have limited the ability of some individuals in some parts of the country to readily obtain firearms does not show that it was understood around 1791 (the year the Second Amendment was adopted) or 1868 (the year the Fourteenth Amendment

was adopted) that the government could impose a waiting period between the time of purchase and the time of possession of a firearm.[3]  The Court does not find the excerpts in Exhibit EC to be relevant, and declines to consider them.[4]  See Hargis, 674 F.3d at 792-93; Charles, 749 F.2d at 463; Rodriguez, 2009 U.S. Dist. LEXIS 31525 at *34.

Exhibit EK consists of excerpts from a book by Adam Winkler, *Gunfight:  The Battle over the Right to Bear Arms in America* (W.W. Norton 2013).  Exhibit EK discusses some of the laws in existence around the founding era.  However, there is nothing in Exhibit EK that discusses waiting period laws between 1791 and 1868.  The first mention of a waiting period law was a 1923 model law that imposed a 1-day waiting period on the delivery of handguns.  According to Winkler, this law was proposed by a private organization, the U.S. Revolver Association.  Winkler states that this law was adopted by nine states, including California.  However, like Exhibit EC, Exhibit EK does not discuss waiting period laws during 1791 or 1868.[5]  Because there is no discussion of waiting periods during the relevant time periods, the Court does not find the excerpts from Exhibit EK to be relevant, and declines to consider them.[6]  See Hargis, 674 F.3d at 792-93; Charles, 749 F.2d at 463; Rodriguez, 2009 U.S. Dist. LEXIS 31525 at *34.

### 3.   Professional Articles

In their June 30, 2014 responsive briefing, Plaintiffs did not make any evidentiary arguments regarding the specific excerpts from the professional journal articles cited by Defendant.  Depending on their use in a case, see Toth v. Grand Trunk R.R., 306 F.3d 335, 349 (6th Cir. 2002), social science studies can be reviewed by courts as "legislative facts."[7]  See Snell

---

[3] If anything, given the absence of any such laws, and accepting Defendant's assertions about American life at the time, it seems more likely that the citizenry of 1791 and 1868 would not have been accepting of such laws because those laws would have created additional difficulties and barriers to obtaining a firearm.

[4] Even if the Court considered the excerpts of Exhibit EC, they would not change the Court's findings or conclusions.

[5] If anything, the cited excerpts indicate that waiting period laws did not exist around 1791 or 1868, that waiting periods are a relatively recent phenomena, and that most states have not had waiting periods.  Exhibit EK does not show that waiting periods were outside the Second Amendment's scope.

[6] Even if the Court considered the excerpts of Exhibit EK, they would not change the Court's findings or conclusions.

[7] Legislative facts generally arise when a court is faced with a constitutional challenge to a statute.  See Korematsu, 584 F.Supp. at 1414; State v. Erickson, 574 P.2d 1, 5 (Alaska 1978).  Legislative facts are facts that help a tribunal or court to determine the content of law and policy and to exercise its judgment or discretion in determining what course

1   v. Suffolk County, 782 F.2d 1094, 1105-06 (2d Cir. 1986); Dunagin v. Oxford, 719 F.2d 738, 748

2   n.8 (5th Cir. 1985); cf. United States v. Carter, 669 F.3d 411, 418 (4th Cir. 2011) (government

3   may establish the "reasonable fit" of legislation through a wide range of sources including

4   empirical evidence). Legislative facts can be considered more liberally and are outside the

5   structures of Federal Rule of Evidence 201. See Castillo-Villagra v. INS, 972 F.2d 1017, 1026

6   (9th Cir. 1992); United States v. Gould, 536 F.2d 216, 219 (8th Cir. 1976); see also Qualley v.

7   Clo-Tex Int'l, Inc., 212 F.3d 1123, 1128 (8th Cir. 2000) (holding that trial court erroneously took

8   judicial notice of legislative facts under Rule 201).

9        The Court finds that the excerpts from Defendant's Exhibits DG (pp. 27-29), DH (pp. 585,

10   588, 590), DS (pp. 228-231), DT (pp. 59-61, 69-72), DV (pp. 1583-1585), DW (pp. 225, 226, 229,

11   232, 234-236), and DX (pp. 40, 51-52) are relevant. Given the absence of additional argument

12   from Plaintiffs on these exhibits, the Court will consider these exhibits as legislative facts.

13   However, the Court will not take judicial notice of these exhibits under Rule 201. See Qualley,

14   212 F.3d at 1128.

15        With respect to Exhibits DM and DQ, these are portions of articles that relate to suicide

16   studies in Australia. Exhibit DM is a 1994 study of 33 survivors of attempted firearm suicides,

17   who were all treated at Westmead Hospital (a teaching hospital of the University of Sydney).

18   Exhibit DQ is a 1999 study of suicide statistics from Tasmania, Australia. The Court does not find

19   these articles to be probative. There are cultural, societal, and geographic differences between

20   Australia and the United States. These types of differences can manifest themselves not only

21   when comparing suicide statistics between the two countries, but also when comparing the suicide

22   rates of the states and territories of Australia with the states of the United States. The Tasmania

23   study, for example, highlights the fact that Tasmania had one of the highest suicide rates of all of

24   Australia, yet made up only 2.6% of Australia's total population. In other words, there was

25   something unique that was occurring in Tasmania. Suicide is a complex psychological

26

27   of action to take; they are facts that are ordinarily general and do not concern the immediate parties. See United States
     v. Gould, 536 F.2d 216, 219 (8th Cir. 1976); Erickson, 574 P.2d at 4-5 & n.14. Legislative facts "have relevance to
28   legal reasoning and the lawmaking process, whether in the formation of a legal principle or ruling by a judge or court
     or in the enactment of a legislative body." Advisory Comm. Note to Fed. R. Evid. 201(a).

1   occurrence.  Without further expert guidance, the Court is not inclined to consider two studies that

2   focus on two small portions of a separate country.  The Court declines to consider Exhibits DM

3   and DQ.[8]  See Hargis, 674 F.3d at 792-93; Charles, 749 F.2d at 463; Rodriguez, 2009 U.S. Dist.

4   LEXIS 31525 at *34.

5            With respect to Exhibit EJ, this exhibit is several pages from a book entitled "Reducing

6   Gun Violence in America."  Only one page of the excerpts has potential relevance (the other

7   excerpts are the cover and publishing pages).  The one page discusses a study that found a

8   reduction in the firearm suicide rate for people over the age of 55, and the reduction may have

9   been due to the Brady Act waiting period.  See Defendant's Ex. EJ.  The book page appears to

10  have been written by the study's authors, Messrs. Cook and Ludwig.  The Court will consider

11  portions of the underlying study.  See Defendant's Ex. DH.  Because the Court will consider

12  portions of the underlying study, additional information from the study's authors is relevant.  The

13  Court will consider Exhibit EJ, but will not take judicial notice of Exhibit EJ under Rule 201.  See

14  Qualley, 212 F.3d at 1128.

15            4.   Newspaper Article

16           Exhibit GN is a 2014 newspaper article from the Washington Post, whose headline reads,

17  "Study:  Repealing Missouri's background check law associated with a murder spike."  Plaintiffs

18  did not address this exhibit as part their June 30 responsive briefing.  Nevertheless, Plaintiffs are

19  not challenging California's background check.  Plaintiffs do not argue that they should be exempt

20  from a background check nor do they argue that the background check is unconstitutional, rather

21  they argue that they should not be subject to the full 10-day waiting period between the time of

22  purchase and the time of possession.  See Doc. No. 105 at 7:6-8, 13:17-20.  The Washington Post

23  article purports to describe the results of a study on an issue that is not before the Court.  Thus, the

24  article is not relevant, and the Court will not consider Exhibit GN.[9]  See Hargis, 674 F.3d at 792-

25  93; Charles, 749 F.2d at 463; Rodriguez, 2009 U.S. Dist. LEXIS 31525 at *34.

26

27  [8] Even if the Court did consider the excerpts from Exhibits DM and DQ, those exhibits would not change the Court's
    findings of fact or conclusions of law

28  [9] Even if the Court did consider the excerpts from Exhibit GN, the Court would not change its findings of fact or
    conclusions of law.

1  **II.    STANDING**

2      Defendant contends that the two entity plaintiffs, California Guns Federation ("CGF") and

3  the Second Amendment Foundation ("SAF") do not have standing to maintain this lawsuit.

4  Defendant argues that there is insufficient evidence that the entities have been personally injured

5  by the Penal Code provisions at issue, and that there is insufficient evidence that any of the

6  entities' members have been injured.  CGF and SAF contend that the evidence is sufficient to

7  show both direct personal injuries to themselves, as well as injuries to their members.

8      *Legal Standard*

9       It is the plaintiff's burden to establish standing to bring a lawsuit in federal court.  See

10  Washington Envtl. Council v. Bellon, 732 F.3d 1131, 1139 (9th Cir. 2013).  An organization may

11  have representational standing, where it acts as a representative of its members, or direct standing,

12  where it seeks to redress an injury it has suffered in its own right.  See Smith v. Pacific Props. &

13  Dev. Corp., 358 F.3d 1097, 1101 (9th Cir. 2004). "An organization has direct standing to sue

14  when it shows a drain on its resources from both a diversion of its resources and frustration of its

15  mission."  Valle Del Sol Inc. v. Whiting, 732 F.3d 1006, 1018 (9th Cir. 2013); Fair Hous. Council

16  of San Fernando Valley v. Roommate.com, LLC, 666 F.3d 1216, 1219 (9th Cir. 2012).  The

17  organization's "standing must be established independent of the lawsuit filed by the plaintiff."

18  Fair Hous., 666 F.3d at 1219.  "An organization cannot manufacture the injury by incurring

19  litigation costs or simply choosing to spend money fixing a problem that otherwise would not

20  affect the organization at all."  Valle Del Sol, 732 F.3d at 1018.  An organization may assert

21  standing on behalf of its member if the "members would otherwise have standing to sue in their

22  own right, the interests at stake are germane to the organization's purpose, and neither the claim

23  asserted nor the relief requested requires the participation of individual members in the lawsuit."

24  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 181 (2000); Washington

25  Envtl. Council v. Bellon, 732 F.3d 1131, 1139 (9th Cir. 2013).

26      *Findings of Fact*

27      SAF has between 30,000 and 40,000 members, supporters, and donors in California.

28

1    Gottlieb Dep. 18:11-13.[10]  One-third to one-half of the total 30,000 to 40,000 California members,

2    supporters, and donors are dues-paying members.  See id. at 18:16-19:4.

3        SAF conducts research on state and federal firearms laws, including California's firearms

4    laws.  See id. at 22:3-11.  Approximately 20% of SAF's research deals with California's firearms

5    laws.  See id. at 22:12-19.

6        SAF also expends funds in the defense of the civil rights of its members, including the

7    prosecution of this lawsuit.  See id. at 35:10-23.

8        SAF seeks input from its members about which litigation to pursue, and SAF members

9    contacted SAF about challenging the California 10-day waiting period.  See id. at 28:1-3, 29:2-11.

10   Over the years, a number of SAF members have contacted SAF to complain about the 10-day

11   waiting period.  See id. at 30:1-15.

12       SAF has California members who are subjected to the 10-day waiting period, and has

13   California members who wish to purchase a firearm and also have a CCW, a COE, and/or another

14   firearm.  See id. at Depo. Ex. 13, Responses to Interrogatories 5, 8-15.

15       SAF has publicly commented on the 10-day waiting period, and done research into the

16   California 10-day waiting period laws for a number of years (possibly for more than a decade).

17   See id. at 23:25-24:23.

18       SAF receives between 50 and 100 calls per year from California members regarding the

19   10-day waiting period.  See id. at 43:4-9.

20       Aside from this lawsuit, SAF has expended resources researching the 10-day waiting

21   period, and expended staff time and money and resources in connection with other people's calls,

22   letters, e-mails, and discussions about the 10-day waiting period.  See 35:17-36:1.

23       SAF has never attempted to purchase a firearm in California, nor has it incurred any

24   expenses in acquiring firearms in California.  See id. at 33:17-20, 62:19-23.

25       CGF is a public interest group that was created by gun owners.  See id. at 117:7-8.

26

27

28   _____

[10] Alan Gottlieb is the Executive Vice President of SAF.  The parties stipulated to use Mr. Gottlieb's deposition testimony in lieu of live testimony.  See Doc. No. 75.

1    CGF's purposes are to defend people whom CGF believes to be unjustly charged with

2    violating California firearms laws, and to challenge laws that CGF believes are unconstitutional

3    under the Second and Fourteenth Amendments.  See id. at 117:8-12.  CGF will file amicus briefs

4    in various cases, including before the United States Supreme Court, but such briefs tend to be on

5    issues that CGF believes would be useful in California.  See id. at 120:2-5.  CGF routinely

6    publishes white papers, FAQ's, and WikiQ's that explain California's gun laws, including

7    explaining legislative history.  See id. at 120:23-121:4.  CGF defends people who have been

8    improperly charged for violation of various California firearms, and also engages in litigation to

9    ensure that California's firearms laws are constitutional.  See id. at 117:21-118:3.

10    CGF has approximately 30,000 members, most of whom are in California.  See Trial Tr.

11    121:11-14.  Almost all of CGF's members are subject to the 10-day waiting period.  See id. at

12    121:18-19. "Quite a few" of CGF's members have written about the 10-day waiting period on

13    CGF's blog.  See id. at 143:11-19.

14    CGF brought this lawsuit so that its members who already have firearms in the AFS

15    system, possess a CCW, or possess a COE, would not have to wait 10 days to obtain a firearm.

16    See id. at 121:23-25.  Although not an individual plaintiff, Gene Hoffman, the CGF's chairman,

17    currently owns a firearm, plans to obtain a firearm in the future, and has a CCW license.  See id. at

18    113:13-114:1, 136:1-7.

19    CGF has never attempted to purchase a firearm on its own behalf for self-defense.  See id.

20    at 145:19-146:2.

21    *Conclusions of Law*

22    1.    Direct Standing

23    To show an injury that is sufficient for direct standing, an organization must show:  (1)

24    frustration of purpose, and (2) diversion of funds.  See Valle Del Sol, 732 F.3d at 1018.

25            a.    CGF

26    CGF has met the first requirement.  It is within CGF's purposes to defend and advocate for

27    Second Amendment rights, including bringing lawsuits that challenge laws that may infringe upon

28    the Second Amendment.  The 10-day waiting period is a law that CGF believes unconstitutionally

1   infringes upon the rights of those who have at least one gun registered in the AFS system, a CCW

2   license, and/or a COE.  CGF brought this lawsuit to remedy this perceived unconstitutional

3   infringement.  Therefore, CGF has demonstrated that the 10-day waiting period frustrates its

4   purposes.

5           CGF has not met the second requirement.  The testimony of CGF's chairman establishes

6   that CGF is active in litigation in general, and has expended resources in connection with this

7   lawsuit.  However, expenditure of resources in the current lawsuit alone does not meet the

8   requirements for direct standing.  See Fair Hous., 666 F.3d at 1219.  There is no evidence that

9   deals with CGF researching, expending funds, educating or engaging in advocacy activities, or

10   spending time addressing members' concerns about the 10-day waiting period separate and apart

11   from this lawsuit.  Cf. Valle Del Sol, 732 F.3d at 1018; Fair Hous., 666 F.3d at 1219.

12          Because there is no evidence that the 10-day waiting period laws have caused a diversion

13   of CGF's resources, separate and apart from this lawsuit, CGF has not met its burden of

14   establishing direct standing.  See id.

15                  b.      SAF

16          SAF has met the first requirement.  SAF is engaged in educational, research, and litigation

17   efforts regarding the Second Amendment.  SAF believes that the 10-day waiting period

18   unconstitutionally infringes upon the Second Amendment rights of its members and of non-

19   members in California, and has brought this lawsuit to remedy that perceived infringement.

20   Therefore, SAF has demonstrated that the 10-day waiting period frustrates its purposes.

21          SAF has met the second requirement.  SAF has been researching the 10-day waiting period

22   for likely more than a decade.  SAF yearly receives numerous complaints and questions from its

23   members about the 10-day waiting period.  SAF has had to divert time, resources, and money as

24   part of its efforts to research the 10-day waiting period and to educate and address the concerns of

25   its California members.  Therefore, SAF has demonstrated a diversion of resources from the 10-

26   day waiting period.  Cf. Valle Del Sol, 732 F.3d at 1018; Fair Hous., 666 F.3d at 1219.

27          Because SAF has met both requirements, it has established its direct standing to challenge

28   the 10-day waiting period laws.  See id.

2.     Representative Standing

An organization has standing to bring suit on behalf of its members if the organization shows:  (1) its members would have standing to bring suit; (2) the lawsuit is germane to the organization's purpose; and (3) neither the claims asserted nor the relief requested require participation of a member.  See Friends of the Earth, 528 U.S. at 181; Bellon, 732 F.3d at 1139.

CGF and SAF have met the requirements for representative standing by an organization. Both CGF and SAF have members in California who either already possess a firearm, a COE, or a CCW license, and plan on obtaining a firearm in the future.  These California members' Second Amendment right to keep and bear firearms is burdened by the 10-day waiting period, see *infra.*, and those members could have filed suit on their own behalf.  The burden imposed by the 10-day waiting period is germane to the purposes of both CGF and SAF.  These organizations actively research, publicly address/educate, and litigate on Second Amendment issues.  No specific members are necessary to either determine the constitutional validity of the challenged laws or to fashion a remedy.  Therefore, CGF and SAF have representative standing to sue on behalf of their members.  Friends of the Earth, 528 U.S. at 181; Bellon, 732 F.3d at 1139.

**III.     SECOND AMENDMENT CHALLENGE**

**A.     Contentions**

*Plaintiffs' Contentions*

Plaintiffs argue that the 10-day waiting period interferes with the right to keep and bear arms, interferes with property rights, and causes additional expenses that may prevent a person from obtaining a firearm.  Plaintiffs argue that there were no waiting period laws in existence in either 1791 or 1868, that waiting period laws are not prevalent today, and are not longstanding and presumptively lawful regulations.

Plaintiffs argue that it is unnecessary to determine whether intermediate or strict scrutiny applies because the waiting period laws will not pass intermediate scrutiny.  Under intermediate scrutiny, the 10-day waiting period laws are justified as being necessary to do a background check and to provide a cooling off period.  However, Plaintiffs argue that they do not contend that they

1    should be exempt from a background check, rather their challenge deals with timing.  As for

2    background checks, 10-days is an arbitrary figure.  For 20% of all applicants, the background

3    check is approved and completed in about one hour.   For those who already own a firearm and are

4    known to be trustworthy due to the licenses that they hold and a history of responsible gun

5    ownership, there is no justification for imposing the full 10-day waiting period.  With respect to

6    cooling off periods, Plaintiffs aver that for those individuals who already possess a firearm, the

7    waiting period will not prevent impulsive acts of violence because the individual already has a

8    firearm.  As to concerns about whether a person may become prohibited from possessing a firearm

9    after the firearm has been delivered, California has implemented two "safety net" systems, APPS

10   and rap back.  These programs undercut the need to impose a full 10-day waiting period.

11          Plaintiffs propose that the Court should order modification of the background check

12   system and waiting period laws as follows:  Any person for whom Defendant can determine (a)

13   has a valid and current CCW license, that person should be subject to the same background check

14   as the 18 statutory exceptions to the 10-day waiting period and should not be subject to the 10-day

15   waiting period; (b) has a valid and current COE and for whom the AFS system shows a firearm

16   purchase since 1996, that person is subject to the same background check as the 18 statutory

17   exceptions to the 10-day waiting period and should not be subject to the 10-day waiting period;

18   and (c) has purchased a firearm that is documented in the AFS system since 1996, that person may

19   take delivery of the firearm upon approval of the background check.  See Doc. No. 91 at pp.29-30.

20          *Defendant's Contentions*

21          Defendant argues that the 10-day waiting period does not burden the Second Amendment.

22   None of the organizational plaintiffs have attempted to purchase a firearm, and both Plaintiffs Jeff

23   Silvester and Brandon Combs have possessed a firearm at all relevant times.  The increased cost or

24   minor inconvenience of having to make return trips to a gun store are *de minimis*.

25          Defendant also argues that the 10-day waiting period falls under one of the longstanding

26   regulatory measures identified by the Supreme Court.  The 10-day waiting period is a condition or

27   qualification on the commercial sale of a firearm.  As a longstanding and presumptively lawful

28   regulation, the 10-day waiting period does not burden the Second Amendment.

1    Defendant also argues that in 1791 and 1868, the nature of production of firearms, where

2  firearms were sold in relation to where people lived, and the relative expense of firearms made

3  obtaining a firearm within 10 days of deciding to purchase one nearly impossible.  As a result, the

4  people of 1791 and 1868 would have accepted a 10-day waiting period before obtaining a firearm.

5    Defendant argues that if the Second Amendment is burdened, the 10-day waiting period's

6  burden is not so severe as to justify strict scrutiny.  Under intermediate scrutiny, the 10-day

7  waiting period laws are constitutional.  The waiting period laws serve the important interests of

8  public safety and keeping prohibited persons from obtaining firearms.

9    The 10-day waiting period reasonably fits these interests in three ways.  First, it provides

10  sufficient time for the Department of Justice to perform a background check.  The nature of the

11  databases utilized often require analysts to seek out information and dispositions from other

12  agencies, entities, and states, which can be extremely time consuming.  Further, sometimes

13  prohibiting information is entered into the system after the initial check.  Without the 10-day

14  waiting period, there could be an incomplete check and prohibited individuals could obtain

15  firearms.  Relying on a CCW license or a COE is not a substitute for the background check

16  because new prohibiting events may have arisen after a person obtains the CCW license or COE.

17  Second, it provides a cooling off period so that individuals will have time to re-think committing

18  impulsive acts of violence.  Suicide is often based on transient thoughts.  Studies show that

19  waiting periods limit a person's access to firearms, and allows time for the transient suicidal

20  thoughts to pass.  Even if a person has a firearm in the AFS system, there is no guarantee that the

21  person still has the firearm.  Further, a firearm may be in an inoperable condition, or a person may

22  not have ammunition for the weapon.  For those individuals, a cooling off period could be

23  beneficial.  Further, some guns are not suitable for some purposes, and a cooling off period for a

24  newly purchased firearm is beneficial.  Finally, the waiting period laws provide Department of

25  Justice agents with additional time in which to investigate straw purchases.  It is better to intercept

26  a weapon before it is delivered to a purchaser.  If the waiting period laws did not exist, law

27  enforcement would have to perform more retrievals of firearms from straw purchasers.  Therefore,

28  the 10-day waiting period is a "reasonable fit" and constitutional.

1      **B.**      **Findings of Fact**

2                   1.      Impact of the 10-day Waiting Period

3           Unless a statutory exception applies, every person who wishes to purchase a firearm in

4    California must wait at least 10-days from the date of purchase before taking possession of a

5    firearm.  See Cal. Pen. Code §§ 26815(a), 27540(a).

6            The 10-day waiting period affects a person's ability to defend themselves through the use

7    of a newly purchased firearm.  See Trial Tr. at 74:2-75:1.  The 10-day waiting period interferes

8    with the exercise of dominion over property with respect to a newly purchased firearm.  See Trial

9    Tr. 29:10-13, 74:21-75:1.

10          Generally, the 10-day waiting period requires a firearm purchaser to make at least two trips

11   to a firearms dealer in order to complete a firearms transaction.  The multiple trips required to

12   complete a transaction can cause disruptions in work and personal schedules, extra fuel expense,

13   and wear and tear on a car depending upon where a firearm or a firearms dealer is located in

14   relation to the purchaser.  See id. at 26:9-14, 33:16-34:12, 35:13-36:8.  This can be a financial

15   burden on a purchaser.  See id. at 26:15-18, 84:15-85:3.

16          The 10-day waiting period may also necessitate additional fees for the transfer of firearms

17   between dealers, so that a person can purchase a firearm from a more distant dealer, but can

18   retrieve the firearm from a closer dealer.  See 28:2-29:1.

19          Schedule conflicts and dealer location may cause a person to miss the window to retrieve a

20   firearm after the 10-day waiting period has expired.  See 65:12-66:10.

21          The additional transfer expenses, the impact on a purchaser's schedule, and/or the location

22   of a firearm may combine with the 10-day waiting period to cause a person to forego purchasing a

23   firearm.  See 111:2-6.

24          Plaintiffs Brandon Combs ("Combs") and Jeff Silvester ("Silvester") each currently

25   possess a firearm and both intend to purchase a firearm in the future.  See 20:24-21:9, 49:12-19.

26   Neither Combs nor Silvester is prohibited from owning or possessing a firearm in California.  See

27   id. at 21:10-11, 63:4-64:21.  Both Combs and Silvester have foregone opportunities to purchase a

28   firearm, or have been unable to complete the purchase of a firearm, due to operation of the 10-day

1    waiting period.  See id. at 27:18-28:6, 29:2-9, 35:9-36:8, 74:21-75:1, 79:11-14, 82:6-84:1.

2                   2.      Waiting Period Laws

3           Defendant has identified no laws in existence at or near 1791 or 1868 that imposed a

4    waiting period of any duration between the time of purchase and the time of possession of a

5    firearm.

6           Defendant has identified no historical materials at or near 1791 or 1868 that address

7    government imposed waiting periods or the perception of government imposed waiting periods in

8    relation to the Second Amendment.

9           To the Court's knowledge, ten states and the District of Columbia impose a waiting period

10   between the time of purchase and the time of delivery of a firearm.  Three states and the District of

11   Columbia have waiting period laws for the purchase of all firearms:  California (10 days), District

12   of Columbia (10 days),[11] Illinois (3 days for pistols, 1 day for long guns),[12] and Rhode Island (7

13   days).[13]  Four states have waiting periods for hand guns:  Florida (3 days),[14] Hawaii (14 days),[15]

14   Washington (up to 5 days from the time of purchase for the sheriff to complete a background

15   check),[16] and Wisconsin (2 days).[17]  Connecticut has a waiting period for long guns that is tied to

16   an authorization to purchase from the Department of Emergency Services and Public Protection.[18]

17   Minnesota and Maryland have a waiting period for the purchase of handguns and assault rifles (7

18   days).[19]  There is no federal waiting period law.  See 18 U.S.C. § 922(s) (Brady Act's 5-day

19   waiting period expired in 1998).

---

[11] D.C. Code Ann. § 22-4508.

[12] 720 Ill. Comp. Stat. 5/24-3(A)(g).

[13] R.I. Gen. Laws §§ 11-47-35(a)(1), 11-47-35.2(a).

[14] Fla. Stat. § 790.0655(1)(a).

[15] Haw. Rev. Stat. Ann. § 134-2(e).

[16] Wash. Rev. Code Ann. § 9.41.090(1)(c).

[17] Wis. Stat. Ann. § 175.35(2)(d).

[18] Conn. Gen. Stat. Ann. §§ 29-37(d), (e).

[19] Md. Code Ann., Pub. Safety §§ 5-101(r), 5-123 to 5-125; Minn. Stat. § 624.7132(Subd. 4).

1    In 1923, the California Legislature created a waiting period for handguns, whereby no

2    handgun, pistol, or other concealable firearm could be delivered to its purchaser on the day of

3    purchase.  <u>See</u> Def. Ex. CD (1923 Cal. Stat. ch. 339 §§ 10, 11).

4    In 1953, the 1923 handgun waiting-period law was codified into the California Penal Code

5    with no substantive changes.  <u>See</u> Def. Ex. CE (1953 Cal. Stat. ch. 36 §§ 12071, 12072).  One

6    California court has cited legislative hearing testimony from 1964 in which witnesses testified that

7    this 1953 law was "originally enacted to cool people off," but that this law was "not enforced with

8    regard to individual transfers through magazine sales nor at swap meets."[20]  <u>People v. Bickston</u>, 91

9    Cal.App.3d Supp. 29, 32 & n.4 (1979).

10   In 1955, the California Legislature extended the handgun waiting period from 1 day to 3

11   days.  <u>See</u> Def. Ex. CF (1955 Cal. Stat. ch. 1521 §§ 12071, 12072).  No legislative history has

12   been cited that addresses why the waiting period was extended from 1 to 3 days.

13   In 1965, the California Legislature extended the handgun waiting period from 3 days to 5

14   days.  <u>See</u> Def. Ex. CI at AG000401-402 (1965 Cal. Stat. ch. 1007 §§ 12071, 12072).

15   The legislative history indicates that the Legislature extended the waiting period from 3

16   days to 5 days in 1965 because the 3-day waiting period did not provide Cal. DOJ sufficient time

17   to conduct proper background checks on prospective concealable firearms purchasers, before

18   delivery of the firearms to the purchasers.  <u>See Bickston</u>, 91 Cal.App.3d Supp. at 32; Def. Ex. CI

19   at AG000468 (June 30, 1965 letter from Cal. Assemblymember Beilenson letter to the Governor);

20   Def. Ex. CI at AG000470 (June 24, 1965 letter from Assistant Attorney General Barrett to the

21   Governor).  Additionally, a report from the 1975-1976 session of the Senate Judiciary Committee

22   indicates that the "purpose of the 5-day provision is to permit the law enforcement authorities to

23   investigate the purchaser's record, before he actually acquires the firearm, to determine whether he

24   falls within the class of persons prohibited from possessing concealed firearms."  Def. Ex. CH at

25   AG000298 (Cal. S. Comm. on the Judiciary, 1975-76 Regular Sess., Rep. on A.B. 1441, at 1-2

26   (1975)).  No legislative history relating to the 1965 law has been cited that relates to a "cooling

27   off" period.

28

---

[20] The parties have not referred or cited to any hearing testimony from 1964.

1    In 1975, the California Legislature extended the handgun waiting period from 5 days to 15

2    days.  See Def. Exh. CH (1975 Cal. Stat. ch. 997 §§ 12071, 12072).

3    The legislative history indicates that the California Legislature extended the waiting period

4    from 5 days to 15 days in order to "[g]ive law enforcement authorities sufficient time to

5    investigate the records of purchasers of handguns prior to delivery of the handguns."  Def. Ex. CH

6    at AG000297 (Cal. S. Comm. on the Judiciary, 1975-76 Regular Sess., Rep. on A.B. 1441, at 1-2

7    (1975)).  A waiting period of 5 days was thought to be "inadequate for the [California] Bureau [of

8    Firearms] to thoroughly check all records of the purchasers . . ."  Id. at AG000344 ( September 15,

9    1975 letter from Cal. Assemblymember Murphy letter to the Governor).  No legislative history

10   relating to the 1975 law has been cited that addresses a "cooling off" period.

11   In 1991, the California Legislature expanded the waiting period to cover all firearms.  See

12   Cal. Pen. Code §§ 12071, 12072 (1991 ed.) & Historical & Statutory Notes for 1990 Legislation.

13   In 1996, the California Legislature reduced the waiting period from 15 days to 10 days.

14   See Def. Ex. CG (Cal. S.B. 671, 1995-96 Regular Sess., ch. 128 sections 12071(b)(3)(A),

15   12072(c)(1)); Trial Tr. 169:2-5.

16   The California Legislature reduced the waiting period from 15 days to 10 days because the

17   California Department of Justice ("Cal. DOJ')'s Bureau of Firearms ("BOF") switched to an

18   electronic database system, which allowed for faster processing of background checks.  See Def.

19   Ex. CG at AG000061, AG000212 (Cal. S.B. 671, 1995-96 Regular Sess., S. Third Reading, as

20   amended Jun. 4, 1996); see also Def. Ex. CG at AG000057 ("This bill will assist the Department

21   and gun dealers in expediting the background check process.").  BOF is the agency within Cal.

22   DOJ that conducts background checks on prospective firearm purchasers.  See Trial Tr. 167:11-13.

23   A report from the Senate Committee on Criminal Procedure and a report from the

24   Assembly Committee on Public Safety indicate that the waiting period is used to provide time to

25   complete a background check and to provide a "cooling off" period.  See Def. Ex. CG at 2099-

26   0051 and AG000075.  However, no legislative history related to the 1996 law has been cited that

27   deals with specific findings or evidence related to the "cooling off" period.

28   One California court has opined:  "[I]t appears that an original intent to provide at least an

1    overnight cooling-off period from 'application for the purchase' was supplemented over the years

2    with additional time to allow the Department of Justice to investigate the prospective purchaser of

3    the weapon." Bickston, 91 Cal.App.3d Supp. at 32.

4              3.      The California Background Check

5        The California background check begins with the completion and submission of a Dealer

6    Record of Sales ("DROS"). See Trial Tr. 170:21-24. The DROS is an application form that a gun

7    dealer electronically submits to Cal. DOJ, which contains information about the prospective

8    purchaser, the firearm, and the dealership. See id. at 171:3-19.

9        After Cal. DOJ receives a DROS application, BOF begins the background check process

10   on the prospective purchaser. See id. at 171:18-172:3.

11       The DROS application is sent to Cal. DOJ's Consolidated Firearms Information System

12   ("CFIS"), which is a computerized system. See id. at 292:7-16. CFIS coordinates the electronic

13   portion of the background check process, called the Basic Firearms Eligibility Check ("BFEC"),

14   by sending inquiries to other electronic databases and compiling the responses.[21] See id. at

15   292:17-294:1.

16       The first database queried as part of the BFEC is California's Department of Motor

17   Vehicles ("DMV") database.[22] See id. at 294:2-3.

18       The identification information on the DROS application is verified with DMV for several

19   reasons: to ensure that the background check is run on the correct person, to prevent the

20   occurrence of "straw purchases,"[23] and to prevent people from using fake identification to

21   purchase firearms. See id. at 236:23-237:9.

22       Cal. DOJ sends a DROS applicant's California driver's license or California identification

23   number to the DMV database. See id. at 294:4-9. The DMV database then returns the person's

24

25   [21] Defendant's Exhibit CB is a chart that depicts the databases reviewed during the automated review portion of the
     background check process.

26
     [22] Firearms purchasers are required to have a valid California driver license or identification card issued by DMV.
27   See Trial Tr. 236:15-22.

28   [23] "Straw purchases" occur when a purchaser obtains a firearm for a separate, undisclosed, prohibited person. See
     Trial Tr. 343:4-14.

1    name, date of birth, and license status to Cal. DOJ.  See id.

2         The name and date of birth returned by the DMV database are checked against the name

3    and date of birth on the DROS application to see whether the information matches.  See id. at

4    294:10-18.  If the information matches and the driver license status is valid, the system continues

5    to the next check within the BFEC process.  See id. at 294:19-21.  If the information does not

6    match, a "DMV mismatch" is recorded, the background check process stops, and the DROS

7    application is sent to a DMV mismatch queue for Cal. DOJ analysts, who are known as Criminal

8    Identification Specialist IIs ("CIS Analysts"), to review.  See id. at 200:12-17, 294:22-295:6.

9         CIS Analysts must verify the information before making a final determination as to

10    whether there is a mismatch.  See id. at 238:13-239:2.  A DMV mismatch does not necessarily

11    indicate that the person is prohibited from owning or possessing a firearm.  See id. at 237:10-

12    238:12.  A DMV mismatch can occur for an innocent reason, such as if a dealer incorrectly enters

13    information on the DROS application, or if the applicant has changed his/her name and is using

14    the new name to purchase the firearm, but has not yet updated that information with the DMV.

15    See id.

16         Unless a DMV mismatch can be corrected by a CIS Analyst, the DROS application must

17    be rejected.  See id. at 172:4-11, 238:17-25.

18         Once a DROS application successfully passes the DMV database check, the next step in

19    the BFEC process is for the DROS application to be queried against the Automated Firearms

20    System ("AFS") database.  See id. at 295:9-12.  The AFS database checks to see if the subject

21    firearm has been reported as lost or stolen.  See id. at 173:7-14, 295:19-20.

22         The AFS contains various firearms records, but does not contain records for every gun in

23    circulation in California.  See id. at 180:17-19.  The bulk of the firearms records in the AFS

24    database are DROS's that were made on a particular date and time.  See id. at 180:21-24.  DROS

25    records from January 1, 2014 forward are kept for long guns.  See id. At 181:24-182:1.  Although

26    they may go back earlier, the bulk of the DROS records for handguns are from 1996 forward.  See

27    id. at 340:1-11.  Registrations of certain weapons classified as "assault weapons" from 1989 to

28    2001 are contained in the AFS.  See id. at 181:2-7.  The AFS also contains records of CCW

1    license holders.  See id. at 181:8-9.  The AFS also contains law enforcement reports of weapons

2    that have been identified as being lost, stolen, evidence, held for safekeeping, or retained for

3    official use.  See id. at 181:9-13.  Finally, the AFS contains voluntary reports of people who have

4    obtained a firearm by various methods, such as operation of law, an inter-family transfer, or

5    transfers relating to curios and relic collections.  See id. at 181:14-21.  The AFS database is not an

6    "absolute database," but is a type of "leads database" that reflects Cal. DOJ's belief about whom

7    the last possessor of a firearm was based on the most recent DROS transaction.  See id. 253:11-14.

8    Law enforcement personnel can access the AFS in the field in real time, and law enforcement

9    officers view the AFS database as reliable.  See id. at 251:19-22, 252:15-21, 443:3-20.

10       If the AFS search finds that the subject firearm has been reported as lost or stolen, Cal.

11   DOJ notifies the local law enforcement agency that made the report and requests that the agency

12   conduct an investigation to confirm that the firearm involved in the pending DROS transaction is

13   the same firearm that was reported as lost or stolen, and to confirm whether the "lost or stolen"

14   entry in the AFS database is still valid and active.  See id. at 174:5-14.  The resulting

15   investigations by local law enforcement agencies require them to take an active role to confirm

16   that the firearm on the DROS application is actually the firearm that was reported as lost or stolen.

17   See id. at 175:5-9.  How soon an agency begins its investigation depends on the agency's

18   priorities, and the issue is rarely resolved within one day's time.  See id. at 175:10-15.

19       If a gun passes the AFS database check, and if the subject gun is a handgun, then the CFIS

20   conducts a 30-day purchase-restriction check.[24]  See id. at 296:5-8.

21       CFIS checks within its own database to determine whether the DROS applicant purchased

22   another handgun within the previous 30 days.  See id. at 296:9-12.  If the DROS applicant

23   purchased another handgun within 30 days, then the background check stops and the DROS

24   application is denied.  See id. at 296:13-15.

25       If the DROS applicant has not purchased a handgun within the previous 30 days, CFIS

26   continues to check whether the applicant has had a previous application denied.  See id. at 296:16-

27

28   _____
     [24] Under California law, a person can lawfully purchase only one handgun in a 30-day period.  See Cal. Pen. Code §
     27535; Trial Tr. at 206:19-21.

23. If so, summary information regarding the previous denial is electronically appended to the background check results for a CIS Analyst to review at a later time. See id. at 296:24-297:3. The background check then continues forward. See id. at 297:3-4.

The next step in the BFEC process for all firearms is for the DROS application to be queried against the Automated Criminal History System ("ACHS"). See id. at 297:14-18. ACHS is a state database that contains criminal history information reported to Cal. DOJ by criminal justice agencies in California. See id. at 176:7-16.

The DROS applicant's name, variations on the DROS applicant's name (e.g. Robert, Bob, Bobby), date of birth, a range of dates around the date of birth, and any other identifying information from the DROS application, are all run through the ACHS database as part of an initial check. See id. at 297:19-22, 298:22-299:8. As part of the initial check, ACHS also will query three other databases: the Wanted Persons System ("WPS") database, the California Restraining and Protective Order System ("CARPOS") database, and the Mental Health Firearms Prohibition System ("MHFPS") database. See id. at 297:23-298:7.

WPS is a California state database that contains records of warrant information. See id. at 184:10-21. A person with a record in WPS could potentially be prohibited from possessing a firearm. See id. at 184:14-18. Under federal law, any warrant prohibits the wanted person from owning or possessing a firearm, and under state law, persons wanted for a felony offense are prohibited from owning or possessing a firearm. See id. at 184:22-185:6

CARPOS is a California state database that contains information on restraining and protective orders. See id. at 182:16-21, 184:6-9. CARPOS is queried in order to detect domestic violence restraining orders and certain protective orders that would prohibit the DROS applicant from owning or possessing a firearm. See id. at 182:22-25.

MHFPS is a California state database that contains mental health records and records of certain prohibited juveniles. See id. at 185:18-186:2. MHFPS is queried in order to detect prohibitions under California law relating to mental health issues. See 186:3-187:17.

The initial check is to see if there is more detailed information about the DROS applicant contained within any of the ACHS, WPS, CARPOS, and MHFPS databases. See id. at 298:17-21.

1       If the name variations and possible birth dates run in the initial check match records in

2  ACHS's own database, then ACHS returns "criminal identification information" ("CII") numbers

3  associated with the records.  See id. at 300:1-13, 327:19-22.  CFIS then conducts a subsequent

4  query of the ACHS database utilizing the unique CII numbers to obtain more detailed criminal

5  history information about the DROS applicant.  See id. at 300:1-13.  If any of the variant names

6  and birth dates match information contained in the WPS, CARPOS, or MHFPS, then the CFIS

7  system will do a subsequent check of those databases using the particular name and birthdate that

8  generated a match during the initial search so that more detailed information/records can be

9  obtained.  See id. at 298:17-21, 300:14-301:23.

10       If matches are found in the ACHS, WPS, CARPOS, or MHFPS databases, the information

11  is appended to the results of the background check.  See id. at 301:18-23.

12       After the ACHS, WPS, CARPOS, or MHFPS queries are complete, the next step in the

13  BFEC process is for the DROS application to be queried against the federal National Instant

14  Criminal Background Check System ("NICS") database.  See id. at 302:1-3.

15       NICS checks are similar to ACHS checks in that NICS does a name variant and birth date

16  range check.  See id. at 302:4-11.  Also similar to ACHS, NICS will conduct a search of its own

17  database as well as a search of three other federal databases:  the Interstate Identification Index

18  ("III") database, the National Crime Information Center ("NCIC") database, and the Immigration

19  and Customs Enforcement ("ICE") database.  See id. at 191:6-8, 193:13-14, 194:17-25, 195:1-3,

20  302:12-17.

21       The III database contains criminal history records from California and other states that

22  share their criminal history records with the FBI.  See id. at 191:6-16.  If a person is convicted of a

23  felony in any state, that person is prohibited from owning or possessing a firearm under California

24  law.  See id. at 192:1-4.

25       The NCIC database contains federal warrants, domestic violence restraining orders, and

26  stolen gun information.  See id. at 193:15-19.

27       The ICE database helps to identify people who are in the United States unlawfully.  See id.

28  at 195:1-7.

If there are matches or "hits" in the NICS system, the CFIS system goes into a response process. See id. at 303:3-7. The CIFS system will check if there is an FBI number or a state identification number from another state that was included in the NICS response. See id. at 303:7-8. If there are FBI or state identification numbers, then the CFIS system will send another transaction out specifically to the III database to see if there is additional information. See id. at 303:9-12.

After the NICS check is completed, the BFEC is considered complete. See id. at 303:13-16. All results obtained by CFIS through the BFEC's search of databases are attached to the DROS application, and those DROS applications for which there is a hit/match are placed into the DROS processing queue for a CIS Analyst to review. See id. at 200:6-11, 303:13-304:3. The processing queue is an electronic queue. See id. at 200:9-10.

CIS Analysts first review records in the DMV mismatch queue to determine whether there is a real mismatch of the applicant's identity in the DMV records, or whether the records can be fixed and a match can be made. See id. at 316:20-317:15. If the CIS Analyst is able to correct the mismatch, the CIS Analyst will then send the DROS application through the BFEC process. See id. If a match cannot be made, the DROS application is rejected. See id. at 317:3-5.

CIS Analysts then verify that each DROS applicant is the same individual matched by the computer to the criminal and other database records. See id. at 201:16-20.

CIS Analysts then look into the record to determine if the information in the record would prohibit the individual from possessing a firearm. See id. at 201:20-22. If there is information in the record that would prohibit possession of the firearm, then the CIS Analyst verifies the prohibiting information. See id. at 201:23-202:6. If the CIS Analyst determines that an individual is prohibited from purchasing or possessing a firearm, the CIS Analyst instructs the dealer not to deliver the firearm to the DROS applicant. See id. at 202:7-10.

The amount of time it takes a CIS Analyst to process a queued DROS application depends upon the size of the records involved and the number of databases for which there have been hits. See id. at 202:11-14. It is "fairly routine" for a CIS Analyst to take longer than a day to process a queued DROS application. See id. at 202:15-20.

1      CIS Analysts may have to confirm or discover a disposition as part of the process of

2  verifying prohibiting information.  For example, if the disposition of a prohibiting arrest was a

3  conviction, the person would not be eligible to own or possess a firearm, but if the conviction was

4  dismissed or reduced, the person may be eligible.  See id. at 179:11-25.

5      In cases in which an arrest record contains no dispositional information, the CIS Analyst

6  must obtain a final disposition on that arrest to determine whether the person is actually

7  prohibited.  See id. at 201:23-202:6.  Without dispositional information, a CIS Analyst cannot

8  determine whether an individual is eligible to own and possess a firearm because there must be a

9  conviction for there to be a prohibition.  See 323:12-21.  If there is an open disposition, a CIS

10  Analyst has to obtain the disposition, which could mean telephoning a local law enforcement

11  agency, a district attorney, or a court to try to find out the disposition (for example, a conviction or

12  a dismissal).  See id. at 180:5-13, 201:23-202:6, 323:12-324:1.  Dispositional records could be

13  lost, missing, or purged.  See 177:10-11.

14      In addition to obtaining and confirming in-state records, CIS Analysts routinely "chase

15  down" out-of-state dispositions.  See id. at 192:14-21.  The federal III database, which contains

16  criminal history information from other states, often does not contain complete and accurate

17  records on out-of-state criminal convictions.  See id. at 192:5-8.  Dispositional information is

18  frequently missing in the III records.  See id. at 192:9-13.  CIS Analysts then have to call or fax

19  courts of other states or federal courts to obtain the disposition information.  See id. at 192:22-

20  193:12.

21      Obtaining the necessary dispositional information from either in-state or out-of-state courts

22  can be a very lengthy process.  See 180:11-13.

23      For cases in which there is a disposition, CIS Analysts review criminal history or other

24  relevant records to confirm that Cal. DOJ is correctly approving or denying a DROS application.

25  See id. at 178:12-20.

26      Further, mental health facilities get information from the patients, who may not be able to

27  provide accurate personal information, and this may cause the CIS Analysts to contact the mental

28  health facility to ensure that a person is not prohibited.  See id. at 455:17-456:5.

1    CIS Analysts must also review and verify the results of the federal NCIC queries because

2    NCIC results are based on a person's name.  See 193:20-194:7.  CIS Analysts may also need to

3    contact the relevant agencies to confirm that certain warrants are still active because sometimes

4    the warrants are no longer valid.  See id. at 194:4-13.

5         In addition to obtaining missing dispositional information, CIS Analysts must inquire into

6    the background or details of records to make the correct determination on a prohibition.  See id. at

7    319:1-14.  For example, an analyst may have to determine whether a felony that was reduced to a

8    misdemeanor actually could have been reduced.  See id. at 319:15-18; see also 319:23-320:7.  To

9    conduct such an investigation, the CIS Analysts must contact the arresting agency for a copy of

10   the arrest report and review that report and determine the relationship between the offender and

11   the victim.  See 320:8-17.

12        Similarly, if a member of the military is arrested out of state for possession of a controlled

13   substance, a CIS Analyst must determine the disposition, determine whether the member was

14   subject to a court-marshal, and find out the type of discharge the individual may have received

15   (i.e., honorable or dishonorable).  See id. at 320:23-321:7.  To conduct this investigation, the CIS

16   Analyst must obtain specific information from the military.  See id. at 321:16-22.

17        CIS Analysts may also have to decipher people's names because aliases may be used.  See

18   id. at 455:4-16.

19        Not all DROS applications go to the processing queue for an analyst to review.  See id. at

20   303:19-21.  If a DROS application has been checked by all of the databases, and there are no hits

21   or matches found in any of the databases, then that DROS application is considered "auto-

22   approved" and is not put into any queue for a CIS Analyst to review.  See id. at 198:5-12, 303:22-

23   304:3.

24        The BCEF currently does not check to see if a DROS applicant has a COE, a CCW license,

25   or a firearm within the AFS system.  However, it is possible for the BCEF to include an automated

26   search to determine whether a DROS applicant has a COE, a CCW license, or a firearm in the

27   AFS system.  See id. at 279:11-281:24.  Such a check would be "simple."  See id. at 279:23.

28

The BFEC may result in one of six dispositions:  approved, denied, delayed, undetermined, approved after delay, and denied after delay.[25]  <u>See id.</u> at 505:11-17.  A DROS application may be delayed for up to 30 days in order for BOF to further investigate whether the applicant is prohibited from possessing a firearm.  <u>See id.</u> at 506:11-21.  For dispositions that result in a finding of "undetermined," i.e. BOF cannot determine whether a person is prohibited from possessing a firearm, the dealer has the discretion to either refuse or permit the transfer of the firearm.  <u>See id.</u> at 232:6-15, 506:24-507:3.

Once BOF approves a DROS application, the DROS applicant has 30 days in which to take possession of the firearm.  <u>See</u> 27 C.F.R. § 478.124; <u>see also</u> Cal. Pen. Code § 26835(f); Trial Tr. 459:10-13.  Accordingly, BOF considers a completed and approved background check to "be good" for 30 days.  <u>See</u> Trial Tr. at 459:10-13.

### 4.    DROS Processing

Cal. DOJ can receive between 1,500 and 10,000 DROS applications per day, but on average, it currently receives between 2,000 to 3,000 DROS applications per day.  <u>See id.</u> at 172:24-173:1, 456:6-8.

In 2010, Cal. DOJ processed 498,945 DROS applications, and had 5,026 denials.  <u>See</u> Def. Ex. AA.  Therefore, about 99% of DROS applications were approved and found to have been submitted by non-prohibited citizens in 2010.

In 2011, Cal. DOJ processed 601,243 DROS applications, and had 5,805 denials.  <u>See id.</u>  Therefore, about 99.1% of DROS applications were approved and found to have been submitted by non-prohibited citizens in 2011.

In 2012, Cal. DOJ processed 817,738 DROS applications, and had 7,524 denials.  <u>See id.</u>  Therefore, about 99.1% of DROS applications were approved and found to have been submitted by non-prohibited citizens in 2012.  Of the denials, most were crime related, but 793 were due to mental health prohibitions and 405 were due to domestic violence restraining orders.  <u>See</u>

---

[25] Under new legislation known as AB 500, and which appears to be codified at Penal Code § 28220(f), BOF can delay a disposition for up to 30 days in order to further investigate whether an applicant is prohibited from possessing a firearm.  <u>See</u> Cal. Pen. Code § 28220(f); Trial Tr. 506:11-21.  Plaintiffs have partially relied upon § 28220(f) in their discussion of straw purchases.  Plaintiffs do not challenge the constitutionality of § 28220(f).

1    Defendant's Ex. AO.

2         In 2013, Cal. DOJ processed 960,179 DROS application, and had 7,371 denials.  See

3    Defendant's Ex. AP; 489Trial Tr. 332:4-14, 453:4-7.  Therefore, about 99.3% of DROS

4    applications were approved and found to have been submitted by non-prohibited citizens in 2013.

5    Of the denials, most were crime related, but 810 were due to mental health prohibitions and 460

6    were due to domestic violence restraining orders.  See Defendant's Ex. AP.[26]

7         There is always a backlog of DROS applications in the electronic DROS application queue

8    for background checks, and the current backlog stands at about 20,000 DROS applications.  See

9    id. at 314:11-20.  There are 24 CIS Analysts, and they typically work well in excess of 40 hours a

10   week to keep up with the influx of DROS applications.[27]  See id. at 200:18-19, 203:1-8, 313:7-

11   314:13.  CIS Analysts are required to work mandatory overtime hours (between 30 and 40

12   overtime hours per week) in order to address the backlog of queued DROS applications.  See id.

13   313:7-314:3.

14        If a DROS application has been in the DROS application queue for an extended period of

15   time before a CIS Analyst can review it, e.g. day 8 or 9 of the 10-day waiting period, then the CIS

16   Analyst will re-run that DROS application through a "refresher" check of the CFIS state data

17   bases in order to ensure that all updated information is in the CIS Analyst's possession.  See id. at

18   322:3-23, 475:1-14.  There have been instances in which additional prohibitors have arisen

19   between the time the DROS application is submitted and the time in which the CIS Analyst

20   reviews the application.  See id. at 322:18-21.  However, no evidence was presented that

21   quantifies how many times new prohibitors have arisen between the initial check and the refresher

22   check.

23        Approximately 80% of all DROS applications are not auto-approved and require the

24   review of a CIS Analyst.  See id. at 200:2-5.

25

26   [26] From 1991 to the present, there has consistently been a DROS application approval rate near 99%.  See Defendant's
     Ex. AA.

27

28   [27] Cal. DOJ does not hire temporary employees as CIS Analysts because the California budget process does not allow
     the BOF to start hiring new people, and it typically takes six to eight months to train a CIS Analyst.  See Trial Tr.
     204:21-205:14, 326:17-327:11.

1    Approximately 20% of all DROS applications are auto-approved and do not go into the

2    DROS application queue for review by a CIS Analyst.  See id. at 198:13-15, 303:22-304:3.

3    Depending on network traffic or database maintenance issues, a DROS application can be

4    auto-approved somewhere between 1 minute and 120 minutes, but "probably" auto approvals

5    occur within 60 minutes.[28]  See id. at 240:1-6, 307:22-309:15.

6    The only time that a CIS Analyst would review an auto-approved DROS application is if

7    BOF is contacted about a particular DROS applicant by an outside source, such as a law

8    enforcement officer or a medical professional.  See 199:8-200:1.  Outside requests to further

9    investigate an auto-approved DROS application occur "occasionally."  See id. at 199:14-16.  No

10   evidence was presented to quantify or explain what is meant by "occasionally."  No evidence was

11   presented concerning at what point in the 10-day waiting period the outside requests are received.

12   No evidence was presented as to how many of the outside requests ultimately led to a denial of the

13   auto-approved DROS applications.

14   There is no evidence of the average amount of time it takes to complete a "non-auto

15   approved" DROS application.  However, because of the daily applications received and the

16   backlog, sometimes a CIS Analyst will not begin to review a queued DROS application until day 8

17   or 9 of the 10 day waiting period.  See id. at 322:3-5.

18   BOF employees believe that 10 days is a sufficient period of time in which to complete a

19   background check.  See 473:25-474:5.

20   If a background check is completed prior to 10 days, the firearm is not released because

21   state law mandates a 10-day waiting period.  See id. at 244:5-12.

22                   5.      Information Entry In The Cal. DOJ Databases

23   Cal. DOJ databases may not have the most up-to-date information because reporting

24   agencies may fail to submit information to the Cal. DOJ databases or may delay in submitting

25   information to Cal. DOJ databases.  See Trial Tr. 177:2-15, 187:8-188:15, 220:23-221:2, 324:13-

26   16.

27

28   [28] The 1 minute figure is based on test programs that were run by BOF.  See Trial Tr. 308:8-17.

1    ACHS is not always up-to-date with criminal history records for various reasons, including

2    a lag time between actual disposition and entry of the disposition, and occasionally records are

3    lost, purged, or never reported.  See id. at 177:5-15.

4    Records in the MHFP are often not complete or up-to-date.  See id. 187:8-10.  Even

5    though mental health facilities are required by law to report prohibiting events immediately, some

6    facilities still submit records only periodically despite the ability to electronically report

7    immediately.  See id. at 187:23-188:7.  Further, some courts have not been reporting mental health

8    prohibition information as required by law, and when the state courts do report prohibiting events,

9    the reports are done through the mail, which results in a time lag between when the courts mail the

10   reports and when Cal. DOJ receives and processes them.[29]  See id. at 187:13-188:15.

11              6.    Cooling Off Period

12   A cooling off period is a period of time that is intended to provide a person with the

13   opportunity to gather their emotions, so that they do not obtain a firearm in a state of anger and

14   make impulsive decisions to commit acts of violence against themselves or others.  See Trial Tr.

15   232:16-233:7, 499:16-24.

16   No evidence has been submitted regarding current or historical California suicide statistics

17   or "time to crime" statistics.[30]

18   One study that examined 30 survivors of firearm suicide attempts indicated that suicide can

19   be a relatively impulsive act in that more than half of the 30 survivors reported having suicidal

20   thoughts for less than 24 hours.  See Defendant's Ex. DS at 230.  Other studies indicate that, of the

21   total number of survivors studied, more than half had considered suicide for less than one hour

22   prior to their attempt.  See Defendant's Ex. DG at p.28.  Another study indicates that risk periods

23   for suicide are transient.  See Defendant's Ex. DT at 61.

24

25

26   [29] There is currently work being done to automate the ability of the state courts to report prohibiting mental health events to the BOF.  See 188:14-15.  There is no indication of when those efforts will come to fruition.

27   [30] Time to crime statistics are kept by the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives.  See Trial Tr. 418:11-23.  Time to crime statistics measure the elapsed time from a lawful sale of a firearm to the time of a crime committed with that firearm.  See id.

28

1       In order to limit the access of a suicidal individual to a handgun, one recent study

2   recommends a waiting period combined with a permit requirement.  See Defendant's Ex. DG at

3   29.  The study hypothesizes that for "a suicidal person who does not already own a handgun, a

4   delay in the purchase of one allows time for suicidal impulses to pass or diminish."  Id.  No

5   specific waiting period is advocated by this study.

6       Studies regarding suicide rates and waiting period laws conducted prior to 2005 are

7   generally considered inconclusive.  See Eugene Volokh, *Implementing the Right To Keep And*

8   *Bear Arms For Self-Defense:  An Analytical Framework And A Research Agenda*, 56 UCLA L.

9   Rev. 1443, 1538 (citing Robert A. Hahn, et al., *Firearms Laws and the Reduction of Violence:  A*

10   *Systematic Review*, 28 Am. Jrnl. of Preventative Med. 40, 52 (2005)).

11       One study examined the national homicide and suicide rates between 1985 and 1997 in

12   light of the enactment of the Brady Act.  See Defendant's Ex. DH.  For victims aged 21 to 55, no

13   statistically significant differences between treatment states and controls states were found, as to

14   either homicide rates or suicide rates.  See id. at 588, 590.  However, a decrease in suicide rates for

15   individuals over the age of 55 was observed.  See id.  The decrease was at least partially offset by

16   an increase in non-gun suicides, which makes it less clear that the waiting period reduced overall

17   suicides for those over age 55.  See Defendant's Ex. EJ.

18       One study performed in 1992 found that only 3% of suicides occur within 2 weeks of

19   obtaining a firearm.  See Defendant's Ex. DW at 235 (discussing Kellerman, A.L., et al., *Suicide In*

20   *The Home In Relationship To Gun Ownership*, N. Eng. J. Med. 327:467-472 (1992)).

21       One study examined suicide rates for the 238,292 individuals who purchased handguns in

22   California in 1991.  See Defendant's Ex. DV.  From 1991 to 1996, the waiting period in effect in

23   California for handguns was 15 days.  See id.  The study concluded that those who purchase a

24   handgun have a substantially increased risk of firearm suicide, beginning with the first week of

25   purchase and lasting for six years.  See id.  Of the 238,292 purchasers, 48 committed suicide

26   within two weeks of obtaining the firearm (after having waited 15 days), and 40 purchasers were

27   murdered with firearms within the first month of obtaining a handgun.  See id. at 1585.

28

1         7.     Criminal Investigations Of Straw Purchases

2          A "straw purchase" is a purchase that a non-prohibited person makes for someone who is

3 prohibited from owning and possessing a firearm. See Trial Tr. 343:4-14. Straw purchases are

4 prohibited under federal law, and may implicate California law. See 18 U.S.C. §§ 922, 924;

5 Abramski v. United States, 134 S.Ct. 2259 (2014); Cal. Pen. Code §§ 27545, 27590.

6          Some straw purchasers have never purchased a firearm in California, and some straw

7 purchasers previously have purchased firearms in California. See id. at 350:12-16.

8          Gun dealers have the right to refuse to conduct a sale of a firearm. See id. at 405:1-3.

9 Dealers can also be indicted for conspiring to facilitate straw purchases of firearms, and so have an

10 incentive to report a suspected straw purchase. See id. at 405:18-25.

11          Cal. DOJ special agents attend gun shows to ensure that promoters are in compliance with

12 the law and to prevent prohibited persons from obtaining firearms, magazines, or ammunition.

13 See id. at 342:14-25. Special agents also look for potential straw purchases of firearms. See id. at

14 343:1-16.

15          The special agents attempt to identify the parties involved in a straw purchase, such as

16 through license plates, business cards on tables, or observing printed forms being filled out. See

17 id. at 346:14-347:10, 400:1-7. As many as four individuals may participate in a straw purchase at

18 a gun show. See 346:14-347:1. Agents spend a good portion of their time attempting to

19 determine whether any person whom they have identified at the gun show is a prohibited person.

20 See id. at 398:9-399:2.

21          The special agents attempt to complete an investigation within 10 days because the agents

22 want to be able to intercept the firearm before it is delivered to the straw purchaser. See id. at

23 348:14-25. Because of the nature of the investigation, if the waiting period were 3 days instead of

24 10, it would be nearly impossible for the special agents to complete an investigation of a gun show

25 straw purchase prior to delivery of the firearm. See id. at 348:14-349:12. The special agents

26 prefer to intercept a firearm before the firearm is transferred from the straw buyer to the prohibited

27 person because it keeps the firearm off of the street and out of trouble. See id. at 349:13-21.

28          There are other ways in which the special agents become aware of straw purchases besides

1    observations at gun shows.  See id. at 351:3-6.  The federal Bureau of Alcohol, Tobacco,

2    Firearms, and Explosives ("BATFE") and the gun dealers themselves may report suspicious

3    activity, as well as special agent inspections of a gun dealer's records.  See id. at 351:8-20.

4    Depending on when the information is obtained by the special agent, the 10-day waiting period

5    may aid the special agents in determining whether a transaction is a straw purchase and may help

6    the agents intercept the firearm.  See 353:6-9, 354:21-355:7, 356:10-16.  However, sometimes the

7    special agents must go retrieve the firearm from the straw purchaser because the firearm has

8    already been delivered.  See id. at 349:22-23, 354:21-355:7, 407:22-408:6, 408:19-24.  For straw

9    purchases detected through an inspection of a dealer's records, the firearm in question usually will

10   have left the store by 30 to 60 days.  See id. at 407:22-408:15.

11       There is no evidence concerning how many straw purchase arrests are made/violations

12   determined by the special agents.  There is no evidence that describes what percentage of straw

13   purchase investigations are from gun shows or BATFE reports or dealer reports or dealer

14   inspections.  However, in approximately 15% of the straw purchase investigations, the weapon

15   was intercepted within the 10-day waiting period.  See id. at 408:16-24.  Approximately 85% of

16   straw purchase investigations do not conclude within the 10-day waiting period and a retrieval of

17   the firearm may then be necessary.  See id.

18              8.    The APPS System

19       The Armed and Prohibited Persons System ("APPS") is a database that cross-references

20   persons with firearms records in the AFS, typically a DROS record, with those who have a

21   prohibiting conviction or circumstance.  See Trial Tr. At 216:21-217:2.  The APPS database

22   consults each of the state databases involved in a BFEC, i.e. the AFS, ACHS, WPS, CARPOS,

23   and MHFPS databases.  See id. at 475:17-476:10.  However, the APPS database is prohibited by

24   law from accessing the NICS system.  See id. at 475:11-15.  APPS became active in 2007.  See id.

25   at 337:19-21.  APPS is updated on a 24 hour 7 days a week basis.  See id. at 497:25-498:7.

26       The purpose behind APPS is to identify prohibited persons who have firearms and to

27   enable law enforcement to retrieve the firearms before those persons can use the firearms to harm

28   others or themselves.  See id. at 217:21-218:3.  APPS is a kind of "pointer tool" that identifies

1   people who may be armed and prohibited in a particular law enforcement agency's jurisdiction,

2   but the information in APPS must be updated and verified before any law enforcement action can

3   be taken. See id. at 218:4-219:7, 337:4-10. As part of the verification process, dispositions

4   sometimes must be "chased down" by an analyst. See id. at 219:11-20.

5       The BFEC and waiting period is designed to stop a prohibited person from obtaining a

6   firearm, whereas the APPS system is designed to retrieve a firearm from someone who has

7   subsequently become prohibited from possessing a firearm. See id. at 420:11-16, 497:10-15.

8       APPS records-matching software searches for only an exact name and date of birth,

9   whereas the BFEC searches for name variants and date of birth ranges. See id. at 304:16-305:10.

10  That is, the APPS check will only find exact matches to the name entered, but will not find

11  variations of a name. See id. at 304:24-305:18.

12      There are 21,000 people identified as armed and prohibited in the APPS system, and these

13  individuals purchased firearms prior to becoming prohibited from doing so. See id. at 338:2-8.

14  Not every person who has become prohibited from possessing a firearm is in the APPS system.

15  See id. at 219:7-10, 340:15-18. Most of the APPS candidates are pulled from records concerning

16  handguns that were sold in California from 1996 forward. See id. at 340:3-11.

17              9.   Rap-Back

18      A "rap-back" is a notification that Cal. DOJ receives whenever someone with fingerprints

19  on file with Cal. DOJ is the subject of a criminal justice agency record, e.g. a notification of a

20  subsequent arrest record. See Trial Tr. 221:21-222:9, 492:7-12. Rap-back is fingerprint based,

21  which means the match is done by fingerprint. See id. at 223:19-20.

22      A non-fingerprint based event, such as a mental health hold or a restraining order, would

23  not be discovered through rap-back. See id. at 223:13-16, 224:8-9. Cal. DOJ does not receive

24  rap-backs for persons who are arrested or convicted outside of California. See id. at 224:25-225:2.

25      Rap-back mainly deals with people who are in the criminal history system and who have

26  fingerprints on record. See 493:8-14. In contrast, APPS deals with people who may or may not

27  have fingerprints in the criminal history system, but who nevertheless are found in a non-

28  fingerprint database, such as the MHFP database. See id. at 493:8-12.

### 10. CCW Licenses

California law provides for either the sheriff of a county or the chief of police of a city to issue a CCW license to a citizen. See Cal. Pen. Code §§ 26150 (sheriff), 26155 (chief of police); Trial Tr. 458:19-20. CCW licenses apply to pistols, revolvers, or firearms that are capable of being concealed upon a person. See Cal. Pen. Code §§ 26150, 26155. A CCW license allows an individual to carry a concealed firearm in public. See id.

CCW licenses, amendments to CCW licenses, and applications for a CCW license are required to be uniform throughout California. See Cal. Pen. Code § 26175; Scocca v. Smith, 912 F.Supp.2d 875, 883 (C.D. Cal. 2012).

In order to obtain a CCW license, an applicant must prove to the sheriff or chief of police that: (1) the applicant is of good moral character; (2) good cause exists for issuance of the license; (3) the applicant either is a resident of the city or county, or has a place of business/employment within the city or county and spends a substantial period of time at the place of business/employment; and (4) the applicant has completed the training course required by Penal Code § 26165.[31] See Cal. Pen. Code §§ 26150, 26155. CCW license applicants must submit fingerprints along with the CCW license application, and those fingerprints are submitted to Cal. DOJ. See Cal. Pen. Code § 26185(a)(1); Scocca, 912 F.Supp.2d at 883. Additionally, if there is "compelling evidence," an applicant may be required to submit to psychological testing before being issued a CCW license. See Cal. Pen. Code § 26190(f).

Once Cal. DOJ receives the fingerprints, Cal. DOJ sends a report to the licensing agency relating to the CCW license applicant, including whether the person is prohibited under state or federal law from possessing, receiving, owning, or purchasing a firearm. See Cal. Pen. Code § 26185(a)(2).

The sheriff or chief of police may not issue a CCW license until he or she receives the Cal. DOJ report on the CCW applicant. See Cal. Pen. Code § 26185(a)(3). No CCW license may be issued if the Cal. DOJ "determines that the person is prohibited by state or federal law from

---

[31] The Court notes that in order to purchase a handgun in California, unless an exemption applies, an individual must obtain a handgun safety certificate. See Cal. Pen. Code § 31615. In order to obtain a handgun safety certificate, an individual must pay a fee and pass a written test. See Cal. Pen. Code §§ 31630, 31640, 31645, 31650, 31655.

1  possessing, receiving, owning, or purchasing a firearm." Cal. Pen. Code § 26195(a); Scocca, 912

2  F.Supp.2d at 883.

3      Once a CCW license is issued, it is valid for up to two years. See Cal. Pen. Code §

4  26220(a).

5      The sheriff or police chief may include reasonable restrictions or conditions that they deem

6  warranted, including restrictions as to the time, place, manner, and circumstances under which the

7  CCW license holder may carry a concealed handgun. See Cal. Pen. Code § 26200(a). With some

8  exceptions, the general rule is that a CCW license has applicability throughout the state of

9  California. See Scocca, 912 F.Supp.2d at 883-84.

10      A CCW license may be revoked whenever Cal. DOJ or the issuing local agency determines

11  that the CCW license holder has become prohibited under state or federal law from possessing,

12  owning, receiving or purchasing a firearm. See Cal. Pen. Code § 26195(b)(1). If Cal. DOJ

13  determines that a CCW license holder has become prohibited, then Cal. DOJ is required to contact

14  the local agency that issued the CCW license. See Cal. Pen. Code § 26195(b)(2). If the local

15  agency revokes a CCW license, that local agency must notify Cal. DOJ. See Cal. Pen. Code §

16  26195(b)(3).

17      BOF does not issue CCW licenses, but does accept the applicant's fingerprints and runs a

18  background check on the applicant in order to insure that the applicant is not prohibited from

19  possessing a firearm. See Trial Tr. 458:17-459:6. The BOF forwards the results of the

20  background check, along with a copy of the applicant's California criminal history, to the sheriff

21  or chief of police. See id. at 459:4-6.

22      BOF considers an approved background check to "be good" for 30 days. See 459:7-13.

23      Sheriffs or chiefs of police rarely issue a CCW license within 30 days of the completed

24  background check, and some agencies may wait as long as 9 months after the background check

25  before issuing the CCW license. See id. at 459:14-23.

26      CCW license holders are subject to the "rap-back" system. See id. at 225:15-17. CCW

27  license holders have a CII number. See id. at 488:14-489:22.

28

1  Silvester possess a CCW license issued by the City of Hanford chief of police.  See Joint

2  Ex. 6.[32]

3       11.    Certificate Of Eligibility

4       A COE is a certificate issued by the California Department of Justice.  See Cal. Pen. Code

5  § 26710; Trial Tr. 60:14-17, 494:14-15.

6       In order to obtain a COE, a person must make a request for a COE to Cal. DOJ.  See Cal.

7  Pen. Code § 26710(a).  The COE applicant is required to pay a fee.  See id. § 26710(d).  A COE

8  applicant also provides a full set of live scan fingerprints and is issued a CII number.  See Trial Tr.

9  at 495:9-13.  Cal. DOJ is then required to examine its records and the records in NICS "in order to

10  determine if the applicant is prohibited by state or federal law from possessing, receiving, owning,

11  or purchasing a firearm."  Cal. Pen. Code § 26710(b).  If a person passes the background check,

12  pays the filing fees, and submits the fingerprints, then Cal. DOJ is required to issue the COE.  See

13  Cal. Pen. Code § 26710(c); Trial Tr. at 511:9-12.

14       A COE is valid for one year.  See Trial Tr. at 61:7-8.  COE's may be renewed on a yearly

15  basis by paying a fee.  See id. at 60:23-25.  Prior to the expiration of the COE, the holder submits

16  a renewal form, attests to the accuracy of the date in the renewal form, and pays a fee.  See id. at

17  61:9-22.

18       A COE is one component/requirement for several exceptions to the 10-day waiting period

19  and for other firearms related activities.  For example, "consultant evaluators," who are exempt

20  from the 10-day waiting period, are required to have a COE.  See Cal. Pen. Code §§ 16410,

21  27750.  Along with a federal license, a COE is required for certain transfers of curio and relic

22  firearms, and for the curio and firearm exception to the 10-day waiting period.  See Cal. Pen. Code

23  §§ 26585, 26970, 27670, 27966.  Retail firearms dealers are required to possess inter alia a COE.

24  See Cal. Pen. Code §§ 26700, 26705.  A COE may also be obtained for employees of firearm

25  dealers.  See Cal. Pen. Code §§ 26915, 29120.  In order to organize a gun show, an organizer or

26  producer must have a COE.  See Cal. Pen. Code §§ 16800, 27200.  A COE is required for some

27

28  [32] The issuing agency is identified as the city of Hanford.  Under Penal Code § 26155, Silvester's CCW license would
have been approved by the Hanford chief of police.

1    transfers of used firearms at gun shows.  See Cal. Pen. Code § 26525.  A manufacturer of firearms

2    is required *inter alia* to possess a COE.  See Cal. Pen. Code § 29050.  Additionally, some

3    individuals in the entertainment industry or individuals working with the military may seek to

4    obtain a COE.  See Trial Tr. 494:25-495:8.

5        A COE reads:  "This is to certify that [Cal. DOJ] has completed a firearms eligibility check

6    on the above named individual.  As of the date of issue, there is nothing that would prohibit the

7    individual from acquiring or possessing a firearm."  Plaintiff's Ex. 4.  COE's also identify their

8    "date of issuance" and their "date of expiration."  See id.

9        COE holders are subject to the "rap-back" system.  See id. at 224:21-24.

10       Combs possess a valid COE.  See Joint Ex. 5.

11   **C.**    **Legal Standard**

12       The Second Amendment reads:  "A well regulated Militia, being necessary to the security

13   of a free state, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const.

14   amend. II.  The Second Amendment right to keep and bear arms is an individual right and a

15   fundamental right that is incorporated against states and municipalities under the Fourteenth

16   Amendment.  See McDonald v. City of Chicago, 130 S.Ct. 3020, 3042 (2010); District of

17   Columbia v. Heller, 554 U.S. 570, 595 (2008); Peruta v. County of San Diego, 742 F.3d 1144,

18   1149-50 (9th Cir. 2014); Nordyke v. King, 681 F.3d 1041, 1043 (9th Cir. 2012) (en banc).  The

19   Second Amendment "protects a personal right to keep and bear arms for lawful purposes, most

20   notably for self-defense within the home."  McDonald, 130 S.Ct. at 3044; see Heller, 554 U.S. at

21   630.  However, the Second Amendment's protection is not unlimited, and longstanding regulatory

22   measures such as "prohibitions on the possession of firearms by felons and the mentally ill, or

23   laws forbidding the carrying of firearms in sensitive places such as schools and government

24   buildings, or laws imposing conditions and qualifications on the commercial sale of arms," are

25   presumptively lawful.  McDonald, 130 S.Ct. at 3047; Heller, 554 U.S. at 626-27; United States v.

26   Chovan, 735 F.3d 1127, 1133 (9th Cir. 2013).

27       The Ninth Circuit has adopted a two-step Second Amendment framework:  (1) the court

28   asks whether the challenged law burdens conduct protected by the Second Amendment, and (2) if

1   so, the court determines whether the law meets the appropriate level of scrutiny.  See Jackson v.

2   City & County of San Francisco, 746 F.3d 953, 960 (9th Cir. 2014); Chovan,735 F.3d at 1136; see

3   also National Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms and Explosives, 700

4   F.3d 185, 194-95 (5th Cir. 2012) ("N.R.A."); Ezell v. City of Chicago, 651 F.3d 684, 702-03 (7th

5   Cir. 2011); United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010).

6          Under the first step, courts must determine "whether the challenged law burdens conduct

7   protected by the Second Amendment, based on a historical understanding of the scope of the

8   Second Amendment right, or whether the challenged law falls within a well-defined and narrowly

9   limited category of prohibitions that have been historically unprotected."  Jackson, 746 F.3d at 960

10  (citing Brown v. Entertainment Merchants Ass'n, 131 S.Ct. 2729, 2733-34 (2011)); Heller, 554

11  U.S. at 625; Chovan, 735 F.3d at 1136).  This is accomplished by asking "whether the regulation

12  is one of the 'presumptively lawful regulatory measures' identified in *Heller*, or whether the

13  record includes persuasive historical evidence establishing that the regulation at issue imposes

14  prohibitions that fall outside the historical scope of the Second Amendment."  Jackson, 746 F.3d

15  at 960 (citing Heller, 554 U.S. at 627; Chovan, 735 F.3d at 1137); see also Peruta, 742 F.3d at

16  1153-54; Ezell, 651 F.3d at 702-03; Chester, 628 F.3d at 680.  In assessing the historical

17  understanding, not all historical or scholarly sources are equal, and courts should focus on

18  scholarly opinions that are consistent with *Heller* and *McDonald*, and on historical sources around

19  the adoption of the Second Amendment (1791) and the time near the adoption of the Fourteenth

20  Amendment (1868).  See Peruta, 742 F.3d at 1155-66; Ezell, 651 F.3d at 702-03; Chester, 628

21  F.3d at 680.  If a law burdens conduct that falls outside of the Second Amendment's scope, then

22  the analysis ends and there is no violation.  See N.R.A., 700 F.3d at 195; Ezell, 651 F.3d at 703.

23         As to the second step, rational basis review is not to be used.  Heller, 554 U.S. at 628 n.27;

24  Chovan, 735 F.3d at 1137.  Instead, if a law burdens a right within the scope of the Second

25  Amendment, either intermediate or strict scrutiny will be applied.  See Jackson, 746 F.3d at 961;

26  Chovan, 735 F.3d at 1138; N.R.A., 700 F.3d at 195; Chester, 628 F.3d at 682.  Whether

27  intermediate or strict scrutiny applies depends on:  (1) how close the law comes to the core of the

28  Second Amendment right, and (2) the severity of the law's burden on the right.  Jackson, 746 F.3d

1    at 960-61; Chovan, 735 F.3d at 1138; N.R.A., 700 F.3d at 195; Ezell, 651 F.3d at 703.  Generally,

2    a regulation that threatens a core Second Amendment right is subject to strict scrutiny, while a less

3    severe regulation that does not encroach on a core Second Amendment right is subject to

4    intermediate scrutiny.  See Jackson, 746 F.3d at 961; N.R.A., 700 F.3d at 195; Chester, 628 F.3d

5    at 682.

6          The "intermediate scrutiny" standard requires:  (1) that the government's stated objective

7    must be significant, substantial, or important, and (2) that there is a reasonable fit between the

8    challenged regulation and the government's asserted objective.  Jackson, 746 F.3d at 960; Chovan,

9    735 F.3d at 1139; N.R.A., 700 F.3d at 195; Chester, 628 F.3d at 683.  For there to be a "reasonable

10   fit," the regulation must not be substantially broader than necessary to achieve the government's

11   interest.  See Peruta, 742 F.3d at 1177; Reed v. Town of Gilbert, 707 F.3d 1057, 1074 n.16 (9th

12   Cir. 2013); Fantasyland Video, Inc. v. County of San Diego, 505 F.3d 996, 1004 (9th Cir. 2007);

13   see also United States v. Marzzarella, 614 F.3d 85, 98 (3d Cir. 2010).  The government cannot rely

14   on "mere speculation or conjecture."  See Edenfield v. Fane, 507 U.S. 761, 770-71 (1993); see

15   also United States v. Carter, 669 F.3d 411, 418 (4th Cir. 2011) (government may not rely on

16   "anecdote and supposition").  A regulation "may not be sustained if it provides only ineffective or

17   remote support for the government's purpose," rather there must be an indication that the

18   regulation will alleviate the asserted harms to a "material degree."  Edenfield, 507 U.S. at 770-71;

19   Valley Broadcasting Co. v. United States, 107 F.3d 1328, 1334 (9th Cir. 1997).

20        **D.**    **Conclusions Of Law**

21        1.    Burden On The Second Amendment

22        When the 10-day waiting period laws apply, they prohibit every person who purchases a

23   firearm from taking possession of that firearm for a minimum of 10 days.  One cannot exercise the

24   right to keep and bear arms without actually possessing a firearm.  Cf. Andrews v. State, 50 Tenn.

25   165, 178 (1871) ("The right to keep and bear arms necessarily involves the right to purchase

26   them . . . .").  The purchased firearm cannot be used by the purchaser for any purpose for at least

27   10 days.  Also, in some cases, due to additional costs and disruptions to schedules, the 10-day

28   waiting period may cause individuals to forego the opportunity to purchase a firearm, and thereby

1   forego the exercise of their Second Amendment right to keep and bear arms.  Therefore, the 10-

2   day waiting period burdens the Second Amendment right to keep and bear arms.[33]  Cf. id.

3       It is Defendant's burden to show that the 10-day waiting period either falls outside the

4   scope of Second Amendment protections as historically understood or fits within one of several

5   categories of longstanding regulations that are presumptively lawful.  See Jackson, 746 F.3d at

6   960; Chovan, 735 F.3d at 1136-37; United States v. Greeno, 679 F.3d 510, 518 (6th Cir. 2012);

7   Ezell, 651 F.3d at 702-03; Chester, 628 F.3d at 680.  Defendant has not met her burden.

8       First, in terms of relevant historical understandings, Defendant has not established that

9   waiting period laws were understood to be outside the protections of the Second Amendment.

10  Defendant has cited no statutes or regulations around 1791 or 1868 that imposed waiting periods

11  between the time of purchase and the time of delivery.  Nor has Defendant cited historical

12  materials or books that discuss waiting periods or attitudes towards waiting periods between 1791

13  and 1868.  There is no evidence to suggest that waiting periods imposed by the government would

14  have been accepted and understood to be permissible under the Second Amendment.  Cf. Peruta,

15  742 F.3d at 1153-66.

16      Second, in terms of Heller's longstanding presumptively lawful regulations, Defendant has

17  not established that the 10-day waiting period is a presumptively lawful longstanding regulatory

18  measure that imposes a condition and qualification on the commercial sale of a firearm.  Such

19  commercial regulations have been recognized as presumptively lawful by the Supreme Court.

20  McDonald, 130 S.Ct. at 3047; Heller, 554 U.S. at 626-27.  The Supreme Court did not explain

21  what precisely it meant by the phrase "conditions and qualifications on the commercial sale of

22  arms," and the parties have cited no cases that interpret this phrase.  Through a parenthetical

23  citation in Nordyke, the Ninth Circuit suggested that a county ordinance, which permitted firearms

24  to be brought to gun shows on county property if the gun was secured or in one's personal

25

26  [33] Defendant has argued that because Combs and Silvester have each had a firearm during the relevant time period,
    their Second Amendment rights have not been impaired.  However, that Combs and Silvester have been able to

27  exercise their Second Amendment right with respect to at least one firearm does not mean that they have diminished
    rights under the Second Amendment.  The Second Amendment applies to "arms" and its language does not limit its

28  full protections to a single firearm.  Some firearms are better suited for particular lawful purposes than others.
    Defendant has cited no authority that suggests that the Second Amendment only has application to a single firearm.

1   possession, was a law imposing a condition and qualification on the commercial sale of a firearm.

2   See Nordyke, 681 F.3d at 1044.  *Nordyke* did not expand on the concept beyond parenthetically

3   quoting the relevant language from *Heller*.  *Nordyke* may be read as indicating that the manner of

4   how a firearm is displayed for sale is an acceptable commercial regulation.

5          Aside from *Nordyke*, and based on a plain reading of the term, longstanding commercial

6   regulations might entail regulations about who may sell (e.g. a licensed dealer) or purchase (e.g.

7   someone over the age of 18) a firearm, what firearms may be sold (e.g. prohibiting the sale of

8   certain types of firearms), when a firearm may be purchased (e.g. no purchases after 8:00 p.m.), or

9   where a firearm store may be located (e.g. zoning ordinances).  In comparison to *Nordyke* and a

10  plain reading of *Heller*'s language, it is not clear to the Court that a 10-day waiting period would

11  qualify as a commercial regulation.  Defendant cites no comparable commercial laws that apply to

12  other goods and that require an individual to wait around 10-days before completing a purchase.

13  The Court is not satisfied that Defendant has shown that the 10-day waiting period is one of

14  *Heller*'s envisioned conditions and qualifications of a commercial sale.

15         Moreover, Defendant has not established that the waiting period law is sufficiently

16  "longstanding" to be entitled to a presumption of lawfulness.  Included in the concept of a

17  "longstanding and presumptively lawful regulation" is that the regulation has long been accepted

18  and is rooted in history.  See N.R.A., 700 F.3d at 196; United States v. Rene E., 583 F.3d 8, 12

19  (1st Cir. 2008).  It is true that California has had some form of a waiting period since 1923.

20  However, as described above, the Court is aware of no waiting period laws in any states during the

21  time periods around 1791and 1868.  Consistent with these historical periods, currently only ten

22  states impose a waiting period between the time of purchase and the time of delivery of a firearm.

23  Waiting period laws did not exist near the time of adoption of the Second and Fourteenth

24  Amendments, and they are not common now.  That one state may have had some form of

25  regulation for a significant period of time is insufficient for the Court to conclude that the law has

26  been so generally accepted that it is presumptively lawful.  Cf. N.R.A., 700 F.3d at 196 (". . . a

27  longstanding measure that harmonizes with the history and tradition of arms regulation in this

28  country would not threaten the core of the Second Amendment guarantee.").  Further, the 10-day

1    waiting period at issue was not imposed until 1996, and it was not until 1975 that California began

2    to impose a waiting period that extended to double digits (15 days).  Prior to 1975, the waiting

3    period was 5 days.  The waiting period that was in effect the longest in California was the 1-day

4    waiting period between 1923 and 1955 for handguns, and there is an indication that the law was

5    not applied to all transactions.  Imposition of waiting periods beyond a "single digit" period is a

6    recent development.  Cf. Church of the Am. KKK v. City of Gary, 334 F.3d 676, 682-83 (7th Cir.

7    2003) (noting that 30-day advance notice requirement to obtain a permit was reasonable under the

8    circumstances of one case, but that a 45-day advance notice requirement was a substantially longer

9    period and not reasonable).  Finally, the waiting period at issue applies to all firearms.  Prior to

10   1991, the waiting period applied only to handguns.  Although the 1996 waiting period is shorter in

11   duration than the 15-day period imposed in 1975, the 1996/1991 waiting period is wider in scope.

12   Applying a waiting period to all firearms is a recent development.  In essence, Defendant has

13   simply pointed to the fact that California has had some form of waiting period since 1923.  That is

14   not enough.

15        The 10-day waiting period burdens the Second Amendment rights of the Plaintiffs.

16        2.    Level Of Scrutiny

17        Defendants contend that intermediate scrutiny applies to this case.  Plaintiffs contend that

18   the Court may utilize intermediate scrutiny because, if the laws do not pass intermediate scrutiny,

19   then they will not pass strict scrutiny.  Plaintiff is correct that if the waiting period laws do not

20   pass intermediate scrutiny, they will not pass strict scrutiny.  Given the parties' focus on

21   intermediate scrutiny, and the necessary implication if the laws do not pass intermediate scrutiny,

22   the Court need not decide whether strict scrutiny applies.  Instead, the Court will examine the

23   waiting period laws under intermediate scrutiny.

24        3.    Governmental Interest

25        Defendant contends that California has important interests in public safety/preventing gun

26   violence and preventing prohibited individuals from obtaining firearms.  Plaintiffs do not dispute

27   that these are important interests.  Courts have recognized a state's important public safety interest

28   with respect to various firearms laws.  See Jackson, 746 F.3d at 965.  "It is self-evident that public

1    safety is an important government interest."  Id.  It is also self-evident that preventing people who

2    are prohibited from possessing a firearm from obtaining one is also an important interest that goes

3    hand in hand with public safety.  Defendant has demonstrated that public safety and keeping

4    firearms out of the hands of prohibited individuals are important interests.  See id.; see also

5    Chovan, 735 F.3d at 1139.

6         4.    Reasonable Fit

7         Defendant has identified three rationales that it contends are "reasonable fits" that justify

8    the 10-day waiting period:  (1) conducting a background check; (2) providing a "cooling off

9    period" to prevent impulsive acts of violence; and (3) investigating straw purchases.  The Court

10   will assess each of these justifications in relation to the three "as applied" groups.

11        a.    Those Who Have  A Firearm In The AFS System

12        The class of individuals that Plaintiffs identify within this group are those who already

13   possess a firearm as confirmed by the AFS database, i.e. a firearm transaction is within the AFS

14   system.  See Doc. Nos. 91 at 30:5-8; and 105 at 7:15-18.  Plaintiffs do not argue that this class of

15   individuals should be exempt from further background checks.  Rather, Plaintiffs contend that

16   these individuals should not be subject to a per se 10-day waiting period, and should be able to

17   take possession of their firearm upon passing the background check.  See Doc. Nos. 98 at 16:10-

18   15; and 105 at 7:6-8, 13:17-20, 30:25-31:12, 31:21-22.  Thus, under Plaintiffs' arguments and

19   challenges, this class of individuals will still be required to undergo and pass a background check

20   when they attempt to purchase a firearm.  See Doc. Nos. 91 at 30:5-8; and 105 at 7:6-9, 13:17-20,

21   30:25-31:22.

22        i.    Background Check

23        Given the current BOF staffing levels, the potential additional research involved in

24   reviewing a DROS application, and the possible response times from other agencies and states,

25   10-days is a sufficient period of time in the clear majority of cases for BOF to complete a

26   background check and approve or deny a DROS application.

27        However, within the 10-day waiting period, background checks can be completed

28   anywhere from 1 minute to 10 days.

1    20% of all DROS applications are auto-approved usually in about 1 to 2 hours, and require

2    no further review.[34]  The mandated 10-day waiting period is the only thing that stops BOF from

3    approving the sale and releasing the firearm when a DROS application is auto-approved.

4    80% of all DROS applications are not auto-approved, and further review, analysis, and/or

5    investigation is necessary to determine if a person is prohibited from possessing a firearm.  For

6    non-auto-approved DROS applications that are completed within 10-days, the 10-day mandatory

7    waiting period is the only thing stopping BOF from approving the sale and releasing the firearm.

8    For all DROS applications that are approved by BOF prior to expiration of the 10-day

9    waiting period, conducting a background check is no longer a justification for the 10-day waiting

10   period because the DROS applicant has been approved as determined by a completed background

11   check.

12   Although additional disqualifying information may come to BOF's attention during the 10-

13   day waiting period, that can be said of any time-frame, be it 1 day or 60 days.  Moreover, the

14   requirement in essence is to pass the background check, it is not to pass the background check

15   every day for 10 straight days.  Further, 20% of all DROS applications are auto-approved in a very

16   short period of time, and they normally are not reviewed or rechecked at any time.  Finally, of the

17   approximately 99% of DROS applications that are approved, no new disqualifying information

18   was obtained during the 10-day waiting period.  Of the approximately 1% of DROS applications

19   that are denied, there is no evidence regarding when in the 10-day waiting period that the

20   disqualifying information was obtained, i.e. was the disqualifying information obtained during the

21   initial BFEC or was it obtained late in the process as part of a re-check.  Requiring an approved

22   DROS applicant to wait the full 10-days, when the application is otherwise approved and the

23   applicant already has a firearm in the AFS system, on the chance that new information might come

24   in, is unduly speculative and anecdotal.  See Edenfield, 507 U.S. at 770-71; Carter, 669 F.3d at

25   418; Valley Broadcasting, 107 F.3d at 1334.

26   If disqualifying information arises about an individual who has already taken possession of

27   a newly purchased firearm, California has in place the APPS system, which is designed to retrieve

---

[34] No evidence indicates that a material number of auto-approved DROS applications are ever rechecked.

1  such firearms from prohibited persons.  The APPS system acts as a safety net for individuals who

2  have been previously approved to possess a firearm, but who later become prohibited.

3                                  ii.       Cooling Off Period

4          The rationale behind the "cooling off period" is to prevent individuals from performing

5  impulsive acts of violence to others or to themselves.  The "cooling off period" seeks to limit a

6  person's access to a firearm.

7          Because 80% of DROS applications are not auto-approved, a waiting period of at least 1-

8  day will naturally occur because CIS Analysts must obtain and review various information.

9          If a person already possess a firearm, then that person will generally have access to that

10  firearm and may commit impulsive acts of violence with it.

11          There is no evidence that a "cooling off period," such as that provided by the 10-day

12  waiting period, prevents impulsive acts of violence by individuals who already possess a firearm.[35]

13  A waiting period for a newly purchased firearm will not deter an individual from committing

14  impulsive acts of violence with a separate firearm that is already in his or her possession.

15          None of the submitted social science studies/excerpts advocate for a 10-day waiting period,

16  or attempt to defend a 10-day waiting period as being supported by clinical or empirical evidence.

17  The studies that are supportive of waiting periods are supportive in theory and seem to assume that

18  the individual does not already possess a firearm.  E.g. Defendant's Ex. DG at 29.

19          It is true that some individuals may not have ammunition for a firearm in their possession,

20  or that the firearm may not be in working condition.  However, no evidence attempts to quantify

21  this, and it is unduly speculative to conclude that this is a common occurrence.  See Edenfield, 507

22  U.S. at 770-71; Carter, 669 F.3d at 418; Valley Broadcasting, 107 F.3d at 1334.

23  _____

24  [35] Defendant argues that because some firearms are better suited for certain purposes than other firearms, a waiting
period may prevent an impulsive act of violence with the new weapon.  Relying on Agent Graham's testimony,
Defendant cites the example of Shareef Allman, an individual who had several firearms, including at least one pistol, a

25  rifle, and an assault-style weapon, and who killed nine people in Cupertino, California.  See Trial Tr. at 360:13-20,
415:21-416:8.  The assault-weapon was not used in the shooting.  See id. at 415:17-21.  The pistol was obtained

26  legally, and it was unknown whether the rifle was legally obtained.  See id. at 417:9-17, 418:3-10.  However, as
Agent Graham admitted, any cooling off period created by the 10-day waiting period did not work.  See id. at 419:20-

27  23.  In Allman's case, Allman did not use the most dangerous firearm (the assault weapon).  The firearms that Allman
did have were either lawfully obtained and subjected to the 10-day waiting period, or they were obtained unlawfully

28  and not subject to any background checks or waiting periods.  Aside from Allman, Agent Graham had no other
examples.  See id. at 414:7-15.

1    If an individual already possess a firearm and then passes the background check, this

2    indicates a history of responsible gun ownership.  There has been no showing that applying the 10-

3    day waiting period to all individuals who already possess a firearm will materially prevent

4    impulsive acts of violence.  See Valley Broadcasting, 107 F.3d at 1334.

5    In terms of the AFS database to confirm possession of a firearm, the BCEF can be

6    modified to make a simple check if a DROS applicant has a firearm within the AFS database.

7    It is true that the AFS system does not contain every firearm in circulation in California.

8    However, if a person has a weapon that appears within the AFS system database, and that person's

9    application is otherwise approved, Defendant has not explained why it should be presumed that

10   such an individual no longer possesses the firearm.  Such a presumption is not supported by any

11   identified evidence.  Moreover, the AFS system is available to law enforcement personnel on a

12   real time basis in the field, and law enforcement considers the AFS system to be reliable.  If a law

13   enforcement officer in the field who is about to confront a suspect can use and rely on the AFS

14   system and proceed with more caution, then it is unknown why Cal. DOJ or BOF cannot also

15   assume that an otherwise approved DROS applicant is still in possession of a firearm that is in the

16   AFS system.  Considering the absence of relevant data, law enforcement's real time reliance on

17   the AFS system, and an otherwise approved background check, it can reasonably be assumed that

18   a DROS applicant who has a firearm in the AFS system is still in possession of that firearm.[36]

19                          iii.    Straw Purchases

20   There is no evidence that the legislature implemented the waiting period laws in order to

21   give law enforcement the opportunity to investigate straw purchases.

22   In a straw purchase, although it might be easier to intercept a weapon prior to delivery, this

23   only occurs in about 15% of investigations.  There is no evidence regarding the number of straw

24   purchase investigations that lead to arrests or convictions or retrievals of firearms relative to the

25   number of DROS applications.  Further, although some straw purchasers have purchased other

---

[36]To the extent that there are unarticulated concerns about whether an individual still possess a firearm within the AFS system, it may be possible to add a question on the DROS application in order for the applicant to confirm that the individual still possess a firearm that was either voluntarily registered, a handgun purchased on or after January 1, 1996, or any firearm purchased on or after January 1, 2014.  However, the parties have not addressed the issue, and the Court expresses no opinion on the matter, other than to say that an additional question may be a possibility.

1    guns in the past, there is no evidence regarding how often this occurs.

2          Straw purchase investigations begin when law enforcement officers review paperwork at

3    gun shops, observe behavior and interactions at gun shows, or receive a tip from BATFE or a gun

4    shop owner.  Not all of the transactions observed or paperwork examined create a reasonable

5    belief that a straw purchase is occurring.  The agents only investigate a transaction if they have

6    reason to believe that a straw purchase is occurring.  Given Agent Graham's description of straw

7    purchase investigations, the vast majority of transactions do not appear to be straw purchases.

8          Applying the full 10-day waiting period to all transactions for purposes of investigating a

9    straw purchase, in the absence of any reason to suspect that a straw purchase is in fact occurring, is

10   too overbroad.  See Peruta, 742 F.3d at 1177.

11         If law enforcement officers personally observe what they believe to be a straw purchase, be

12   it at a gun show or at a gun store, they may intercede during the purchase process.

13         If the legislature believes that law enforcement should have additional time in which to

14   investigate a straw purchase, then a statute could be enacted that permits law enforcement to cause

15   a delay in the approval of a DROS application, if law enforcement has reason to believe that a

16   straw purchase is occurring.[37]

17                     iv.     Conclusion

18         As applied to individuals who already possess a firearm as confirmed by the AFS system,

19   Defendant has not established that applying the full 10-day waiting period when the background

20   check is completed prior to 10-days is a "reasonable fit."  The 10-day waiting period laws as

21   applied to individuals who already lawfully possess a firearm as confirmed by the AFS system,

22   and who pass the background check prior to 10-days, violates the Second Amendment.[38]  See

23   Edenfield, 507 U.S. at 770-71; Peruta, 742 F.3d at 1177; Valley Broadcasting, 107 F.3d at 1334.

24   _____

25   [37] California has provided for additional delays if there is difficulty in determining whether an individual is prohibited
     from possessing a firearm.  Cal. Pen. Code § 28220(f).  Plaintiffs suggest that law enforcement may utilize AB 500/§

26   28220(f) in the context of straw purchases.  The parties have not briefed this issue extensively, and the Court does not
     express an opinion on the question, other than to note that such an interpretation of § 28220(f) may be possible.

27   [38] Again, the Court emphasizes that this as applied challenge is not one that challenges the requirement that a
     purchaser pass a background check.  These individuals must still pass the background check when they attempt to

28   purchase a firearm.  They may not, however, be required to wait the full 10-days if the background check is completed
     and approved prior to 10-days.

b.     Those Who Have A CCW License

i.     Background Check

Plaintiffs do not contend that CCW license holders should not have to undergo and pass the background check.  First, Plaintiffs' proposed injunctive relief requests that CCW license holders undergo the same background check as other individuals who are exempt from the 10-day waiting period.  Police officers who are exempt from the 10-day waiting period pursuant to California Penal Code § 26950(a) and § 27650(a) must still pass the BFEC.  See Trial Tr. 501:17-19.  Therefore, the BFEC/standard background check would apply to CCW license holders when they attempt to purchase a firearm.  Second, Plaintiffs have expressly confirmed that all members of the as applied challenges would still be required to pass a background check when they attempt to purchase a firearm.  See Doc. No. 105 at 7:6-8, 13:17-20, 30:25-31:22.

The Court's above analysis with respect to background checks for those who have a firearm in the AFS system also applies to CCW license holders.  If the background check is completed in less than 10-days, then a background check is no longer a justification to make a CCW license holder wait the full 10-days.

Also, the BFEC can be modified to make a simple check through the AFS system to determine if a person has a valid CCW license.

Additionally, not only does the APPS system act as a safety net for any CCW license holder who may become prohibited from possessing a firearm, the rap back program acts as a further safety net with respect to California criminal conduct by a CCW license holder.

ii.     Cooling Off Period

For CCW license holders who already possess a firearm as confirmed by the AFS system, the above analysis regarding a cooling off period (for those who already have a firearm as confirmed in the AFS system) also applies to CCW license holders.

For CCW license holders who do not already possess a firearm as confirmed by the AFS system, there is no evidence regarding unlawful firearm violence committed by CCW license holders.  There is no evidence regarding suicide attempts by CCW license holders or how long after purchase of a firearm that suicides by CCW license holders generally occur.  The social

1   science studies regarding waiting periods in general are inconclusive at best.  None of the

2   submitted social science studies presented to the Court address suicide as it relates to individuals

3   who must meet the type of requirements of a CCW license,[39] and none of the excerpts advocate for

4   or defend a 10-day cooling off period.

5          The nature and unique requirements of CCW licenses are such that it is unlikely that CCW

6   license holders would engage in impulsive acts of violence.  CCW license applicants must

7   demonstrate good moral character.  Engaging in unlawful acts of violence is inconsistent with

8   good moral character.  CCW license applicants must take a statutorily mandated class and

9   demonstrate proficiency and safe handling of a firearm.  Safe handling practices could cause a gun

10  owner to be more reflective and deliberate about using a firearm.  CCW license applicants must

11  pass the BFEC, which searches databases that deal with criminal and mental health prohibitions.

12  If the person does not pass the background check, they cannot obtain a CCW license.  CCW

13  license applicants must demonstrate good cause to either a sheriff or a police chief in order to

14  obtain the CCW license, and a sheriff or chief of police may impose reasonable restrictions on as

15  part of a CCW license.  Thus, CCW licenses are not issued without reason and individual

16  consideration.  If there is sufficient cause to believe that an applicant has or is experiencing mental

17  health problems, then a sheriff or police chief may require that applicant to undergo psychological

18  testing.  If a person is mentally unstable with respect to themselves or others, the psychological

19  testing could detect that problem.  With the exception of passing the BFEC/standard background

20  check, none of these CCW license requirements must be met by an ordinary California firearms

21  purchaser.  Finally, once issued, a CCW license allows its holder to carry a concealed handgun in

22  public for 2 years, generally throughout the entire State of California.

23         If an individual has met the requirements for obtaining a CCW license, and thereby has

24  demonstrated that he or she can be expected and trusted to carry a concealed handgun in public for

25  2 years, it is unknown why that person would have to wait 10-days before being permitted to take

26  _____

27  [39] The Court notes that one professional article endorsed waiting periods, prohibiting certain individuals from
    purchasing firearms, and permits for handgun purchasers.  See Defendant's Ex. DG.  California has such a prohibition
    and conducts a background check to enforce those prohibitions.  Also, CCW license holders who purchase a handgun

28  will have gone through two certification-type processes:  the process to obtain the CCW license and the process to
    obtain a handgun safety certificate.  See Cal. Pen. Code §§ 26150, 26155, 31615.

1    possession of newly purchased firearm.[40]  Imposing the 10-day waiting period as a cooling off

2    period on a CCW license holder is speculative and its effects appear remote at best.[41]  <u>See</u>

3    <u>Edenfield</u>, 507 U.S. at 770-71; <u>Peruta</u>, 742 F.3d at 1177; <u>Valley Broadcasting</u>, 107 F.3d at 1334.

4                                   iii.    <u>Straw Purchase</u>

5          The Court's above analysis with respect to straw purchases for those who have a firearm in

6    the AFS system also applies to CCW license holders.

7          There is no data or evidence regarding CCW license holders engaging in straw purchases.

8          The requirements for obtaining a CCW license strongly indicate that a CCW license holder

9    is unlikely to engage in a straw purchase.  A CCW license holder must demonstrate to either a

10   sheriff or a police chief that he or she is of good moral character.  Engaging in a straw purchase so

11   that a prohibited person may obtain a firearm is not compatible with good moral character.  A

12   CCW license holder must also demonstrate good cause for issuance of a CCW license.  If there is

13   good cause to obtain the CCW license, it seems unlikely that a CCW license holder would

14   jeopardize the CCW license for the purpose of helping a prohibited individual obtain a firearm.

15   <u>See</u> <u>Edenfield</u>, 507 U.S. at 770-71; <u>Valley Broadcasting</u>, 107 F.3d at 1334.

16                                  iv.    <u>Conclusion</u>

17         As applied to individuals who hold a valid CCW license, Defendant has not established

18   that applying the full 10-day waiting period when the background check is completed prior to 10-

19   days is a "reasonable fit."  The 10-day waiting period laws as applied to individuals who possess a

20   valid CCW license, and who pass the background check prior to 10 days, violates the Second

21   Amendment.[42]  <u>See</u> <u>Edenfield</u>, 507 U.S. at 770-71; <u>Peruta</u>, 742 F.3d at 1177; <u>Valley Broadcasting</u>,

22   107 F.3d at 1334.

23

24   _____

     [40] The Court notes that the submitted legislative history regarding the California waiting periods generally support the
25   conclusion that the waiting period laws were modified to 5 days, 15 days, and 10 days in response to concerns about
     the background check process.  There is little evidence to suggest that the waiting periods were modified for the
26   purpose of expanding or retracting a cooling off period.

27   [41] The Court notes that the state of Florida excepts its CCW license holders from the 3-day waiting period for
     handguns.  <u>See</u> Fla. Stat. § 790.0655(2)(a).

28   [42] Again, the Court emphasizes that this as applied challenge is not one that challenges the requirement that a

1          <u>c.</u>     <u>Those Who Have A COE</u>

2          Plaintiffs do not contend that COE holders should not have to undergo and pass a

3 background check.  First, Plaintiffs' proposed injunctive relief requests that COE holders undergo

4 the same background check as other individuals who are exempt from the 10-day waiting period.

5 Police officers who are exempt from the 10-day waiting period pursuant to California Penal Code

6 §§ 26950(a) and 27650(a) must still pass the BFEC/standard background check.  <u>See</u> Trial Tr.

7 501:17-19.  Therefore, the BFEC/standard background check would apply to COE holders when

8 they attempt to purchase a firearm.  Second, Plaintiffs have expressly confirmed that all members

9 of the as applied challenges would still be required to pass a background check when they attempt

10 to purchase a firearm.  <u>See</u> Doc. No. 105 at 7:6-8, 13:17-20, 30:25-31:22.

11          The class of COE holders under this as applied challenge was somewhat unclear.  Plaintiffs

12 indicated that the class consisted of those who merely hold a valid COE.  <u>See</u> <u>id.</u> at 7:11-13.

13           However, a COE in and of itself only establishes that a person passed the background

14 check one other time in the past.  Unlike a CCW license holder, a COE holder does not have to

15 establish good moral character, good cause, take a mandated course, or be subject to possible

16 psychological testing.  That is, COE holders are not subject to nearly the same level of scrutiny as

17 are CCW license holders.  At oral argument, Plaintiffs acknowledged that the process to obtain a

18 CCW license is more demanding than that required to obtain a COE.  <u>See</u> <u>id.</u> at 8:12-21.

19          If a COE holder does not already possess a firearm, they are very similar to a first time

20 firearms purchaser.  Plaintiffs do not challenge the waiting period laws for first time firearms

21 purchasers without a COE.  Plaintiffs stated at oral argument that while it is theoretically possible

22 for a COE holder to not possess a firearm, it was highly unlikely.  <u>See</u> <u>id.</u> at 8:21-9:1.  However,

23 Plaintiffs conceded that "if somebody has a COE, but there is no evidence that they also own a

24 gun, it may be appropriate to subject them to a 10-day waiting period."  <u>Id.</u> at 10:8-12.

25          Given the Plaintiffs' concessions at oral argument and the nature of merely holding a COE,

26 the Court cannot hold that the 10-day waiting period as applied to those who merely hold a valid

27

28 purchaser pass a background check.  These individuals must still pass the background check when they attempt to
purchase a firearm.  They may not, however, be required to wait 10-days if the background check is completed and
approved prior to 10-days.

1    COE violates the Second Amendment.

2           However, Plaintiffs stated that any concerns about whether a COE holder already possess a

3    firearm could be addressed through the remedy issued, essentially by fashioning "a remedy that

4    says COE and possess a firearm." Id. at 9:22-10:3.  This is consistent with the relief requested by

5    Plaintiffs in their proposed findings of fact and conclusions of law.  Plaintiffs requested injunctive

6    relief for those who hold a valid COE and also have a firearm as confirmed by the AFS system.

7    See Doc. No. 91 at 30:1-4.

8           Consideration of the waiting period laws as applied to those who possess both a valid COE

9    and a firearm as confirmed by the AFS system leads to a finding that the waiting period laws

10   violate the Second Amendment.  For those who have both a valid COE and already possess a

11   firearm as confirmed by the AFS system, the constitutional analysis would be the same as detailed

12   above for those who already possess a firearm as confirmed by the AFS system.  The only

13   distinction between the two "as applied groups" is that the COE holder has made himself or

14   herself more identifiable in terms of the state criminal law firearms prohibitions through the rap

15   back program and the issuance of a CII number.

16          The BFEC can be modified to make a simple check through the AFS system to determine

17   if a DROS applicant has a valid COE and also to determine if the DROS applicant has a firearm

18   within the AFS database.

19          The Court will accept Plaintiffs' concessions and suggestions.  For the reasons stated

20   above with respect to those who have a firearm as confirmed by the AFS system, the Court finds

21   that the 10-day waiting period laws as applied to those who possess both a valid COE and a

22   firearm as confirmed by the AFS system, and who pass the background check prior to 10 days, is

23   not a reasonable fit and thus, violates the Second Amendment.  See Edenfield, 507 U.S. at 770-71;

24   Peruta, 742 F.3d at 1177; Valley Broadcasting, 107 F.3d at 1334.

25

26   **IV.**          **FOURTEENTH AMENDMENT CHALLENGE**

27          Plaintiffs state that the Court need not address their Fourteenth Amendment challenges if

28   the Court finds merit to their three as applied challenges to the 10-day waiting period.  Plaintiffs

1    contend that if a violation of the Second Amendment is found, then the appropriate injunctive

2    relief would essentially create additional exceptions to the waiting period and the Fourteenth

3    Amendment issues would not need to be addressed.  Because the Court has found violations of the

4    Second Amendment as discussed above, the Court will follow Plaintiffs' recommendation and

5    decline to reach the Fourteenth Amendment issues.

6

7    **V.    ORDER**

8         The Court has found that the 10-day waiting periods of Penal Code § 26815(a) and §

9    27540(a) violate the Second Amendment as applied to certain groups.  Plaintiffs urge the Court to

10   follow the approach of *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012), in which the

11   Seventh Circuit stayed its ruling for 180-days in order to give the Illinois legislature the

12   opportunity to craft new laws in light the unconstitutionality of various Illinois firearms laws.  The

13   Court finds *Moore*'s approach to be appropriate.

14        Accordingly, IT IS HEREBY ORDERED that:

15   1.   The 10-day waiting periods of California Penal Code § 26815(a) and § 27540(a) violate

16        the Second Amendment as applied to those individuals who successfully pass the

17        BFEC/standard background check prior to 10 days and who are in lawful possession of an

18        additional firearm as confirmed by the AFS system;

19        a.   If the BFEC/standard background check for such an individual is completed and

20             approved before 10-days, Defendant shall immediately release the firearm for

21             delivery to such individual and shall not wait the full 10-days;

22   2.    The 10-day waiting periods of California Penal Code § 26815(a) and § 27540(a) violate

23        the Second Amendment as applied to those individuals who successfully pass the

24        BFEC/standard background check prior to 10 days and who possess a valid CCW license

25        issued pursuant to California Penal Code § 26150 or § 26155;

26        a.   If the BFEC/standard background check for such an individual is completed and

27             approved before 10-days, Defendant shall immediately release the firearm for

28             delivery to such individual and shall not wait the full 10-days;

3.   The 10-day waiting periods of California Penal Code § 26815(a) and § 27540(a) violate the Second Amendment as applied to those individuals who successfully pass the BFEC/standard background check prior to 10 days and who possess both a valid COE issued pursuant to California Penal Code § 26710 and a firearm as confirmed by the AFS system.

    a.   If the BFEC/standard background check for such an individual is completed and approved before 10-days, Defendant shall immediately release the firearm for delivery to such individual and shall not wait the full 10-days;

4.   Defendant shall modify their BFEC procedures as they deem necessary so as to be able to comply fully and in good faith with this order;[43]

5.   Nothing in this order is to be construed as interfering with Defendant's authority to deny a transfer or sale of a firearm to those who are prohibited by state or federal law from possessing a firearm;

6.   Nothing in this order is to be construed as interfering with the Defendant's ability to delay a transfer or sale of a firearm when further investigation is required to confirm that a buyer or transferee is not prohibited by state or federal law from possessing a firearm;

7.   Paragraphs 1 through 6 of this order are stayed for a period of 180 days from entry of this order;

8.   The parties shall appear for a status conference on December 8, 2014 in Courtroom No. 2 at 1:30 p.m.;[44] and

9.   The Clerk shall enter judgment in favor of Plaintiffs and against Defendant.

IT IS SO ORDERED.

Dated:   August 22, 2014

_____
SENIOR  DISTRICT  JUDGE

---

[43] The Court particularly directs Defendant's attention to the testimony Assistant Bureau Chief Buford and the "simple" checks within AFS to determine if an individual has a firearm, has a valid CCW license, or has a valid COE.

[44] The parties shall file a joint status conference report on December 1, 2014.  If the parties agree upon a different date for a status conference, they may file a stipulation with the Court to move the status conference.

1
2
3
4
5
6                    **UNITED STATES DISTRICT COURT**
7                    **EASTERN DISTRICT OF CALIFORNIA**
8

9   **JEFF SILVESTER, et al.,**                    **CASE NO. 1:11-CV-2137 AWI SAB**

10                **Plaintiffs**

11                    **v.**                        **ORDER ON DEFENDANT'S MOTION
                                                    TO STAY AND MOTION TO ALTER
12  **KAMALA HARRIS, Attorney General of**         **JUDGMENT**
    **California, and DOES 1 to 20,**
13                                                  **(Doc. Nos. 110, 114)**
                  **Defendants**
14

15

16          This case involved a Second Amendment challenge to statutes that imposed a 10-day

17  waiting period between the time of purchase and time of possession of a firearm.  Following a

18  bench trial, the Court issued findings of fact and conclusions of law.  The Court held that the 10-

19  day waiting period violated the Second Amendment as applied to three classes of individuals.  The

20  Court also enjoined Defendant from enforcing the 10-day waiting period with respect to the three

21  classes of individuals.  However, as suggested by Plaintiffs, the Court stayed its order for a period

22  of 180 days.  Defendant later filed a motion to amend judgment, a notice of appeal, and a motion

23  for a stay pending appeal.  For the reasons that follow, Defendant's motions will be denied.

24

25  **I.      Motion To Stay**

26          *Defendant's Argument*

27          Defendant argues that the relevant factors all favor a granting a stay.  First, this case is the

28  first of its kind to challenge a firearm waiting period law.  The law surrounding the Second

1   Amendment is evolving, and issues such as of what sort of waiting period a state may impose on

2   the acquisition of a firearm, and on what grounds, are of nationwide importance.  The Ninth

3   Circuit could reach different conclusions than those reached by the Court.  Thus, this case involves

4   "serious legal questions."  Second, California will suffer irreparable harm if an injunction is not

5   issued.  A state suffers irreparable injury whenever an enactment of its representatives is enjoined.

6   Furthermore, irreparable injury occurs if a party will not be able to recoup significant time and

7   resources to comply with an injunction if the injunction is later overturned.  The declarations of

8   Bureau of Firearms ("BOF") Chief Stephen Lindley and BOF employee Marc St. Pierre show that

9   it will likely take at least 12-months to comply with an injunction, either to hire and train

10  additional personnel or to change the relevant computer system.  Current BOF computer personnel

11  are working on other critical tasks that have firm legislative deadlines.  It is thus undesirable to

12  pull those personnel off of their current projects.  Past experience with upgrading BOF computers

13  through outside vendors indicates that 12 months likely will be needed, including the bidding

14  process and installation of new software.  In terms of additional personnel (which is not the

15  preferred method of compliance), BOF would need to obtain additional funding from the

16  Legislature, go through the process of hiring, and then go through a 6 to 8 month training period

17  process.  If the Ninth Circuit reverses this Court's order, there is no realistic prospect that

18  California will be able to recover any compensation for the efforts it was forced to undertake.

19  BOF would have to go through a process to undo the changes to the system that were done, and

20  may be left with additional personnel.  Third, the balance of harms favors a stay.  Combs and

21  Silvester already have a firearm, and they may still obtain a firearm during the pendency of this

22  suit.  The Court continued to allow BOF to conduct a background check on every prospective

23  firearm purchaser, and that check can take up to 10-days in any event.  The injunction may or may

24  not reduce the 10-day waiting period for a particular purchaser, and a second trip to obtain the

25  firearm could still be required.  This harm is outweighed by the harm to California.  Finally, the

26  public interest favors a stay.  The waiting period law was enacted for the important purpose of

27  keeping firearms out of the hands of people who might have a propensity to misuse them.  A stay

28  would preserve the status quo for a system that processes 1 million firearm applications a year.

1    *Plaintiffs' Opposition*

2    Plaintiffs argue that a stay is not justified.  Defendant argues that this case raises "serious

3    legal questions" because it involves issues of first impression.  However, in order to issue a stay

4    based on "serious legal questions," Defendant must show that the balance of hardships tips sharply

5    in her favor.  Defendant has not done so.  Defendant argues that California is harmed because one

6    of its laws will be enjoined and because it will incur associated fiscal and administrative costs.

7    The Ninth Circuit has recognized that simply because an enactment is being enjoined is not

8    dispositive, because the basis of enjoining the state law is a violation of either a federal statute or

9    the federal Constitution, which also represent enactments of the people.  Defendant has also not

10   explained why it cannot simply allow delivery of firearms to the three as-applied classes once the

11   background check is complete.  Defendant does not adequately appreciate the nature and

12   magnitude of the harm suffered by Plaintiffs, especially because the deprivation of a constitutional

13   right is recognized to be an irreparable harm.  Finally, the public interest does not lie in favor of a

14   stay.  When the state is asserting harm, there is no interest in enforcing an unconstitutional law.

15   *Legal Standard*

16   Federal Rule of Civil Procedure 62(c) allows a district court to suspend, modify, restore, or

17   grant an injunction during the pendency of an appeal.  See Fed. R. Civ. P. 62(c); Natural Res. Def.

18   Council, Inc. v. S.W. Marine, Inc., 242 F.3d 1163, 1166 (9th Cir. 2001).  "A stay is not a matter of

19   right, even if irreparable injury might otherwise result," rather, a stay is "an exercise of judicial

20   discretion" and the "propriety of its issue is dependent upon the circumstances of the particular

21   case." Nken v. Holder, 556 U.S. 418, 433 (2009); Lair v. Bullock, 697 F.3d 1200, 1203 (9th Cir.

22   2012).  "The party requesting a stay bears the burden of showing that the circumstances justify an

23   exercise of that discretion."  Nken, 556 U.S. at 433-34; Lair, 697 F.3d at 1203.  In determining

24   whether to issue a stay pending an appeal, courts consider four factors:  "(1) whether the stay

25   applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the

26   applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will

27   substantially injure the other parties interested in the proceeding; and (4) where the public interest

28   lies." Nken, 556 U.S. at 434; Lair, 697 F.3d at 1203.  The first two factors "are the most critical."

1    <u>Nken</u>, 556 U.S. at 434.  With respect to the first factor, the Ninth Circuit has characterized a

2    "strong showing" in various ways, including "reasonable probability," "fair prospect," "substantial

3    case on the merits," and "serious legal questions . . . raised."  Leiva-Perez v. Holder, 640 F.3d 962,

4    967-68 (9th Cir. 2011).  These formulations are "largely interchangeable," and each indicate that,

5    "'at a minimum,' a petitioner must show that there is a 'substantial case for relief on the merits.'"

6    <u>Lair</u>, 697 F.3d at 1204; <u>Leiva-Perez</u>, 640 F.3d at 967-68.  With respect to the second factor, the

7    proponent of the stay must demonstrate that there is a probability that she will suffer an irreparable

8    injury if the stay is not granted.  <u>Lair</u>, 697 F.3d at 1215; <u>Leiva-Perez</u>, 640 F.3d at 969.

9    *Discussion*

10      1.    First Factor – Strong Showing Of Success

11        There is no dispute that the first factor may be met if the stay applicant has raised "serious

12   legal questions."  <u>Lair</u>, 697 F.3d at 1204.  "Serious questions are substantial, difficult and

13   doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation."

14   <u>Gilder v. PGA Tour, Inc.</u>, 936 F.2d 417, 422 (9th Cir. 1991); <u>Republic of the Phil. v. Marcos</u>, 862

15   F.2d 1355, 1362 (9th Cir.1988).  Plaintiffs do not dispute that this case and Defendant's appeal

16   raise "serious legal questions."  The Court agrees that Second Amendment law is evolving,

17   although the framework for evaluating laws under the Second Amendment has now been

18   established.  <u>See United States v. Chovan</u>, 735 F.3d 1127 (9th Cir. 2013).  In the absence of an

19   argument on this point from Plaintiffs, the Court is satisfied that this case raises "serious legal

20   questions."[1]  <u>See Gilder</u>, 936 F.2d at 422.

21      2.    Second Factor – Harm To The Applicant

22        Defendant has identified as an irreparable harm the harm that befalls a state when one of its

23   laws has been held unconstitutional.  Citing a chambers order from then Justice Rehnquist, the

24   Ninth Circuit in *Coalition for Economic Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997)

25   stated that this as an irreparable injury.  However, very recently the Ninth Circuit noted that the

26   Supreme Court has never adopted Justice Rehnquist's opinion that this form of harm is an

---

[1] The Court notes that Defendant has not identified any error of law or any erroneous factual finding.  The Court stands by its analysis and its findings that the waiting period laws violate the Second Amendment as applied to three classes of individuals.

1  irreparable injury. See Latta v. Otter, - - - F.3d - - -, 2014 U.S. App. LEXIS 19828, *19 n.1 (9th

2  Cir. 2014). Further, the Ninth Circuit has characterized the relevant language from *Coalition* as

3  "dicta." Independent Living Ctr. of S. Cal. v. Maxwell-Jolly, 572 F.3d 644, 658 (9th Cir. 2009).[2]

4  *Independent* explained that to the extent a state suffers an abstract form of harm whenever one of

5  its acts is enjoined, that harm is not dispositive because such a rule would eviscerate the balancing

6  of competing claims of injury. See id. In *Latta*, the Ninth Circuit recognized *Coalition*'s

7  statement and *Independent*'s characterization of *Coalition*. See Latta, - - - F.3d - - -, 2014 U.S.

8  App. LEXIS 19828 at *19. *Latta* did not expressly address how to apply *Coalition* and

9  *Independent*, but it nevertheless found that lifting a stay on an injunction that prohibited the

10  enforcement of an Idaho law was appropriate in light of other factors. Given *Latta*'s

11  methodology, the Court finds that a state suffers an abstract harm whenever one of its duly enacted

12  laws is enjoined, but this abstract harm is not a dispositive harm and it may be outweighed by

13  other factors. Therefore, the Court concludes that California will suffer an abstract injury if the

14  Court's injunction is not stayed.

15      With respect to administrative and fiscal costs, the Court agrees with Defendant that hiring

16  and training additional personnel, as well as hiring outside contractors, would represent an

17  additional expenditure of funds that Defendant would likely not be able to recover. However,

18  Defendant (through Chief Lindley's declaration) acknowledges that she has computer personnel

19  who could modify the system.[3] See Lindley Dec. ¶ 15. The problem is that Defendant believes

20  that other projects are deserving of greater priority. See id. There is no description of what these

21  critical projects are or when the deadlines might be, nor is there an explanation of why outside

22  contractors cannot be utilized for some of those projects, nor is there an explanation of why

23  computer personnel from different departments or agencies cannot be utilized. A bench trial has

24  concluded, and a law that is actively being enforced has been found to be unconstitutional. The

25  Court does not know how Defendant or the BOF prioritizes projects, but dealing with an

26  _____

[2] Vacated on other grounds, Douglas v. Independent Living Ctr. of So. Cal, Inc., 132 S. Ct. 1204 (2012).

27

28  [3] The Court notes that Assistant Bureau Chief Steve Buford was heavily involved in the background check system design and process, as well as former BOF employee Donnette Orsi. See Doc. No. 85 at 168:7-170:6, 279:8-24, 307:13-308:17. No declaration from Assistant Bureau Chief Buford was submitted by Defendant.

1    unconstitutional law should be towards the top of the list.[4]  It is true that redirecting personnel may

2    cause difficulties, but there is not enough before the Court for it to conclude that Defendant

3    probably would suffer irreparable harm from such redirection.[5]  The Court is not satisfied that

4    Defendant has demonstrated irreparable fiscal or administrative harm.[6]

5              **3.**     Third Factor – Harm To Others

6              In this case, the Court determined that the 10-day waiting period laws burden the Second

7    Amendment right to keep and bear arms because they prohibit the exercise of that right for all

8    purposes with respect to a newly purchased firearm.  The Court also determined that the 10-day

9    waiting period laws have caused additional expense and inconvenience, and that they have caused

10   individuals to forego exercising their Second Amendment rights.  The Court examined the

11   historical evidence submitted by the parties and concluded that there were no comparable laws in

12   existence during the relevant historical periods, and that waiting period laws exist today in only a

13   distinct minority of States.  The Court also found that no evidence justified a 10-day waiting

14   period under intermediate scrutiny.[7]  Therefore, the Court has determined that the 10-day waiting

15   period laws, as applied to those who have a Carry Concealed Weapons permit ("CCW"), those

16   who already have a firearm, or those who have a firearm and a Certificate of Eligibility ("COE"),

17   violate the Second Amendment.   It has been held that a deprivation of constitutional rights, "for

18   even minimal periods of time, unquestionably constitutes irreparable injury."  Elrod v. Burns, 427

19   U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976); Latta, - - - F.3d - - -, 2014 U.S. App.

20

---

21   [4] It may be that the nature of the resources available to Defendant, combined with the tasks that need to be completed in order to comply with the injunction, make hiring outside vendors the best choice.  However, there is insufficient information before the Court on this issue.

22

23   [5] Defendant suggests that if the background check system was modified, and the Ninth Circuit later reverses the injunction, time and resources would need to be spent to restore the system to its prior configuration.  However, there is no evidence regarding how difficult, time consuming, or costly such a process would be.

24

25   [6] The Court notes that Chief Lindley's declaration indicates that under a manual approach, i.e. analysts review each application, the CCW, COE, and AFS databases would have to be separately queried for each applicant.  However, Chief Lindley does not discuss how additional questions (e.g. whether the applicant currently has a valid CCW permit) to the DROS application form might change how applications would be reviewed.  Nevertheless, the issue is not before the Court, and it may be that additional questions or changes to the DROS application are undesirable.  The Court merely notes that Chief Lindley's declaration does raise questions.

26

27

28   [7] Defendant made various arguments to justify the waiting period, but the evidence did not actually support a 10-day waiting period.  The arguments were more in line with "rational basis scrutiny" than with "intermediate scrutiny."

1  LEXIS 19828 at *19-*20; Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012).  Because the

2  waiting period laws violate their constitutional rights, the named Plaintiffs and all those who fit

3  within the as-applied classes will suffer irreparable injury if a stay pending appeal is granted.[8]

4          4.      Public Interest

5          It has been recognized that enforcement of an unconstitutional law is contrary to the public

6  interest.  See Gordon v. Holder, 721 F.3d 638, 653 (D.C. Cir. 2013); Melendres, 695 F.3d at 1002;

7  Scott v. Roberts, 612 F.3d 1279, 1297 (11th Cir. 2010); Tyson Foods, Inc. v. McReynolds, 865

8  F.2d 99, 103 (6th Cir. 1989); Levine v. Fair Political Practices Comm'n, 222 F.Supp.2d 1182,

9  1191 (E.D. Cal. 2002).  Because the waiting period law is unconstitutional with the respect to the

10  three as applied classes, this factor weighs against a stay.[9]  See id.

11         5.      Conclusion

12         When an applicant relies on "serious legal questions," she must demonstrate that the

13  balance of equities tips sharply in her favor.  See Leiva-Perez, 640 F.3d at 966; Tribal Village of

14  Akutan v. Hodel, 859 F.2d 662, 663 (9th Cir. 1988); Lopez v. Heckler, 713 F.2d 1432, 1435 (9th

15  Cir. 1983).  Given the on-going constitutional violations that are occurring to the likely thousands

16  of Californians by operation of the 10-day waiting period laws, the Court cannot conclude that the

17  balance of equities tips sharply in Defendant's favor.  Combined with the public interest that

18  weighs against granting an injunction, the Court does not find that issuing a stay is appropriate.

19  Defendant's motion for a stay under Rule 62(c) will be denied.

20

21  **II.     Motion To Alter Judgment**

22         *Defendant's Argument*

23         Defendant argues that to comply with the Court's order, BOF will either have to change

24  the computer system to automatically search the CCW database, the COE database, and the AFS

---

[8] The extent of the harm will vary from person to person, because everyone must pass the background check.  As discussed in the Court's prior opinion, it could take less than 2-hours or more than 10-days to complete the check.

[9] Defendant's motion suggests that the public has an interest in preventing violence and keeping firearms out of the hands of those who have a propensity to commit violence.  However, Defendant submitted no evidence that demonstrated that the 10-day waiting period will have that effect on the three as-applied classes to any appreciable degree, and all persons wishing to purchase a firearm will still have to pass the background check.

1   database, or hire additional staff to manually check these databases.  A significant number of staff

2   would have to be added, and it takes 6 to 8 months to train these individuals.  Further, auto-

3   approved applications would no longer be "auto-approved" because an analyst would have to

4   review the additional databases.  Finally, BOF cannot hire additional staff until it receives funding

5   from the Legislature, which is currently in recess.  To hire and train more staff would likely

6   require 12 months.  However, BOF prefers the automated computer approach.  Under this

7   approach, fewer analysts would be needed and a firearm could be released much sooner, assuming

8   all appropriate criteria are met.  BOF personnel are currently performing other critical tasks, and

9   an outside vendor would be necessary.  Given the history of past projects, the bidding and

10  completion of computer modification would likely take at least 12-months.  Finally, if the Court's

11  intent was to give the Legislature time to act, more time is needed as the Legislature is in recess.

12          *Plaintiffs' Argument*

13          Plaintiffs argue that Defendant has not shown why additional time is needed.  Although

14  Defendant claims that more time is needed to hire personnel and reconfigure the system, no effort

15  to comply been demonstrated since the Court's order.  To the extent that Defendant needs to

16  improve systems and hire staff, she should make efforts to do so now rather than induce urgency

17  by waiting until expiration of the stay.  Further, the Department of Justice has had millions of

18  dollars appropriated to it, which should be sufficient to comply with Court's order without further

19  legislative involvement.  Also, Defendant has made it clear that she can comply with the Court's

20  order without any legislative action.  Even if a legislative "fix" were enacted, Defendant would

21  presumably return to the Court and ask for more time to implement a new law.  Relying on the

22  legislative calendar to drag out the process is not appropriate.  If it becomes clear that the

23  Legislature wishes to address the problem, Defendant can request additional time from the Court.

24  Finally, if the injunction is modified, Defendant should be required to file periodic status

25  conferences to ensure that all efforts are being made to meet the new deadline.

26          *Legal Standard*

27          Federal Rule of Civil Procedure 59(e) provides a mechanism for a court to reconsider and

28  alter or amend a prior order.  See Fed. R. Civ. P. 59(e); Kona Enters. v. Estate of Bishop, 229 F.3d

877, 883 n.6, 890 (9th Cir. 2000).  "While Rule 59(e) permits a district court to reconsider and amend a previous order, the rule offers an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources."  Wood v. Ryan, 759 F.3d 1117, 1121 (9th Cir. 2014); Kona Enters., 229 F.3d at 890.  Rule 59(e) amendments are appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law.  Wood, 759 F.3d at 1121; Kona Enters., 229 F.3d at 890.  In "unusual circumstances," the Court may grant a Rule 59(e) motion on additional grounds.  See Allstate Ins. Co. v. Herron, 634 F.3d 1101, 1111 (9th Cir. 2011).  The Rule 59(e) standard is a "high hurdle."  Weeks v. Bayer, 246 F.3d 1231, 1236 (9th Cir. 2001).  Rule 59(e) motions "may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation."  Kona Enters., 229 F.3d at 890.

   *Discussion*

   The arguments made in favor of altering judgment are extremely similar to those made in support of the motion for stay.  For similar reasons discussed with respect to the stay motion, the Court will not alter the judgment.  Defendant has the personnel within BOF to make changes to the background check system. Defendant just does not want to reassign those personnel to change the background check at this time.  Insufficient information has been provided to the Court as to why reassignment is so undesirable.[10]  Furthermore, it is unclear why other Department of Justice (other state agencies) computer personnel cannot be utilized to work on the other "critical projects" or on the Court's injunction.[11]

   The Court accepts that Defendant has reviewed the Court's order/injunction and has made efforts to determine what is necessary to comply.  The Reply Declaration of Chief Lindley indicates the BOF is taking steps to implement that computer/automated approach, including:  (1) analyzing the technology changes that must occur; (2) finalizing a Request for Proposal to solicit

---

[10] The Court emphasizes that it is not holding that Defendant cannot utilize outside vendors as part of complying with the injunction.

[11] The Court does accept that additional funding from the Legislature is needed to hire additional analysts.

1   bids from prospective vendors; (3) identifing the equipment needed for new employees and

2   identified trainers for those new employees; (4) preparing new written procedures that will be

3   necessary for analysts to implement the Court's order; and (5) working on recruitment.  See

4   Lindley Reply Dec. ¶ 7.  However, Chief Lindley declares that any further steps beyond what has

5   occurred will require significant expenditures that cannot be recovered.  See id. at ¶ 8.  For

6   example, any payments made to vendors could not be recovered, BOF might have to pay vendors

7   to undo changes, and BOF might be left with excess staffing.[12]  See id. at ¶¶ 9, 10.  In light of

8   Chief Lindley's declaration, the Court cannot find that Defendant is ignoring its order.

9       The Court is not unsympathetic to the changes that BOF is required to make in order to

10  follow the Court's injunction.  That was the primary reason why the Court stayed its order for 180

11  days.[13]  The Court also understands that technological changes can take time.  If additional

12  information shows that outside vendors are necessary, and that they require additional time, and

13  assuming that Defendant exercises due diligence in attempting to follow the Court's injunction,

14  the Court will likely grant requests for additional time for Defendant to comply.  For now, the

15  Court's order remains stayed for a total of 180 days, and Defendant has time to request a stay

16  pending appeal from the Ninth Circuit.  See Fed. R. Civ. P. 62(g); Fed. R. App. P. 8(a).

17

18                                      **ORDER**

19       Accordingly, IT IS HEREBY ORDERED that:

20  1.      Defendant's motion to stay (Doc. No. 114) is DENIED; and

21  2.      Defendant's motion to alter judgment (Doc. No. 110) is DENIED.

22

23  IT IS SO ORDERED.

24  Dated:   November 20, 2014      _____

25                                      SENIOR  DISTRICT  JUDGE

26  [12] It is not clear to the Court that BOF would have excess staffing.  Defendant has argued that BOF requires its staff to
    work overtime as a matter of course, and that analysts are extremely busy under current staffing levels.  Also, it is
27  unclear why termination of employment would not occur if an employee is truly not necessary.

28  [13] To give the Legislature time to review the order and the absence of an objection or a reply from Defendant during
    the briefing process were the other considerations.