14-16840

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**JEFF SILVESTER, BRANDON COMBS, THE CALGUNS FOUNDATION, INC., a non-profit organization, and THE SECOND AMENDMENT FOUNDATION, INC., a non-profit organization,**

Plaintiffs-Appellees,

**v.**

**KAMALA D. HARRIS, Attorney General of California (in her official and individual capacities),**

Defendant-Appellant.

---

On Appeal from the United States District Court
for the Eastern District of California

No. 1:11-cv-02137-AWI-SKO
The Honorable Anthony W. Ishii, Judge

## DEFENDANT-APPELLANT'S
## EXCERPTS OF RECORD
## VOLUME 2

KAMALA D. HARRIS
Attorney General of California
DOUGLAS J. WOODS
Senior Assistant Attorney General
MARK R. BECKINGTON
Supervising Deputy Attorney
General
PETER H. CHANG
Deputy Attorney General

JONATHAN M. EISENBERG
Deputy Attorney General
State Bar No. 184162
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013
  Telephone: (213) 897-6505
  Fax: (213) 897-5775
  Email: jonathan.eisenberg@doj.ca.gov
*Attorneys for Defendant-Appellant*
*Kamala D. Harris, Attorney General of*
*the State of California*

# INDEX

## VOLUME 1:

| File Date | Document | Page Nos. |
|---|---|---|
| 8/25/14 | District Court Findings of Fact and Conclusions of Law | 1-56 |
| 11/20/14 | District Court Order on Defendant's Motion to Stay and Motion to Alter Judgment | 57-66 |

## VOLUME 2:

| File Date | Document | Page Nos. |
|---|---|---|
| 12/19/14 | Amended Notice of Appeal | 67-68 |
| 11/24/15 | Appellant's Notice to Ninth Circuit of Ruling on Motion to Amend Judgment and Statement of Intent to Prosecute Appeal | 69-70 |
| 10/7/14 | Order Granting Appellant's Motion to Hold Appeal in Abeyance | 71-72 |
| 9/24/14 | Notice of Appeal | 73-76 |
| 11/3/14 | Supplemental Declaration of Stephen J. Findley in Support of Defendant's Motion to Alter or Amend Judgment | 77-79 |
| 9/22/14 | Declaration of Stephen J. Lindley in Support of Defendant's Motion to Alter or Amend Judgment | 80-83 |
| 9/22/14 | Declaration of Marc St. Pierre in Support of Defendant's Motion to Alter or Amend Judgment | 84-88 |
| 8/25/14 | Entry of Judgment | 89 |
| 6/30/14 | "Ready Reference" Table | 90-91 |
| 3/26/14 | Excerpt of Reporter's Transcript of Proceedings (Day 1) | 92-105 |
| 3/27/14 | Excerpt of Reporter's Transcript of Proceedings (Day 2) | 106-147 |
| 3/28/14 | Excerpt of Reporter's Transcript of Proceedings (Day 3) | 148-193 |
| 3/19/14 | Combs' Certificate of Eligibility (Pls. Exh. 4) | 209-210 |
| 3/19/14 | Silvester License to Carry (Pls. Exh. 5) | 211-212 |
| 3/19/14 | Summary Dealer Records of Sale Statistics (Def. Exh. AA) | 213 |
| 3/19/14 | Dealer Records of Sale Monthly Statistics for 2012 (Def. Exh. AO) | 214 |
| 3/19/14 | Dealer Records of Sale Monthly Statistics for 2013 | 215 |

| File Date | Document | Page Nos. |
|---|---|---|
| | (Def. Exh. AP) | |
| 3/19/14 | NICS Operation 2011 (Def. Exh. BO) | 216-220 |
| 3/19/14 | Bureau of Firearms DROS Processing Flow Diagram (Def. Exh. CB) | 221 |
| 3/19/14 | Assem. Bill No. 263 (1923 Reg. Sess.) c. 339 (Def. Exh. CD) | 222-223 |
| 3/19/14 | Assem. Bill No. 1919 (1952-53 Reg. Sess.) c. 36 (Def. Exh. CE) | 224-226 |
| 3/19/14 | Assem. Bill No. 3508 (1954-55 Reg. Sess.) c. 1521 (Def. Exh. CF) | 227-229 |
| 3/19/14 | Sen. Bill No. 671 (1995-96 Reg. Sess.) (Def. Exh. CG) | 230-238 |
| 3/19/14 | Assem. Bill No. 1441 (1974-75 Reg. Sess.) (Def. Exh. CH) | 239-245 |
| 3/19/14 | Assem. Bill No. 1564 (1964-65 Reg. Sess.) (Def. Exh. CI) | 246-250 |
| 3/19/14 | Lewiecki and Miller, Suicide, Guns, and Public Policy, American Journal of Public Health (2013) (Def. Exh. DG) | 251-253 |
| 3/19/14 | Ludwig and Cook, Homicide and Suicide Rates Associated with Implementation of the Brady Handgun Violence Prevention Act, Journal of the American Medical Association (2000) (Def. Exh. DH) | 254-256 |
| 3/19/14 | Peterson, et al., Self-Inflicted Gunshot Wounds: Lethality of Method Versus Intent, American Journal of Psychiatry (1985) (Def. Exh. DS) | 257-260 |
| 3/19/14 | Miller and Hemenway, The Relationship Between Firearms and Suicide: A Review of the Literature, Aggression and Violent Behavior (1998) (Def. Exh. DT) | 261-267 |
| 3/19/14 | Wintemute, et al., Mortality Among Recent Purchasers of Handguns, New England Journal of Medicine (2003) (Def. Exh. DV) | 268-270 |
| 3/19/14 | Brent, Firearms and Suicide, Annals New York Academy of Sciences (2001) (Def. Exh. DW) | 271-277 |
| 3/19/14 | Hahn, et al., Firearms Laws and the Reduction of Violence: A Systematic Review, American Journal of Preventive Medicine (2005) (Def. Exh. DX) | 278-280 |
| 2/14/14 | Final Pretrial Order (Dkt. 48) | 280-306 |
| 3/14/14 | Answer to First Amended Complaint (Dkt. 11) | 307-316 |

| File Date | Document | Page Nos. |
|---|---|---|
| 2/24/14 | First Amended Complaint (Dkt. 10) | 317-329 |
| | Trial Court Civil Docket Sheet | 330-339 |

1  KAMALA D. HARRIS, State Bar No. 146672
   Attorney General of California
2  MARK R. BECKINGTON, State Bar No. 126009
   Supervising Deputy Attorney General
3  JONATHAN M. EISENBERG, State Bar No. 184162
   Deputy Attorney General
4  PETER H. CHANG, State Bar No. 241467
   Deputy Attorney General
5   455 Golden Gate Ave., Suite 11000
    San Francisco, CA 94102
6   Telephone:  (415) 703-5939
    Fax:  (415) 703-1234
7   E-mail:  Peter.Chang@doj.ca.gov
   *Attorneys for Defendant Kamala D. Harris,*
8  *Attorney General of California*

9                IN THE UNITED STATES DISTRICT COURT

10            FOR THE EASTERN DISTRICT OF CALIFORNIA

11                       FRESNO DIVISION

12

13

| | |
|---|---|
| 14  **JEFF SILVESTER, BRANDON COMBS, THE CALGUNS FOUNDATION, INC., a** | 1:11-cv-02137-AWI-SKO |
| 15  **non-profit organization, and THE SECOND AMENDMENT FOUNDATION, INC., a** | **AMENDED NOTICE OF APPEAL** |
| 16  **non-profit organization,** | Judge:        Hon. Anthony W. Ishii |
| 17                          Plaintiffs, | Trial Date:   March 25, 2014 |
| | Action Filed:  December 23, 2011 |
| 18              **v.** | |
| 19 | |
| 20  **KAMALA HARRIS, Attorney General of California (in her official capacity),** | |
| 21                           Defendant. | |

22

23        TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

24        PLEASE TAKE NOTICE that Kamala D. Harris, Attorney General of California, defendant

25  in the above-named case, hereby appeals to the U.S. Court of Appeals for the Ninth Circuit from

26  the Final Judgment entered on August 25, 2014 and this Court's order denying Defendant's post-

27  judgment Motion to Alter or Amend Judgment entered on November 20, 2014.

28

1

1    Defendant previously filed a Notice of Appeal to appeal the Court's final judgment entered

2  on August 25, 2014.  Subsequently on November 20, 2014, the Court denied Defendant's post-

3  judgment Motion to Alter or Amend Judgment.  Defendant files this Amended Notice of Appeal

4  to appeal both the Final Judgment and the order denying Defendant's Motion to Alter or Amend

5  Judgment.

6

7  Dated:  December 19, 2014                          Respectfully submitted,

8                                                     KAMALA D. HARRIS
                                                      Attorney General of California
9                                                     MARK R. BECKINGTON
                                                      Supervising Deputy Attorney General
10
                                                      /s/ Peter H. Chang
11
12                                                    PETER H. CHANG
                                                      Deputy Attorney General
                                                      *Attorneys for Defendant Kamala D. Harris,*
13                                                    *Attorney General of California*

14  SA2012104659
    11637060.doc
15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                            2
Amended Notice of Appeal  (1:11-cv-02137-AWI-SKO)

No. 14-16840

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

**JEFF SILVESTER, BRANDON COMBS, THE CALGUNS FOUNDATION, INC., a non-profit organization, and THE SECOND AMENDMENT FOUNDATION, INC., a non-profit organization,**

> Plaintiffs and Appellees,

**v.**

**KAMALA HARRIS, Attorney General of California (in her official capacity),**

> Defendant and Appellant.

---

On Appeal from the United States District Court
for the Eastern District of California

Case No. 1:11-cv-02137-AWI-SKO
The Honorable Anthony W. Ishii, Judge

## NOTICE OF RULING ON MOTION TO AMEND JUDGMENT AND STATEMENT OF INTENT TO PROSECUTE APPEAL

| | |
|---|---|
| KAMALA D. HARRIS | JONATHAN M. EISENBERG |
| Attorney General of California | Deputy Attorney General |
| DOUGLAS J. WOODS | State Bar No. 184162 |
| Senior Assistant Attorney General | 300 South Spring St., Suite 1792 |
| MARK R. BECKINGTON | Los Angeles, CA 90013 |
| Supervising Deputy Attorney General | Telephone: (213) 897-6505 |
| PETER H. CHANG | Fax: (213) 897-5775 |
| Deputy Attorney General | Email: Jonathan.Eisenberg@doj.ca.gov |
| | *Attorneys for Appellant Kamala D. Harris,* |
| | *Attorney General of California* |

Appellant Kamala D. Harris, Attorney General of California ("Appellant"), hereby notifies the Court that, on November 20, 2014, the trial court decided, by denying, Appellant's motion to amend the judgment in the present case.

Appellant also advises the Court that Appellant intends to prosecute the appeal that was originally noticed on September 24, 2014.

Appellant makes these statements in response to the Court's October 7, 2014, order.

Dated:  November 25, 2014         Respectfully Submitted,

                                 KAMALA D. HARRIS
                                 Attorney General of California
                                 DOUGLAS J. WOODS
                                 Senior Assistant Attorney General
                                 MARK R. BECKINGTON
                                 Supervising Deputy Attorney General

                                 /s/ Jonathan M. Eisenberg_____
                                 JONATHAN M. EISENBERG
                                 Deputy Attorney General
                                 *Attorneys for Appellant Kamala D. Harris,*
                                 *Attorney General of California*

1

FILED

UNITED STATES COURT OF APPEALS

OCT 07 2014

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| JEFF SILVESTER; et al., | No. 14-16840 |
| Plaintiffs - Appellees, | D.C. No. 1:11-cv-02137-AWI-SKO |
| v. | Eastern District of California, Fresno |
| KAMALA D. HARRIS, Attorney General of the State of California, in her official capacity, | |
| Defendant - Appellant. | ORDER |

The notice of appeal was filed during the pendency of a timely filed motion

listed in Federal Rule of Appellate Procedure 4(a)(4).  The notice of appeal is

therefore ineffective until entry of the order disposing of the last such motion

outstanding.  *See* Fed. R. App. P. 4(a)(4).  Accordingly, appellant's motion to hold

this appeal in abeyance is granted.  Appellate proceedings other than mediation

shall be held in abeyance pending the district court's resolution of the motion to

amend the judgment.  *See Leader Nat'l Ins. Co. v. Indus. Indem. Ins. Co.*, 19 F.3d

444, 445 (9th Cir. 1994).

AT/MOATT

Within 5 days after the district court's ruling on the pending motion, appellant shall notify this court in writing of the ruling and shall advise whether appellant intends to prosecute this appeal.

To appeal the district court's ruling on the post-judgment motion, appellant must file an amended notice of appeal within the time prescribed by Federal Rule of Appellate Procedure 4.

The Clerk shall serve this order on the district court.

FOR THE COURT:

MOLLY C. DWYER
CLERK OF COURT

By: Allison Taylor
Motions Attorney/Deputy Clerk

AT/MOATT                                                           14-16840

1  KAMALA D. HARRIS, State Bar No. 146672
   Attorney General of California
2  MARK R. BECKINGTON, State Bar No. 126009
   Supervising Deputy Attorney General
3  PETER H. CHANG, State Bar No. 241467
   Deputy Attorney General
4  JONATHAN M. EISENBERG, State Bar No. 184162
   Deputy Attorney General
5    300 Spring Street, Suite 1702
     Los Angeles, CA  90013
6    Telephone:  (213) 897-6505
     Fax:  (213) 897-5775
7    E-mail:  Jonathan.Eisenberg@doj.ca.gov
   *Attorneys for Defendant Kamala D. Harris,*
8  *as California Attorney General*

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE EASTERN DISTRICT OF CALIFORNIA

11                      FRESNO DIVISION

12

13

14 | **JEFF SILVESTER, BRANDON COMBS,** | 1:11-cv-02137-AWI-SKO |

**THE CALGUNS FOUNDATION, INC., a**

15 **non-profit organization, and THE SECOND** | **NOTICE OF APPEAL, INCLUDING**

**AMENDMENT FOUNDATION, INC., a** | **REPRESENTATION STATEMENT**

16 **non-profit organization,**

17                              Plaintiffs,     Judge:        Hon. Anthony W. Ishii
                                               Trial Date:   March 25, 2014
18        **v.**                               Action Filed:  December 23, 2011

19

20 **KAMALA D. HARRIS, Attorney General of**
   **California (in her official capacity),**

21                              Defendant.

22

23       TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

24       PLEASE TAKE NOTICE that Kamala D. Harris, Attorney General of California (the

25 "Attorney General"), defendant in the above-named case, hereby appeals to the U.S. Court of

26 Appeals for the Ninth Circuit from this Court's final judgment entered in this action on

27 August 25, 2014.

28

                                    1

Notice of Appeal (1:11-cv-02137-AWI-SKO)

1    By a motion filed on September 22, 2014, the Attorney General also is seeking, under

2    Federal Rule of Civil Procedure 59(e), to amend the judgment to adjust this Court's remedial

3    order for injunctive relief entered in this action; that order also issued on August 25, 2014.  The

4    instant notice of appeal will become effective upon the disposition of that motion.  *See* Fed. R.

5    App. P. 4(a)(4)(B)(i) ("If a party files a notice of appeal after the court announces or enters a

6    judgment—but before it disposes of any motion listed in Rule 4(a)(4)(A)—the notice becomes

7    effective to appeal a judgment or order, in whole or in part, when the order disposing of the last

8    such remaining motion is entered.").  A motion to amend a judgment is one of the motions that

9    has this effect.  *See* Fed. R. App. P. 4(a)(4)(A)(v).

10   Dated:  September 24, 2014                    Respectfully submitted,

11                                                 KAMALA D. HARRIS
                                                   Attorney General of California
12                                                 MARK R. BECKINGTON
                                                   Supervising Deputy Attorney General
13                                                 PETER H. CHANG
                                                   Deputy Attorney General
14

15

16                                                 _/s/_____
                                                   JONATHAN M. EISENBERG
17                                                 Deputy Attorney General
                                                   *Attorneys for Defendant Kamala D. Harris,*
18                                                 *as California Attorney General*

19

20

21

22

23

24

25

26

27

28

2

# REPRESENTATION STATEMENT

The undersigned represents Kamala D. Harris, Attorney General of California, defendant and appellant in this matter, and no other party.  Below is a service list that shows all of the parties in this lawsuit, and identifies their counsel by name, firm/office, U.S. mail address, telephone number, and e-mail address.

Plaintiff (and Putative Appellee) **Jeff Silvester** is represented by Victor J. Otten, Otten Law, PC, 3620 Pacific Coast Hwy., Ste. 100, Torrance, CA  90505; (310) 378-8533; vic@ottenlawpc; and also by Donald E.J. Kilmer, Law Offices of Donald Kilmer, APC, 1645 Willow St., Ste. 150, San Jose, CA  95125; (408) 264-8489; don@dklaawoffice.com.

Plaintiff (and Putative Appellee) **Brandon Combs** is represented by Victor J. Otten, Otten Law, PC, 3620 Pacific Coast Hwy., Ste. 100, Torrance, CA  90505; (310) 378-8533; vic@ottenlawpc; and also by Donald E.J. Kilmer, Law Offices of Donald Kilmer, APC, 1645 Willow St., Ste. 150, San Jose, CA  95125; (408) 264-8489; don@dklaawoffice.com.

Plaintiff (and Putative Appellee) **The Calguns Foundation, Inc.,** is represented by Victor J. Otten, Otten Law, PC, 3620 Pacific Coast Hwy., Ste. 100, Torrance, CA  90505; (310) 378-8533; vic@ottenlawpc; and also by Donald E.J. Kilmer, Law Offices of Donald Kilmer, APC, 1645 Willow St., Ste. 150, San Jose, CA  95125; (408) 264-8489; don@dklaawoffice.com.

Plaintiff (and Putative Appellee) **The Second Amendment Foundation, Inc.,** is represented by Victor J. Otten, Otten Law, PC, 3620 Pacific Coast Hwy., Ste. 100, Torrance, CA  90505; (310) 378-8533; vic@ottenlawpc; and also by Donald E.J. Kilmer, Law Offices of Donald Kilmer, APC, 1645 Willow St., Ste. 150, San Jose, CA  95125; (408) 264-8489; don@dklaawoffice.com.

Defendant and Appellant **Kamala D. Harris**, Attorney General of California, is represented by Jonathan M. Eisenberg, Office of the California Attorney General, 300 South Spring St., Ste. 1702, Los Angeles, CA  90013; (213) 897-6505; jonathan.eisenberg@doj.ca.gov; and also by

1   Peter H. Chang, Office of the California Attorney General, 455 Golden Gate Ave., Ste. 11000,

2   San Francisco, CA  94102; (415) 703-5939; peter.chang@doj.ca.gov.

3   Dated:  September 24, 2014                    Respectfully submitted,

4                                                KAMALA D. HARRIS
                                                 Attorney General of California
5                                                MARK R. BECKINGTON
                                                 Supervising Deputy Attorney General
6                                                PETER H. CHANG
                                                 Deputy Attorney General
7

8

9                                                 /s/
                                                 _____
10                                               JONATHAN M. EISENBERG
                                                 Deputy Attorney General
11                                               *Attorneys for Defendant Kamala D. Harris,*
                                                 *as California Attorney General*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

Notice of Appeal (1:11-cv-02137-AWI-SKO)

1  KAMALA D. HARRIS, State Bar No. 146672
   Attorney General of California
2  MARK R. BECKINGTON, State Bar No. 126009
   Supervising Deputy Attorney General
3  JONATHAN M. EISENBERG, State Bar No. 184162
   Deputy Attorney General
4  PETER H. CHANG, State Bar No. 241467
   Deputy Attorney General
5   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
6   Telephone:  (415) 703-5939
    Fax:  (415) 703-1234
7   E-mail:  Peter.Chang@doj.ca.gov
   *Attorneys for Defendant Kamala D. Harris,*
8  *as California Attorney General*

9                 IN THE UNITED STATES DISTRICT COURT

10               FOR THE EASTERN DISTRICT OF CALIFORNIA

11                          FRESNO DIVISION

12

13

14 **JEFF SILVESTER, BRANDON COMBS,**          1:11-cv-02137-AWI-SKO
   **THE CALGUNS FOUNDATION, INC., a**
15 **non-profit organization, and THE SECOND**  **SUPPLEMENTAL DECLARATION OF**
   **AMENDMENT FOUNDATION, INC., a**          **STEPHEN J. LINDLEY IN SUPPORT OF**
16 **non-profit organization,**                **DEFENDANT'S MOTION TO ALTER**
                                              **OR AMEND JUDGMENT**
17                          Plaintiffs,

18         v.

19

20 **KAMALA D. HARRIS, Attorney General of**
   **California (in her official capacity),**
21                          Defendant.

22

23

24

25

26

27

28

                                  1

## DECLARATION OF STEPHEN J. LINDLEY

I, Stephen J. Lindley, declare:

1.    I have personal knowledge of the following facts, and, if I am called as a witness at a relevant proceeding, I could and would testify competently to the following facts.

2.    I am the Chief of the California Department of Justice (DOJ)'s Bureau of Firearms (BOF).

3.    Funds already appropriated by the Legislature to BOF, including the DROS Special Account and the Firearms Safety and Enforcement Special Fund, are used to pay for current BOF operations. Funds in the DROS Special Account are used to maintain BOF's DROS operations with the current level of staffing. That money is used to pay for salaries and benefits of existing employees, maintenance of facilities, equipment and systems, training costs, and other program costs.

4.    In addition to the DROS program, BOF currently administers more than 30 other programs mandated by the California Legislature. These programs include the Armed Prohibited Persons System (APPS), the Automated Firearm System (AFS), Dealer Inspection, and Personal Firearms Eligibility Check. Funds now appropriated to BOF are used to pay for the operations of these programs as well.

5.    I am also aware that plaintiffs assert that DOJ has made no material progress toward complying with the Court's order. This is untrue.

6.    Since the Court issued its order, the DOJ has taken steps to implement the automated approach that I discussed in my September 24, 2014 declaration (in paragraphs 14 and 15). We have been analyzing the technology changes that must be made to DROS and other DOJ systems to comply with the Court's Order and have taken steps to make those changes. Specifically, we have designed the business rules and processes to implement the Court's order and are finalizing a Request for Proposal to solicit bids from prospective vendors in order to implement the necessary changes to DOJ's systems.

7.    On the personnel side, we have identified the equipment needed for new employees and identified trainers for those new employees. We are currently preparing job fliers, identifying

2

1   workspace for new employees, preparing written procedures for CIS analysts for the new process

2   necessary to implement the Court's order, and working on a recruitment plan to bring in qualified

3   applicants.

4       8.    Any further steps beyond what we have already taken will require significant

5   expenditures that cannot be recovered if BOF is later relieved from complying with the Court's

6   order.

7       9.    For example, once BOF procures a vendor to make changes to DOJ's systems, the

8   payments made to the vendor cannot be later be recovered. Furthermore, once changes to DOJ's

9   systems are made, should those changes be not necessary later, BOF may have to pay a vendor to

10  undo those changes.

11      10.    Additionally, once BOF hires additional analysts to perform the extra steps in DROS

12  processing required to implement the Court's order, BOF would be left with excess staffing

13  should those analysts not be needed later.

14

15      I declare under penalty of perjury that the foregoing is true and correct. Executed on

16  November 3, 2014 at Sacramento, California.

17

18

19                      Stephen J. Lindley

20

21

22

23

24

25

26

27

28

Supp. Decl. of Stephen J. Lindley ISO Motion to Amend  (1:11-cv-02137-AWI-SKO)

1   KAMALA D. HARRIS, State Bar No. 146672
    Attorney General of California
2   MARK R. BECKINGTON, State Bar No. 126009
    Supervising Deputy Attorney General
3   JONATHAN M. EISENBERG, State Bar No. 184162
    Deputy Attorney General
4   PETER H. CHANG, State Bar No. 241467
    Deputy Attorney General
5     455 Golden Gate Avenue, Suite 11000
      San Francisco, CA  94102-7004
6     Telephone:  (415) 703-5939
      Fax:  (415) 703-1234
7     E-mail:  Peter.Chang@doj.ca.gov
    *Attorneys for Defendant Kamala D. Harris,*
8   *as California Attorney General*

9                  IN THE UNITED STATES DISTRICT COURT

10               FOR THE EASTERN DISTRICT OF CALIFORNIA

11                            FRESNO DIVISION

12

13

14   **JEFF SILVESTER, BRANDON COMBS,**          1:11-cv-02137-AWI-SKO
     **THE CALGUNS FOUNDATION, INC., a**
15   **non-profit organization, and THE SECOND**  **DECLARATION OF STEPHEN J.**
     **AMENDMENT FOUNDATION, INC., a**            **LINDLEY IN SUPPORT OF**
16   **non-profit organization,**                 **DEFENDANT'S MOTION TO ALTER**
                                                   **OR AMEND JUDGMENT**
17                              Plaintiffs,

18          v.

19
     **KAMALA D. HARRIS, Attorney General of**
20   **California (in her official capacity),**

21                              Defendant.

22

23

24

25

26

27

28

                                    1

1

## DECLARATION OF STEPHEN J. LINDLEY

2      I, Stephen J. Lindley, declare:

3      1.      I have personal knowledge of the following facts, and, if I am called as a witness at a

4   relevant proceeding, I could and would testify competently to the following facts.

5      2.      I am the Chief of the California Department of Justice (DOJ)'s Bureau of Firearms

6   (BOF).

7      3.      I have been employed with DOJ since 2001, and have held my current position since

8   2009.

9      4.      I have reviewed the Court's August 25, 2014, Order and understand its requirements.

10   I have discussed the requirements with members of my staff and have come to an initial

11   determination of the changes that BOF must make to implement the Court's Order.

12      5.      To comply with the Court's Order, BOF has two options.  Either BOF will need to

13   have its analysts manually evaluate whether each of the firearm-purchase (DROS) applicants

14   meets the criteria in the Order for immediate release of the firearm(s) after passing the

15   background check, or alternatively, it will need to change certain of its computer systems so that

16   relevant data from the CCW database, the COE database, and the Automated Firearm System

17   (AFS) are automatically queried and returned as part of the Basic Firearms Eligibility Check

18   (BFEC).

19      6.      The manual approach requires at least 12 months to implement.

20      7.      Under the manual approach, BOF analysts would manually query the CCW database,

21   the COE database, and AFS, as part of the background check.  However, this would require a

22   significant increase to the number of analysts BOF has on staff for two reasons.

23      8.      First, BOF analysts would need to manually query these databases for all DROS

24   applications, and not just those that were *not* auto-approved.  A DROS applicant could no longer

25   be auto-approved under this approach, because a determination must first be made as to whether

26   each applicant meets the criteria in the Order.  This means that analysts' workload would be

27   instantly increased because the analysts would have to review applications that were previously

28

2

auto-approved. (In the first eight months of 2014, BOF analysts reviewed approximately 85 percent of all DROS applications while the remainder were auto-approved.)

9. Second, for BOF analysts to manually query the CCW database, the COE database, and AFS, the analysts must access a separate system interface and perform the queries separately against the different databases. This increases the amount of time that analysts must spend reviewing each application.

10. BOF processed 960,179 DROS applications in 2013. BOF anticipates processing a similar number of DROS applications this year. Any increase in the time that it takes the analysts to review each application is amplified by the large number of DROS applications that BOF processes.

11. For these two reasons, if BOF analysts are required to manually query the CCW database, the COE database, and AFS to comply with the Court's Order, BOF will need a significant increase in the number of analysts it currently has on staff.

12. BOF's existing analysts on staff are already working in excess of 40 hours a week. BOF presently mandates the analysts to work at least 10 hours of overtime each week to keep up with the processing of DROS applications.

13. To hire additional BOF analysts to meet the anticipated increase in workload under the manual approach, BOF would require a significant increase in funding, which must come from the California Legislature. Assuming that BOF is able to obtain the necessary funding from the Legislature, it would then take at least six to eight months to hire and train the analysts before the new analysts may process applications independently. For these reasons, it would take more than 180 days and most likely at least 12 months to get sufficient numbers of analysts to manually implement the Court Order.

14. The second approach is to change DOJ's computers systems so that relevant data from the CCW database, the COE database, and AFS are automatically queried as part of the BFEC for each DROS applicant. Then, after completion of the background check, and if the

3

DROS applicant meets the criteria in the Order, DOJ could inform the firearm dealer that the firearm(s) may be released to the DROS applicant.

15.     This is BOF's preferred approach since, once implemented, it will likely require fewer human resources and would be more efficient.  This approach, however, will also most likely take at least 12 months to implement.  DOJ's internal IT staff with the proper skills and training to work on these systems and databases are presently assigned to other critical projects, many associated with deadlines set by statutes.  DOJ risks missing certain of the deadlines if these IT staff members are required to be pulled off of those projects in order to change BOF's applications and databases within 180 days.  Based on my preliminary analysis, and the fact that staff with the necessary skills is presently assigned to other critical BOF projects, I believe that BOF will have to contract with outside vendors to work with DOJ staff to implement the changes to the various systems and databases described in the paragraphs to implement the changes ordered by the Court.

16.     Furthermore, even under this approach, additional BOF analysts are likely required since the analysts may need to review certain extra records, such as records where a positive identity match could not be made or records that show unclear results.  Therefore, the above-described delay issues related to BOF's budget and hiring and training new analysts would still come into play.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.


Executed this 22 day of September, 2014, at Sacramento, California.



Stephen J. Lindley

4

1   KAMALA D. HARRIS, State Bar No. 146672
    Attorney General of California
2   MARK R. BECKINGTON, State Bar No. 126009
    Supervising Deputy Attorney General
3   JONATHAN M. EISENBERG, State Bar No. 184162
    Deputy Attorney General
4   PETER H. CHANG, State Bar No. 241467
    Deputy Attorney General
5    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
6    Telephone: (415) 703-5939
     Fax: (415) 703-1234
7    E-mail:  Peter.Chang@doj.ca.gov
    *Attorneys for Defendant Kamala D. Harris,*
8   *as California Attorney General*

9                        IN THE UNITED STATES DISTRICT COURT

10                     FOR THE EASTERN DISTRICT OF CALIFORNIA

11                                   FRESNO DIVISION

12

13

14   **JEFF SILVESTER, BRANDON COMBS,**          1:11-cv-02137-AWI-SKO
     **THE CALGUNS FOUNDATION, INC., a**
15   **non-profit organization, and THE SECOND**  **DECLARATION OF MARC ST. PIERRE**
     **AMENDMENT FOUNDATION, INC., a**            **IN SUPPORT OF DEFENDANT'S**
16   **non-profit organization,**                 **MOTION TO ALTER OR AMEND**
                                                  **JUDGMENT**
17                                Plaintiffs,

18        v.

19
     **KAMALA D. HARRIS, Attorney General of**
20   **California (in her official capacity),**

21                                Defendant.

22

23

24

25

26

27

28

                                      1

**DECLARATION OF MARC ST. PIERRE**

I, Marc St. Pierre, declare:

1.     I have personal knowledge of the following facts, and, if I am called as a witness at a relevant proceeding, I could and would testify competently to the following facts.

2.     I am a Data Processing Manager II with the California Department of Justice (DOJ). I manage the Information Technology (IT) application development team responsible for supporting numerous applications for the Bureau of Firearms (BOF), including the Automated Firearms System (AFS), Carry Concealed Weapons (CCW), California Firearms Information Gateway (CFIG), Certificate of Eligibility (COE), Consolidated Firearms Information System (CFIS), Dealer Record of Sale (DROS) System, and the DROS Entry System (DES).

3.     I have been with the Department of Justice since 1998. I have held my current position since July 1, 2013.

4.     I am familiar with the various BOF applications and databases that my team supports as part of the DROS background check process.

5.     Presently, the CCW database and COE database are not queried as part of the Basic Firearms Eligibility Check (BFEC). Also, AFS is not queried as part of the BFEC to determine whether a DROS applicant in the AFS has a firearm.

6.     Presently, AFS is queried as part of the BFEC only to determine whether the firearm identified in the DROS application by its serial number has been reported lost or stolen.

7.     Conceptually, it may be simple to alter the DROS background check process to check whether a DROS applicant has an active CCW license or an active COE, or the applicant has a firearm in AFS. Technologically, however, it is a complex process that will require highly-skilled resources to make the changes to the various IT systems and processes involved in the DROS background check process.

8.     In my preliminary analysis, I believe that, to implement the Court's Order such that queries to CCW, COE, and AFS are automated as part of the BFEC, changes must be made at least to the DROS, DES, and CFIS. I am currently investigating and analyzing the changes that

may be needed to be made to each of these systems. Further analysis may show that it will be necessary to modify other systems, including but not limited to CFIG, COE, CCW, and AFS.

9.    I have been involved with BOF's procurement of outside vendors to make technical changes to DOJ's computer systems and am familiar with the general process and the time required.

10.    The first step in the procurement process is to prepare a Statement of Work (SOW) and a Request for Proposal (RFP). To prepare these documents, BOF will first need to develop an initial set of business requirements (or business rules) for the changes that need to be made to the computer systems.

11.    This involves a preliminary determination as to which of BOF's computer systems and databases may need to be changed, and what changes may need to be made to each of the impacted systems and databases. As discussed above in paragraph 8, I have made a preliminary determination as to which systems may be impacted and am in the process of determining the changes that will likely need to be made to each of those systems.

12.    Once BOF determines the preliminary set of business requirements, DOJ will prepare the SOW and the RFP, and release them to the vendors.

13.    The vendors may then ask DOJ questions about various aspects of the SOW and RFP. BOF will publish the answers to those questions to all vendors, who may then ask additional or follow up questions. There may be multiple rounds of questions and answers.

14.    After all vendor questions have been answered, the vendors would submit their bids and responses for the project. DOJ would then review these responses and bids, including checking the vendors' references.

15.    DOJ would then select a vendor for the project, negotiate a contract with the vendor, and then submit the contract for approval through the Department's contract and procurement section. After the contract is approved, DOJ then conducts fingerprint clearance checks on the selected vendor's proposed personnel to work on the project. Once the fingerprint clearances are received the vendor may begin work on the project. DOJ must provide the vendor personnel with

3

adequate on-site workspaces, with all the necessary equipment and software required to complete the scope of work.

16.     I estimate that the procurement process I describe in paragraphs 10-15 above will take approximately six months.

17.     I base my estimate based on my involvement in BOF's recent procurement of contracts with an outside vendor to make changes to BOF's computers systems, which took approximately six months, from developing the preliminary business requirements to when the vendor actually began work on the project.

18.     After procuring the vendor, it will most likely take the vendor, working closely with DOJ staff, at least six months to develop detailed business requirements, write the code, test the code, and then ultimately implement the code.  It typically takes this amount of time to make technical changes to BOF's computer systems because it is an iterative process to write and test the code and further modify the business requirements as necessary.  During the process of writing and testing code, the initially-determined business requirements typically need to be modified because of issues that became apparent or arise during the writing and testing of the code.  After the business requirements are then modified, new code would have to be written and tested, which may then lead to the need for further modification of the business requirements. This process repeats until the final code is successfully tested and implemented, and which business requirements meet BOF's objectives.

19.     In sum, based on my past experiences with DOJ, my preliminary estimate is that it will most likely take at least 12 months to procure a vendor and make the necessary technical changes to BOF's computer systems and databases to implement the changes ordered by the Court.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Decl. of Mara St. Pierre ISO Motion to Amend  (1:11-cv-02137-AWI-SKO)

1

Executed this _22_ day of September, 2014, at Sacramento, California.

2

3

4

5

Marc St. Pierre

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

**JUDGMENT IN A CIVIL CASE**

**JEFF SILVESTER, ET AL.,**

CASE NO: **1:11–CV–02137–AWI–SKO**

v.

**KAMALA D. HARRIS, ET AL.,**

_____

**XX** –– **Decision by the Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

**THAT JUDGMENT IS HEREBY ENTERED IN ACCORDANCE WITH THE COURT'S ORDER FILED ON 8/25/2014**

**Marianne Matherly**
Clerk of Court

ENTERED:  **August 25, 2014**

by:  /s/  T. Lundstrom_____
                Deputy Clerk

# "READY REFERENCE" TABLE

(Providing citations to specific portions of each jurisdiction's laws; please see the endnotes and fully review the sections cited.)

| JURISDICTION NAME | PURCHASER WAITING PERIOD | LICENSE: DEALER, MANUFACTURER, ETC. | LOCAL GOVERNMENT LIMITS (PREEMPTION) | LIMITS TO INTERSTATE PURCHASE AND SALE |
|---|---|---|---|---|
| ALABAMA | | 13A-11-78 [pistols]; 40-12-143 [handguns] & 40-12-158 [long guns] | 11-45-1.1; 11-80-11 | |
| ALASKA | | | 18.65.778 [concealed handguns]; 29.35.145 | |
| AMERICAN SAMOA | | 46.4222 [import]; 46.4223 [sale] | | 46.4222 [importation] |
| ARIZONA | | | 13-3108, but see 15-341 | 13-3106 & 13-3112(U)(V)(W) |
| ARKANSAS | | | 14-16-504; 14-54-1411 | 5-73-125 |
| CALIFORNIA | Penal Code 12072(c) | Penal Code 12070 et seq.; 12086 [firearm manufacture]; 12095 [short-barreled shotguns]; 12250 [machine guns]; 12287 [assault weapons & .50 BMG rifles]; 12305 [destructive devices] | Gov't Code 53071 & 53071.5 | Penal Code 12071(b)(8)(C); 12071(b)(3)(A); 12076 |
| COLORADO | | | 18-12-105.6 [firearms in vehicles]; 29-11.7-101 et seq. | 12-27-101 to 104 |
| CONNECTICUT | 29-37a [2 weeks: long guns] | 29-28 [handguns] | | |
| DELAWARE | | Title 24,§§ 901 to 905 | Title 9, §330(c); Title 22, §111 | |
| DISTRICT OF COLUMBIA | 22-4508 [48 hrs: pistols] | 7-2504.01 et seq.; 22-4509 & 4510 | | 7-2505.02(b)(1) |
| FLORIDA | 790.0655 [3 days: handguns] | | 790.33; 790.335 [registration] | 790.28 |
| GEORGIA | | 43-16-1 et seq. [handguns & arms <15"] | 16-11-173 | 10-1-100 & 101 |
| GUAM | | 60104 & 60115 [register] | | |
| HAWAII | 134-2  [14 to 20 days to obtain a license to purchase any handgun] | 134-31 et seq. | | |
| IDAHO | | | | 18-3314 & 3315 |
| ILLINOIS | Ch. 720, 5/24-3(A)(g) [72 hrs: concealable; 24 hrs: long guns, stunguns and tasers] | | Ch. 430, 65/13.1 [not preempted] Ch. 720, 5/24-10 [affirmative defense] | Ch. 430, 65/3a |
| INDIANA | | 35-47-2-14 to 16 & 21 | 35-47-11 | 35-47-5-6 |
| IOWA | | | 724.28 | |
| KANSAS | | | | 48-1901 to 1904 |
| KENTUCKY | | | 65.870; 237.110(19) | 237.020 |
| LOUISIANA | | 40:1787 [register] | 40:1796 | 40:1801 to 1804 |
| MAINE | | | Tit. 25, §2011 | |
| MARYLAND | Pub. Safety Art. 5-123 & 124 [7 days: regulated firearms] | Pub. Safety Art. 5-106 et seq. [regulated firearms] & 11-105 [explosives] | Crim. Law Art. 4-209; Pub. Safety Art. 5-104, 133(a) & 134(a) [regulated firearms] | Pub. Safety Art. 5-204 [long guns] |
| MASSACHUSETTS | | Ch. 140, §122 et seq. | | |
| MICHIGAN | | | 123.1101 to 123.1104 | 3.111 & 3.112 |
| MINNESOTA | 624.7132, subd. 4 [5 business days: pistols, assault weapons] | | 471.633 & 634; 609.67 subd. 6; 624.7131 subd. 12; 624.7132 subd. 16; 624.717; 624.74 subd. 4 | 624.71 |
| MISSISSIPPI | | | 45-9-51 & 53 | |
| MISSOURI | Section Repealed | | 21.750 | 407.500 & 407.505 |
| MONTANA | | | 45-8-351 | |
| NEBRASKA | 69-2405 [3 days; handgun] | | 69-2425 [no preemption] | 28-1211 |
| NEVADA | | 202.440 [local license] | | |
| NEW HAMPSHIRE | | 159.8 & 159.10 [handguns] | 159:26 | 159:8-a |
| NEW JERSEY | 2C:58-3 [up to 30 days for permit] | 2C:58-1 & 58-2 | 2C:1-5.d. | |
| NEW MEXICO | | | | 30-7-9 |

# "READY REFERENCE" TABLE

| JURISDICTION NAME | PURCHASER WAITING PERIOD | LICENSE: DEALER, MANUFACTURER, ETC. | LOCAL GOVERNMENT LIMITS (PREEMPTION) | LIMITS TO INTERSTATE PURCHASE AND SALE |
|---|---|---|---|---|
| NEW YORK | 400.00 (4.a) [up to 6 months for permit] | Penal Law 400.00 | Penal Law 400.00.6 [licenses] | Penal Law 265.40 |
| NORTH CAROLINA | 14-404 [up to 30 days for handgun permit] | | 14-409.40; 14-415.23 [concealed handguns] | 14-409.10 |
| NORTH DAKOTA | | | 62.1-01-03 | |
| NORTHERN MARIANA IS. | | 2209; 2210; 2217 | 2227 [no preemption] | |
| OHIO | | | Note after 2923.12: 2004 Ohio Laws File 53 (HB 12) §9 [concealed handguns] | 2923.22 |
| OKLAHOMA | | | Title 21, §1289.24 | Title 21, §1288 |
| OREGON | | | 166.170 to 176 | 166.490 |
| PENNSYLVANIA | 6111(a) [48 hrs] | 6112 & 6113 | 6120 | 6141.1 |
| PUERTO RICO | | Tit. 25, §§ 456, 456g, 458 | | |
| RHODE ISLAND | 11-47-35 & 35.2 [7 days] | 11-47-19 [machine gun manufacturers]; 11-47-38 & 39 [retail dealers] | 11-47-58 | 11-47-36 [concealable firearm] |
| SOUTH CAROLINA | | 23-31-130 & 150 [pistols]; 23-31-370 [machine guns] | 23-31-510 & 520 | 23-31-10 & 20 |
| SOUTH DAKOTA | 23-7-9 [48 hrs: pistols (concealed permit holders exempt)] | | 7-18A-36; 8-5-13; 9-19-20 | 23-7-40 |
| TENNESSEE | 39-17-1316 | | 39-17-1314 | |
| TEXAS | | | Local Gov't Code 229.001 & 235.021 to 024 | Penal Code 46.07 |
| UTAH | | | 76-10-500 | 76-10-524 |
| VERMONT | | | Title 24, §2295 | Title 13, §§ 4014 & 4015 |
| VIRGINIA | | | 15.2-915 to 915.4; 15.2-1206 to 1209.1 | |
| VIRGIN ISLANDS | 466 [48 hrs] | 461-462 & 467-468 | | 470 [importation] |
| WASHINGTON | 9.41.090(1) [5 days: pistols] | 9.41.100 & 9.41.110 | 9.41.290 | 9.41.122 & 9.41.124 |
| WEST VIRGINIA | | | 8-12-5a | |
| WISCONSIN | 175.35 [48 hrs: handguns] | | 66.0409 | 175.30 |
| WYOMING | | | 6-8-401 | |

## ENDNOTES

(**N.B.:** The text of the above-cited provisions should be thoroughly examined in context to ascertain their TRUE effect.)

1.  Blank spaces indicate no relevant statutes were located.
2.  Jurisdictions include the 50 States, the District of Columbia, American Samoa, Guam, Northern Mariana Islands, Puerto Rico, and Virgin Islands.
3.  "PURCHASER WAITING PERIOD" – generally refers to the period between purchaser application for firearms and allowable receipt or delivery.  Exceptions exist among the jurisdictions.
4.  "LICENSE: DEALER, MANUFACTURER, ETC." – generally means the person must have BOTH a Federal and State license.
5.  "LOCAL GOVERNMENT LIMITS (PREEMPTION)" – means that the jurisdiction overrides its subordinate jurisdictions in whole or in part.
6.  "LIMITS TO INTERSTATE PURCHASE AND SALE" (also known as "Contiguous State Provisions") – those legislative limits to interstate purchase and sale enacted by jurisdictions based on the GCA are cited, if available.

**NOTICE:** For an official interpretation of a jurisdiction's law, consult the appropriate government officials of that jurisdiction.

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII

| | | |
|---|---|---|
| JEFF SILVESTER, et al., | ) | 1:11-cv-2137-AWI |
| | ) | |
| Plaintiff, | ) | COURT TRIAL |
| | ) | |
| vs. | ) | Day 1 |
| | ) | |
| KAMALA D. HARRIS, Attorney | ) | |
| General of California, and | ) | |
| DOES 1 to 20, | ) | |
| | ) | |
| Defendants. | ) | |

Fresno, California                    Tuesday, March 25, 2014

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Volume 1, Pages 1 to 158, inclusive

REPORTED BY:   GAIL LACY THOMAS, RMR-CRR
Official Court Reporter
CSR NO. 3278

Silvester - X

35

1  two trips?

2  A.  My understanding of the way shipping a firearm works, I

3  would have it shipped, I would have to go to the dealer that

4  received the firearm and start the transaction and then wait

5  ten days or ten 24-hour periods and then go a second time to

6  pick up the firearm.

7  Q.  Now, you've estimated that you've spent -- you estimated

8  that -- excuse me.

9       Now, you have also talked about the instances when

10  you have been unable to purchase firearms because of having to

11  make a second trip; correct?

12  A.  Yes.

13  Q.  And one of the handguns you talked about was in Redding?

14  A.  Yes, or there -- local about.  I'm not specifically sure

15  that it was actually in Redding.

16  Q.  Sure.  And you live in Hanover, California?

17  A.  Hanford.

18  Q.  Hanford, California.  And it's about -- would you say it's

19  about 350 miles from your place, from Hanford to Redding?

20  A.  I'm not sure specifically, but it sounds about right.

21  Q.  So if the Waiting-Period Law did not apply to you, it

22  would not be a financial burden for you to drive from Hanford,

23  California to Redding, California one time to pick up the

24  handgun; correct?

25  A.  No, I would take my family camping.

1  Q.  Okay.  So you would make -- right.  Okay.

2      But to drive there a second time to pick up a handgun

3  makes it financially unfeasible to buy that gun?

4  A.  Yes.

5  Q.  So it's the expense of having to travel to a faraway

6  location like Redding a second time that makes it financially

7  unfeasible to buy that gun.  Right?

8  A.  Yes.

9  Q.  Now, the closest gun dealer to you is 8.2 miles from your

10  house; is that correct?

11  A.  Currently?

12  Q.  Currently.

13  A.  Today?  No.

14  Q.  Okay.  Today, what is the closest gun dealer to you?

15  A.  Maybe two miles.

16  Q.  Okay.  The closest gun dealer to you is two miles.  And

17  you have also bought a gun from a dealer as far away as

18  41 miles from your house; correct?

19  A.  Yes.

20  Q.  A gun shop called PRK Arms; correct?

21  A.  Correct.

22  Q.  And you take business trips, right, as part of your

23  business as a commercial insurance salesman?

24  A.  Yes.

25  Q.  And you drive while on these business trips, right?

Silvester - X

37

1   A.   Yes.

2   Q.   You drive on these business trips at least once a month?

3   A.   Yes.

4   Q.   In fact, you drive past one or more gun dealers while on

5   these business trips at least once a month; correct?

6   A.   Yes.

7   Q.   Now, Mr. Silvester, you testified you have a gun; correct?

8   A.   Yes.

9   Q.   In fact, you have more than one gun?

10  A.   Yes.

11  Q.   Now, these guns are legally registered to you?

12  A.   Yes.

13  Q.   These guns were not always available to you for use;

14  correct?

15  A.   Would you be more specific about what you mean?

16  Q.   Well, there are times when one or more of your guns were

17  not in working condition; correct?

18  A.   Yes.

19  Q.   In fact, there are times when one or more of your guns

20  were not in working condition for months at a time.

21  A.   Um-hmn.

22  Q.   If a gun is not in working condition, it's not available

23  for you to use; correct?

24  A.   Yes.

25  Q.   And there are times when you didn't have the proper

38

1    ammunition for one or more of your guns; correct?

2    A.  Yes.

3    Q.  In fact, there are times when you didn't have the proper

4    ammunition for one or more of your guns, and you had no

5    specific plans to acquire ammunition, the proper ammunition;

6    correct?

7    A.  Yes.

8    Q.  If a gun lacks the proper ammunition, it is not available

9    to be used; correct?

10   A.  Yes.

11   Q.  Different guns are also suitable for different purposes;

12   correct?

13   A.  Generally speaking, I would agree.

14   Q.  Okay.  For example, a gun that's suitable for sports

15   shooting or hunting may not be best suited for self-defense.

16   A.  By my personal definition of best suited, yeah.

17   Q.  What is your personal definition of best suited?

18   A.  The -- my personal definition would be something like, you

19   know, the best suited weapon for the environment and the

20   easiest for me to manipulate and handle for the situation.

21   Q.  Thank you.

22          Now, there's some exceptions to the Waiting-Period

23   Law that could apply to you, right?

24   A.  I'm not aware of any.

25   Q.  Well, for example, if your immediate family were to give

Silvester - X

39

1    you a gun, it wouldn't be subject to the waiting period,

2    right?

3    A.   I'm not a hundred percent sure about the law, but -- I'm

4    going to say, no, because I'm not sure a hundred percent.

5    Q.   Well, your father has given you a gun; correct?

6    A.   Yes.

7    Q.   Now, when your father gave you the gun, was there a 10-day

8    waiting period before you could receive the gun?

9    A.   No, there was not.

10   Q.   You received the gun immediately; correct?

11   A.   Yes.

12   Q.   Now, if you loan a gun to someone, you also don't need to

13   wait 10 days; correct?

14   A.   Correct.

15   Q.   You can just give the gun to that person immediately?

16   A.   Um-hmn.

17   Q.   If you borrow a gun from someone, you don't need to wait

18   10 days for that; correct?

19   A.   Correct.

20   Q.   And you can just have the gun immediately?

21   A.   Correct.

22   Q.   Do you have friends who own firearms?

23   A.   A few.

24   Q.   You have loaned -- have you loaned guns to your friends?

25   A.   I have loaned one gun, yes.

Silvester - X

40

1   Q.   Have you loaned the same gun to your friends multiple

2   times?

3   A.   I don't believe so.

4   Q.   So it's your testimony that you have only loaned your

5   handgun to someone once.

6   A.   That I can remember currently, yes.

7   Q.   You were deposed in this case last year; correct?

8   A.   Yes.

9   Q.   My colleague, Jonathan Eisenberg, took the deposition,

10  right?

11  A.   Yes.

12  Q.   And your attorney Victor Otten was there?

13  A.   Yes.

14  Q.   And there was a court reporter?

15  A.   Yes.

16  Q.   And the court reporter wrote down the questions that were

17  asked and the answers that you gave?

18  A.   Yes.

19  Q.   This deposition was on May 9th, 2013?

20  A.   Yes.

21  Q.   And when you testified, you swore to tell the truth;

22  correct?

23  A.   Yes.

24  Q.   And you told the truth at the deposition?

25  A.   Yes.

Silvester - X

41

1          MR. CHANG:  Your Honor, may I approach the witness?

2          THE COURT:  Yes.

3          (Pause in the proceedings.)

4    BY MR. CHANG:

5    Q.  Now, Mr. Silvester, I'll direct your attention to the top

6    of the page, the deposition transcript I just handed you.  You

7    were asked this question, you gave this answer:

8          "Have you ever loaned your -- any of your firearms to

9    another individual where that person had the firearm for more

10   than 24 hours?

11         "Answer:  Yes.

12         "Question:  How many times have you loaned a firearm

13   to someone for 24 hours or more?

14         "Answer:  I'm unsure of the total number of times.

15         "Question:  Can you give me your best estimate,

16   please.

17         "Answer:  More than five."

18         That was the testimony you gave under oath at the

19   deposition?

20   A.  Yes.

21   Q.  What's the longest period of time you have ever loaned a

22   gun to a friend?

23   A.  I'm not sure.

24   Q.  You have loaned a gun to a friend for as long as two

25   weeks, right?

Silvester - X

42

1    A.   I believe so.

2    Q.   You have also borrowed a firearm from a friend; correct?

3    A.   Yes.

4    Q.   You have borrowed a shotgun from a friend?

5    A.   Yes.

6    Q.   You also own a shotgun; correct?

7    A.   Yes.

8    Q.   Mr. Silvester, you're not a California peace officer;

9    correct?

10   A.   Correct.

11   Q.   You don't have a federal firearms dealer license?

12   A.   Correct.

13   Q.   And you're not a California firearms dealer; correct?

14   A.   Correct.

15   Q.   And you're not the holder of a dangerous weapons permit

16   from the California Department of Justice; correct?

17   A.   Correct.

18   Q.   And you're not a federally licensed gunsmith?

19   A.   Correct.

20   Q.   And you're not the owner of a target range?

21   A.   Correct.

22   Q.   And you're not the holder of an Entertainment Firearm

23   Permit from the California Department of Justice; correct?

24   A.   Correct.

25   Q.   And you're not the holder of a certificate of eligibility

Silvester - X

43

1  for a firearms consultant from the California Department of

2  Justice; correct?

3  A.  Correct.

4  Q.  Now, during your direct testimony, you mentioned that --

5  you mentioned a California firearms registry; correct?

6  A.  I don't remember what I said.

7  Q.  Did you say that your handgun is in the California

8  registry?

9  A.  My current handgun?

10  Q.  Correct.

11  A.  I don't recall what I said, but I believe that my gun is

12  in the registry, yes.

13  Q.  Okay.  Do you have any long guns?

14  A.  Yes.

15  Q.  Are you aware that the California firearm registry has

16  long guns in the database since only this year?

17  A.  Yes.

18  Q.  And unless someone volunteers to register an older long

19  gun, it's not in the registry; correct?

20  A.  Correct.

21  Q.  Now, you had -- you had talked about the Hanford Police

22  Department, before they gave you a concealed weapon permit, a

23  Concealed Carry Permit, that they required you to undergo

24  extra training; correct?

25  A.  Yes.

1   Foundation too; correct?

2   A.   That's correct.

3   Q.   I believe that you said that you billed The Second

4   Amendment Foundation at the rate of about $2,750 a month for

5   one-third time; correct?

6   A.   That sounds accurate.

7   Q.   You were involved in preparing interrogatory responses

8   with this case; correct?

9   A.   I was prepared only to the extent that I answered the

10  interrogatory answers for me.

11  Q.   And the work that you did preparing for the interrogatory

12  responses was in early 2013; correct?

13  A.   That sounds correct.

14  Q.   And you were working for pay for both the Calguns

15  Foundation and the Second Amendment Foundation at that time

16  when you prepared the interrogatory responses; correct?

17  A.   I'm not sure that I understand your question as it relates

18  to "prepare."

19  Q.   Okay.  You testified that you prepared interrogatory

20  responses; correct?

21  A.   I testified that I answered interrogatory questions.

22  Q.   Okay.  Let me rephrase using the word "answered."  You

23  were working for pay for both the Calguns Foundation and The

24  Second Amendment Foundation when you answered your

25  interrogatory responses; correct?

Combs - X

78

1    A.  Yes.

2    Q.  You're a California resident, Mr. Combs?

3    A.  Yes.

4    Q.  Born in California?

5    A.  Yes.

6    Q.  Would you consider yourself to be a lifelong California

7    resident?

8    A.  Yes.

9    Q.  In the last 10 years, have you lived continuously in

10   California, or have you lived out of state for any time?

11   A.  I domiciled in California for my entire life.

12   Q.  It's been stipulated that you own firearms and have owned

13   them at all times relevant to this lawsuit; correct?

14   A.  Yes.

15   Q.  The first time you owned a firearm was when you were about

16   25 years old; correct?

17   A.  Yes.

18   Q.  And are you about 29 or 30 years old now?

19   A.  I'm 30.

20   Q.  You recall that I deposed you in May of 2013?

21   A.  Yes.

22   Q.  I asked you to give me your best estimate of the number of

23   firearms that you've owned or co-owned over the course of your

24   life.

25   A.  Yes.

Combs - X

79

1   Q.  Do you remember the answer that you gave?

2   A.  I don't recall specifically.

3   Q.  You said as many as 50 firearms.

4   A.  That sounds accurate.

5   Q.  So that means that you acquired all 50 of those firearms

6   since you turned 25 about five years ago; correct?

7   A.  That would stand to reason.

8   Q.  And the Waiting-Period Law was in effect while you were

9   acquiring 50 firearms in a five-year period; correct?

10  A.  Yes.

11  Q.  You contend that you've been unable to purchase a number

12  of firearms, you couldn't even give me a count, because of the

13  Waiting-Period Law; is that correct?

14  A.  Yes.

15  Q.  Haven't you gone to many gun stores when you really didn't

16  have a specific intent to purchase a firearm, and what you

17  were really doing was window-shopping?

18  A.  I believe that I've gone to many gun stores with the

19  intent of looking through inventory with the intent to

20  purchase if I find something that's suitable for my needs.

21          MR. EISENBERG: I'd like to go over some of your

22  deposition testimony with you.  I've got two copies of the

23  deposition transcript.  I'd like to approach the witness,

24  Your Honor.

25          THE COURT:  Yes.

1    MR. EISENBERG: And hand him one of the copies.

2 BY MR. EISENBERG:

3 Q. Have you seen the deposition transcript for your

4 deposition before?

5 A. Yes.

6 Q. Does this look like -- does the document that I've handed

7 you look like the transcript?

8 A. Yes.

9 Q. What I'm trying to get at are questions that I think

10 there's a need for a lead-up to so, I intend to read the

11 transcript and then ask you the question. And if I misstate

12 something, I'm happy to have somebody say I said a word wrong.

13 I'm going to try to read it accurately. Okay? So I'm going

14 to read you the transcript up to a point and then move on to

15 the question.

16    Starting at line 9, page 88.

17    I asked you: "Okay, let's, have you" -- I'm sorry,

18 "have you ever gone to a firearms retailer or brick and mortar

19 store intending to buy a firearm and then not bought a firearm

20 because of the 10-day waiting period?"

21    You answered: "Yes."

22    Do you see that?

23 A. Yes, I do.

24 Q. "What retailers have you entered with the purpose -- with

25 that purpose and being unable to complete the transaction?"

159

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII

| | | |
|---|---|---|
| JEFF SILVESTER, et al., | ) | 1:11-cv-2137-AWI |
| Plaintiff, | ) | |
| | ) | COURT TRIAL |
| vs. | ) | |
| | ) | Day 2 |
| KAMALA D. HARRIS, Attorney General of California, and DOES 1 to 20, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

Fresno, California                    Wednesday, March 26, 2014

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Volume 2, Pages 159 to 366, inclusive

REPORTED BY:  GAIL LACY THOMAS, RMR-CRR
Official Court Reporter
CSR NO. 3278

Buford - D

172

1  Vehicles files to ensure that the purchaser's identification

2  information is accurate.  We know who we're doing the

3  background check on.

4  Q.  Is it ever the case that a person applying for a firearm

5  uses an incorrect DMV license or a personal identification?

6  A.  Every day.

7  Q.  And if an applicant uses a mismatched or an incorrect

8  identification, what does that mean for the application?

9  A.  That means that the application has to be rejected.  And

10  so we reject the application and notify the dealer not to

11  deliver the firearm.

12  Q.  Is the -- is the DMV check, is it against the computer

13  database, is it against written records?  How is it --

14  A.  It goes against the DMV electronic database, the

15  Department of Motor Vehicles files electronic database.

16  Q.  Is the initial comparison done by a computer or by a

17  person?

18  A.  The initial comparison is done by the computer.

19  Q.  Is a human being ever involved in checking on the DMV

20  record?

21  A.  When there is a mismatch.

22  Q.  Why is a human being involved in that part of the process?

23  A.  Because we would not be able to keep up with the work.

24  There's just so many of them that happen.  Every day we

25  receive between -- at this point in time between 2 to 3,000

Buford - D

173

1   gun purchase applications a day. So that was the process

2   because we collect the identification information, because

3   that information is automated within the Department of Motor

4   Vehicles. It makes it easy for us to use the systems to run

5   that match because basically you're just matching numbers and

6   the information exactly.

7   Q. Is there -- are there any other databases that are checked

8   at that initial point along with or near in time to the DMV

9   check?

10  A. Yes. We also strip off the information relating to the

11  firearm, and we run that information against the Department of

12  Justice Automated Firearms System to see if the firearm had

13  been previously reported lost or stolen by a law enforcement

14  agency.

15  Q. Why does the Bureau of Firearms check if a firearm is

16  reported lost or stolen?

17  A. Well, I believe it's Penal Code Section 11106 or -- yes,

18  Penal Code Section 11106 basically says that's the Attorney

19  General's role is to maintain a database to return lost or

20  stolen firearms. And so part of the DROS process, a lot of

21  the firearms that are involved in that process potentially

22  could be used -- had been reported lost or stolen, and

23  occasionally we do bump into something, and we try to make

24  sure those guns are returned back to the rightful owners.

25  Q. Is the AFS check done completely by a computer, or are

Buford - D

174

1   human beings involved?

2   A.   That's computerized as well because we have computerized

3   records of lost and stolen firearms as reported by law

4   enforcement.

5   Q.   If a DROS application runs through the AFS system and it

6   comes back that there is a hit, that this firearm matches up

7   to a lost or stolen firearm, what happens next in the process?

8   A.   The law enforcement agency that made the actual lost or

9   stolen entry is notified by the department and asked to

10  investigate to determine if the firearm involved in the

11  transaction is the actual firearm that had been previously

12  reported lost or stolen.  And they're also contacted to verify

13  whether lost or stolen entry in the database is still valid

14  and active.

15  Q.   So these law enforcement agencies, are they part of the

16  Bureau of Firearms?

17  A.   No, these are state-wide law enforcement agency,

18  state-wide police -- police offices and sheriff's offices.

19  Q.   When you say statewide, do you mean that they're part of

20  state government, and they're not part of local government?

21  A.   No, they're local government.  They're local chiefs --

22  local police stations, local Sheriff's Offices, County

23  Sheriff's Offices and City police and other police -- police

24  entities within the state.  Police agencies, I should say.

25  Q.   When there is a match for a lost or stolen firearm, and

Buford - D

186

1   some other entity's database?

2   A.   It's a state database.

3   Q.   Why is the Bureau of Firearms looking at people's mental

4   health records in relation to firearms purchases?

5   A.   Because under California law, people that have been

6   involuntarily admitted to a mental health facility under

7   Welfare and Institutions Code Sections 5150, 5152, 5250, or

8   5350 are prohibited for a period of five years from owning and

9   possessing firearms as well as people that have been

10  identified as Tarasoff reporting, those folks are also

11  prohibited for a period of five years, as well as people that

12  have been reported to the bureau by the courts as Penal Code

13  Section 1026, mentally -- I think that's insane, Penal Code

14  Section 1370, incompetent to stand trial, or -- and also

15  folks, I think, under 5300 of the Welfare and Institutions

16  Code Section that have been identified as gravely disabled.

17  Those folks are prohibited under California law.

18  Q.   You mentioned the term "Tarasoff."  What is Tarasoff?

19  A.   Tarasoff, I believe, it relates back to a case called

20  *Tarasoff* under California law where essentially an individual

21  went into their licensed psychologist or psychiatrist and made

22  a threat against themselves or reasonably identifiable

23  victims, subsequently carried out that threat, and I think

24  there was a lawsuit that ensued because the psychoanalyst did

25  not report that information to law enforcement.

Buford - D

187

1          So as a result now under California law, if an

2     individual does go into their -- their licensed

3     psychotherapist or psychologist and makes a threat against

4     themselves or reasonably identifiable victim, that

5     psychotherapist is required by California law to report that

6     information to law enforcement, who, in turn, reports it to

7     the Department of Justice.

8     Q.  Are there records in MHFPS complete and up-to-date for all

9     people with a mental health history?

10    A.  No.

11    Q.  Is there any lag about information getting into that

12    system?

13    A.  There is not only a lag, but there is also underreporting,

14    which was identified recently last year by the Bureau of State

15    Audits in an audit of the State's courts, and the audit

16    revealed that many of the courts were not reporting all of

17    their mental health prohibitions to the department as required

18    under state law.

19    Q.  Does the -- do records ever come in, you know, not --

20    well, do records of mental health prohibition adjudications

21    come into that MHFPS system instantaneously or nearly

22    instantaneously?

23    A.  Currently not all records come in instantaneously.  The

24    public and private mental health facilities statewide, and

25    there's approximately 200 of them, they have the capability to

Buford - D

188

1    report to us electronically via the Internet.  They've been

2    advised and trained and told that they are required to report

3    immediately, report people that they admit and assessed S-50

4    as a danger to themselves or a danger to others immediately.

5    Some of them do report immediately.  Others kind of take their

6    time.  You know, when they get a nice little stack and will

7    report them.

8          And then the reports that we receive from the courts,

9    as I said earlier, there's an underreporting by the courts.  A

10   lot of times many cases, the courts are underfunded,

11   understaffed.  The reports that we currently receive from the

12   courts come in on paper.  And so they come through the mail,

13   so that there are times when things -- there's a lag because

14   of the mail and because of the paper.  We are working to

15   automate that process for the courts as well.

16   Q.  Does the Bureau of Firearms get the social security number

17   for each person submitting a DROS application to purchase a

18   firearm?

19   A.  No.  In fact, state law in many cases prohibits government

20   agencies from requesting social security information on

21   various types of applications.

22   Q.  If you had social security information, would it make it

23   faster to identify people correctly?

24   A.  It would certainly help.

25   Q.  I'd like to move on and discuss any other databases.  Are

Buford - D

189

1   there any other systems or databases that are checked when a

2   DROS application comes through the Bureau of Firearms?

3   A.  Yes.  There is a check with the Consolidated Firearms

4   Information System, which is a system that's used to process

5   DROS information.  It looks for whether a DROS from the --

6   this individual -- or this individual had been previously

7   denied on a purchase before.  It's sort of a trigger, sort of

8   a reminder to people maybe you need to look a little harder,

9   dig a little deeper.  If you don't see anything out there now,

10  they may have been previously denied, so you need to look a

11  little bit deeper.

12          We also look at the federal databases, which is the

13  National Instant Criminal History Check System, known as NICS.

14  And under the NICS umbrella, there are a number of databases.

15  Q.  Let me go back quickly about CFIS.  If somebody had been

16  denied before to purchase a firearm, does that mean that the

17  person is automatically going to be denied again?

18  A.  No.

19  Q.  Why is that -- if somebody was denied before, why aren't

20  they automatically denied again?

21  A.  Because it's possible that they had a conviction that was

22  subsequently overturned.  It could have been a felony

23  conviction that they subsequently went back to court and had

24  that felony reduced to a misdemeanor.  It could be a number of

25  reasons why a person that had been previously denied would no

Buford - D

205

1  there's a few reasons.  One is the state budget process

2  doesn't allow me to just go out and start hiring people.  You

3  have to go through the state process, which requires approval

4  by the state legislature as well as the governor.

5         Secondly, there is a training curve.  It takes us

6  from three to six months to train an individual to be able to

7  do those background checks.  They have to understand state

8  law.  They have to understand federal law.  They have to

9  understand that things in between, the court case decisions,

10 and things of that nature that help them -- that assist them

11 in determining whether someone is prohibited or not.  They

12 have to understand how to access the database, records, read

13 those database records, analyze those database records, and

14 understand them.  So it takes us a lot to train folks.

15 Q.  After a CIS has finished doing the review of a DROS

16 application, are there any decisions that have to be made

17 about the application?

18 A.  Yes.

19 Q.  What are the decision options?

20 A.  Well, it's either we're going to approve it.  If it's

21 missing information, we're going to delay it and chase that

22 information down.  Or if there's prohibiting information in

23 there, we're going to deny the individual.  And if it's a

24 situation where the DROS is coming to its maturity of 30 days

25 old, and we've exhausted all of our chasing efforts to try to

Buford - D

206

1  resolve things and we cannot resolve it, then they would

2  identify the record or identify the record as undetermined.

3  Q.  I'd like to ask you some further questions about the NICS

4  check.  I may need to go get an exhibit.  It seems I have

5  mismarked one.

6        Are there prohibiting events under California law

7  that are not looked for in just a NICS check?

8  A.  Yes, there's several.

9  Q.  What are some of those?

10  A.  The most notable are our violent misdemeanors, our 5150

11  Welfare and Institutions Codes.  NICS does not enforce those.

12  NICS does not enforce our 707(b) Welfare and Institutions

13  Code, violent juveniles.  They don't have access to the

14  information either.  NICS does not enforce California's --

15  they don't verify the identification information through DMV

16  to verify if the information -- if the -- if the person

17  involved in a transaction is really not the same person on the

18  ID.

19        NICS does not look for people -- under California

20  law, you can only buy one handgun in a 30-day period.  NICS

21  does not look for, nor enforce that.

22        NICS does not look for, nor enforce California's

23  five-year prohibition on Tarasoff folks.  And NICS does not

24  look for -- I can't say for sure, but I don't believe NICS

25  looks for whether guns involved in a transaction have

Buford - D

207

1   previously been reported stolen.  I don't think NICS receives

2   gun information on transactions.

3   Q.  California supplies some information to NICS; correct?

4   A.  Yes.

5   Q.  Why doesn't California just give all this information to

6   NICS so that they can be run through the NICS check?

7   A.  Because federal law does not give the NICS authority to

8   enforce some of the state prohibitors.

9   Q.  Can the State just force the FBI -- force them to put this

10   information into NICS?

11   A.  No.

12   Q.  Do you know the number of people that we're talking about

13   that would make it through a NICS check, but be barred from --

14   by a California check in a given year?

15   A.  Not off the top of my head.  I'd have to look through my

16   reports.  We have annual reports that we can produce on demand

17   that would tell us that information.

18         MR. EISENBERG:  If I may have a moment to go get that

19   report.

20         THE COURT:  Yes.

21         MR. EISENBERG:  It would refresh the witness'

22   recollection.

23         (Pause in the proceedings.)

24         MR. EISENBERG:  Your Honor, may I go get one of the

25   other binders and give it to the witness?

Buford - D

208

1      THE COURT:  Yes.

2      MR. EISENBERG:  Thank you.

3  BY MR. EISENBERG:

4  Q.  Assistant Chief Buford, may I have you turn to Exhibit Tab

5  AP, with the Bates number AG-002394.

6      THE CLERK:  Sorry, Counsel, which exhibit is it

7  again?

8      MR. EISENBERG:  AP as in "Peter."  And the Bates

9  number is AG-002394.

10      THE WITNESS:  Got it.

11  BY MR. EISENBERG:

12  Q.  Okay, have you ever seen this document before?

13  A.  Yes.

14  Q.  Where have you seen this document?

15  A.  This document is generated from the Consolidated Firearms

16  Information System report screen.

17  Q.  And you see that the left side columns have headers or

18  subheaders with the word "denial" in them?

19  A.  Yes.

20  Q.  What does a denial mean in this context?

21  A.  It means that the subject was matched to a prohibiting

22  record.  The purchaser was matched to a prohibiting record,

23  and the transaction was denied, and the dealer was contacted

24  and told not to deliver the firearm.

25  Q.  And on the right side of the left side column, there are

Buford - D

209

1 numbers. What do those numbers represent?

2 A. The number of denials.

3 Q. Are there any categories, any rows here that reflect

4 denials that the NICS system doesn't check for?

5 A. Yes.

6 Q. Can you identify them for the Court, please?

7 A. Yes. The 30-day reject -- and this report is from January

8 through December 2013. So for the 30-day reject, which would

9 enforce California law in that area, there have been 2,814

10 subjects. For the mental health, 5150 and Tarasoff folks

11 individuals, there were 802. For the violent juveniles, there

12 were 329.

13 Q. Do each of these denials represent people who were

14 prohibited from getting firearms because of the California

15 check?

16 A. Yes. And, again, there were 926 violent misdemeanors as

17 well.

18 Q. Are there other categories -- I didn't mean to cut you off

19 there.

20 A. No, that was it.

21 Q. Let me ask you to look at the -- the left side column, the

22 first entry is total DROS's received, and the number is

23 960,179? What does that number reflect?

24 A. That's the number of DROS applications that we received

25 during the calendar year 2013.

Buford - D

210

1  Q.  And they were all processed through this system that we've

2  been talking about?

3  A.  Yes.

4  Q.  If I could turn your attention to Exhibit AQ.  "Q" as in

5  "queen."  Page 2407.  Bates number 2407 at the bottom of the

6  page.  Actually the first page of AQ.

7  A.  Did you say 2407, AQ-002407.

8  Q.  Right, it should be the first page?

9  A.  I have 2406, and then it skips to 2408.

10  Q.  Oh, boy.  Okay.

11  A.  You said AQ, right?

12  Q.  AQ, yes.

13  A.  I'm in the wrong section.

14  Q.  There may be a little bit of a misstatement in some of the

15  numbering here.

16  A.  I have it.

17  Q.  Oh, you do have it?

18  A.  Yes.

19  Q.  The Bates number is AG-002407, and this document actually

20  has the AQ stamp right on there at the bottom.

21  A.  I have it.

22  Q.  Have you ever seen this report before?

23  A.  Yes.

24  Q.  What is this report in context -- in the context of the

25  Bureau of Firearms?

Buford - D

211

1  A.  This report is generated out of the Consolidated Firearms

2  Information System, the reports menu.  It's the -- it's an

3  on-demand report for DROS information -- DROS statistical

4  information.

5  Q.  What time period does this report cover?

6  A.  This report covers 1/1 of 2014 through January 31, 2014.

7  So the month of January only.

8  Q.  Let's look at the right side column.  First entry, Total

9  DROS Received, and there's a number 64,312.  What does that

10  number reflect?

11  A.  That's the number of DROS applications received during the

12  month of January 2014.

13  Q.  And was each of those applications processed by one of the

14  CIS's?

15  A.  Yes.

16  Q.  So there 64,000 just in the month of January this year.

17  A.  Yes.

18  Q.  Are the categories of denials that were made under the

19  California system, but that would not have even been checked

20  for under the NICS system, present on this report?

21  A.  Yes.

22  Q.  Could you point out to the line numbers and the numbers of

23  denials, please?

24  A.  Yeah, for the 30-day rejects, it's 122.  For the violent

25  misdemeanors, it's 44.  For the mental health, it's 30.  For

Buford - D

212

1   the violent juveniles, it was 11.

2   Q. Are there any others? Trying to make sure it's complete.

3   A. I believe that's --

4   Q. Okay.

5   A. That's it. I mean, there's some other areas here, but I

6   can't say if they were caught under the federal areas as well.

7   Q. But, again, each of those denials represent somebody who

8   would have received a gun if only a NICS check had been done?

9   A. That's correct.

10   Q. Let me ask you to turn to Exhibit AN. AN as in "Nancy."

11   A. Got it.

12   Q. If you look at 2131, are we seeing the same kind of report

13   for just the different month, December of 2011?

14   A. Yes.

15   Q. If I could just have you flip through each of these pages,

16   are we seeing that same kind of report for each month of the

17   year, 2011?

18   A. Yes.

19   Q. And so somebody could use these charts to figure out how

20   many people were caught by the California system and denied

21   firearms because they're prohibited people. That would not

22   have even been checked for under the NICS system?

23   A. Yes.

24   Q. Let me have you turn to page -- to Exhibit AO, "O" as in

25   "Oliver." So I'm not going to take you through the same

Buford - D

213

1  series of questions for each one.  I'd like to proceed more

2  generally unless the Court would prefer me to operate in

3  another way.

4        Document with Bates number AG-002144.  Is this the

5  same kind of report for the year 2012?

6  A.  Yes, this is for calendar year 2012.

7  Q.  And if you would look at just the top right side, there's

8  total received from vendor 817,748.  That represents what?

9  A.  That's the number of DROS transactions received that

10  calendar year.

11  Q.  And, again, if we were to take you through the other

12  denial categories, you could show which categories there are

13  California checks on and denials based on that would not have

14  been caught through the NICS system?

15  A.  Yes.

16  Q.  And the rest of the exhibit goes through the same data,

17  only breaks it down by month?

18  A.  Yes.

19  Q.  If we could have you look at AP.  And I'll focus your

20  attention on just the documents with the Bates numbers 2 --

21  AG-002049 through 2046.  Pardon me.

22  A.  2056.

23  Q.  I think you'll see that there's -- there's two different

24  kinds of reports in here.  There's like the one at 2186 that

25  has some gray lines.

Buford - D

214

1    A.    Are you talking AG-002052?

2    Q.    2186.

3    A.    2186.

4    Q.    And I'm only pointing those out to you to say we're not

5    going to talk about those ones.

6    A.    Okay.

7    Q.    But interspersed, we see a lot of these other reports that

8    are the Dealer Records of Sales Statistics for the various

9    months in 2013.  Do they contain the same kind of data that

10   we've just been talking about?  So like, for example, 2049,

11   2050, all the ones that say "Dealer Record of Sales

12   Statistics."

13   A.    Okay.  The reports from 2049 through 2051 are the same

14   report.

15   Q.    Right.

16   A.    The reports from 2052 to where you asked me to turn to

17   2186 and probably further, that's a totally different report.

18   That's a daily report.

19   Q.    Right.  Right.  If you go through, you'll actually see

20   that we go back to the Dealer Record of Sales Statistics every

21   so often.  They're kind of intermingled.

22          So what I'm just generally asking you are these

23   Dealer Records of Sales Statistics reports covering various

24   periods of time in 2013?

25   A.    Yes.

Buford - D

215

1   Q.  And if I were to take you through them laboriously, we

2   could show all the number of, you know, juvenile denials, 5150

3   denials, et cetera.

4   A.  Yes.

5   Q.  I am going to spare everybody the pain of going through

6   all of that.

7        MR. KILMER:  And furthermore, Your Honor, we'll

8   stipulate that the records are accurate.

9        THE COURT:  All right.

10  BY MR. EISENBERG:

11  Q.  You said that the --

12  A.  I'm going to just clarify one of the things that's not

13  reflected on the DROS statistical report that is reflected on

14  these other daily reports are the number of DMV mismatch

15  rejects.

16  Q.  Right.

17  A.  So those numbers as I called them off from this

18  statistical report did not include the daily amount of DMV

19  rejects that actually had been rejected.

20  Q.  Okay, thank you very much for that clarification.

21       Is the DMV reject something that NICS checks for?

22  A.  No.  No.

23  Q.  So your understanding if somebody is using a fake ID, fake

24  driver's license for a NICS check, it doesn't get caught?

25  A.  No, because NICS doesn't run -- they rely on the dealer to

Buford - D

216

1  check the identification.

2  Q.  I believe you testified earlier that a NICS check can take

3  up to three days.  That's your understanding?

4  A.  It can take no more than three days.

5  Q.  So what happens if a NICS check has not been completed

6  after three days?

7  A.  The dealer is advised that they may release the firearm at

8  their discretion.

9  Q.  So what would happen if the NICS system finds out on the

10  fifth or sixth day that the applicant is prohibited?

11  A.  NICS has to contact ATF and ask ATF to go out and retrieve

12  the firearm.

13  Q.  I'm going to move on to another topic, which is the APPS

14  system.  Have you heard of something called APPS within the

15  Bureau of Firearms?

16  A.  Yes.  It means Armed and Prohibited Persons System.

17  Q.  Have you heard of something called a PAPF?

18  A.  Prohibited Armed Persons File.

19  Q.  Right?

20  A.  Yes.

21  Q.  What is APPS?

22  A.  APPS is a database of persons that have been determined to

23  have a record on file with the department as being the last

24  person to be in possession of a particular firearm -- used

25  typically based on a Dealer Record of Sale that's subsequently

Buford - X

234

1    Q.  All right.  So getting back to the cooling-off period for

2    purposes of stopping impulsive violent acts, the background

3    check really has nothing to do with that, does it?

4    A.  That's separate.  The background check that we do is --

5    yeah, it's making sure that -- the assumption is that we don't

6    know whether you're legally lawfully eligible to own or

7    possess that gun.

8    Q.  And you mentioned a minute ago, that -- and I don't want

9    to misstate your testimony, that the DROS system basically

10   assumes everybody that applies does not have a firearm;

11   correct?

12   A.  That's our assumption, yes.

13   Q.  Okay.  And why does the agency assume that?

14   A.  Because we don't know.  We don't necessarily know.  That's

15   not something that we look for when we get the DROS

16   application.  That's not one of the first checks we do is do

17   you have a gun?  The assumption is that, you know, we're

18   essentially an administering state law that requires the

19   background check, and that's what we do.

20   Q.  All right.  But a point in fact, you testified earlier

21   that there is -- one of the databases that you administer is

22   something called an AFS system?

23   A.  Yes.

24   Q.  And that is the database of firearms or at least

25   historical firearms transactions in California?

Buford - X

235

1  A.  That's true.

2  Q.  And isn't it true that in California with some limited

3  exceptions -- and I'll ask you about those in a minute -- that

4  all transactions have to go through a DROS process?

5  A.  Yeah, after 1991.  That would be true for firearm

6  transfers that occurred subsequent to 1991.

7  Q.  Okay, so subsequent to 1991, that the way people purchase

8  firearms in California is they either go to a dealer, which is

9  licensed by the federal and state government, and they go

10  through the DROS system, and if the person also wants to, say,

11  buy a gun from a private party, state law at least says that

12  they must go through a dealer to do that.

13  A.  They're supposed to do that, yes.

14  Q.  All right.

15  A.  Not all of them do, though.

16  Q.  I'm not here talking about people who break the law.  I'm

17  talking about people who are following the law.  Okay.

18        So since 1991, all legal transactions of acquisitions

19  to firearms are supposed to go through a Dealer Record of

20  Sales process.  Is that true?

21  A.  That's fair.

22  Q.  Now, there are some minor exceptions, for instance,

23  interfamily transfers can happen without the DROS process;

24  correct?

25  A.  That's correct.

Buford - X

236

1   Q.   And an inheritance can sometimes happen -- of a firearm

2   can happen without going through the DROS process?

3   A.   Yes.

4   Q.   And I think antique firearms can also be transferred

5   without going through the DROS process; is that correct?

6   A.   Yes.  Antique long guns, yes.

7   Q.   That's a good distinction.  Antique handguns do require a

8   DROS process?

9   A.   I believe so, yes.

10  Q.   Okay.  You were speaking earlier about some of the

11  statistics about denials.  And you talked about something

12  called the DMV mismatch.

13  A.   Yes.

14  Q.   What is that?

15  A.   That's when essentially we talked about the first part of

16  the Dealer Records of Sales process is we take the purchaser's

17  identification information, and we run that against the

18  Department of Motor Vehicles files, because under California

19  law, purchasers are required to have a valid California

20  drivers license or a California identification card issued by

21  the State DMV to buy a gun.  So we verify that information

22  against DMV files.

23  Q.   Okay, and the purpose of that verification is to make sure

24  that the person who is representing themselves to the dealer

25  is the true person?

Buford - X

251

1        MR. EISENBERG:  Objection.  Assumes facts not in

2  evidence.

3        THE COURT:  Overruled.  The answer will stand.

4        THE WITNESS:  I don't -- there is another entity

5  within the department that handles all the system accesses

6  for -- for local law enforcement and that's knowledgeable

7  about that, so that's not something that I have extensive

8  knowledge about.

9  BY MR. KILMER:

10  Q.  Okay, well, I'm not going to ask you about the

11  technicalities of it, but do you know whether or not judges

12  need that information when they're making decisions about

13  restraining orders?

14        MR. EISENBERG:  Objection.  Calls for speculation.

15        THE COURT:  Foundation.  Sustained.

16        THE WITNESS:  Um --

17        THE COURT:  That's okay.  You don't have to answer.

18  BY MR. KILMER:

19  Q.  Does the AFS -- can the AFS system provide information to

20  police officers in the field with regard to whether weapons

21  are contained in the home or not?

22  A.  Yes.

23  Q.  And how is that information accessed by the officer in the

24  field?

25  A.  If some officers have mobile digital terminals in their

Buford - X

252

1  vehicles, if they have that, they have that kind of

2  connection, they can access it.  Some of them don't have that.

3  They may have to call a dispatcher and ask the dispatcher at

4  the agency to run the information to see if they can get that

5  information.

6  Q.  Does that come in through CLETS as well?

7  A.  Yes, it's usually through CLETS.

8  Q.  And then the CLETS system sends out a message, and that

9  accesses your AFS database?

10  A.  Yes.

11  Q.  All right.  So for public safety reasons, it's possible

12  for other agencies to access your AFS system to determine if

13  somebody at least in your system, on your records is shown to

14  have purchased a firearm and had not transferred it.

15  A.  AFS, again, it's a leads database.  So it doesn't mean

16  just because it says that, there's a firearm in that house.

17  It doesn't mean there's an actual firearm in the house.  We

18  don't have a registration process in California.  It's a lead,

19  so it's possible.  It alerts the officer to be a little bit

20  more cautious potentially, because potentially, there could be

21  a firearm there.

22  Q.  You said that earlier in your testimony, too.  You're

23  saying that California doesn't have a registration system.

24  A.  Right.

25  Q.  But, in fact, since 1991, at least for handguns, the State

Buford - X

253

1    of California has kept records for every transaction; correct?

2    A.   There are transaction records, yes.  But when people die,

3    or when they leave the State, when they sell the firearm out

4    of state, there is no requirement for them to notice the

5    department that they're no longer in possession.  That firearm

6    can leave the state, can come back into the state in various

7    ways.  So there is no real registration.  If there is real

8    registration, you'd have to reregister your gun every so many

9    years and say you're still in possession of that gun, or let

10   us know when you're no longer in possession of that firearm.

11   We don't have that.  So we're not really tracking it.  All we

12   know is what we believe was the last possessor of that

13   firearm.  That's what's in AFS.  It's a leads database.  It's

14   not an absolute database.

15   Q.  All right.  And so what is contained in the database?  Is

16   it the firearm itself and the serial number and the person and

17   their address and their physical description?

18   A.   There is -- if they run the firearm by serial number, it

19   will bring up the firearm by serial number and will give them

20   the lead on the last known possessor of that firearm, whether

21   it be a law enforcement agency, whether it be held in

22   evidence, whether it had been involved in a DROS transaction,

23   with a particular individual.

24   Q.  Okay.  And that AFS database that's accessing the DROS

25   information, it would also include for the California driver's

Buford - X

280

1   A.  So, yeah, we could check that.  The problem is, that that

2   in itself doesn't mean that the person is still eligible to

3   own or possess a firearm.

4   Q.  Yeah, and maybe I --

5   A.  Because things change.

6   Q.  Maybe my question was a little long.  Because what I meant

7   to ask was, could the system be made to run the person through

8   the complete background check, and then as a last inquiry --

9   inquire whether they have a COE, a CCW, or a gun already in

10  the AFS system.  That's the question I want.

11  A.  It could run the background check, but then someone's

12  going to have to look at the hits, and someone's going to have

13  to match up the records, and someone's going to have to review

14  the record to make sure that the information in those records

15  is up-to-date, accurate, and correct.

16  Q.  Okay.  Now, you also testified earlier that approximately

17  20 percent of the DROS's that are processed are auto-approved

18  within an hour.

19  A.  Right.

20  Q.  Okay.  And of those 20 percent that are auto-approved

21  within an hour, you can add as a further check whether or not

22  the person has a COE, a CCW, or a gun already in the AFS

23  system.  That's possible.

24  A.  That's possible.

25          MR. KILMER:  Thank you.  Nothing further, Your Honor.

Buford - RD

281

1          THE COURT:  And redirect.

2                    REDIRECT EXAMINATION

3   BY MR. EISENBERG:

4   Q.  Assistant Chief Buford, I want to talk a little bit about

5   the AFS.

6   A.  Sure.

7   Q.  Does the AFS give accurate information about whether a

8   person listed with the firearm has the firearm in working

9   condition?

10  A.  No, it doesn't.

11  Q.  Does the AFS system give accurate information about

12  whether the person listed as having a firearm has loaned it

13  out to someone?

14  A.  No, it doesn't.

15  Q.  Does it have -- does the AFS system have accurate

16  information about --

17  A.  Let me back up.  If the loan exceeds 30 days under state

18  law, the person is required to report that loan through a

19  dealer.  But if the loan does not exceed 30 days, then, no, it

20  would not.

21  Q.  Thank you for the clarification.

22          Does the AFS system tell you whether the person who

23  is listed as having the gun has working ammunition for the

24  gun?

25  A.  No, it does not.

Buford - RD

282

1   Q.  Does the AFS system indicate whether the person who has

2   the gun has had it temporarily taken away by a family member

3   or a friend?

4   A.  No, it would not.

5   Q.  Does the Department of Justice mandate that firearms

6   dealers charge a certain shipping fee, a certain amount to

7   ship a firearm to another dealer?

8   A.  No.

9   Q.  Earlier, you were giving some testimony about something

10  called a CII?

11  A.  Yes.

12  Q.  Is there a CII associated with a person's mental health

13  records?

14  A.  No.

15  Q.  Is there a CII associated with a person's --

16  A.  Let me clarify.

17  Q.  Pardon?

18  A.  With regard to a mental health record, there are some

19  of -- some individuals that are criminals, but are also

20  criminals -- that also have a mental health adjudication

21  attached to their criminal record.  So in some cases, it is

22  possible to have a CI number attached to a mental patient.

23  But the majority of mental patients that we receive come from

24  public and private mental health facilities, and there are no

25  CI numbers associated with those individuals.

Graham - D

347

1   people.

2   Q.   And what are you doing to identify all the people that

3   seem to be involved in the transaction?

4   A.   Sometimes you can get a license plate from one or more of

5   those parties.  Sometimes it may help from a business card

6   that's laying on the table.  You may have to do surveillance

7   at the closing of the show to see what cars people go to, if

8   it's people involved at the tables, and those are usually the

9   things -- a person's surveillance that goes on to identify the

10  parties.

11  Q.   Do you always complete all the identification in a matter

12  of minutes?

13  A.   No.

14  Q.   Matter of hours?

15  A.   I'd like to say, yes, but that's not always the case.

16  Q.   Have you ever had an investigation that went for longer

17  than a day.

18  A.   Yes.

19  Q.   What are the circumstances that would make an

20  investigation go longer than a day?

21  A.   Sometimes people that are engaged in straw purchasing,

22  they'll show up to shows in rental cars, and that puts another

23  hurdle in front of us in actually making a quicker

24  identification.  So you may have to contact a rental car

25  company.  Often the rental car company's corporate office has

Graham - D

348

1    nothing -- let's say, in San Francisco, has nothing to do with

2    the actual location of where that car was rented, for example.

3    Let's say it was a Sacramento rental, but the corporate office

4    might be down in San Francisco, which is where the vehicle is

5    actually plated to.  So we've got to do follow-ups with those

6    and jump through hoops and access and then dig around and see,

7    well, who rented the car, that sort of thing.

8    Q.  Have you ever had a straw purchaser investigation from a

9    gun show go longer than 10 days?

10   A.  Probably like 11 or 12 because the -- maybe the person

11   didn't come and pick up the weapon, you know, right on the

12   10th day perhaps or -- and into the 11th day, that sort of

13   thing.

14   Q.  Are you trying to finish the investigation within 10 days,

15   or do you not care about that 10-day deadline?

16   A.  Yeah.  We don't want the weapon to get out on the street

17   if we think there is a straw purchase involved.  So the best

18   thing I can say is an interception of what we think is a straw

19   purchase is the best scenario in this case.  We may not have

20   the people fully identified, though, because of various

21   factors, and we may actually have to contact them in the

22   parking lot at the gun store, as they walk out of the store,

23   or if we follow them back to their apartment or their house or

24   something like that.  So it may not be nice and tidy in the

25   sense because of all the factors I've talked about.

Graham - D

349

1  Q. If the Waiting-Period Law was only three days, would you

2  be able to finish all of your straw purchaser investigations

3  in time to do intercepts?

4  A. No, that would be nearly impossible to do, specifically

5  the ones with the gun shows, and some of the ones that we

6  become aware of that happen at normal gun dealers, you know,

7  seven days a week.

8  Q. So if the waiting period were, say, only three days, how

9  would you stop the gun from being released to the purchaser?

10  A. I don't know that we would even have most of the parties

11  involved -- identified by then. Sometimes we do, but

12  sometimes we don't just because of the factors I've mentioned.

13  Q. Why is it preferable to intercept the firearm rather than

14  try to retrieve it?

15  A. Because the retrieval is problematic because the minute

16  that gun leaves the store, and then it's handed to the straw

17  purchaser, they may wait five minutes to transfer that weapon,

18  they may wait a, you know, day or two or longer. It's just

19  once that gun hits the streets, we have a lot of trouble, you

20  know, having a hundred percent certainty that we're going to

21  get that gun back.

22  Q. Have you ever done a gun retrieval operation?

23  A. Yes.

24  Q. What's safer, intercepting the gun before it gets to the

25  prohibited person or trying to retrieve it from the prohibited

Graham - D

350

1  person?

2  A.  In the sense that the public would be put less at risk, it

3  would be safer for the public if we can intercept all of them,

4  but that's never the case.  We're not in all places at all

5  times.

6  Q.  Do you know the number of special agents that do this kind

7  of work in California?

8  A.  Probably right now, we're somewhere in the neighborhood of

9  50 agents that are in the field that are available for this

10  kind of work.  It could be higher than that.  I'm not a

11  personnel specialist, so I don't know that number.

12  Q.  Have you ever worked a case where the straw purchaser was

13  somebody who is not a first-time buyer of firearms?

14  A.  Yes.

15  Q.  So you've seen something like a repeat straw purchaser?

16  A.  Yes.

17  Q.  If somebody who is a second-time purchaser did not have to

18  go through the 10-day waiting period at all, how would you

19  deal with a second-time straw purchaser?

20  A.  I think they most likely would end up having to do

21  retrievals, because the way I understand your question is, the

22  gun would just be immediately released after zero time or

23  three days?

24  Q.  Let's say zero time.  Let's say nearly instantaneous.

25  A.  Yeah, we would, for the most part -- I mean maybe

Graham - D

351

1   99 percent of the time, it would go into a retrieval method

2   because of manpower issues and stuff.

3   Q.   I want to ask you about some other of your work.   Are

4   there other ways that the special agents become aware of

5   possible straw purchases?

6   A.   Yes.

7   Q.   Can you tell me what some of those other ways are?

8   A.   Sometimes we get notified by the Bureau of Alcohol,

9   Tobacco, and Firearms.   Sometimes we'll be notified by a gun

10  dealer themself, and it might be a corporate chain.   Maybe

11  they did an audit of their past 30 days' worth of

12  transactions, and they may have caught something that they

13  thought retroactively was kind of suspicious.   So they will

14  contact us occasionally.

15          Actually I think the other time would be -- we have

16  our own field inspectors that are field reps that go out and

17  inspect the guns for us, and they will, just like the ATF

18  inspectors or investigators that go out, they will come across

19  suspicious transactions after a prohibited person is denied,

20  and maybe there's a common address or common last name.

21  Q.   I'll go ahead and be asking you questions about the

22  dealers' situation, and the field representative situation.

23  I'll take them one at a time.

24  A.   Sure.

25  Q.   So you're actually aware of cases where a dealer will call

Graham - D

352

1   the Bureau of Firearms and say, "I think somebody attempted to

2   make a straw purchase in that case."

3   A.  Yes.

4   Q.  When the Bureau of Firearms gets a call like that, what do

5   you do?

6   A.  Usually it will -- it might come to our field

7   representatives.  They'll try to pull together the data, if

8   it's available, such as transaction dates, whatever

9   information the FFL or federal firearms licensee would have

10  provided to us.  And then typically I'll get something

11  e-mailed to me like in a pdf format.  Ill review it and see if

12  it's something that I think is something we need to send out

13  to one of the field offices.

14  Q.  You mentioned the term "field rep."  What is a field rep?

15  A.  A field rep for DOJ is a field representative.  So they

16  have a few functions.  The biggest function they do is

17  actually inspecting the guns for us.  They also provide

18  training to the mental health facilities, to make sure they

19  are aware of when they have to go and let us know about maybe

20  a patient that was deemed to be a 5150, for example, those

21  types of things.  There are some other training aspects of

22  their job, that by and large, it's making sure that the gun

23  source is in compliance with state law.

24  Q.  If there was a suspected straw purchase that a dealer

25  called in, and you did not have a waiting period before the

Graham - D

353

1   gun was released, would you be able to intercept the sale?

2   A.   If there was zero waiting period, I would assume the

3   dealer would be calling us after the facts, given your fact

4   pattern, so it would be a retrieval mode is what we would go

5   into.

6   Q.   Does having a 10-day waiting period help you in your law

7   enforcement work related to the dealer reports of suspected

8   straw purchases?

9   A.   Yes.

10   Q.   I want to pick up the line of questioning about field

11   representatives.   I think you mentioned something about field

12   representatives inspecting dealers?

13   A.   Yes.

14   Q.   Do field representatives actually go out and inspect

15   dealers?

16   A.   Yes.

17   Q.   Are these -- are these inspections announced to the

18   dealers in advance?

19   A.   Sometimes they are.   They're not required to be, though.

20   They can be random or unannounced, if you will.

21   Q.   So are some of the inspections actually unannounced?

22   A.   Yes.

23   Q.   About how many gun dealers are there in California, do you

24   know?

25   A.   Not exactly.   I think the last number I heard was around

Graham - D

354

1   1800.

2   Q.  Are all of them subject to these inspections?

3   A.  Yes.

4   Q.  Is there an amount of -- number of times that an average

5   dealer is audited like a field representative?

6   A.  I think the general rule is, they try to get to each of

7   the dealers about every three years.  The other folks that may

8   be testifying as a course of this trial may have better

9   information than that, but that's my understanding.

10  Q.  Have the inspections ever uncovered straw purchases?

11  A.  Yes.

12  Q.  Do you have any examples of that?

13  A.  Yeah, some of the times that the field reps -- I'm

14  speaking about the California DOJ field reps.  They'll find

15  a -- during the course of inspection, a group of denial

16  letters that the DOJ, the mail unit has sent to the dealer.

17  Let's say there's 10 letters.  And they'll look at those 10

18  letters to make sure that those guns didn't, in fact, leave

19  the store with the prohibited person.  That's one of the

20  aspects of the inspection.

21          So assuming that didn't happen, the next thing is

22  they're going to go look at -- to see who that weapon -- if

23  those were subsequently sold, did they go to somebody with

24  maybe the same last name or the same physical address, those

25  are a couple things that they'll look at, and they will

Graham - D

355

1  often -- you know, let's say it's been three years since

2  they've been to that particular store.  They're going to find

3  over the course of that time maybe some suspicious

4  transactions.  I'll be notified and evaluate what we have,

5  and, again, I may ask for a team from the local office where

6  that store is located to go, you know, pull up some paperwork,

7  that sort of thing.

8  Q.  Why is it suspicious that two people from the same address

9  would try to buy the same firearm?

10  A.  Well, if there is someone that's going to get denied, I'll

11  just say a male/female situation.  If a male is prohibited, he

12  goes and tries to buy a pump shotgun with a particular sale

13  number.  We deny that person, for whatever reason, and then

14  nine or ten days later, a female goes in, same last name, and

15  buys the exact same weapon, the same serial number.  And, in

16  fact, sometimes I've even seen them use the same credit card.

17  It's a joint credit card or that sort of situation.  That --

18  you know, that's a scenario from another investigation that's

19  been pushed into our laps in a sense by a field rep

20  investigation.

21  Q.  What if there's not the same last name between the two

22  people, but the same physical address, why does that give you

23  any suspicion about the transaction?

24  A.  Again, the same kind of situation.  They will -- maybe

25  it's a roommate, or perhaps if it's boyfriend or girlfriend if

Graham - D

356

1    it's a male and female situation again, but there is no actual

2    marriage, but a common last name.  We've had that sort of

3    scenario pop up with the dealer inspection as well.  It could

4    be a relative.

5    Q.  Do the dealer inspections ever find guns that are actually

6    on 10-day wait?

7    A.  Yes.  Typically one of the batches of guns that will be in

8    a particular store are guns that are sitting there waiting to

9    be released at the conclusion of the 10-day waiting period.

10   Q.  So is there a chance that if a field inspection finds, you

11   know, the attempted transaction that was denied and then the

12   person with the same last name or the same address tries to

13   make that transaction, you might actually find that gun still

14   on hold because of the 10-day waiting period.  Is that

15   possible?

16   A.  Yes.

17   Q.  So does the fact that the gun has not yet been released

18   help you -- help you to enhance public safety in any way?

19   A.  Yes.  In that scenario, we would actually be able to

20   potentially intercept the weapon before it actually got onto

21   the street if you evaluated the case, and we felt it was a

22   straw purchase.

23   Q.  I'd like to ask you about another topic called CCW's.

24   Have you ever heard of something called a CCW in the context

25   of your work?

Graham - D

358

1   holder now has a criminal conviction?

2   A.  Yeah.  That's a possibility.

3   Q.  Is that something that's done instantly to all of the

4   local enforcement agencies?

5   A.  That's probably outside of my job scope, so I'm not sure

6   how that process would actually happen.

7   Q.  It's been suggested that a person who already has -- well,

8   let me lay some foundation.

9          Have you ever heard of the concept of a cooling-off

10  period for a firearm purchase?

11  A.  Yes.

12  Q.  What's your understanding of that concept?

13  A.  Basically the idea behind that concept, or at least my

14  understanding is, that it would allow a person to rethink

15  potential bad acts they may be planning, or something like

16  that if they were forced to delay the acquisition of a weapon

17  that they were trying to acquire.

18  Q.  It's been suggested that for a person who already has a

19  firearm, a cooling-off period really could not have an effect

20  in terms of reducing violence.  Are you aware of any

21  situations where the cooling-off effect could still be

22  possible if a person already has a gun?

23          MR. KILMER:  Objection.  Calls for speculation.

24          THE COURT:  Sustained.  Foundation.

25  BY MR. EISENBERG:

Graham - D

359

1   Q.  Are you aware of any situations where a person who already

2   has a firearm acquires a new firearm and uses the new firearm

3   to commit an act of violence?

4   A.  Yes.

5   Q.  Are you aware -- let me rephrase it.

6           How could it be the cooling-off period that could

7   have an effect on whether that person commits a violent act --

8           MR. KILMER:  Objection.  Calls for --

9           MR. EISENBERG:  -- with the new firearm.

10          MR. KILMER:  Objection.  Calls for speculation.

11          THE COURT:  Overruled.  Go ahead.

12          THE WITNESS:  If someone has, let's say, a single

13  shot .22 rifle or maybe a revolver, or something like that,

14  and they were planning on doing something outlandish and

15  illegal with those weapons, or their existing pool of weapons,

16  they may seek to acquire something that they could do more

17  harm with, maybe a semiautomatic or maybe something more

18  powerful along the lines of a rifle or shotgun or something

19  like that.  And you can purchase multiple long guns, for

20  example, in one transaction, so they might want to buy a clump

21  of weapons or a group of weapons on a successive purchase if

22  they already have, say, one or two.  So they could arm

23  themselves more, I guess, is my final there.

24          MR. KILMER:  I renew my objection, Your Honor.  Move

25  to strike.  The initial answer was whether or not he had

Graham - D

360

1   personal knowledge of somebody using a new firearm to commit

2   the violent act.  The previous testimony was all speculation

3   based on a hypothetical person.

4              THE COURT:  All right.  Response?

5              MR. EISENBERG:  I guess I can ask him more questions

6   to try to pin it down to a situation.

7              THE COURT:  All right.  I'll go ahead and sustain the

8   objection.  Go ahead.

9   BY MR. EISENBERG:

10  Q.  Special Officer Graham, are you merely speculating about

11  situations, or are there situations that you're aware of in

12  your law enforcement experience that are like that?

13  A.  The one thing that I can think of, there is a shooting

14  that occurred in the Cupertino area of the Bay Area in

15  California.  It was an individual that shot and killed

16  people -- I think it was at a rock quarry, or something like

17  this.  He had lawfully purchased some firearms, and at least

18  one, and then he acquired more.  So I think that was

19  responsive to your question in the way in which you phrased

20  it.  And I was thinking about that specific shooting incident.

21  Q.  I'd like to speak now about exemptions to the

22  Waiting-Period Law.  Are you aware that there are statutory

23  exemptions to the Waiting-Period Law?

24  A.  Yes.

25  Q.  Are you aware that there is an exemption for peace

367

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII

JEFF SILVESTER, et al.,    )   1:11-cv-2137-AWI
                    )
       Plaintiff,   )
                    )   COURT TRIAL
    vs.             )
                    )   Day 3
KAMALA D. HARRIS, Attorney )
General of California, and  )
DOES 1 to 20,          )
                    )
       Defendants.  )
                    )

Fresno, California          Thursday, March 27, 2014

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Volume 3, Pages 367 to 534, inclusive

REPORTED BY:   GAIL LACY THOMAS, RMR-CRR
Official Court Reporter
CSR NO. 3278

Graham - X

385

1   might access?

2   A.  We might look into the Armed Prohibited Persons System,

3   the APPS system, we might look into the restraining order

4   system, criminal history system, mental health.  We might look

5   at warrants to see if somebody has a warrant in addition to

6   what we're looking under them for.  There may be other

7   agencies that have had unresolved criminal matters, if there

8   is a warrant floating around for them.  Let's see, DMV.  We

9   look for vehicle information, driver history to see where they

10  might reside, things like that.

11  Q.  Okay, and those are all to identify somebody who might be

12  prohibited from having a firearm; correct?

13  A.  Yes.

14  Q.  And then make a positive ID of the person and try and

15  locate them.

16  A.  Correct.

17  Q.  Okay, but in order for you to get the warrant or persuade

18  the neutral and attached magistrate that a crime has been

19  committed, you also have to present evidence that the

20  person -- there is evidence that the person has a gun too;

21  correct?

22  A.  Yes.

23  Q.  And how do you go about doing that research?

24  A.  Depending if we know about the person on the front side

25  such as a -- like an APPS case, we'll have information -- the

Graham - X

386

1   Armed Prohibited Persons System might be there, and some of

2   that information, I think as I testified yesterday, comes from

3   the Automated Firearms System.  In the event that we're doing

4   a more fluid situation as opposed to a kind of a planned event

5   with an APPS case, if it's a gun show case, and we identify

6   somehow a felon at a gun show, and they're buying ammunition,

7   we don't necessarily know what gun they're asking -- that they

8   may have, but we know that they've bought a particular type of

9   ammunition, so we may have to ask a little bit broader, if

10  we're looking for a .45-caliber weapon that this felon has

11  just bought ammunition for an hour ago.

12  Q.  Isn't it true that under California law, that a

13  prohibited -- somebody is prohibited from having a gun is also

14  prohibited from having ammunition?

15  A.  Yes.

16          MR. EISENBERG:  Calls for a legal conclusion.

17          THE COURT:  Overruled.

18  BY MR. KILMER:

19  Q.  I want to make sure that the record is clear on that.  It

20  is a true statement that people who are prohibited from having

21  guns are also prohibited from having ammunition?

22  A.  Yes.

23  Q.  So they're also prohibited from purchasing ammunition?

24  A.  Yes.  When we catch them, we would arrest them for that if

25  we caught them in the middle of it.

Graham - X

387

1    Q.  So if a peace officer observes a known felon to purchase

2    ammunition, they can make an arrest on the spot.

3    A.  Yes.

4    Q.  Okay.  Is it fair to say that you access the AFS system

5    for evidence that somebody already has a firearm?

6    A.  That's one of the reasons, yes, sir.

7    Q.  All right.  And so if you can put those two together, the

8    fact that this person is in a prohibited class of people, and

9    the AFS system indicates that they already have firearms, is

10   that generally enough to at least approach a magistrate for a

11   warrant for a prohibited person of a possession of a gun?

12   A.  Not necessarily.  There may be a large staleness issue.

13   Q.  I'm sorry, a large --

14   A.  Staleness issue, where the specific gun was purchased in

15   1986.

16   Q.  All right.

17   A.  And clearly there is a long gap in between.  So we would

18   have to do a ton of research to figure out, hey, does this

19   person have any gun arrests that don't show an evidence entry,

20   or a warrant kind of linked to an evidentiary entry, an

21   Automated Firearm System, that sort of thing.

22   Q.  Now, when you access the AFS to try to determine if this

23   prohibited person has a gun, and it shows a firearm purchased

24   in the last, say, six months, does that make it easier to make

25   a decision to approach a magistrate about getting a warrant?

Graham - X

388

1    A.   It would make things a lot easier, but that still may not

2    be enough.   Certain DA's offices wouldn't -- they wouldn't

3    want to have that much of a window.

4    Q.   All right.

5    A.   So that -- it would really depend maybe prosecutor by

6    prosecutor.   We will typically run our search warrants through

7    a prosecutor before taking them to a judge.

8    Q.   Okay.   So the date on which the last purchase is

9    information that's available to you on the AFS system.

10   A.   If assuming it's a handgun or a registered assault weapon,

11   there's a date tied to it.   If there are long guns prior to

12   the 1-1-14, we don't have any information on those unless the

13   person put a -- like, say, a voluntary registration form or a

14   firearm ownership record in with us because they wanted to

15   self-register in a sense or self -- to identify themselves to

16   certain weapons.

17   Q.   Now, we've heard testimony that the AFS system does not

18   keep records of long gun sales prior to January 1st of this

19   year?

20   A.   That's correct.

21   Q.   But does the AFS system keep a record of the fact that a

22   transaction took place prior to that regardless of the weapon?

23   A.   No, AFS does not do that.

24   Q.   Okay.   When you make the entry while you're doing your

25   investigation and you access the database, and you make the --

Graham - X

389

1   I assume you sit at a terminal and enter your password and log

2   onto the system; correct?

3   A.  Yes.

4   Q.  And then you'll make an inquiry as to -- into the AFS

5   system, what kind of inquiries do you make -- do you type in?

6   A.  We might just do a name tied with a date of birth search,

7   John Smith, 1-1, you know, 2010 was the birth date I'll make

8   up --

9   Q.  All right.

10  A.  And try to see what weapons might be associated with that

11  person.  We'll have to somewhat filter it, maybe with the

12  driver's license or, you know, something like that.

13  Q.  All right.  And does that sometimes result in multiple

14  hits?

15  A.  Often.

16  Q.  Just because of commonality of names and that sort of

17  thing?

18  A.  Yes.

19  Q.  Are you also able to input into the system any unique

20  identifiers about people other than their name or date of

21  birth?

22  A.  Could you explain what you mean by unique identifiers?

23  Q.  Like a California driver's license number, for instance.

24  A.  I don't enter driver's license numbers and link them to, I

25  guess, an evidence entry, per se, or something like that.  I'm

Graham - RX

442

1    are what help populate APPS or provide candidates for

2    population of APPS.

3    Q.  Okay.  And in order for you to -- the AFS system, I

4    believe you earlier testified, is the system that is -- the

5    catalog of the Dealer Record of Sales that the Department of

6    Justice has, and that includes handguns since '91 and long

7    guns since January 1st of this year; correct?

8    A.  That's actually incorrect.

9    Q.  Okay.

10   A.  The handguns are from '96 to current.

11   Q.  Okay.

12   A.  And then long guns are from January of this year to

13   current.

14   Q.  That's the AFS system?

15   A.  AFS, and there's also registered assault weapons that

16   would also be in the pool of weapons that might trigger

17   someone being in APPS if they were lawful -- the lawful owner

18   of one of those weapons too.

19   Q.  Okay, and how would you assess the reliability of that --

20   of the AFS database in connection with the investigations

21   you've done?

22   A.  In the sense that there are -- the DROS entries are in

23   there are by and large good data.  Occasionally you'll have a

24   serial number error.  Maybe a dealer -- you know, hit the

25   wrong zero, instead of an O or something.  By and large,

Graham - RX

443

1  that's pretty good.  You may have a make issue or maybe a typo

2  in the model.  But it's pretty good information on the DROS's.

3  Q.  Pretty reliable?

4  A.  Yes.

5  Q.  In fact, the AFS system has also accessed real time by

6  these officers in the street investigating act of crimes

7  sometimes too, aren't they?

8  A.  AFS, yes.

9  Q.  For instance, an officer might be investigating, rolling

10 up to a scene of alleged domestic violence, and they want to

11 know whether there might be a gun in the house; is that

12 correct?

13 A.  That might be something that an officer would do, roll

14 into a hot caller.  The dispatcher would funnel that

15 information perhaps if there is a shots fired call or domestic

16 or something.

17 Q.  And that's an automated system and pretty fast?

18 A.  Yes, if you know the person that you're dealing with.  If

19 you've got prior calls for service, then maybe they might have

20 a name and date of birth already.

21 Q.  Have you ever relied upon the AFS database for an

22 investigation on the proposition that somebody had a gun in

23 the house, and then you later found out that they didn't have

24 a gun?

25 A.  Yeah.  Yes.  We'll knock on a door, and they'll say, "Oh,

Graham - RX

444

1    I sold it," or something like that.

2    Q.  How many times has that happened?

3    A.  Personally?

4    Q.  Sure.  I don't want you to testify unless you personally

5    know.

6    A.  Right.  Probably dozens of times.

7    Q.  Over the course of how many years?

8    A.  Ten years, let's say.

9    Q.  All right.  Do you -- in the course of your duties in

10   enforcing California firearms laws, you interact quite a bit

11   with licensed dealers; is that correct?

12   A.  Yes.

13   Q.  In fact, this whole system for ensuring that firearms

14   remain -- only go to law-abiding citizens remain out of the

15   hands of prohibited people wouldn't work if the licensed

16   dealers weren't trustworthy; is that correct?

17   A.  Yeah, the premise is that they're going to put the

18   accurate information in the computer, and they're going to

19   verify, let's say, the driver's license number and make sure

20   that the person -- the driver's license info matches the

21   person standing in front of them.  They'll take the

22   thumbprint, and then they'll push it on to the background

23   check unit through the DROS system.

24   Q.  So this whole system depends for the bulk of its

25   enforcement on the law-abiding people trusting each other and

Graham - RD

447

1    active pool of people out there.

2    Q.   So you're not really that well versed in what databases

3    APPS pulls from, are you?

4    A.   I'm well versed in the ones that I use.  But I may not

5    know every single aspect of the system and all the business

6    rules on the computer side of things.

7              MR. EISENBERG:  Okay.  No further questions.

8              THE COURT:  And recross?

9              MR. KILMER:  Nothing further, Your Honor.

10             THE COURT:  Okay, either side may still call you back

11   to testify.  You're still under oath.  I'll leave it to

12   counsel to let you know the date and time if necessary to

13   return.

14             THE WITNESS:  Sure.  Thank you.

15             THE COURT:  All right.

16             MR. EISENBERG:  Your Honor, the defense would like to

17   call Bureau of Firearms Chief Steve Lindley.  May we have a

18   moment to locate him?  We understand that he's in the

19   building.

20             THE COURT:  Sure.

21             (Pause in the proceedings.)

22             THE CLERK:  Would you come right up here, sir.  Raise

23   your right hand.

24   ///

25   ///

Lindley - D

448

1                    **STEVE LINDLEY,**

2    called as a witness on behalf of the Defendants, having been

3    first duly sworn, testified as follows:

4           THE CLERK:  Take the witness stand right over there

5    and give us your full name, please.

6           THE WITNESS:  Stephen J. Lindley, L-I-N-D-L-E-Y.  I

7    spell Steven with a P-H.

8                        DIRECT EXAMINATION

9    BY MR. EISENBERG:

10   Q.  Good morning, Chief Lindley.

11   A.  Good morning.

12   Q.  I'd like to start by asking you some questions about your

13   education and professional background.  Now, Chief, did you

14   attend college?

15   A.  Yes.

16   Q.  Did you graduate from college?

17   A.  Yes.

18   Q.  What year did you graduate?

19   A.  1998 with my bachelor's.

20   Q.  And did you have a major course of study?

21   A.  Criminal justice.

22   Q.  Did you pursue formal education beyond your bachelor's

23   degree?

24   A.  Yes.

25   Q.  What other degrees, if any, did you obtain?

Lindley - D

449

1  A.  I have a master's in business management.

2  Q.  What year did you receive that degree?

3  A.  Late 1999.

4  Q.  Have you had any professional employment in law

5  enforcement?

6  A.  Yes.

7  Q.  Will you tell me what was the name of the first law

8  enforcement agency for which you worked?

9  A.  The National City Police Department in San Diego County.

10  Q.  What years did you work for the National City PD?

11  A.  Roughly between 1990 and 2001.

12  Q.  What was your job title at the police department?

13  A.  I started off as a police cadet and left there as a police

14  sergeant.

15  Q.  Did you have any other jobs in between those two ranks?

16  A.  Yes, I was a reserve officer, a police officer, a

17  detective, and then a sergeant.

18  Q.  At some point, did your employment with the National City

19  Police Department conclude?

20  A.  Yes.

21  Q.  Did you move on to another law enforcement employer?

22  A.  Yes.

23  Q.  Which employer is that?

24  A.  The Department of Justice.

25  Q.  And what year did you begin work at Cal DOJ?

Lindley - D

450

1  A.   2001.

2  Q.   And you're presently employed at the California Department

3  of Justice?

4  A.   Yes.

5  Q.   What is your current job?

6  A.   I'm the Bureau Chief for the Bureau of Firearms.

7  Q.   How long have you been the Bureau Chief?

8  A.   Roughly four years.

9  Q.   So that takes us back to about 2009?

10  A.   Yes.

11  Q.   In the intervening years about 2001 and 2009, you're

12  employed by the Bureau of Firearms at all times?

13  A.   No.

14  Q.   What years were you employed between 2001 and 2009 with

15  the Bureau of Firearms?

16  A.   Well, actually I started off at the Department of Justice

17  in the California Bureau of Investigations as a special agent

18  assigned to the San Diego regional office.  In the summer of

19  2003, I was promoted and moved to the Los Angeles regional

20  office, and I handled a team working out of the Riverside

21  regional office where I was the supervisor.  In the summer of

22  2006, I was promoted up to the division's headquarters in

23  Sacramento.  I spent about a year there.  And then I moved

24  over to the Bureau of Firearms in July of 2007.

25  Q.   Okay, so I was mistaken.  Those years between 2001 and

Lindley - D

451

1  2007, you were in the employment of the California Department

2  of Justice, but not the Bureau of Firearms within Cal DOJ; is

3  that right?

4  A.  Correct.

5  Q.  In your current position, do you supervise other

6  employees?

7  A.  Yes.

8  Q.  How many other employees do you supervise?

9  A.  Roughly about 224.

10  Q.  Are any of those employees peace officers?

11  A.  Yes.

12  Q.  Are you yourself a peace officer?

13  A.  Yes.

14  Q.  And are the remainder of the employees nonpeace officers?

15  A.  Yes.

16  Q.  Are you the supervisor for Assistant Chief Buford?

17  A.  Yes.

18  Q.  Are you the supervisor -- well, are you ultimately the

19  supervisor for Mitch Matsumoto?

20  A.  Yes.

21  Q.  Are you ultimately the supervisor for Special Agent

22  Supervisor Graham?

23  A.  Yes.

24  Q.  Have you ever worked as an instructor in any law

25  enforcement techniques?

Lindley -- D

452.

1   A.   Yes.

2   Q.   Would you describe briefly that experience?

3   A.   I taught at the San Diego Sheriff's Academy for about four

4   years.   I believe around 1998 to 2002 or so, and I taught

5   criminal -- excuse me, I taught interview and interrogation

6   and preliminary investigation and occasionally ethics.

7   Q.   At the Bureau of Firearms, have you articulated a concept

8   known as "Time Equals Safety"?

9   A.   Yes.

10  Q.   Will you please explain what that concept is.

11  A.   The more time that we have to do a quality background

12  check, the better the public safety so that we can ensure that

13  we're not allowing any prohibited person to possess a firearm.

14  Q.   Is there a staff at the Bureau of Firearms that performs

15  the background checks on a prospective firearms purchasers?

16  A.   Yes, we have a unit that does that.

17  Q.   Do you know roughly how many people work in that unit?

18  A.   All told, somewhere probably between 28 and 30, that's

19  including management, admin staff, and then our analysts and

20  supervisors.

21  Q.   You've heard of the term, a "DROS application"?

22  A.   Yes.

23  Q.   What is a DROS application?

24  A.   It's an application from an individual to purchase a

25  firearm and allows us the opportunity to do a background check

Lindley - D

453

1    on them.

2    Q.   So the Bureau of Firearms processes the DROS applications?

3    A.   Yes.

4    Q.   Do you know how many DROS applications the Bureau of

5    Firearms processed last year?

6    A.   I believe it was 960,179.  I might be off by a number or

7    two.

8    Q.   And do you have the figure for the prior year 2012?

9    A.   It was 817,248, I believe, give or take a few.

10   Q.   Is the staffing that you have to process the background

11   checks enough that the work can get done in a 40-hour week by

12   your staff?

13   A.   No.

14   Q.   Does your -- well, is there a name for the people that do

15   the background checks?  Do they have a job title?

16   A.   Are you talking about their specific job title or just the

17   unit?

18   Q.   The job title of the individuals.

19   A.   Usually they are Criminal Identification Specialists, and

20   their classification is a II based on their level of

21   expertise.

22   Q.   Have you ever heard that position referred to by just the

23   abbreviation CIS?

24   A.   Yes.

25   Q.   Do the CIS's work overtime?

Lindley - D

454

1    A.   Yes.

2    Q.   Do you know how much overtime?

3    A.   Depends on the employee.  I have a set minimum that they

4    need to work on a monthly basis in order for us to keep our

5    heads above water.  But there are a number of analysts that

6    work well in excess of 100 hours of overtime a month.

7    Q.   You're the manager of those folks ultimately; correct?

8    A.   Yes.  I'm responsible for them.

9    Q.   Why are you having people work so much overtime?

10   A.   We have high volumes for the DROS applications.

11   Q.   Can you just bring in temporary CIS's when they are --

12   when there's a backlog of work?

13   A.   No, you cannot.

14   Q.   Why not?

15   A.   Through the process of just the state hiring, our

16   background checks that we do on the -- on our individual

17   employees before we employ them at the Bureau of Firearms as a

18   full -- not a criminal background check, but investigative

19   employment background check is an investigation on top of just

20   the time that it takes to train an individual, that can be

21   anywhere from four to nine months, depending on the

22   individual, for really they're qualified to do those checks,

23   and we feel comfortable allowing them to do them.

24   Q.   If you had an extra large sum of money, say, an extra

25   billion dollars just to hire and train CIS's, would you be

Lindley - D

455

1    able to perform -- get all the background checks to perform

2    instantaneously or nearly instantaneously?

3    A.    No.

4    Q.    Why do you say that?

5    A.    There's still a wide variety of information that we have

6    to pull, and we talk about a background check, it sometimes

7    can be a background investigation.    If an individual has an

8    open disposition on an arrest, whether it's a recent arrest or

9    one a couple years old, and that disposition would be

10   prohibited if they were either convicted or pled guilty to

11   that charge, we have to chase down the disposition.    That's

12   just one of the issues.    We have to contact the courts and get

13   them to provide us that information.    That has proved very

14   challenging over the past several years.    We have to decipher

15   people's names because they're not always using the same name,

16   so we have aliases issues in order to find out about.

17              Mental health hospitals, when they send us the

18   information, they send us the information that they are

19   provided by the patient at that time.    But oftentimes when the

20   patient is coming in, they're not in their right mind.    That's

21   why they're in that facility.    And oftentimes when they're

22   leaving, they might be prescribed a number of drugs.    That

23   also might make them a little less lucent, so it's a problem

24   getting their names.    We have to decipher that.    They have to

25   contact that facility and make sure that we're not giving a

Lindley - D

456

1  prohibited person a firearm and ensuring that the person is

2  not prohibited.  We make sure they're approved as well.  So

3  it's just not as easy as checking a box in order to do a

4  quality background check that we feel is in the public's best

5  safety sense.  It takes time to do that.

6        On top of it, we can't control the volume that comes

7  in.  Some days we get 1500.  There's been days we've gotten

8  10,000.

9  Q.  If the Bureau of Firearms was ordered to do an

10  instantaneous background check or near instantaneous

11  background check, how would that sync up with your philosophy

12  of time equals safety?

13  A.  We could do it.  It would be a very poor quality

14  background check.  We wouldn't have the time to check our work

15  and make sure that we're ensuring that people who are

16  prohibited don't possess a firearm.  It just wouldn't be very

17  quality, and it wouldn't be the -- it would be -- in my terms

18  kind of a crappy background check for California, and we'd be

19  allowing prohibited people to get a gun.

20  Q.  Are you familiar with the term "CCW?"  Actually let me

21  back up a second.

22        You spoke about people admitted to mental health

23  facilities maybe not giving correct identifying information

24  upon intake.  What's the basis for that knowledge that you're

25  claiming?

Lindley - D

457

1    A.   I was a police officer for roughly 11 years on the

2    streets.  I've dealt with people with mental illness a

3    majority of that time.  Besides the social issues with that

4    and how we need to take care of them, they can pose a threat

5    to themselves or others at times.  You know, sometimes they

6    think they're the devil.  Sometimes they think aliens are

7    invading their body.  There's ones that think they have robots

8    inside their body.  They're giving names that aren't their

9    true person because they have some serious mental health

10   issues.  When we take them to the facility to be evaluated,

11   again, that evaluation takes some time by the doctors and the

12   staff there.  And then depending on when they're released and

13   what drugs they might be under in order to control the

14   psychosis, again, can interfere with their memory, you know,

15   just being lucent or not at that time.

16   Q.   Do you have an understanding of what the law is for

17   whether a person who has been on a mental health hold may

18   possess or acquire a firearm?

19   A.   There's roughly a five-year prohibition for a California

20   5150.  Also for a 5250, it's also a five-year prohibition in

21   California.  However, under federal law, that 5250 is a

22   lifetime prohibition.

23   Q.   What is a 5150?

24   A.   When someone who has been in a mental institution for

25   about 72 hours for evaluation, and under 5150 of the Welfare

Lindley - D

458

1   and Institutions Code, that outlines.  If they're in there for

2   that time frame, and the facility believes they're a danger to

3   themselves or others, they would have what's called a 5150

4   placed on them.

5   Q.  If a person is a 5150, they're prohibited from having a

6   firearm under California law?

7   A.  Correct.

8   Q.  Are they prohibited from having a firearm under federal

9   law?

10  A.  Not under 5150, no.

11  Q.  Now, I'd like to move on to the questions about CCW's.

12  Have you heard the term "CCW" in the course of your work?

13  A.  Yes.

14  Q.  What's your understanding of what a CCW is?

15  A.  In laymen's terms, it's a permit to carry a concealed

16  weapon.  Normally a firearm.

17  Q.  Does the Bureau of Firearms issue CCW's to citizens?

18  A.  No, we do not.

19  Q.  Do you know what agency or agencies issues CCW's?

20  A.  Local Sheriff's Departments and police departments.

21  Q.  Is the Bureau of Firearms involved in any way in the

22  application for a CCW?

23  A.  Yes.

24  Q.  How?

25  A.  Depending on the county, depending on the City.  Normally

Lindley - D

459

1   when they start the process to obtain a CCW, at some point

2   during that process, they need to have fingerprints taken and

3   sent to the Department of Justice to do a background check on

4   them.  We determine whether the person is prohibited or not

5   prohibited and forward that to the licensing agency along with

6   the copy of their California criminal history.

7   Q.  Does the Bureau of Firearms communicate to law enforcement

8   agencies that there's any kind of expiration date or time

9   period within which the check that you've done is valid?

10  A.  Like with our other processes, when we clear someone to

11  purchase a firearm, stating they're not prohibited, you

12  normally have 30 days.  That background check is good for 30

13  days.

14  Q.  And is it the case, to your knowledge, that the other law

15  enforcement agencies always issue the CCW's within that 30-day

16  window?

17  A.  I would say it's rare that they issue that license within

18  the 30-day window.

19  Q.  Do you know about the length of time it takes for the CCW

20  to issue?

21  A.  It really depends on the agency, but some agencies are as

22  far as nine months after we've done the background check, that

23  they're issuing the CCW permit to the citizen.

24  Q.  If a person has a CCW, does that entitle the person to

25  purchase a firearm without going through the 10-day waiting

Lindley - D

460

1  period?

2  A.  No, it does not.

3  Q.  If a person has a CCW, does that entitle the person to

4  purchase a firearm without going through a background check?

5  A.  No, it does not.

6  Q.  Doesn't the fingerprinting and the background check that

7  the Bureau of Firearms did when the person applied count for

8  the length of the CCW?

9  A.  No, it does not.

10  Q.  Are you familiar with the California Penal Code?

11  A.  It's very large, but, yes.

12  Q.  In the course of doing the background check, is there a

13  check for whether the applicant is a trustworthy person?

14  A.  I don't believe that's in the Penal Code.

15  Q.  Is trustworthy person, is that a criteria that is measured

16  in the background check?

17  A.  Not the background check, no.

18  Q.  Do you understand that there is a firm definition in

19  criminal law of what a trustworthy person is?

20  A.  I'm not aware of that.

21  Q.  Are you aware that there are statutory exemptions to the

22  Waiting-Period Law?

23  A.  Yes.

24  Q.  I'd like to -- well, are you knowledgeable about the

25  different exemptions?

Lindley - D

461

1    A.  For the most part, yes.

2    Q.  I'd like to ask you questions about the various

3    exemptions.

4         Are you aware that there is an exemption to the

5    waiting period for peace officers?

6    A.  Yes.

7    Q.  Do you know why there is an exemption for peace officers?

8    A.  It's designed so they can get their duty weapon that they

9    need to perform their duties.

10   Q.  Is a peace officer subject to a background check on, you

11   know, joining a police academy?

12   A.  A somewhat extensive background check, yes.  I mean, they

13   have psychological examinations, a polygraph examination.  The

14   background check that they do is more of a background

15   investigation into who they are, what they are, going back to

16   high school, college, checking their neighbors, past

17   employers, friends, family, girlfriends, boyfriends, and we

18   need to know what type of a character we're going to give that

19   authority to.

20        Top of that, if they are hired by the agency, they

21   have anywhere between 600 and 900 hours of training in an

22   academy.  Once they graduate there, they can have anywhere

23   from six months and a year of field training before they're

24   actually let out by themselves as a peace officer and then

25   constantly supervised by the agency.

Lindley - D

462

1   Q.  Is the background -- the background investigation that you

2   mentioned, is it just the same as what a person going through

3   a DROS application background check goes through?

4   A.  No, apples and oranges.

5   Q.  Are you aware that there are exemptions for firearms

6   dealers from the Waiting-Period Law?

7   A.  Yes.

8   Q.  Why are firearms dealers exempt from the Waiting-Period

9   Law?

10  A.  Well, just the level of regulation that they're under, not

11  only from California, from DOJ, but also from ATF, the federal

12  firearms license.  They have to apply for federal firearms

13  license from the ATF.  Once that process has been completed

14  and they've been given that license, then they can apply for a

15  Certificate of Eligibility or COE from DOJ.  Again, that isn't

16  fingerprint-based alone.  More intensive of a background check

17  than would be done on DROS.

18          Top of that, they're heavily regulated at their place

19  of business.  For instance, any time during their normal

20  business hours, either ATF or DOJ can inspect that premise,

21  and they can't stop us from doing that.  That's part of

22  running that business and part of having those licenses.

23  Q.  Are you aware of an exemption to the Waiting-Period Law

24  for dangerous weapons permits holders?

25  A.  Yes.

Lindley - D

463

1   Q.   Why is there such an exemption?

2   A.   Normally most dangerous weapons holders, permit holders,

3   oftentimes they're also FFL holders and COE holders, normal

4   firearms dealers in California, or they have some type of

5   contracting or business with the federal government.  So

6   they've gone through an intensive security check through them

7   as well.  We do the check, and we just don't do a background

8   check on them.  We actually do a background investigation very

9   similar to what we do for a peace officer.  We talk to them,

10  we talk to their neighbors, their business neighbors, we talk

11  to their family.  We talk to ex-wives, current wives,

12  boyfriends, relatives, to get somewhat of a knowledge about,

13  one, why they need that permit, and who they are because we're

14  giving them some great responsibility with that permit.

15       Again, they're heavily regulated by both DOJ and ATF

16  if they have an FFL, and they have constant supervision.  On

17  top of that, we inspect their premises and their firearms

18  regularly to make sure they're in compliance.

19  Q.   Is the background investigation that a person goes through

20  to get a dangerous weapons permit the same as for a person

21  submitting a DROS application to purchase a firearm?

22  A.   No, far more intensive.  I could actually add all

23  Dangerous Weapons Permits that are approved by the department

24  are approved by me, so I see all those and approve those.

25  That's a little bit different than most DROS applications.

Lindley - D

464

1   Q.   There are peace officers in the Bureau of Firearms;

2   correct?

3   A.   Correct.

4   Q.   If a peace officer seeks to exercise the exemption, the

5   Waiting-Period Law exemption, is there anything that a peace

6   officer has to do, or can they just go to a gun store, flash

7   their badge and walk out with a gun?

8   A.   They have to request that letter through their chain of

9   command all the way up to my boss, which is the director of

10  the divisional law enforcement, and I have to make a

11  recommendation to him or her at the time.  If I approve of

12  that agent or that peace officer, I give him that exemption.

13  Q.   Do you routinely approve those applications?

14  A.   I have never approved one.

15  Q.   I'd like to move on to discuss another exemption.  Have

16  you heard that there is an exemption for people who hold a

17  curio and relic firearm permit?

18  A.   Yes.

19  Q.   What is a curio and relic firearm?

20  A.   One that is on the ATF's list of curio and relic firearms,

21  and that is normally 50 years older or old.

22  Q.   If a person has a curio and relic permit, has that been

23  obtained from the State of California?

24  A.   Partially from the State and partially from ATF, I

25  believe.

Lindley - D

465

1  Q.  What are the agencies involved in granting this permit?

2  A.  Both DOJ and ATF, and, again, they have a Certificate of

3  Eligibility listing them as a curio and relic dealer.

4  Q.  Are you aware of the general availability of curio and

5  relic firearms in California?

6  A.  Roughly, yes.

7  Q.  Are curio and relic firearms as readily -- well, sorry.

8      Are you aware of the general availability of firearms

9  that are not curio and relic firearms in California?

10 A.  Yes.  There's roughly over 1900 dealers in California that

11 sell firearms.

12 Q.  Are curio and relic firearms as readily available as other

13 kinds of firearms?

14 A.  Generally, no.  Again, it's a small segment of firearm

15 purchases.  And it's based upon their age, their historical

16 value, maybe who possessed them before.  You know, whether it

17 was used in combat, let's say, like a Colt 1911.  And just

18 even though there are guns that are still out there, not a

19 large percentage of them come into the market for resale.

20 Q.  Are you aware of whether there are variations in the

21 quality of curio and relic firearms?

22 A.  Yes.  You could equate it to like vehicles compared to --

23 there's different qualities of T-Birds going all the way back

24 to 1957.  The better quality that it is, the more it can

25 command on the market as a price.

Lindley - D

466

1   Q.   Is it common to find a 50-year-old firearm in mint

2   condition?

3   A.   Common, no, but they're out there.

4   Q.   I'd like to move on to discuss another exemption.   Are you

5   aware of whether there is an exemption for the Waiting-Period

6   Law for gunsmiths?

7   A.   Yes.

8   Q.   What is a gunsmith?

9   A.   I guess in laymen's terms would be an individual with

10  training to work on firearms.   I would equate it to a very

11  good mechanic for a vehicle.

12  Q.   And gunsmiths are licensed by some entity?

13  A.   They're licensed by ATF.

14  Q.   Does the State of California license gunsmiths?

15  A.   I don't believe that we do.

16  Q.   Why is there an exemption for gunsmiths from the

17  Waiting-Period Law?

18  A.   They take in firearms from individuals, and under

19  California law, a firearm can be loaned to an individual up to

20  30 days, but oftentimes a gunsmithing process, depending on

21  what the individual wants done with that firearm and how

22  quickly the gunsmith can do it might take, 30, 60, 90 days.

23  So during that process, they would kind of be in violation of

24  California law.   Therefore, if we have an exemption for them,

25  again, the -- they've gone through the background passes with

Lindley - D

467

1    ATF, and they're regulated by ATF, and that's part of their

2    business in order to bring in firearms to do work on them.

3    Q.   Like to move on to discuss another exemption.   Have you

4    heard of an exemption for firearm wholesalers?

5    A.   Yes.

6    Q.   Why are firearm wholesalers exempt from the Waiting-Period

7    Law?

8    A.   Again, very similar to regular firearm dealers is they're

9    transacting firearms back and forth, and they're regulated and

10   licensed not only by ATF, but by California DOJ as well.

11   They're open to inspection on other premises, they have to go

12   through certain processes in order to transfer those firearms,

13   so it's a regulated process for both what would be a normal

14   DROS application.

15   Q.   If a wholesaler wants to stop the Bureau of Firearms from

16   doing an inspection, can a wholesaler do that?

17   A.   Not during their normal business hours.

18   Q.   Does the Bureau of Firearms have to preannounce that

19   they're doing an inspection of a wholesaler?

20   A.   No, we do not.

21   Q.   I'd like to discuss another exemption.   Have you heard of

22   an exemption from the Waiting-Period Law for target shooting

23   facilities?

24   A.   Yes.

25   Q.   Why -- why does that exemption exist, to your

Lindley - D

468

1   understanding?

2   A.  Well, a lot of the firearm facilities that have --

3   shooting facilities that have firearms on the premises

4   oftentimes have a FFL and a COE in order to sell firearms.  I

5   would harken it towards people coming there, they want to try

6   different firearms and see how they feel in their hands, how

7   they shoot them.  Very similar to how someone wants to

8   purchase a vehicle, they want to take the car for a test

9   drive.  Kind of the same thing.  They might think they might

10  want a certain caliber, a certain type of a gun.  They can

11  test fire there.  If they don't, they find another one that

12  they do, and the facility can make that sale.

13          On top of that, the guns that they have there for

14  firing can't be taken off the premises.  A lot of facilities

15  oftentimes when a person is doing the shooting, oftentimes

16  that's one-on-one supervision from one of the range masters.

17  Q.  And, Chief, I'd like to ask you about another exemption.

18  Are you aware of whether there is an exemption that applies in

19  the entertainment industry?

20  A.  Yes.

21  Q.  Why is there an exemption for the entertainment industry

22  from the Waiting-Period Law?

23  A.  In order for them to be able to get firearms in use in

24  television movie productions.  But there's a couple of

25  distinctions with them that's far above what normal people or

Lindley - D

469

1   even normal businesses deal with.  One, they've gone through
2   the Dangerous Weapons Permit process normally, a slight
3   variation of the entertainment permit, so we've done a full
4   background on them.  Most of the firearms that they have on
5   the premise that they're using will oftentimes don't fire real
6   bullets anymore.  They've been gunsmithed to fire blank
7   ammunition.  A lot of that deals with the insurance companies
8   that insure these events, the movie industry.  And they have
9   very strict guidelines of what they want on those sets because
10  accidents have happened in the past.
11          So just the regulations that the insurance companies
12  and the movie industry has put on themselves are oftentimes
13  far greater than what we would have placed on them or have
14  placed on them.  But, again, they're subject to inspection by
15  us at any time.
16  Q.  What kind of safeguards are you aware that the movie
17  industry uses that's not necessarily required by state law?
18  A.  Well, I can talk about Universal Studios.  And they have
19  their prop masters that have dangerous weapons permits.  All
20  the stunt actors that would use that firearm also has a
21  Dangerous Weapon Permit.  That's just by their policy.  So
22  when their -- I guess one of the events they have is a
23  *Terminator* ride or a *Terminator* show, the prop master will
24  bring that firearm in a locked safe to the event, hand it to
25  the actor or the stunt person.  They check it, they use it,

Lindley - D

470

1    they come back, it's put right back in the safe, locked and
2    taken back to their master safe.  And those firearms cannot
3    fire a regular 9-millimeter bullet.  It's some form of a blank
4    that is firing.  They're very protected because of insurance
5    purposes to ensure they don't have any accidents on the
6    facility.
7    Q.  You're aware that the background checks that the Bureau of
8    Firearms does sometimes lead to the denial of firearm
9    purchases; correct?
10   A.  Correct.
11   Q.  Does the Bureau of Firearms -- do they do any work
12   retrieving firearms that are in the hands of prohibited
13   people?
14   A.  We have our Armed Prohibited Person System.
15   Q.  In terms of public safety, is it preferable to have one
16   versus the other?  Is it preferable to stop the release of a
17   firearm to a prohibited person, or is it preferable to
18   retrieve a firearm from a prohibited person?
19   A.  It's always far easier, cheaper, and in the public's best
20   interest to prevent a prohibited person from possessing a
21   firearm in the first place.  Retrieving a firearm from
22   someone, especially, let's say, they have some mental health
23   issues, can be a very dangerous event for the public, for the
24   agents, or the officers that are allowed to do that, and for
25   the individual that's prohibited.

Lindley - D

471

1    Q.  Are there any examples of where California's background

2    check system has prevented firearms from being released to

3    prohibited persons that you're aware of, any specific

4    instances?

5    A.  There are thousands of them, there's a couple that come to

6    mind as far as notable instances that happened within the last

7    couple years.

8    Q.  Please describe those instances.

9    A.  I believe his name is John Bedell, B-E-D-E-L-L.  He was

10   the Pentagon shooter back in March.  I believe he did the

11   shooting at the Pentagon early March of 2010.  That individual

12   was a California resident.  He tried to purchase a firearm, I

13   believe, in January of that year here in California.  That

14   purchase was denied because -- and he had some prohibitions.

15   Unfortunately, after that denial, he drove to Las Vegas and

16   purchased actually two handguns from a private dealer in

17   Las Vegas at a gun show, then drove out to Arlington, Virginia

18   and conducted the shooting at the Pentagon.

19          One of far more recent is the individual who shot

20   several people at the Santa Monica College.  Again, I believe

21   his name was John Zawahri, Z-A-W-A-R-I, I believe.  He tried

22   to purchase a handgun in California as well and was denied

23   because he had several firearm prohibitions.  Unfortunately,

24   he was able to obtain a gun illegally and conduct the shooting

25   at the college.  So those are the two instances where

Lindley - D

472

1    California law prevented it.  They chose to get guns in other

2    illegal means, sometimes from another state.  But our process

3    worked in stopping a prohibited person from possessing a

4    firearm.

5    Q.   You're aware -- you testified that there are approximately

6    960,000 DROS applications processed by your bureau in 2013;

7    correct?

8    A.   Yes.

9    Q.   Do you know how many denials were issued?

10   A.   74' or 7500, roughly.

11   Q.   Do you know if any people who have been denied were second

12   time or subsequent purchasers; in other words, it was not the

13   first attempt to purchase a firearm?

14   A.   I know that it has happened, but it has been brought to my

15   attention.  I just can't remember the particular instances,

16   but that does happen.

17         When somebody is denied a firearm purchase because

18   they're prohibited, one of the things that DOJ does is we

19   notify the local jurisdiction that the gun purchase or the

20   attempted gun purchase was made in -- on top of contacting the

21   DA's office of that county, notifying them of that purchase,

22   or that attempted purchase took place, and that that is a

23   crime.

24         THE COURT:  All right, it's 12:00.  We'll take our

25   noon recess.  1:30 this afternoon.

Lindley - D

473

1           MR. EISENBERG:  I actually only have one more

2      question.

3           THE COURT:  We'll finish up at least direct exam.

4      BY MR. EISENBERG:

5      Q.  If the waiting period were reduced from 10 days to a

6      smaller number, say, three days, zero days, would there be the

7      same number of denials in 2013?

8      A.  I believe denials would go up, denials could go down,

9      depending on what information we're able to obtain in three

10     days.  For instance, if someone -- if as I say goes down to

11     three days, someone purchased a firearm on Friday afternoon at

12     6:00, and they had an open disposition on an arrest, or they

13     had some type of 5150 that we needed to check information on,

14     we can't get to that information on Saturday or Sunday because

15     those businesses are closed, the courts are closed.  If the

16     Court is dark on Monday, we wouldn't be able to check at all

17     before the three 24-hour periods.  So we would not be able to

18     do an accurate or thorough background check because we just

19     don't have the time to do it because we rely on information

20     from other entities in order to make a good determination.

21     Q.  So would more guns go to prohibited persons on a

22     background check, or would you catch more people with a

23     shorter background check, a shorter waiting period?

24     A.  I look at it like this:  Time equals safety.  The longer

25     we can do a background check, and I think 10 days is a very

Lindley - D

474

1  adequate time for to us get through a majority of those

2  background checks. Anything lower than that, it's very

3  difficult for us to be able to contact the entities that we

4  need to do to determine whether somebody is prohibited or not

5  prohibited.

6       MR. EISENBERG: I have no further questions for this

7  witness at this time, Your Honor.

8       THE COURT: All right. Okay, we'll take our noon

9  recess, 1:30 this afternoon.

10      THE WITNESS: Thank you, Your Honor.

11      (Noon recess.)

12                    **AFTERNOON SESSION**

13      MR. EISENBERG: Your Honor.

14      THE COURT: All right, back on the record.

15      MR. EISENBERG: Your Honor, during the break, I

16  realized that I might have a few more questions for the

17  witness. I spoke with plaintiffs' counsel. He said I could

18  just finish up and then -- is that all right with you?

19      THE COURT: Oh, sure. Fine. Continue on with direct

20  examination.

21  BY MR. EISENBERG:

22  Q.  Good afternoon, Chief Lindley.

23      Have you heard of a term "refresher" in connection

24  with the background check?

25  A.  Yes.

Lindley - D

475

1   Q.   What's your understanding of that term?

2   A.   Basically as the -- our DROS entry system gets the

3   information from the dealer, it's forwarded to our DROS

4   system.   A background check, electronic background check is

5   done at that time, so an analyst can analyze information to

6   see what actual work needs to be done.   That's usually done

7   day one, let's say.

8              Sometimes the analyst might not get to that

9   information for several more days.   Before they start their

10  background process, they will refresh that information to make

11  sure that any information that maybe came in in the past three

12  or four, five days is refreshed, and we have the best

13  information possible in order to start the background process

14  with.

15  Q.   Are you familiar with the system known as APPS, A-P-P-S?

16  A.   Yes.

17  Q.   Are you aware that APPS is a database system?

18  A.   It is a system that relies on information from other

19  databases, yes.

20  Q.   Okay, relies on information from other databases?

21  A.   Yes.

22  Q.   Do you know what databases APPS pulls its information

23  from?

24  A.   It uses our CFIS, AFS information to identify individuals

25  that have legally purchased firearms at one time or registered

Lindley - D

476

1   assault weapons since 1989.  Then it compares that information

2   to the department's mental health system, our commission on

3   the Restraining Order System, the wanted persons system, and

4   our criminal history system.

5   Q.  Have you heard of a term called BFEC in your work at the

6   Bureau?

7   A.  Yes.  Our Basic Firearms Eligibility Check.

8   Q.  Are there databases consulted in a BFEC?

9   A.  Yes, basically the same ones, however, we also check the

10  National NICS system as part of BFEC.

11  Q.  Does the APPS database pull from NICS?

12  A.  No.  It is not allowed to.

13  Q.  Why is it not allowed to?

14  A.  I believe under federal law, that's not one of the uses

15  for a NICS check.

16  Q.  In your work either as a police officer or at the Bureau

17  of Firearms, have you ever come across a situation where one

18  family member wants to take firearm -- firearms away from

19  another family member who may be acting erratically or

20  depressed?

21  A.  Yes.  That happens a little more often as of late,

22  especially dealing with our soldiers that are returning from

23  Iraq and Afghanistan, and if that they have certain PTSD, or

24  Posttraumatic Distress Disorder.

25          MR. KILMER:  I object to this point, Your Honor, this

Lindley - D

477

1  entire line of questioning.  Is the witness testifying as to

2  his own personal experience, or is he testifying to newspaper

3  articles he's read?

4           THE COURT:  All right.  Foundation?

5           MR. EISENBERG:  Okay.

6           THE COURT:  Sustained.  Foundation.

7  BY MR. EISENBERG:

8  Q.  Have you had any personal experience with the scenarios

9  described?

10  A.  Yes.

11  Q.  What's the basis of those experiences?

12  A.  They were forwarded to my telephone number, and I talked

13  to these family members personally.

14  Q.  In what capacity were you speaking to them?

15  A.  As the Chief of the Bureau of Firearms and as a police

16  officer, a human, someone they can turn to for some

17  assistance.

18  Q.  Is there anything that law enforcement is authorized to do

19  in a situation like that?

20  A.  Well, if an individual wants to surrender firearms for

21  safekeeping to law enforcement, they're allowed to do that.

22  And oftentimes, these citizens are doing that.  Oftentimes,

23  it's a wife or close family member that wants to get the

24  firearms out of the house until that individual, their loved

25  one can seek treatment through the VA system for their PTSD

Lindley - D

478

1     that they sustained as a cause of the war.

2           They oftentimes tell me that, you know, they're not

3     going to commit suicide by taking pills, you know, jumping to

4     death, suffocating themselves or hanging themselves, but

5     because they're very familiar with firearms, they will shoot

6     themselves.  And they oftentimes quote the data, I think that

7     was a 2012 data, that the military especially the U.S. Army

8     was sustaining more losses through suicide, returning soldiers

9     than they were going through on --

10          MR. KILMER:  Objection.

11          MR. EISENBERG:  Let him finish his testimony.

12          THE COURT:  Well, hold on.

13          MR. KILMER:  The witness is testifying as an expert

14    now regarding mental health issues, Your Honor.

15          THE COURT:  Sustained.  Rephrase the question.

16    BY MR. EISENBERG:

17    Q.  Was the entire testimony stricken or just part of it,

18    Your Honor?

19          THE COURT:  Well, just for clarity, I'll strike the

20    entire last answer.  Go ahead and rephrase and restate the

21    question.

22    BY MR. EISENBERG:

23    Q.  What, if anything, can law enforcement do in a situation

24    like that where one family member wants to take guns away from

25    another family member?

1   A.  Well, in a case of a husband or wife, identify it as

2   community property so they can surrender those firearms to law

3   enforcement for safekeeping.

4         MR. EISENBERG:  I have no further questions at this

5   time.

6         THE COURT:  And cross-examination.

7         MR. KILMER:  Thank you, Your Honor.

8                    CROSS-EXAMINATION

9   BY MR. KILMER:

10  Q.  Good afternoon, Mr. Lindley.  Is it Director Lindley?

11  A.  It's Chief Lindley.

12  Q.  Chief Lindley, I'm sorry.

13        You testified earlier that when it comes to

14  regulating the sale of firearms, timing was safety.  Am I

15  accurately remembering your testimony?

16  A.  Yes.

17  Q.  Does that mean also more time equals more safety?

18  A.  I think there's a limit in order of what time frame we can

19  do the background check.  Oftentimes, we have to delay a

20  purchase for longer than the 10 days because we're trying to

21  trace down the disposition.  At one point, we can do that for

22  a much longer period.  Recently under current California law,

23  we can only now do that for 30 days.

24  Q.  All right.  So sometimes on one side of the equation, you

25  need more time in order to get to more safety.

Lindley - X

480

1   A.   In order for us to make an accurate determination about
2   the person's status, yes.  It does take longer at times.
3   Q.   But the equation you gave us was time equals safety.
4   A.   In my opinion, it does.
5   Q.   Okay.  Is there such a thing as too much safety?
6   A.   I would say no.
7   Q.   So then how would you do a balancing test between time and
8   safety if there's not too much safety?
9   A.   Don't understand your question.
10  Q.   I mean, for example, you cited recent legislation that
11  allows you to delay a sale for up to 30 days.
12  A.   Correct.
13  Q.   To conduct further investigations.
14  A.   Correct.
15  Q.   Is 30 days always enough?
16  A.   No.
17  Q.   Is 60 days always enough?
18  A.   No.
19  Q.   Ninety days?
20  A.   That percentage, it's getting very small at that point,
21  but there are times where it takes longer than 90 days, yes.
22  Q.   What's the longest it's ever taken to complete a
23  background check?
24  A.   I believe we had ones that took as long as 12 to 16
25  months.

Lindley - X

481

1    Q.  At what point does that become not just a delay, but

2    actually a denial of the right?

3         MR. EISENBERG:  Objection.  Vague and ambiguous,

4    calls for a legal conclusion.

5         THE COURT:  Sustained.

6    BY MR. KILMER:

7    Q.  Would it be fair to say that a goal of your background

8    check system and the 10-day waiting period system is to

9    hopefully get to almost a perfect record of denying people who

10   are not entitled to have guns?

11   A.  Okay, that was a little bit of a spin.  Maybe you can

12   clarify that.  I'm not exactly sure what you're asking.

13   Q.  I mean, for example, do you have any statistics on your

14   accuracy rate?  Are you denying 90 percent of unlawful

15   purchases?

16   A.  We have a percentage of people that we deny on an annual

17   basis.  We have that statistic.  I think he said earlier 7400

18   to 7500 last calendar year.

19   Q.  All right.  And that was against more than 900,000

20   approved sales?

21   A.  No, that was against 960,179 total sales.

22   Q.  All right.

23   A.  So you subtract that down, you're looking at somewhere

24   around 953,000, 152,000.

25   Q.  So would it be fair to say that less than 1 percent to

Lindley - X

482

1  have DROS applications resulted in a denial?

2  A.  If you look historically, it's right around 1 percent.

3  Some years it goes up slightly maybe to 1.1, 1.2 percent.

4  Other times it goes as low as .7 percent.  Looking at now last

5  year, somewhere between .7 and .8 percent.

6  Q.  All right.  Do you keep any statistics on mistakes made by

7  the system, for example, where a firearm was approved, and the

8  10-day waiting period lapsed, and there was a mistake?

9  A.  We keep those.

10  Q.  How many times has that happened?

11  A.  More than I would like it to.  Probably looking at about

12  10, 12 times a year.

13  Q.  So very small?

14  A.  It is very small.

15  Q.  So you'd characterize your system as pretty reliable?

16  A.  I would hope to be.  We want it to be absolutely reliable,

17  but we do have a human factor and a lot of information.

18  Q.  All right.  And that was the point of my earlier question

19  is that your goal as administrator of this system is to get to

20  where you're not falsely denying, and you're not falsely

21  approving sales?

22  A.  Absolutely.  I mean, I want to be in a zero failure

23  business.

24  Q.  All right.  But right now, you're pretty close to that if

25  you're only making a mistake of approving a sale -- I mean, if

Lindley - X

483

1   you deny or delay a sale, the worse thing that happens is

2   somebody doesn't get a gun?

3   A.   Yes, and there's an appeal process for that because there

4   are times where we didn't get all the pertinent information,

5   and they have an appeals process for that.

6   Q.   But from a public safety perspective, the bottom line is

7   one gun has been kept off the street.  One person's rights may

8   need to still be further adjudicated, but one gun has been

9   kept off the street in a potentially dangerous situation.

10  A.   Yes, as far as the information we had, we denied that

11  purchase.

12  Q.   And a very minuscule, maybe 10 or less per year against

13  the background of sometimes a million sales a year, do you

14  accidentally approve a sale that shouldn't have been?

15  A.   That should have been denied?

16  Q.   Yes.

17  A.   Yes, that happens.

18  Q.   There are some exceptions to the waiting period, and you

19  testified about those earlier.  Are you aware of any exception

20  for a victim of domestic violence to obtain the means of

21  self-defense immediately after being a victim of domestic

22  violence?

23  A.   Either purchasing a gun or being able to obtain a gun

24  through other means?

25  Q.   To purchase a gun through your system.

519

1        THE COURT:  If not already, Plaintiffs' 4 and 5 are

2   admitted into evidence if they have not already been.

3        (Plaintiffs' Exhibits 4, 5, received in evidence.)

4        THE COURT:  So we're basically dealing with

5   Plaintiffs' 1, 2, and 3?

6        Okay, let me turn, then, to defense exhibits.  If I

7   can just get an update on the status of the defense exhibits

8   which have not already been addressed.

9        MR. EISENBERG:  There are none.  The remaining

10  documents are all the ones that are subject to the request for

11  judicial notice.  And the parties have not been able to reach

12  an agreement on whether those documents are admissible.  And

13  those documents would include Exhibit 1, 2, and 3 on the

14  plaintiffs' side, I believe.  They're the same kind of

15  documents as the historical materials that the defense

16  submitted.  We've talked about ways to reach an agreement,

17  including proposals for stipulations, but we have not been

18  able to reach an agreement.  The only thing we have been able

19  to reach an agreement on is that we will -- we will provide

20  you excerpts of documents that you deem admitted.

21        MR. KILMER:  That is the agreement, Your Honor.

22        THE COURT:  All right.  Let me just -- in terms of

23  the defense exhibits, I have seven binders here of the defense

24  exhibits.  Obviously probably about three of the binders have

25  already been resolved, but I don't necessarily want to have to

520

1  go through as to each binder, each exhibit one by one to get

2  argument.  What I want to try to do is do this as efficiently

3  as possible.  I recognize, and counsel has noted that in the

4  various fairly recent cases of the Circuit, including the

5  *Peruta* case and the *Chovan* case, there was a discussion

6  regarding information that the courts really need to look at.

7          And, for example, in the *Peruta* case, the Court made

8  it very clear in criticizing contrary decisions on other

9  circuits, that they didn't do the full research that the Court

10  in *Peruta* did, and the Court reviewed -- and, of course, this

11  is on the issue of whether or not the Second Amendment applies

12  to the issue at hand, which is the right to bear arms

13  essentially outside the home.  And the Court does go through

14  the history of case authority.  The Court goes through

15  historical legislation, and the Court goes through

16  commentaries.  And the case authority dates back to what the

17  Court called 19th century case law.  The historical

18  legislation dated back to post civil war legislative scene.

19  And the commentaries, be considered post civil war

20  commentators, understanding of the right.  So it is fairly

21  clear that I have to consider each of those aspects in terms

22  of historical context.

23          So let me just say in general parameters -- and,

24  again, with respect to weight of the evidence as opposed to

25  admissibility, I am proposing to admit Law Review articles.

521

1    Courts generally cite to Law Review articles fairly

2    frequently.  Legislative histories, the courts can take

3    judicial notice of legislative histories.

4         To the extent that certain proposed exhibits are

5    dealing with public agency reports, notices, statistics, to

6    the extent that they are public records, I would consider

7    admitting those.

8         The big concern I have is with respect to articles,

9    because, frankly, with respect to articles, if it's one person

10   or a small body, a group of people's opinions, personal

11   opinions in the form of an article, I'm not sure that those

12   are the things that courts can take judicial notice of.

13   Certainly if they are in dispute, then that is one of the

14   factors on judicial notice because basically the Court can

15   only take judicial notice of those items or exhibits for which

16   they are relatively uncontroverted.  So that's problematic in

17   terms of taking judicial notice.

18        I also recognize, however, that I do need some

19   background information.  The only question is with these

20   various proposed exhibits, which ones are really helpful and

21   authoritative items of background information that are not

22   primarily editorial comment by one or more individuals

23   regarding their personal opinions regarding primarily, in this

24   case, any waiting periods or the impact of various state laws.

25        I'm certainly open to any suggestions with those sort

522

1    of parameters as to how we're going to deal with this.  If it

2    comes down to, okay, we're just going to set aside a couple

3    days, I'll start with exhibit whatever -- and I'll just use

4    this hypothetical -- Exhibit 1, and we will go through

5    Exhibit 1 through 100, and take up every page to see what's

6    relevant or not.  We can do that.  I don't propose to do that.

7            What I propose to do is allow defense counsel to

8    submit as to each exhibit for which there is a dispute the

9    basis for taking judicial notice; the -- a very brief summary

10   of what the exhibit states that would be relevant to the

11   particular issues at hand here; give plaintiff's counsel an

12   opportunity to respond, and then I would conduct another

13   hearing after I've had a chance to review that.  But I --

14   again, I'm not otherwise inclined to go through each exhibit

15   and hear arguments on each exhibits.  That would take arguably

16   days.  And I just don't see doing that.

17           So with that little bit of my thoughts, defense?

18           MR. EISENBERG:  Yes, Your Honor.  We certainly agree,

19   and the things like legislative history, Law Review articles,

20   early case law, legislation should come in.  We have submitted

21   some of those materials, and I would think, then, that you

22   would just deem them admitted without need of document by

23   document review.

24           THE COURT:  Right.

25           MR. EISENBERG:  So we certainly do not have a

523

1    negative response to that commentary.

2            As far as some of the other categories, we believe

3    that history books were cited, the Malcolm were cited  --

4    Joyce Lee Malcolm, the professor of history, her books have

5    been cited in either Heller or -- and McDonald or both.

6    Scholarly works of history seem to be something that is

7    definitely relied on in these kinds of cases.

8            I also want to draw your attention to an advisory

9    committee comment about Federal Rule of Evidence 201, because

10   we're talking about legislative facts as opposed to

11   adjudicative facts, and the standard of not controverted does

12   not apply.

13           Quote, "In determining the content or applicability

14   of the rule in domestic law, the judge is unrestricted in his

15   investigation and conclusion.  He may reject the propositions

16   of either party or of both parties.  He may consult the

17   sources of pertinent data to which they refer, or he may

18   refuse to do so.  He may make an independent search for

19   persuasive data or rest content with what he has or what the

20   parties present.

21           "The parties do no more than to assist.  They control

22   no part of the process."

23           That, and the case that we cited to *Daggett*, and just

24   simply the practice of the Ninth Circuit is that in a case

25   where you're considering the constitutionality of a law, a

524

1    wide range of materials come in even if there are, say, two

2    sides of a scholarly dispute.  The Heller opinion, you know,

3    showcased a scholarly dispute, and all of those materials were

4    considered.  They were not rejected on the grounds that they

5    were uncontroverted.

6         I don't think you're going to find very many books

7    about the history of the Second Amendment or the meanings that

8    are not controverted by one side or the other.  So, therefore

9    we have proposed excerpts from history books to be considered,

10   and the plaintiffs in their submission have done the same

11   thing.  You know, the Founders Amendment book by Stephen

12   Halbrook, a well-known NRA lawyer who definitely has a strong

13   position on the issue.  We're not going to say that you should

14   not even look at that material just because the author has a

15   perspective that a lot of people disagree with.  We believe

16   that our materials are ultimately going to be more persuasive

17   to you, but we think that they all should be admitted and

18   given the weight that you deem just.

19        And to back up my point, I actually want to quote

20   from the response of the plaintiffs to our motion on this

21   topic.  Now, we're dealing with the historical materials, not

22   the medical science studies that go to the second part of the

23   *Chovan* test.

24        But they wrote here, "Given that the United States

25   Supreme Court in both *District of Columbia v. Heller*" -- and

525

1    they give the cite, "and the *McDonald v. City of Chicago*" --
2    and then they give the site, "engaged in a survey of
3    historical evidence of the scope and meaning of the Second" --
4    well, they skipped the word "of" -- "scope and meaning of the
5    Second Amendment, the plaintiffs herein cannot and do not
6    object to that kind of evidence being derived from academic
7    studies and law journal articles."
8         MR. KILMER:  May I respond to that, Your Honor?
9         THE COURT:  Sure.  Are you done on that, then?
10        MR. EISENBERG:  Yeah, I would just submit that they
11   have already essentially conceded the point.
12        MR. KILMER:  Your Honor, I think the point we were
13   trying to make there, and I don't -- I'm not contradicting our
14   statement, but the kind of analysis that the Supreme Court
15   engaged in in the *District of Columbia v. Heller* and *McDonald*
16   *v. City of Chicago*, is that they did survey the historical
17   data, and they did derive some of the historical data from Law
18   Review articles.  That's without question.
19        However, the problem is that the defendants are
20   trying to admit as evidence the opinions and analysis of law
21   professors, and that's just not appropriate.  Now, if those
22   articles contain excerpts of law journals or statutes or
23   writings on the meaning of the Second Amendment at the time of
24   its ratification and at the time of its incorporation, those
25   obviously are relevant for the Court to look at, but there's a

526

difference between a court reading a case or reading a law

review article that is cited in a brief in order to have an

informed opinion and then calling the Law Review article

evidence.  It's not evidence.

THE COURT:  All right.

MR. KILMER:  Further comment on the suicide studies,

Your Honor --

MR. EISENBERG:  We haven't even addressed that issue.

THE COURT:  All right.  Okay, and I'm not sure how

the lower courts or Supreme Court did their survey, whether --

whether the trial court level documents were submitted as

exhibits as evidence, or whether or not there were simply a

list given -- I don't know.  I guess part of the problem is

certainly, it's sort of like, okay, I'm not sure how each of

these articles fit in.  I can obviously tell once there are

proposed findings of facts as articles are referred to and the

specific citations to specific articles would obviously be

helpful.  Of course, then it's what I allow first.  Do I admit

provisionally or otherwise these as exhibits and then take a

look and see when there are proposed findings of facts?  Just

whether or not I'm going to give -- then it's just a matter of

how much weight I would give to those references.

MR. KILMER:  Your Honor, if I may be somewhat

presumptuous in inquiring about how the Court is going to --

we're going to proceed with the findings of facts is my

527

1  suggested solution.  My understanding of how we're going to

2  proceed once the evidence is closed is that the parties

3  will -- the Court will set a briefing schedule.  We'll get

4  copies from the transcripts from this matter.  We'll each

5  prepare a proposed findings of facts and conclusions of law.

6  I'm assuming we're going to be able to also support that with

7  the memorandum of points and authorities, and then we'll also

8  be able to each submit what we -- excerpts of records, almost

9  like a Court of Appeal, we'll submit excerpts of record of

10 those exhibits and those portions of testimony that we want

11 the Court to focus on instead of just giving you a whole bunch

12 of documents.

13          I have no objection to the Court simply taking under

14 submission the admissibility of the contested exhibits and

15 then ruling on their admissibility in a separate memorandum

16 after you've taken a look at our proposed findings of facts

17 and conclusions of law and read our memorandum in support and

18 taken a look at the specific exhibits we think are important.

19 And then the Court can simply make its evidentiary ruling at

20 that time.  That may be the most efficient way to proceed.

21          THE COURT:  Defense?

22          MR. EISENBERG:  Mr. Kilmer, are you proposing to do

23 that for both the historical materials and the medical

24 studies?

25          MR. KILMER:  I'm proposing that -- that the parties

528

simply tender their arguments in their proposed findings of

fact and conclusions of law from exhibits that have been

marked.  I mean, I'm not in the business of censoring district

court judges.  If the judge wants to look at it and then say,

"No, this isn't admissible, I'm not going to allow it," and

it's always subject to a motion to strike, I suppose.

MR. EISENBERG:  Okay, with the understanding that all

of the submitted exhibits could be considered, and there's not

a category that you're saying that we're not permitted to even

cite to the judge, then we will agree to this proposal, which,

by the way, I have just heard for the first time.

THE COURT:  All right.  Okay.

MR. KILMER:  That's because I just thought of it for

the first time.

THE COURT:  That may be the most pragmatic thing to

do, understanding, then, that really your proposed findings of

facts will be essentially drafts because I may make certain

rulings that might cause you to modify them.  But that

certainly would be probably cleaner than saying, okay,

defense, instead of that, you're going to prepare little brief

excerpts of each of the documents here so that we can take a

look at that and I can rule on it.  Because it could well be

as we're going through your proposed findings of fact that you

may be able to really pinpoint more as to a particular exhibit

which portions of that exhibit that you want the Court to

529

1    refer to in terms of a proposed findings of fact. And there
2    might be some that you might decide, well, we really don't
3    need that, it's duplicative. Or this person's article is
4    really covered by this particular Law Review article, or
5    something like that, so it's really cumulative or redundant.
6    So that's a possibility, and I certainly don't have a problem
7    with that.
8         I will tell you, Miss Thomas, my court reporter, has
9    indicated that she can probably get to you a certified copy of
10   the transcript, if you ordered them in three weeks. So that's
11   something --
12        MR. KILMER: That's good. So, Your Honor, the status
13   of the contested exhibits at this point is that they are
14   basically being that each of the exhibits are at this point in
15   time an offer of proof, subject to -- perhaps a motion to
16   strike, that the Court will rule on at the same time it
17   renders its decision in this case.
18        THE COURT: I can take it -- each of the exhibits
19   under submission, and then once I've had a chance to take a
20   look at your proposed findings of fact, which would include
21   references to specific exhibits including the Plaintiffs'
22   Exhibits 1 through 3, and the various defense exhibits for
23   which have not yet been submitted or withdrawn. That might be
24   a workable solution. Defense?
25        MR. EISENBERG: Your Honor, we are in agreement with

530

1   what we're hearing.  Thank you very much, Your Honor.

2           THE COURT:  Now -- and let me do this:  So right now,

3   what I would propose to do is just set a schedule.  Now, as it

4   turns out, as you think about this and start drafting your

5   proposed findings of facts, you're thinking, you know, there's

6   a problem here, then I don't have a problem in coming back and

7   we can talk about it further.  And in all candor, if at some

8   point in time, it's, "Judge, I'm sorry, we're going to have to

9   go through 1 through 100 before we continue on with our

10  proposed findings of facts," we can certainly do that.  I

11  don't have a problem with that because obviously this is

12  something that has been suggested, and it seems to be

13  workable.  It might turn out not to be.  But if it is

14  workable, obviously it's probably the cleanest way to do it.

15          So with that understanding, then, as far as preparing

16  proposed findings of facts and conclusions of law, and

17  assuming -- and I'm not sure if you're going to be requesting

18  or ordering transcripts.  If you are, that will be about three

19  weeks.  With that understanding, let me get a time frame for

20  submitting proposed findings of facts and conclusions of law.

21  If you want to chat first briefly about scheduling it, it

22  might be more productive to do that.

23          So let me just take a quick break.  You can meet and

24  confer, and if you can agree on a schedule and then a date

25  that I can set aside for essentially what would be closing

531

1    arguments, it would be after the parties have submitted your

2    proposed findings of facts and conclusions of law and that

3    will give us all frameworks to deal with closing arguments.

4           So let me take a quick break, and you can check.

5    Mr. Nazaroff will have my schedule, and obviously whatever

6    time frame, we'll just work it in.

7           MR. KILMER:  One quick question, Your Honor, just so

8    we understand the format.  So that we're going to agree on a

9    date where each party submits a proposed findings of facts and

10   conclusions of law, the excerpts that we want the Court to

11   look at, and then a legal memorandum addressing the points we

12   want to argue.  Will the parties then have an option to also

13   file simultaneous responses, and then we'll come back for oral

14   argument if necessary?

15          THE COURT:  Yeah, if you wish.  You can file a

16   response to the other side's proposed findings of facts and

17   conclusions of law and the memorandum.  That's fine.  Go ahead

18   and build that in.

19          MR. KILMER:  And I'm going to be the rude one and ask

20   what page limits does the Court want to impose on us?

21          THE COURT:  I'm not going to impose any page limits.

22   As I said, it's important, I said this at the outset, and I

23   still believe that we need to make sure that both sides within

24   the framework of the rules, et cetera, that you make as clear

25   and as complete record as possible.

532

```
1              MR. KILMER:  Thank you, Your Honor.
2              THE COURT:  I'm perfectly fine with that.
3              Let me take a quick break.  As soon as you're ready,
4    meet and confer.  Figure out on your schedules, check with
5    Mr. Nazaroff, make sure that we can carve out some time if you
6    think that we need a day, we need two days, or whatever, to do
7    the closing arguments, that's fine.  We'll just work out a
8    time frame.  And then figure out your own calendars as to what
9    will work out best.  As I've indicated, Miss Thomas, your
10   three weeks is --
11             (The court reporter nods.)
12             THE COURT:  As soon as you're ready to come back on
13   the record with a briefing schedule, I'll come back on the
14   record.  You can cite it on the record, and I'll be okay with
15   that.
16             MR. KILMER:  Thank you, Your Honor.
17             MR. EISENBERG:  Thank you, Your Honor.
18             THE COURT:  We'll take a brief recess.
19             (Recess.)
20             THE COURT:  All right, back on the record, update on
21   the status of the case, briefing schedule, et cetera.
22             MR. KILMER:  Yes, Your Honor.  I think we have agreed
23   on a schedule.  And that is that -- that madam reporter will
24   have until the 21st of April, which is a Monday, to have the
25   transcripts to us by then or sooner.  That the parties will
```

533

1    then file their initial findings of fact and proposed findings

2    of facts and conclusions of law, any memorandum of law that

3    they wish to accompany that, and then the excerpt of record

4    that they want the Court to consider, basically pinpointing

5    what they want the Court to look at.  And that filing date

6    will be June 16th.  And then each party will be entitled to

7    file a response on June 30th.  And then the parties would

8    return on July 21st for oral argument or closing argument.

9            THE COURT:  All right.  Defense?

10           MR. EISENBERG:  We agree with that schedule,

11   Your Honor.

12           THE COURT:  That will be the order of the Court,

13   then.  And if it turns out, when I get the initial briefing,

14   that it might take some further time, what I might do is just

15   move it to a separate date.  Monday is my law and motion day,

16   and if I think it needs more time, then I would try to move it

17   over to a different day rather than a Monday.  But I'll give

18   you plenty of notice so you can plan accordingly.  I'm not

19   just going to tell you a week before to show up on a Tuesday

20   instead of Monday.

21           MR. EISENBERG:  Your Honor, I'll be on a family

22   vacation July 26th to August 2nd.  If I don't tell you that,

23   my wife will be very angry with me.

24           THE COURT:  If I move it to a day other than the

25   21st, I'll obviously make sure it's a day that everyone is



*KAMALA D. HARRIS*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

DIVISION OF LAW ENFORCEMENT
BUREAU OF FIREARMS
P.O. BOX 160367
SACRAMENTO, CA 95816-0367
Telephone: (916) 227-2153
Fax: (916) 227-1021

January 14, 2014

BRANDON S COMBS

MADERA, CA 93638

Certificate of Eligibility Number: 16276

## CERTIFICATE OF ELIGIBILITY (COE)
## CONFIRMATION NOTICE

The California Department of Justice, Bureau of Firearms has received and processed your COE application. Your new certificate is enclosed. Please note the expiration date on your certificate.

California Penal Code sections 26700, 26705, 27200 and 29050 require that all firearms dealers, firearms manufacturers, certain manufacturer employees, and gun show producers possess a valid COE.

If you have any questions, plesae contact the Firearms Licensing and Permits Section at the number listed above.

Sincerely,

STACY HEINSEN, Manager
Firearms Licensing and Permits Section
Bureau of Firearms

For KAMALA D. HARRIS
Attorney General

LCOE-001 Rev. 04/2012

**State of California**
**Department of Justice**

# CERTIFICATE OF ELIGIBILITY

**Number: 16276**

Issued to:

**BRANDON S COMBS**

This is to certify that the Department of Justice, Bureau of Firearms has completed a firearms eligibility check on the above named individual. As of the date of issue, there is nothing that would prohibit the individual from acquiring or possessing a firearm.

Date of Issue:  **February 2, 2014**     Expiration Date:  **February 1, 2015**

Signature of Issuing Officer: _____

EOR210

# License To Carry Concealed Pistol, Revolver, or Other Firearm Within the State of California

## Issued By:

Agency **Hanford Police**

"ORI"

Date of Issue **11-02-13**

Expiration Date **11-02-15**

Local Agency Number **376**

CII # **COP**

☐ Initial

☒ Subsequent

Signature and Title of Issuing Officer

## SECTION A

Name of Licensee **Jeffrey Sherman Silvester**

Residence Address

City **Hanford** Zip **93230** County **Kings**

Business Address — Occupation **Insurance**

Birthdate — Hgt. **6-1** Wgt. **240** Eye Color **Blu** Hair Color **Bro**

EOR211



LICENSE TYPE: ○ Employ. ☐ Standard ☒ Judicial ○ Reserve ☐ Custodial ☐

## SECTION B - Description of Weapon(s)

| Manufacturer | Serial Number | Caliber | Model |
|---|---|---|---|
| SPH | | .45 | PC91051 |
| SSS | | 9mm | P226 |
| GLC | | 8888 | 23GEN4 |

Restrictions (if any)    None

RIGHT THUMB PRINT

*EOR212

Signature of Licensee

Photo (optional)

BOF 4501 (11/06)



# DEALER'S RECORD OF SALE

### (Calendar Year Statistics)

| Year | Handguns | Handgun Denials |
|------|----------|-----------------|
| 1972 | 190,335 | |
| 1973 | 192,108 | |
| 1974 | 234,691 | |
| 1975 | 231,916 | |
| 1976 | 204,658 | |
| 1977 | 225,412 | |
| 1978 | 258,485 | |
| 1979 | 268,447 | |
| 1980 | 325,041 | |
| 1981 | 371,160 | |
| 1982 | 311,870 | 1,008 |
| 1983 | 268,462 | 1,148 |
| 1984 | 275,882 | 1,349 |
| 1985 | 293,624 | 1,413 |
| 1986 | 266,480 | 1,515 |
| 1987 | 273,628 | 1,702 |
| 1988 | 291,171 | 1,803 |
| 1989 | 333,069 | 1,793 |
| 1990 | 330,285 | 2,437 |

| Year | Handguns | Handgun Denials | Long guns | Long gun Denials | All Guns | Total Denials |
|------|----------|-----------------|-----------|------------------|----------|---------------|
| 1991 | 329,133 | 3,934 | 160,300 | 1,925 | 489,433 | 5,859 |
| 1992 | 382,122 | 4,037 | 177,486 | 1,726 | 559,608 | 5,763 |
| 1993 | 433,822 | 4,605 | 208,375 | 1,904 | 642,197 | 6,509 |
| 1994 | 382,085 | 3,862 | 217,587 | 2,564 | 599,672 | 6,426 |
| 1995 | 254,626 | 2,534 | 157,042 | 1,672 | 411,668 | 4,206 |
| 1996 | 215,804 | 2,111 | 138,068 | 1,531 | 353,872 | 3,642 |
| 1997 | 204,409 | 1,839 | 150,727 | 1,615 | 355,136 | 3,454 |
| 1998 | 189,481 | 1,721 | 153,059 | 1,596 | 342,540 | 3,317 |
| 1999 | 244,569 | 2,233 | 268,849 | 2,546 | 513,418 | 4,779 |
| 2000 | 201,865 | 1,572 | 184,345 | 1,903 | 386,210 | 3,475 |
| 2001 | 155,203 | 1,449 | 198,519 | 2,158 | 353,722 | 3,607 |
| 2002 | 169,469 | 1,661 | 182,956 | 2,172 | 352,425 | 3,833 |
| 2003 | 126,233 | 1,254 | 164,143 | 1,774 | 290,376 | 3,028 |
| 2004 | 145,335 | 1,497 | 169,730 | 1,828 | 315,065 | 3,325 |
| 2005 | 160,990 | 1,592 | 183,857 | 1,878 | 344,847 | 3,470 |
| 2006 | 169,629 | 2,045 | 205,944 | 1,689 | 375,573 | 3,734 |
| 2007 | 180,190 | 2,373 | 190,438 | 1,926 | 370,628 | 4,299 |
| 2008 | 208,312 | 2,737 | 216,932 | 2,201 | 425,244 | 4,938 |
| 2009 | 228,368 | 2,916 | 255,504 | 2,221 | 483,872 | 5,137 |
| 2010 | 236,086 | 2,740 | 262,859 | 2,286 | 498,945 | 5,026 |
| 2011 | 293,429 | 3,094 | 307,814 | 2,767 | 601,243 | 5,805* |
| 2012 | 388,006 | 3,842 | 429,732 | 3,682 | 817,736 | 7,524 |

*The Handgun and Long Gun Dealer's Record of Sales Denials counts do not equal because the same subject may have been denied for both a handgun and long gun purchased at the same time.

5/1/2013

AA

AG002143
Silvester v. Harris

# DROS MONTHLY STATISTICS
## HANDGUNS AND LONG GUNS

### 01/01/2012 Through 12/31/2012

**OFFENSE CODE DENIALS:**

| | |
|---|---|
| FORGERY/FRAUD | 120 |
| OTHER (YES ANSWER, ETC.) | 2,450 |
| NON IMMIGRANT ALIEN | 66 |
| WEAPONS | 152 |
| SEX CRIMES | 52 |
| ROBBERY | 98 |
| ASSAULT | 2,167 |
| HOMICIDE (INCLUDES MANSLAUGHTER) | 15 |
| VEHICLE CODE VIOLATIONS | 285 |
| BURGLARY (INCLUDES RSP) | 306 |
| NON-STAT MENTAL | 12 |
| DANGEROUS DRUGS/NARCOTICS | 1,175 |
| KIDNAP | 2 |
| THEFT | 168 |
| ARSON | 19 |

**OTHER DENIALS:**

| | |
|---|---|
| FEDERAL BRADY PROHIBITION** | 2,213 |
| JUVENILE PROHIBITION | 373 |
| DOMESTIC VIOLENCE RESTRAINING ORDER | 405 |
| CONDITION OF PROBATION | 71 |
| FELONY CONVICTION | 2,084 |
| MISDEMEANOR | 1,054 |
| MENTAL HEALTH | 781 |
| OTHER | 105 |

**TOTAL DENIALS:**

| | |
|---|---|
| OTHER | 1,630 |
| FELONIES | 2,084 |
| BRADY PROHIBITIONS | 2,213 |
| MISDEMEANORS | 1,054 |
| TOTAL | 6,981 |

**30-DAY REJECT DENIALS:**

| | |
|---|---|
| 30-DAY REJECTS | 1,930 |

**DROS DOCUMENTS PROCESSED:**

| | |
|---|---|
| TOTAL RECEIVED FROM VENDOR | 817,748 |
| HANDGUNS | 388,006 |
| RIFLE/SHOTGUNS | 429,732 |
| EXEMPT HANDGUN | 8 |
| EXEMPT RIFLE/SHOTGUNS | 2 |
| TOTAL DROS FROM ACCOUNTING | 817,748 |
| PAWN HANDGUNS | 5,353 |
| PAWN RIFLE/SHOTGUN | 3,774 |

**DENIALS BY FIREARM TYPE:**

| | |
|---|---|
| HANDGUNS | 3,559 |
| RIFLE/SHOTGUNS | 3,525 |

**PAWN DENIALS BY FIREARM TYPE:**

| | |
|---|---|
| RIFLE/SHOTGUNS | 64 |
| HANDGUNS | 58 |

**PRIVATE PARTY SALES:**

| | |
|---|---|
| RIFLE/SHOTGUNS | 27,882 |
| HANDGUNS | 63,775 |
| DENIALS | 530 |

**PEACE OFFICERS** (CERT LIST EXEMPT):

| | |
|---|---|
| HANDGUNS | 18,669 |
| DENIALS | 1 |

**CURIO & RELIC:**

| | |
|---|---|
| HANDGUNS | 27,107 |
| DENIALS | 345 |

AO

AG002144
Silvester v. Harris

# DEALER RECORD OF SALE STATISTICS

## 01/01/2013 Through 12/31/2013

**OFFENSE CODE DENIALS:**

| | |
|---|---|
| ARSON | 20 |
| ASSAULT | 2,026 |
| BURGLARY (INCLUDES RSP) | 322 |
| DANGEROUS DRUGS/NARCOTICS | 1,191 |
| FORGERY/FRAUD | 130 |
| HOMICIDE (INCLUDES MANSLAUGHTER) | 17 |
| KIDNAP | 2 |
| MENTAL HEALTH | 201 |
| NON IMMIGRANT ALIEN | 72 |
| NON-STAT MENTAL | 8 |
| OTHER (YES ANSWER, ETC.) | 2,513 |
| ROBBERY | 75 |
| SEX CRIMES | 65 |
| THEFT | 238 |
| VEHICLE CODE VIOLATIONS | 298 |
| WEAPONS | 198 |

**SUMMARY OF DENIALS:**

| | |
|---|---|
| CONDITION OF PROBATION | 95 |
| DOMESTIC VIOLENCE RESTRAINING ORDER | 460 |
| FEDERAL BRADY PROHIBITION** | 2,291 |
| FELONY CONVICTION | 2,297 |
| JUVENILE PROHIBITION | 329 |
| MENTAL HEALTH | 802 |
| MISDEMEANOR | 926 |
| OTHER | 171 |
| TOTAL | 7,371 |

**30-DAY REJECT DENIALS:**

| | |
|---|---|
| 30-DAY REJECTS | 2,814 |

**DROS PROCESSED:**

| | |
|---|---|
| TOTAL DROS RECEIVED | 960,179 |
| HANDGUNS | 422,030 |
| LONG GUNS | 538,149 |
| PAWN REDEMPTION HANDGUNS | 5,772 |
| PAWN REDEMPTION LONG GUNS | 4,155 |

**DENIALS BY FIREARM TYPE:**

| | |
|---|---|
| HANDGUNS | 3,725 |
| LONG GUNS | 3,646 |

**PAWN DENIALS BY FIREARM TYPE:**

| | |
|---|---|
| LONG GUNS | 57 |
| HANDGUNS | 60 |

**PRIVATE PARTY SALES:**

| | |
|---|---|
| LONG GUNS | 44,375 |
| HANDGUNS | 75,554 |
| DENIALS | 633 |

**PEACE OFFICERS** (CERT LIST EXEMPT):

| | |
|---|---|
| HANDGUNS | 22,838 |
| DENIALS | 6 |

**CURIO & RELIC:**

| | |
|---|---|
| HANDGUNS | 36,040 |
| DENIALS | 552 |

AG002394

Silvester v. Harris

U.S. Department of Justice
Federal Bureau of Investigation
*Criminal Justice Information Services Division*





*National Instant Criminal Background
Check System (NICS) Operations*

2011

EOR216

AG001801

# Our Mission

## FBI

The mission of the FBI is to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners.

## Criminal Justice Information Services (CJIS) Division

The mission of the CJIS Division is to equip our law enforcement, national security, and intelligence community partners with the criminal justice information they need to protect the United States while preserving civil liberties.

## NICS Section

The mission of the NICS Section is to enhance national security and public safety by providing the timely and accurate determination of a person's eligibility to possess firearms and/or explosives in accordance with federal law.

i

AG001802

Silvester v. Harris

# Executive Summary

The FBI Criminal Justice Information Services Division's National Instant Criminal Background Check System (NICS) Section has processed firearm background checks since November 30, 1998. Since that time, the experience gained enhances national security and public safety by identifying, developing, and implementing improvements in support of the NICS Section's mission. Striving to provide effective and efficient service to its customers, highlights of the NICS operations in 2011 include the following:

- From the inception of the NICS on November 30, 1998, to December 31, 2011, a total of 140,882,399 transactions have been processed. Of these, 67,155,452 transactions were processed by the NICS Section and 73,726,947 transactions were processed by state users. Of the 16,454,951 background checks processed through the NICS in 2011, a total of 6,875,625 transactions were processed by the NICS Section and 9,579,326 were processed by state users.

- From November 30, 1998, to December 31, 2011, the NICS Section has denied a total of 899,099 transactions. Denials issued by the NICS Section in 2011 totaled 78,211.

- The NICS Section processed 110,686 explosives transactions. Denials issued by the NICS Section in 2011 totaled 2,558.

- The NICS Section processed 1,071,459 firearms and explosives transactions via the Internet-based NICS E-Check. This number is approximately a 96.67 percent increase over the number of NICS E-Check transactions processed in 2010.

- The number of records maintained in the NICS Index, as of December 31, 2011, totaled 7,310,638, which is an increase of 868,100 records over December 31, 2010.

- The NICS Section achieved a 91.52 percent Immediate Determination Rate, surpassing the U.S. Attorney General-mandated goal of 90 percent or better.

- The NICS Section staff obtained approximately 45,700 final dispositions which were posted to criminal history records and disseminated over 34,260 dispositions to state agencies to assist in updating state records. As of December 31, 2011, the NICS Section staff had obtained approximately 782,000 record-completing dispositions.

- The Voluntary Appeal File (VAF) permits the NICS Section to maintain information about persons to document their eligibility to receive firearms. As of December 31, 2011, the VAF maintained approximately 19,932 entries with an active Unique Personal Identification Number (UPIN). From VAF program inception through December 31, 2011, over 39,000 background checks have been processed using a UPIN.

- The NICS availability averaged 99.87 percent.

- There were 3,166 firearm retrieval referrals forwarded to the Bureau of Alcohol, Tobacco, Firearms and Explosives by the NICS Section.

ii

AG001803

Silvester v. Harris

# Table of Contents

FBI, CJIS Division, and NICS Section Mission Statements ........................................... i

Executive Summary ........................................................................................................ ii

Welcome to the NICS Section ......................................................................................... 1

2011 NICS Operations

-NICS Participation ......................................................................................................... 3

-NICS Availability ........................................................................................................... 4

-Answer Speed ................................................................................................................. 5

-Transfer Process Abandonment Rate ............................................................................. 6

-Immediate Determination Rate ...................................................................................... 7

-Transactions Created in the NICS .................................................................................. 8

-NICS E-Check ................................................................................................................ 9

-NICS Peak Season ........................................................................................................ 10

-Federal Prohibitors ...................................................................................................... 11

-Federal Denials ............................................................................................................ 12

-Firearm Retrieval Referrals ......................................................................................... 14

-NICS Appeals ............................................................................................................... 14

-VAF .............................................................................................................................. 14

-Explosives Background Checks .................................................................................... 15

-NICS Index .................................................................................................................. 16

-Success and Outreach .................................................................................................. 18

iii

# 2011 NICS Operations

Firearm Retrieval Referrals

Because of the NICS Section's commitment to public safety and national security, the search for the needed disposition information continues beyond the three business days allowed by the Brady Act. In some instances, the information is subsequently obtained and a final status determined; however, if the final status (determined after the lapse of three business days) results in a deny decision and the NICS Section is advised by the FFL that the firearm was transferred, then the ATF is notified a prohibited person is in possession of a firearm. In 2011, the NICS Section referred 3,166 firearm retrieval actions to the ATF.

NICS Appeals and Voluntary Appeal File (VAF)

In 2011, approximately 1.14 percent of the firearm background checks processed by the NICS Section received a final transaction status of deny. Pursuant to the Brady Act, any person who believes they were wrongfully denied the transfer of a firearm, based on a record returned in response to a NICS background check, can request an appeal of the decision. An appeal is defined as "a formal procedure to challenge the denial of a firearm transfer." Pursuant to 28 C.F.R., §25.2--"an individual may request the reason for the denial from the agency that conducted the check of the NICS (the 'denying agency,' which will be either the FBI or the state or local law enforcement agency serving as a POC)." In the alternative, per 28 C.F.R., §25.2, an individual denied by a POC state can elect to submit an appeal to the NICS Section.

Some records used to determine if an individual is eligible to possess or receive a firearm are not complete or up-to-date. As a result, eligible firearm transferees may be subject to lengthy delays or receive erroneous denials even after the completion of a successful appeal. Often, the record-completing information located by NICS Section employees cannot be used to update a criminal history record or an appellant's fingerprints confirm they are not the subject of the prohibiting record initially matched to the received name and descriptors.

The NICS Section processes VAF applications and appeal requests in the order they are received. In 2011, the NICS Section received a total of 17,203 VAF applications and appeal requests. Of those, a total of 1,617 received were submitted by persons denied by POC state agencies. In 2011, the NICS Section's research resulted in the overturn of 3,236 deny transactions.

The primary reason for the overturned deny decisions in 2011 was the appellant's fingerprints not matching the fingerprints of the subject of the firearms-disqualifying record. Another chief reason deny decisions are overturned on appeal pertain to criminal history records that do not contain current and accurate information.

The NICS Section established and implemented the Appeal and VAF Web site in February 2011. By accessing the Web address <www.fbi.gov/nics-appeals>, appellants can electronically begin appealing the reason they were delayed or denied the right to possess or receive a firearm. Additionally, by choosing the option of delay, an applicant can begin the application process for the VAF.

In cases where the matches are refuted by fingerprints, the subject's deny decision may be overturned and the transaction proceeded. However, because the NICS is required to purge all

14

AG001818

Silvester v. Harris



# Bureau of Firearms
## Consolidated Firearms Information System
## Dealer Record of Sale (DROS) Processing

**Dealer Record of Sale (DROS) Process**

- See California Penal Code 12070-12086
- Firearms Dealer uses Verizon website to submit DROS transaction.
- Verizon submits batch of DROS transactions hourly to CFIS.
- CFIS database stored procedure builds DROS BFEC request.

**BFEC Process checks:**
- DMV query for CDL/CID to match on name, DOB and ID#, and for prohibiting offense. DMV search must be a valid match before processing with other checks.
- Previous denial check within DROS
- 30-day restriction check on handguns (for non-exempt persons.
- AFS Stolen Gun check for handguns.
- AGHS with QFN query
- WPS, MHFPS and CARPOS queries based on response from AGHS
- NICS query to four federal databases III, NCIC, ICE (Alien Registration), and NICS
- CFIS queues BFEC results and Firearms analyst reviews to determine approval, delay or denial.

**Delay/Denials:**
- CFIS record is updated.
- CFIS sends delay/denial notice to Verizon
- CFIS sends delay/denial, firearms NOT delivered
- Dealer checks website; if DROS denied or-delayed, firearms NOT delivered
- When DROS is Delayed, Firearms Analyst conducts manual research to determine approval or denial

**Approvals:**
- CFIS record is updated.
- DROS gun request is generated to RelJIAL, which sends DROS record to AFS

DROS
Form

Dealer
submits

Verizon DROS
Front-End

Batch DROS
Transactions

Send
Delay/Deny
Notice

DROS records
queried & updated

DROS
Analyst

Reviews
BFEC to
Approve/Deny

CFIS Oracle
Database

send DROS
Gun Request

send BFEC
Request

Update DB with
DMV results

Update DB with
Other BFEC Query
results

CFIS

RelJAL

CFIS

add/update DROS
Gun

DMV
(Verifies name/DOB/CDL,
matches DMV records)

AFS

AGHS

WPS

CARPOS

MHFPS

NICS

CB

AG000004

*Silvester v. Harris*

Printed on 4/12/2

# STATUTES OF CALIFORNIA

### CONSTITUTION OF 1879
As Amended

### MEASURES SUBMITTED TO VOTE OF ELECTORS, 1922

### GENERAL LAWS, AMENDMENTS TO CODES, RESOLUTIONS, CONSTITUTIONAL AMENDMENTS

PASSED AT THE

### REGULAR SESSION OF THE FORTY-FIFTH LEGISLATURE

## 1923



CALIFORNIA STATE PRINTING OFFICE
FRANK J. SMITH, Superintendent
SACRAMENTO, 1923

A 27172

Name of purchaser _____age_____years.
Permanent address (state name of city, town or township,
street and number of dwelling)_____

_____
Height_____feet_____inches. Occupation _____
Color _____skin_____eyes_____hair_____
If traveling or in locality temporarily, give local address

_____
Signature of purchaser_____
(Signing a fictitious name or address is a misdemeanor.)　(To
be signed in duplicate.)
Witness_____, salesman.
　(To be signed in duplicate.)

SEC. 10. No person shall sell, deliver or otherwise transfer *Restrictions on transfer of certain firearms.* any pistol, revolver or other firearm capable of being concealed upon the person to any person whom he has cause to believe to be within any of the classes prohibited by section two hereof from owning or possessing such firearms, nor to any minor under the age of eighteen years. In no event shall any such firearm be delivered to the purchaser upon the day of the application for the purchase thereof, and when delivered such firearm shall be securely wrapped and shall be unloaded. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer any such firearm to any other person within this state who is not personally known to the vendor. Any violation of the provisions of this section shall be a misdemeanor.

SEC. 11. The duly constituted licensing authorities of *Local licenses for sale of certain firearms.* any county, city and county, city, town or other municipality within this state, may grant licenses in form prescribed by the attorney general, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said county, city and county, city, town or other municipality pistols, revolvers, and other firearms capable of being concealed upon the person, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol or revolver shall be delivered

(*a*) On the day of the application for the purchase, and when delivered shall be unloaded and securely wrapped; nor

(*b*) Unless the purchaser either is personally known to the seller or shall present clear evidence of his identity.

4. No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed in any part of said premises where it can readily be seen from the outside.

# STATUTES OF CALIFORNIA

## 1952 AND 1953

CONSTITUTION OF 1879 AS AMENDED
MEASURES SUBMITTED TO VOTE OF ELECTORS,
1952 GENERAL ELECTION

### GENERAL LAWS, AMENDMENTS TO CODES, RESOLUTIONS, AND CONSTITUTIONAL AMENDMENTS

PASSED AT

#### THE 1952 REGULAR SESSION OF THE LEGISLATURE

THE 1952 FIRST AND SECOND EXTRAORDINARY
SESSIONS OF THE LEGISLATURE

AND THE

1953 REGULAR SESSION OF THE LEGISLATURE



C-1—L-2700

Applications and licenses shall be uniform throughout the State, upon forms to be prescribed by the Attorney General.

12052. The fingerprints of each applicant shall be taken [Fingerprints] and two copies on standardization 8-inch x 8-inch cards shall be forwarded to the State Bureau of Criminal Identification and Investigation. Upon receipt of the fingerprint cards, the bureau shall promptly furnish the forwarding licensing authority a report of all data and information pertaining to any applicant of which there is a record in its office. No license shall be issued by any licensing authority until after receipt of such report from the bureau.

12053. When licenses are issued by a sheriff a record thereof [Records] shall be kept in the office of the county clerk; when issued by police authority a record shall be maintained in the office of the authority by whom issued. Copies of each license issued shall be filed immediately by the issuing officer or authority with the State Bureau of Criminal Identification and Investigation.

12054. Each applicant for a license shall pay a fee of one [Fee] dollar ($1) at the time of filing his application. The officer receiving the application and the fee shall transmit the fee with the fingerprint cards to the State Bureau of Criminal Identification and Investigation. All money so received by the bureau shall promptly be deposited in the State Treasury and credited to the General Fund.

## Article 4. Licenses to Sell Concealed Weapons

12070. Any person who, without being licensed as provided [Unlicensed sale, etc., of concealed weapons] in this article, engages in the business of selling or otherwise transferring, or who advertises for sale, or offers or exposes for sale or transfer, any pistol, revolver or other firearm capable of being concealed upon the person is guilty of a misdemeanor.

12071. The duly constituted licensing authorities of any city [License to sell pistols, etc., at retail] or county may grant licenses in form prescribed by the Attorney General, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the county, city and county, city, town or other municipality pistols, revolvers, and other firearms capable of being concealed upon the person, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol or revolver shall be delivered

(a) On the day of the application for the purchase, and when delivered shall be unloaded and securely wrapped; nor

(b) Unless the purchaser either is personally known to the seller or shall present clear evidence of his identity.

4. No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed

in any part of the premises where it can readily be seen from the outside.

*Transfers, deliveries*

12072. No person shall sell, deliver, or otherwise transfer any pistol, revolver, or other firearm capable of being concealed upon the person to any person whom he has cause to believe to be within any of the classes prohibited by Section 12201 from owning or possessing such firearms, nor to any minor under the age of 18 years. In no event shall any such firearm be delivered to the purchaser upon the day of the application for the purchase thereof, and when delivered such firearm shall be securely wrapped and shall be unloaded. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer any such firearm to any other person within this State who is not personally known to the vendor. Any violation of the provisions of this section is a misdemeanor.

*Register of sales*

12073. Every person in the business of selling, leasing or otherwise transferring a pistol, revolver or other firearm, of a size capable of being concealed upon the person, whether such seller, lessor or transferor is a retail dealer, pawnbroker, or otherwise, except as provided by this chapter, shall keep a register in which shall be entered the time of sale, the date of sale, the name of the salesman making the sale, the place where sold, the make, model, manufacturer's number, caliber, or other marks of identification on such pistol, revolver or other firearm.

*Exemption*

This section shall not apply to wholesale dealers in their business intercourse with retail dealers, nor to wholesale or retail dealers in the regular or ordinary transport of unloaded firearms as merchandise by mail, express or other mode of shipment, to points outside of the city or county wherein they are situated.

*Register furnished by State Printer*

12074. The register shall be prepared by and obtained from the State Printer and shall be furnished by the State Printer to the dealers on application at a cost to be determined by the Department of Finance for each 100 leaves in triplicate, one original and two duplicates for the making of carbon copies. The original, duplicate, and triplicate copies shall differ in color, and shall be in the form provided by this article.

*Not transferable*

12075. The State Printer upon issuing a register shall forward to the State Bureau of Criminal Identification and Investigation the name and business address of the dealer together with the series and sheet numbers of the register. The register shall not be transferable. If the dealer moves his business to a different location he shall notify the bureau of such fact in writing within 48 hours.

*Purchaser must sign, etc.*

12076. The purchaser of any firearm capable of being concealed upon the person shall sign, and the dealer shall require him to sign his name and affix his address to the register in triplicate, and the salesman shall affix his signature in triplicate as a witness to the signature of the purchaser.

One of the triplicate sheets of the register shall, on the date of sale, be placed in the mail, postage prepaid, and properly addressed to the Bureau of Criminal Identification and Investigation at Sacramento and one shall be mailed, postage prepaid, to

VOLUME 2

# STATUTES OF CALIFORNIA

## 1954 AND 1955

CONSTITUTION OF 1879 AS AMENDED
MEASURES SUBMITTED TO VOTE OF ELECTORS,
1954 GENERAL ELECTION

GENERAL LAWS, AMENDMENTS TO CODES,
RESOLUTIONS, AND CONSTITUTIONAL
AMENDMENTS

PASSED AT

THE 1954 REGULAR SESSION OF
THE LEGISLATURE

THE 1954 FIRST EXTRAORDINARY SESSION
OF THE LEGISLATURE

AND THE

1955 REGULAR SESSION OF THE LEGISLATURE



67—L-594

Case: 14-16840, 03/25/2015, ID: 9472628, DktEntry: 24-3, Page 166 of 278

## CHAPTER 1520

*An act to amend Section 12025 of the Penal Code, relating to the carrying of dangerous weapons without a license.*

[Approved by Governor June 30, 1955. Filed with
Secretary of State July 1, 1955.]

In effect
September
7, 1955

*The people of the State of California do enact as follows:*

SECTION 1. Section 12025 of the Penal Code is amended to read:

12025. Except as otherwise provided in this chapter, any person who carries concealed upon his person or concealed within any vehicle which is under his control or direction any pistol, revolver, or other firearm capable of being concealed upon the person without having a license to carry such firearm as provided in this chapter is guilty of a misdemeanor, and if he has been convicted previously of any felony or of any crime made punishable by this chapter, is guilty of a felony.

Firearms carried openly in belt holsters are not concealed within the meaning of this section, nor are knives which are carried openly in sheaths suspended from the waist of the wearer.

———

## CHAPTER 1521

*An act to amend Section 12071 of the Penal Code, relating to the sale, transfer and possession of deadly weapons.*

[Approved by Governor June 30, 1955. Filed with
Secretary of State July 1, 1955.]

In effect
September
7, 1955

*The people of the State of California do enact as follows:*

SECTION 1. Section 12071 of the Penal Code is amended to read:

12071. The duly constituted licensing authorities of any city or county may grant licenses in form prescribed by the Attorney General, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the county, city and county, city, town or other municipality pistols, revolvers, and other firearms capable of being concealed upon the person, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture.

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol or revolver shall be delivered

(a) Within three days of the application for the purchase, and when delivered shall be unloaded and securely wrapped; nor

(b) Unless the purchaser either is personally known to the seller or shall present clear evidence of his identity.

4. No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed in any part of the premises where it can readily be seen from the outside.

## CHAPTER 1522

*An act to amend Section 12072 of the Penal Code, relating to the sale, transfer and possession of deadly weapons.*

In effect
September
7, 1955

[Approved by Governor June 30, 1955. Filed with
Secretary of State July 1, 1955.]

*The people of the State of California do enact as follows:*

SECTION 1.　Section 12072 of the Penal Code is amended to read:

12072.　No person, corporation or dealer shall sell, deliver, or otherwise transfer any pistol, revolver, or other firearm capable of being concealed upon the person to any person whom he has cause to believe to be within any of the classes prohibited by Section 12021 from owning or possessing such firearms, nor to any minor, under the age of 18 years. In no event shall any such firearm be delivered to the purchaser within three days of the application for the purchase thereof, and when delivered such firearm shall be securely wrapped and shall be unloaded. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer any such firearm to any other person within this State who is not personally known to the vendor. Any violation of the provisions of this section is a misdemeanor.

## CHAPTER 1523

*An act to amend Section 12076 of the Penal Code, relating to the sale, transfer and possession of deadly weapons.*

In effect
September
7, 1955

[Approved by Governor June 30, 1955. Filed with
Secretary of State July 1, 1955.]

*The people of the State of California do enact as follows:*

SECTION 1.　Section 12076 of the Penal Code is amended to read:

12076.　The purchaser of any firearm capable of being concealed upon the person shall sign, and the dealer shall require him to sign his name and affix his address to the

*Discard Earlier Pocket Supplement*

# 1992 POCKET SUPPLEMENT

**1**

## ISSUED IN JANUARY, 1992

### COVERING LEGISLATION THROUGH THE 1991
### SESSION OF THE 1991–92 LEGISLATURE

# DEERING'S
# PENAL
# CODE

## ANNOTATED

## OF THE STATE OF CALIFORNIA

### §§ 11000–End

Annotated and Indexed by the Publisher's Editorial Staff

*Note*—An updated analysis of the Penal Code appears at the beginning of the supplement to the first volume.

CALIF. ATTY. GEN'L LIBRARY

JAN 10 1992

SACRAMENTO

**BANCROFT-WHITNEY**
Law Publishers
3250 Van Ness Avenue
P.O. Box 7005
San Francisco, CA 94120-7005
800-848-4000

ITEM-114

2099-0004

AG000008

*Silvester v. Harris*

28

— 13 —

SEC. 4. Section 12072 of the Penal Code is amended to read.

12072. (a) (1) No person, corporation, or firm shall knowingly supply, deliver, sell, or give possession or control of a firearm to any person within any of the classes prohibited by Section 12021 or 12021.1.

(2) No person, corporation, or dealer shall sell, supply, deliver, or give possession or control of a firearm to any person whom he or she has cause to believe to be within any of the classes prohibited by Section 12021 or 12021.1 of this code or Section 8100 or 8103 of the Welfare and Institutions Code.

(3) (A) No person, corporation, or firm shall sell, loan, or transfer a firearm to a minor.

(B) Subparagraph (A) shall not apply to or affect those circumstances set forth in subdivision (p) of Section 12078.

(4) No person, corporation, or dealer shall sell, loan, or transfer a firearm to any person whom he or she knows or has cause to believe is not the actual purchaser or transferee of the firearm, or to any person who is not the person actually being loaned the firearm, if the person, corporation, or dealer has either of the following:

(A) Knowledge that the firearm is to be subsequently loaned, sold, or transferred to avoid the provisions of subdivision (c) or (d).

(B) Knowledge that the firearm is to be subsequently loaned, sold, or transferred to avoid the requirements of any exemption to the provisions of subdivision (c) or (d).

(5) No person, corporation, or dealer shall acquire a firearm for the purpose of selling, transferring, or loaning the firearm, if the person, corporation, or dealer has either of the following:

(A) In the case of a dealer, intent to violate subdivision (b) or (c).

(B) In any other case, intent to avoid either of the following:

(i) The provisions of subdivision (d).

(ii) The requirements of any exemption to the provisions of subdivision (d).

(6) The dealer shall comply with the provisions of paragraph (18) of subdivision (b) of Section 12071.

(b) No person licensed under Section 12071 shall supply, sell, deliver, or give possession or control of a pistol, revolver, or firearm capable of being concealed upon the person to any person under the age of 21 years or any other firearm to a person under the age of 18 years.

(c) No dealer, whether or not acting pursuant to Section 12082, shall deliver a firearm to a person, as follows:

(1) Prior to April 1, 1997, within 15 days of the application to purchase a pistol, revolver, or other firearm capable of being concealed upon the person, or, after notice by the department pursuant to subdivision (d) of Section 12076, within 15 days of the submission to the department of any correction to the application, or within 15 days of the submission to the department of any fee

90

Ch. 128

— 12 —

lease conditions, or similar circumstances not under the control of the licensee.

(e) Except as otherwise provided in this subdivision, the Department of Justice shall keep a centralized list of all persons licensed pursuant to subparagraphs (A) to (E), inclusive, of paragraph (1) of subdivision (a). The department may remove from this list any person who knowingly or with gross negligence violates this article. Upon removal of a dealer from this list, notification shall be provided to local law enforcement and licensing authorities in the jurisdiction where the dealer's business is located. The department shall make information about an individual dealer available, upon request, for one of the following purposes only:

(1) For law enforcement purposes.

(2) When the information is requested by a person licensed pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code for determining the validity of the license for firearm shipments.

(f) The Department of Justice may inspect dealers to ensure compliance with this article. The department may assess an annual fee, not to exceed eighty-five dollars ($85), to cover the reasonable cost of maintaining the list described in subdivision (e), including the cost of inspections. Dealers whose place of business is in a jurisdiction that has adopted an inspection program to ensure compliance with firearms law shall be exempt from that portion of the department's fee that relates to the cost of inspections. The applicant is responsible for providing evidence to the department that the jurisdiction in which the business is located has the inspection program.

(g) The Department of Justice shall maintain and make available upon request information concerning the number of inspections conducted and the amount of fees collected pursuant to subdivision (f), a listing of exempted jurisdictions, as defined in subdivision (f), the number of dealers removed from the centralized list defined in subdivision (e), and the number of dealers found to have violated this article with knowledge or gross negligence.

(h) Paragraph (14) or (15) of subdivision (b) shall not apply to a licensee organized as a nonprofit public benefit or mutual benefit corporation organized pursuant to Part 2 (commencing with Section 5110) or Part 3 (commencing with Section 7110) of Division 2 of the Corporations Code, if both of the following conditions are satisfied:

(1) The nonprofit public benefit or mutual benefit corporation obtained the dealer's license solely and exclusively to assist that corporation or local chapters of that corporation in conducting auctions or similar events at which firearms are auctioned off to fund the activities of that corporation or the local chapters of the corporation.

(2) The firearms are not pistols, revolvers, or other firearms capable of being concealed upon the person.

90

AG000026

*Silvester v. Harris*

SENATE COMMITTEE ON CRIMINAL PROCEDURE
Senator Milton Marks, Chair
1995-96 Regular Session

S
B

6
7
1

SB 671 (Lewis)
As proposed to be amended
Hearing date: March 28, 1995
Penal Code
SAH:ll

FIREARM DEALER RECORD OF SALE - ELECTRONIC TRANSMISSION TO THE
DEPARTMENT OF JUSTICE

HISTORY

Source:  Department of Justice

Prior Legislation:  None

Support:  California Rifle and Pistol Association; Sports and Arms Show Producers of
America

Opposition:  None Known

NOTE - THIS ANALYSIS REFLECTS AUTHORS AMENDMENTS TO BE OFFERED IN
COMMITTEE.

(More)

2099-0048

AG000052

*Silvester v. Harris*

SB 671 (Lewis)
Page 2

---

## KEY ISSUES

1. EXISTING LAW GENERALLY REQUIRES THAT A DEALERS RECORD OF SALE (DROS) FORM FOR ALL FIREARM SALES/TRANSFERS BE FORWARDED BY MAIL IN PRESCRIBED FORMAT TO THE DEPARTMENT OF JUSTICE IN ORDER TO ENABLE THE DEPARTMENT TO DETERMINE IF THE PERSON SEEKING TO OBTAIN A FIREARM IS WITHIN ANY PROHIBITED CLASS OF PERSONS.

SHOULD THE DEPARTMENT OF JUSTICE BE REQUIRED TO IMPLEMENT AN EXCLUSIVELY ELECTRONIC/TELEPHONIC SYSTEM FOR THE TRANSMISSION OF DROS INFORMATION, EFFECTIVE JANUARY 1, 1997?

2. EXISTING LAW REQUIRES A FIFTEEN DAY WAITING PERIOD BEFORE THE DELIVERY OF A FIREARM IN CALIFORNIA AND PROVIDES THAT THE WAITING PERIOD FOR LONGGUNS WILL BE REDUCED TO TEN DAYS ON JANUARY 1, 1996.

SHOULD THE FIFTEEN DAY WAITING PERIOD FOR LONGGUNS, CURRENTLY REDUCED ON JANUARY 1, 1996, BE MAINTAINED UNTIL JULY 1, 1996, AT WHICH TIME THE WAITING PERIOD FOR ALL FIREARMS WOULD BE REDUCED TO TEN DAYS?

3. SHOULD RELATED CHANGES BE MADE?

---

## PURPOSE

Existing law prohibits the sale/transfer of a firearm to prohibited classes of persons (such as felons and those with specified mental illness).

Under existing law a dealer is required to record on a register specified information regarding the identity, residence address, and date of birth of any purchaser or transferee of any firearm. A copy of the register - Dealer Record of Sale (DROS) - is required to be mailed to the Department of Justice in order to determine whether the purchaser or transferee is among a specified category of persons and the department is required to immediately notify the dealer of that fact. In addition, the department is authorized to charge the dealer a fee sufficient to

(More)

2099-0049

AG000053

*Silvester v. Harris*

EOR233

SB 671 (Lewis)
Page 3

reimburse specified costs, including, but not limited to, the costs of furnishing this information.

This bill would provide that effective January 1, 1997, the Department of Justice shall only accept DROS information by an electronic or telephonic transfer. A number of proposed statutory changes are made by this bill to accomplish that goal.

Existing law generally requires a waiting period before the delivery of a firearm to a person. The waiting period currently is fifteen days for both handguns and longguns. The waiting period for longgun deliveries is reduced to ten days effective January 1, 1996.

This bill would delay the reduction of the waiting period for longguns for six months and would reduce the waiting period for all firearms to ten days effective July 1, 1996.

The purpose of this bill is to implement an exclusive electronic/telephonic DROS system effective no later than January 1, 1997, and to reduce the waiting period for all firearms to ten days effective July 1, 1996.

COMMENTS

1. Sponsors stated purpose for this bill.

For several years the Department of Justice has been working on the development of a DROS system which does not depend on licensed firearm dealers mailing paper copies of the requisite forms to the Department. Part of the impetus for that effort has been that when the longgun waiting period/DROS requirement was added in 1990, the fifteen day wait was partly predicated on the Department's need to gear up for the additional workload pertaining to longguns. The longgun waiting period is currently set to drop to ten days on January 1, 1996, since it was believed that the Department would be able to develop systems which could do the DROS work more quickly and efficiently.

In addition, there is an ongoing effort throughout law enforcement to computerize all record keeping systems so that information is made available in the most timely and accessible manner possible. Creating a modern DROS system will arguably contribute to that goal.

2. Background Regarding Department of Justice and "Computerization".

In 1990, the Legislature added Penal Code 12083 (this bill deletes that obsolete section) which required the Department of Justice to undertake a feasibility study due 7/1/91

(More)

2099-0050

AG000054

EOR234          *Silvester v. Harris*

SB 671 (Lewis)
Page 4

concerning proposed changes in firearm statutes, particularly as they relate to this article, which would accomplish, among other things, the following:

> Introduce a system whereby licensed firearm dealers may utilize an 800 hotline telephone number or a 976 telephone number in order to contact the Department of Justice to determine the eligibility of a person to purchase and possess a firearm.

> Reduce the current 15-day waiting period to a lesser waiting period as the result of the introduction of automation, computerization, or other devices or means which have increased efficiency in screening the eligibility of persons to purchase and possess firearms.

This bill proposes to at least take some steps toward achieving some of the process changes mentioned in that study. [The Department of Justice report was issued in May, 1991.]

3. How the System Would Work.

The sponsors indicate that the new electronic system would involve direct computer/modem connections between licensed firearms dealers and the Department of Justice. The telephonic system concept appears to involve persons employed by the Department who would enter data over the telephone. The Department would utilize its own Hawkins Data Center as well as seek budget approval to obtain whatever other resources are needed. No information has been provided regarding projected additional funding needed, if any, to implement the new system.

GIVEN THE USUAL GLITCHES IN COMPUTER SYSTEMS, IS THE SELF-IMPOSED EXCLUSIVE ELECTRONIC/TELEPHONIC JANUARY 1, 1997, IMPLEMENTATION PROPOSED IN THIS BILL A REALISTIC DEADLINE?

4. The Reduced Waiting Period.

The waiting period for firearm deliveries in California appear to be based on several factors. One is the need to allow time for the Department of Justice to do background checks. Another is the desire to provide a "cooling off" period, especially for handgun sales. The federal "Brady Bill" enacted in 1994 requires that states do perform background checks and does require a minimum waiting period (as short as three days if specific steps are taken and a response to a background check is obtained within that time frame; five days if no response is given before five days has elapsed).

(More)

2099-0051

AG000055

*Silvester v. Harris*

EOR235

SB 671
Page 1

SENATE THIRD READING
SB 671 (Lewis)
As Amended June 4, 1996
Majority vote

SENATE VOTE: 37-0

PUBLIC SAFETY          5-4          APPROPRIATIONS          13-5

Ayes: Setencich, Boland, Bowler,     Ayes: Poochigian, Aguiar, Baca,
      Rainey, Rogan                         Bordonaro, Brewer, Bustamante,
                                            Frusetta, Goldsmith, Olberg,
                                            Rogan, Takasugi, Villaraigosa,
                                            Setencich

Nays: Villaraigosa, Kuehl, Martinez,  Nays: V. Brown, Bates, Burton,
      K. Murray                             Friedman, Lee

SUMMARY: Provides for the electronic and telephonic transfer of gun purchaser
information to the Department of Justice (DOJ), and reduces the waiting period
for the delivery of concealable firearms purchased. Specifically, this bill:

1) Sets forth procedures under which information concerning an application
   for the purchase of a pistol, revolver or other firearm capable of being
   concealed upon a person could be electronically or telephonically
   submitted to the DOJ for processing.

2) Requires that by January 1, 1998, all gun purchaser information shall be
   transmitted electronically or telephonically to DOJ.

3) Provides that until January 1, 1998, DOJ shall determine which of two
   specified methods will be used by dealers for submitting firearm purchaser
   information.

4) Requires DOJ, among other things, to develop standards for all appropriate
   electronic/telephonic equipment and telephone numbers to affect the
   transfer of information to the department under these provisions.

5) Adds to the list of specified information the DOJ must retain on the
   registry of firearm transfers the date upon which a firearm is acquired or
   loaned.

6) Provides that the waiting period for the delivery of concealable guns
   purchased shall be reduced from 15 to 10 days. This provision will take
   effect as of April 1, 1997.

7) Establishes guidelines for the retention by dealers of gun sale records.

8) Deletes the requirement that dealers mail a copy of an application to
   purchase a firearm to local law enforcement.

9) Adds an additional offense to the list of unlawful firearm transfers that
   are punishable by imprisonment in the state prison for two, three or four

years. Specifically, provides that a licensed firearms dealer who delivers a pistol, revolver or other firearm capable of being concealed upon the person to any person he or she knows, or should know, is under the age of 18 years shall be punished by imprisonment in the state prison for two, three, or four years.

FISCAL EFFECT: According to the Assembly Appropriations Committee analysis, the postponement in implementing the new information transfer procedures will result in DOJ having $144,500 in excess spending authority in 1995-96 due to a combination of the necessity of additional staff during the six-month delay and a reduction in computer costs during the same period. Any mandate in this bill would not be state-reimbursable because this bill only expands the definition of a crime or the penalty for the conviction of a crime.

EXISTING LAW:

1) Requires every firearms dealer to keep a register in which certain information concerning the sale of firearms is to be entered pursuant to specified procedures. A violation of these provisions is a misdemeanor.

2) Requires a dealer to submit to DOJ two copies of the original sheet of the register by placing the copies in the mail, postage prepaid, and properly addressed to DOJ in Sacramento.

3) Requires, as of January 1, 1996, a 15-day waiting period before the delivery of purchased concealable firearms and a 10-day waiting period for the delivery of long-arm guns purchased.

4) Provides that the following offenses are punishable by imprisonment in the state prison for two, three or four years:

   a) A person, corporation, or firm knowingly supplying, delivering, selling or giving possession or control of a firearm to any person with a prior conviction for one of several offenses, as specified.

   b) Making an unlawful transfer of a firearm after having already been convicted of a similar offense, as specified.

   c) Making an unlawful transfer of a firearm after having already been convicted of a violent offense, an offense involving an unlawful transfer or manufacture of illegal weapons or explosives, or possession of a silencer, as specified.

   d) An unlawful transfer of a firearm by a defendant who is prohibited from possessing a firearm as the result of a prior conviction, as specified, or because he or she is in a mental institution or suffering from a mental disorder or illness.

   e) An unlawful transfer of a firearm by a person who actively participates in "criminal street gang" as defined.

5) Provides that no licensed dealer shall supply, sell, deliver, or give possession or control of a concealable firearm to a person under the age

of 21 years. A violation of this provision is punishable by imprisonment in the county jail for up to one year, a fine of up to $1,000, imprisonment in the state prison for 16 months, two or three years, or both imprisonment and a fine.

BACKGROUND: According to the author, under current law the waiting period for long guns decreased from 15 to 10 days on January 1, 1996. In order for the DOJ to meet this shortened time frame, they need the ability to utilize computer and fax technology to receive dealers' record of sale (DROS) information. This bill will enable the DOJ to develop such a telephonic/ electronic system for DROS information. This will expedite the background check process by eliminating the time lost through the mailing of DROS materials. The DOJ believes that the electronic/telephonic DROS system will enable them to meet a 10-day background check deadline for all firearms.

ARGUMENTS IN SUPPORT: None

ARGUMENTS IN OPPOSITION: None

Analysis prepared by: Jennifer P. Anderson / apubs / 445-3268

FN 025802

2099-0057

AG000061

*Silvester v. Harris*

EOR238

DEERING'S CALIFORNIA CODES

# PENAL CODE
## *Annotated*

OF THE STATE OF CALIFORNIA

*Adopted February 14, 1872*
with amendments through the 1979
Session of the 1979–80 Legislature

§ 11000 to End

*Annotated and Indexed by*
*The Publisher's Editorial Staff*



1980



BANCROFT-WHITNEY CO.
301 Brannan Street
San Francisco, California 94107

*Silvester v. Harris*

AG000231

CONCEALED WEAPONS § 12071

Licensing under Federal Gun Control Act of 1968: 18 USCS § 923.
79 Am Jur 2d Weapons and Firearms §§ 4, 29, 32.

SUGGESTED FORM

Allegation Charging Engaging in Business of Selling, etc., of Firearms Capable of Being Concealed on Person Without License

*[For general form of complaint, see form set out under § 740.]*

___1___, being duly sworn, states, on information and belief that the defendant[s] did in the ___2___ [City of ___3___ or ___4___ Judicial District], County of ___5___, State of California, on or about ___6___, 19_7_, commit a misdemeanor, to wit: A violation of Section 12070 of the Penal Code of the State of California, in that ___8___ [he *or* she *or* they] did then and there engage in the business of ___9___ [selling, *or specify other act denounced by statute]* ___10___ *[specify firearms]* capable of being concealed on the person without having a license issued by ___11___ to engage in said business.

## § 12071. [Local licenses for sale of certain firearms]

The duly constituted licensing authorities of any city or county shall accept applications for, and may grant licenses permitting the licensee to sell at retail within the county city, and county, city, town or other municipality pistols, revolvers, and other firearms capable of being concealed upon the person. If a license is granted it shall be in the form prescribed by the Attorney General, effective for not more than one year from the date of issue, and be subject to the following conditions, for breach of any of which the license shall be subject to forfeiture.

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be seen.

3. No pistol or revolver shall be delivered

(a) Within 15 days of the application for the purchase, and when delivered shall be unloaded and securely wrapped; nor

(b) Unless the purchaser either is personally known to the seller or shall present clear evidence of his identity.

4. No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed in any part of the premises where it can readily be seen from the outside.

Added Stats 1953 ch 36 § 1; Amended Stats 1955 ch 1521 § 1; Stats 1965 ch 1007 § 1; Stats 1972 ch 501 § 2; Stats 1975 ch 997 § 1.

Prior Law: Stats 1923 ch 339 § 11 p 701.

Amendments:
1955 Amendment: Substituted "Within three days" for "On the day" in subd 3(a).
1965 Amendment: Substituted (1) "seen" for "read" in subd 2; and (2) "five" for "three" after "within" in subd 3(a).
1972 Amendment: (1) Added "shall accept applications for, and" in the first

AG000232
*Silvester v. Harris*

paragraph; (2) added "permitting the licensee to sell at retail within the county, city and county, city, town or other municipality pistols, revolvers, and other firearms capable of being concealed upon the person. If a license is granted it shall be" in the first paragraph; (3) added "the" before "form" in the first paragraph; and (4) substituted "and be" for "permitting the licensee to sell at retail within the county, city and county, town or other municipality pistols, revolvers, and other firearms capable of being concealed upon the person," before "subject" in the first paragraph.

1975 Amendment: Substituted "15" for "five" in subd 3(a).

Collateral References:
Witkin Crimes p 727.
Cal Jur 2d Weapons §§ 4, 5.
Cal Digest of Official Reports 3d Series Weapons §§ 3, 11.
79 Am Jur 2d Weapons and Firearms §§ 4, 32.

## § 12072. [Restrictions on transfer of certain firearms]

No person, corporation or dealer shall sell, deliver, or otherwise transfer any pistol, revolver, or other firearm capable of being concealed upon the person to any person whom he has cause to believe to be within any of the classes prohibited by Section 12021 from owning or possessing such firearms, nor to any minor, under the age of 18 years. In no event shall any such firearm be delivered to the purchaser within 15 days of the application for the purchase thereof, and when delivered such firearm shall be securely wrapped and shall be unloaded. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer any such firearm to any other person within this state who is not personally known to the vendor. Any violation of the provisions of this section is a misdemeanor.

Added Stats 1953 ch 36 § 1; Amended Stats 1955 ch 1522 § 1; Stats 1965 ch 1007 § 2; Stats 1975 ch 997 § 2.

Prior Law: Stats 1923 ch 339 § 10 p 701.

Amendments:
1955 Amendment: (1) Added "corporation or dealer" after "person" in the first sentence; (2) substituted "12021" for "12201" after "Section" in the first sentence; and (3) substituted "within three days" for "upon the day" after "purchaser" in the second sentence.
1965 Amendment: Substituted "five" for "three" after "within".
1975 Amendment: Substituted "15" for "five" in the second sentence.

Cross References:
Misdemeanor defined: § 17.
Punishment for misdemeanor: §§ 19, 19a.
"Pistol," "revolver," and "firearm capable of being concealed upon the person" defined: § 12001.

Collateral References:
Witkin Crimes pp 537, 727, 728.
Cal Jur 2d Weapons §§ 4, 5.
Cal Digest of Official Reports 3d Series Weapons §§ 3, 11.
79 Am Jur 2d Weapons and Firearms §§ 4, 29, 32.
See form set out below, following Notes of Decisions.

Proof of Facts:
1 Am Jur Proof of Facts 315, Age.

AG000233

Silvester v. Harris

SENATE COMMITTEE ON JUDICIARY          1975-76 REGULAR SESSION

AB 1441 (Murphy)                                              A
As introduced                                                B
Penal Code
                                                             1
## CONCEALABLE FIREARMS                                      4
-WAITING PERIOD-                                             4
                                                             1
### HISTORY

Source:  County of Santa Cruz

Prior Legislation:  None

Support:  Calif. D.A.'s & P.O.'s Ass'n., Attorney
                General

Opposition:  Calif. Wildlife Federation

### DIGEST

Increases, from 5 days to 15 days, the time during
which the seller of a concealable firearm must
wait after the application for purchase, before
delivering the firearm.

### PURPOSE

Give law enforcement authorities sufficient time
to investigate the records of purchasers of
handguns prior to delivery of the handgun.

### COMMENT

1.  Under existing law, the seller of a concealable
    firearm is prohibited from delivering the fire-
    arm unless both of the following facts exist:

    (a) 5 days have elapsed from the date of
        the application for purchase.

    (b) The purchaser is personally known to
        the seller or presented clear evidence
        of his identity.

                                        (More)

AB 1441 (Murphy)
Page Two

Violation of either of these provisions is
a misdemeanor and subjects the seller's
license to forfeiture.

Existing law also requires that a record of
every purchase of a concealable firearm be
mailed to the Department of Justice and the
local chief of police.

The purpose of the 5 day provision is to
permit the law enforcement authorities to
investigate the purchaser's record, before
he actually acquires the firearm, to deter-
mine whether he falls within the class of
persons prohibited from possessing conceal-
able firearms.

2.  Proponents claim that 5 days is an insuffi-
cient time within which to conduct the
investigation.  Thus, this bill would in-
crease the waiting period to 15 days.

According to the Bureau of Identification,
the 15 day waiting period would permit comple-
tion of investigation prior to delivery, in
95% of handgun sales.  A 30-day period would
allow compliance in all situations.

3.  The number of handguns sold in California in
1974 averaged 902 per day.  The Bureau of
Identification sent notifications on approx-
imately 252 sales per day.

4.  Opponents of this bill claim that the reason
why investigations are commonly not completed
within the 5 day period is the failure of the
parties themselves -- the dealer, the law
enforcement agency involved, or the Bureau of
Identification -- to fulfill their responsi-
bilities.

*****

AG000298

*Silvester v. Harris*

September 15, 1975

Honorable Edmund G. Brown, Jr.
Governor of California
State Capitol
Sacramento, CA  95814

Dear Governor Brown:

My bill, AB 1441, has passed the Assembly and the
Senate and is now before you for your approval.

AB 1441 was introduced at the request of the Santa
Cruz County Board of Supervisors.  It increases, from five
days to 15 days, the time during which the seller of a concealable
firearm must wait after the application for purchase,
before delivering the firearm.  The purpose of the bill is to
give law enforcement authorities sufficient time to investigate
the records of purchasers of handguns prior to delivery
of the handgun.

Under existing law, the seller of a concealable firearm
is prohibited from delivering a firearm unless (a) five
days have elapsed from the date of the application for purchase,
and (b) the purchaser is personally known to the seller or
presented clear evidence of his identity.

Violation of either of these provisions is a misdemeanor
and subjects the seller's license to forfeiture.

Existing law also required that a record of every purchase
of a concealable firearm be mailed to the Department of
Justice and the local chief of police.

The current five-day waiting period is inadequate to
allow for a thorough investigation to make sure the purchaser
is qualified to own a handgun.  In many instances, it takes
three days just for the dealer to mail the paperwork to the
Department of Justice in Sacramento.

AG000343

Silvester v. Harris

EOR244

Hon. Edmund G. Brown, Jr.
Page two

The Department's Bureau of Identification reports that
it takes more than five days to review any record the buyer may
have. The Bureau says five days is clearly inadequate to review
the records and give timely notification to police agencies.

To back up its claim, the Bureau points out that it
processed 238,184 handgun sales in California last year. That
amounts to nearly 20,000-per-month or 900-per-day. The Bureau
found an average of 252 buyers-per-day whose records included
felony or serious misdemeanor arrests or convictions. State law
provides that conviction of a felony, narcotic addiction, being
under the age of 18, and adjudication by a court to be a danger
to others as a result of mental disorder, disqualify an individual
f. m owning or purchasing a concealable firearm.

In addition, the Bureau notifies local police agencies
when the purchaser has a record of a violent misdemeanor, which
does not disqualify an individual from purchasing a handgun.

Because the five-day waiting period has been shown to
be inadequate for the Bureau to thoroughly check all records of
the purchasers, I introduced AB 1441 to extend the period to
15 days.

Therefore, I respectfully request your favorable action
on this legislation.

Sincerely,

FRANK MURPHY, JR.

FMJr/jj

AG000344

*Silvester v. Harris*

# *West's*
# ANNOTATED
# CALIFORNIA CODES

## PENAL CODE

## Sections 1572 to End

*Official California*
*Penal Code*
*Classification*

SUPERSEDED

ST. PAUL, MINN.
WEST PUBLISHING CO.

AG000399

*Silvester v. Harris*

COPYRIGHT © 1970

By

WEST PUBLISHING CO.

51A Cal.Code

AG000400

*Silvester v. Harris*

§ 12071.    Retail licenses; business regulations

The duly constituted licensing authorities of any city or county may grant licenses in form prescribed by the Attorney General, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the county, city and county, city, town or other municipality pistols, revolvers, and other firearms capable of being concealed upon the person, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture.

1.    The business shall be carried on only in the building designated in the license.

2.    The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be seen.

3.    No pistol or revolver shall be delivered

(a)  Within five days of the application for the purchase, and when delivered shall be unloaded and securely wrapped;  nor

(b)  Unless the purchaser either is personally known to the seller or shall present clear evidence of his identity.

4.    No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed in any part of the premises where it can readily be seen from the outside.

(Added by Stats.1953, c. 36, p. 657, § 1.   Amended by Stats.1955, c. 1521, p. 2799, § 1;  Stats.1965, c. 1007, p. 2636, § 1.)

Historical Note

Prior to the 1955 amendment, paragraph (a) of subsection 3 provided that no pistol or revolver shall be delivered.

"(a) On the day of the application for the purchase, and when delivered shall be unloaded and securely wrapped;".

The 1965 amendment substituted, in subd. 2, the word "seen" for "read";  and provided that no delivery be made within 5 rather than 3 days of the application for purchase.

Derivation: Stats.1923, c. 339, p. 701, § 11.

Cross References

Attorney general, prescribing forms for applications for licenses, see § 12051.
Issuance of license to carry concealed weapons, see § 12050 et seq.
Prescribed form of dealer's record of sale of revolver or pistol, see § 12077.
Unauthorized sale of dangerous weapons, see § 12020.

§ 12072.    Prohibited transfers; delivery of weapon; transfer to stranger; offense

No person, corporation or dealer shall sell, deliver, or otherwise transfer any pistol, revolver, or other firearm capable of being concealed upon the person to any person whom he has cause to believe to be within any of the classes prohibited by Section 12021 from owning or possessing such firearms, nor to any minor, under the age of 18 years.  In no event shall any such firearm be delivered to the purchaser within five days of the application for the purchase thereof, and when delivered such firearm shall be securely wrapped and shall

AG000401

EOR248          Silvester v. Harris

be unloaded. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer any such firearm to any other person within this state who is not personally known to the vendor. Any violation of the provisions of this section is a misdemeanor.

(Added by Stats.1953, c. 36, p. 658, § 1. Amended by Stats.1955, c. 1522, p. 2800, § 1; Stats.1965, c. 1007, p. 2636, § 2.

### Historical Note

The 1955 amendment expanded the application of the section to cover a "corporation or dealer" as well as a person, and modified the second sentence to prohibit delivery "within three days of the application" rather than merely "upon the day of the application".

The 1965 amendment provided that no delivery should be made within "5" rather than "3" days of the application for purchase.

Derivation: Stats.1923, c. 339, p. 701, § 10.

### Cross References

Misdemeanor,
    Defined, see § 17.
    Punishment, see §§ 19, 19a.

## § 12073.    Register of sales; contents; exemptions

Every person in the business of selling, leasing or otherwise transferring a pistol, revolver or other firearm, of a size capable of being concealed upon the person, whether such seller, lessor or transferor is a retail dealer, pawnbroker, or otherwise, except as provided by this chapter, shall keep a register in which shall be entered the time of sale, the date of sale, the name of the salesman making the sale, the place where sold, the make, model, manufacturer's number, caliber, or other marks of identification on such pistol, revolver or other firearm.

This section shall not apply to wholesale dealers in their business intercourse with retail dealers, nor to wholesale or retail dealers in the regular or ordinary transport of unloaded firearms as merchandise by mail, express or other mode of shipment, to points outside of the city or county wherein they are situated.

(Added by Stats.1953, c. 36, p. 658, § 1.)

### Code Commissioners' Notes

See Code Commissioners' Notes preceding § 12350.

### Historical Note

Derivation: Stats.1917, c. 145, p. 222, § 7;    1098, p. 2817, § 2;  Stats.1947, c. 1281, p. 2793, Stats.1923, c. 339, p. 699, § 9;  Stats.1931, c.    § 2; Stats.1949, c. 938, p. 1712, § 1.

### Cross References

Prescribed form of register, see § 12077.

654

AG000402

*Silvester v. Harris*

DISTRICT OFFICE ADDRESS
10801 SANTA MONICA BOULEVARD
LOS ANGELES 25, CALIFORNIA
272-5520

SACRAMENTO ADDRESS
STATE CAPITOL
ZONE 14

COMMITTEES
CRIMINAL PROCEDURE
FINANCE AND INSURANCE
NATURAL RESOURCES
WAYS AND MEANS
SUBCOMMITTEE ON WORKMEN'S
COMPENSATION, CHAIRMAN

# Assembly
# California Legislature

### ANTHONY C. BEILENSON
MEMBER OF THE ASSEMBLY, FIFTY-NINTH DISTRICT

1965 JUL 1 PM 2 40
RECEIVED
GOVERNOR'S OFFICE

June 30, 1965

The Honorable Edmund G. Brown
Governor
State Capitol
Sacramento, California

RE:  AB 1564

Dear Governor Brown:

You have before you for your consideration AB 1564.

This bill was introduced at the request of the Attorney General.

It provides that the present three day waiting period to obtain a conceable weapon from a dealer shall be extended from three to five days. Also provides that the dealer's license to carry on his business shall be displayed on the premises where it can be seen rather than read.

At the present time, local police authorities and the C.I.I. feel that the three day waiting period is not enough, in all cases, for them to run an adequate record check of the person seeking to purchase a concealable weapon.  Five days has been suggested as a more useful waiting period, and this bill proposes to make such a change in the law.

It is a recognition of the needs of law enforcement agencies to effectively implement the code section in question.

The bill is supported, of course, by the Attorney General and other law enforcement agencies, and has been opposed by a representative of the gun dealers.

Yours sincerely,

ANTHONY C. BEILENSON

B/h

AG000468

EOR250                              *Silvester v. Harris*

62. Mavaddat N, Barrowdale D, Andrulis IL, et al. Pathology of breast and ovarian cancers among BRCA1 and BRCA2 mutation carriers: results from the Consortium of Investigators of Modifiers of BRCA1/2 (CIMBA). Cancer Epidemiol Biomarkers Prev. 2012;21(1):134–147.

63. Ryle JA. The Natural History of Disease. Oxford, UK: Oxford University Press; 1936.

64. Anderson W. Natural histories of infectious disease: ecological vision in twentieth-century biomedical science. Osiris. 2004;19:39–61.

65. Ayres JR, Paiva V, França I Jr. From natural history of disease to vulnerability: changing concepts and practices in contemporary public health. In: Parker R,

Sommer M, eds. Routledge Handbook of Global Public Health. New York, NY: Routledge; 2011:98–107.

66. Polyak K. Is breast tumor progression really linear? Clin Cancer Res. 2008; 14(2):339–341.

67. Polyak K, Haviv I, Campbell IG. Co-evolution of tumor cells and their microenvironment. Trends Genet. 2009; 25(1):30–38.

68. Polyak K, Kalluri R. The role of the microenvironment in mammary gland development and cancer. Cold Spring Harb Perspect Biol. 2010;2(11): a003244.

69. Foulds L. The experimental study of tumor progression: a review. Cancer Res. 1954;14(5):327–339.

70. Nowell PC. The clonal evolution of tumor cell populations. Science. 1976; 194(4260):23–28.

71. Owen GI, Zelent A. Origins and evolutionary diversification of the nuclear receptor superfamily. Cell Mol Life Sci. 2000;57(5):809–827.

72. Sáez PJ, Lange S, Pérez-Acle T, Owen G. Nuclear receptor genes: evolution. In: Encyclopedia of Life Sciences. Available at: http://www.els.net/WileyDCA/ElsArticle/refId-a006145.html. Accessed September 14, 2012.

73. Baker ME, Chandrawangbhuwana C. Motif analysis of amphioxus, lamprey and invertebrate estrogen receptors: toward a better understanding of estrogen receptor evolution. Biochem Biophys Res Commun. 2008;371(4):724–728.

74. Baker ME. Origin and diversification of steroids: co-evolution of enzymes and nuclear receptors. Mol Cell Endocrinol. 2011;334(1–2):14–20.

75. Markov GV, Laudet V. Origin and evolution of the ligand-binding ability of nuclear receptors. Mol Cell Endocrinol. 2011;334(1–2): 21–30.

76. Eick GN, Thornton JW. Evolution of steroid receptors from an estrogen-sensitive ancestral receptor. Mol Cell Endocrinol. 2011;334(1–2): 31–38.

77. Asztalos S, Gann FH, Hayes MK, et al. Gene expression patterns in the human breast after pregnancy. Cancer Prev Res (Phila). 2010;3(3): 301–311.

# Suicide, Guns, and Public Policy

| E. Michael Lewiecki, MD, and Sara A. Miller, PhD

Suicide is a serious public health concern that is responsible for almost 1 million deaths each year worldwide. It is commonly an impulsive act by a vulnerable individual. The impulsivity of suicide provides opportunities to reduce the risk of suicide by restricting access to lethal means.

In the United States, firearms, particularly handguns, are the most common means of suicide. Despite strong empirical evidence that restriction of access to firearms reduces suicides, access to firearms in the United States is generally subject to few restrictions.

Implementation and evaluation of measures such as waiting periods and permit requirements that restrict access to handguns should be a top priority for reducing deaths from impulsive suicide in the United States. (Am J Public Health. 2013; 103:27–31. doi:10.2105/ AJPH.2012.300964)

"Knowing is not enough; we must apply. Willing is not enough; we must do."
—Johann Wolfgang von Goethe

**SUICIDE IS A COMPLEX** behavior involving the intentional termination of one's own life. The prevalence, causes, means, and prevention of suicide have been extensively studied and widely reported.[1b–4] The World Health Organization (WHO) has identified suicide as a serious public health concern that is responsible for more deaths worldwide each year than homicide and war combined,[5] with almost 1 million suicides now occurring annually. In 2007, the Centers for Disease Control and Prevention (CDC) reported that 34 598 Americans died by suicide, far more than the 18 361 murders during the same period.[6] Among Americans younger than 40 years, suicide claimed more lives (n = 13 315) than any other single cause except motor vehicle accidents (n = 23 471).[6]

Psychiatric disorders are present in at least 90% of suicide victims, but untreated in more than 80% of these at the time of death.[7] Treatment of depression and other mood disorders is therefore a central component of suicide prevention. Other factors associated with suicidal behavior include physical illness, alcohol and drug abuse, access to lethal means, and impulsivity. All of these are potentially amenable to modification or treatment if recognized and addressed. It is important to distinguish between impulsivity as a personality trait and the impulsivity of the act of suicide itself. It is not generally appreciated that suicide is often an impulsive final act by a vulnerable individual[8] who may or may not exhibit the features of an impulsive personality.[9]

The impulsivity of suicide provides opportunities to reduce suicide risk by restriction of access to lethal means of suicide ("means restriction"). Numerous medical

organizations and governmental agencies, including the WHO,[5] the European Union,[10] the Department of Health in England,[11] the American College of Physicians,[12] the CDC,[4,13] and the Institute of Medicine,[14] have recommended that means restriction be included in suicide prevention strategies. In the United States, firearms are the most common means of suicide,[15] with a suicide attempt with a firearm more likely to be fatal than most other means.[16] In a study of case fatality rates in the northeastern United States, it was found that 91% of suicide attempts by firearms resulted in death.[17] By comparison, the mortality rate was 84% by drowning and 82% by hanging; poisoning with drugs accounted for 74% of acts but only 14% of fatalities. Many studies have shown that the vast majority of those who survive a suicide attempt do not go on to die by suicide. A systematic review of 90 studies following patients after an event of self-harm found



| COMMENTARIES |

that only two pecent went on to die by suicide in the following year and that seven percent had died by suicide after more than nine years.[18]

The availability of guns in the community is an important determinate of suicide attempts by gun.[19] Given the public health importance of suicide and what is known about the role of guns in suicide, strategies that keep guns out of the hands of individuals who intend self-harm are worthy of careful scrutiny. Since a hand-gun (revolver or pistol) is far more likely to be used for suicide than a long gun (shotgun or rifle),[20] it may be particularly beneficial to focus suicide prevention efforts on this type of weapon. Only a small minority of states restrict access to handguns by methods such a waiting period, a permit requiring gun safety training, or safe storage of guns in the home. In 2010, US Department of Justice reported that only 15 states had a waiting period for purchasing a handgun.[21] Although federal law prohibits the sale of handguns to persons younger than 21 years, in the absence of federal preemption (i.e., the removal of legislative authority from a lower level of government), some states and municipalities allow the sale of handguns to younger individuals.[21]

## IMPULSIVITY OF SUICIDE

Impulsive suicide attempts are "acts of self-harm involving little preparation or premeditation," whereas nonimpulsive suicide attempts are characterized by preparation and forethought.[22(p98)] Impulsive suicide is a response to extreme fluctuations in an individual's psychological state, often with a triggering event that others would consider trivial.[8] Impulsivity has been measured in

different ways, including the amount of planning (measured through use of the Suicide Intent Scale[23]) and time criteria (the time between the decision to attempt suicide and the actual attempt).[22] In a study using the Suicide Intent Scale that involved 478 individuals who had attempted suicide, it was reported that 55% of the attempts were impulsive, 28% had an intermediate level of impulsivity, and 17% were nonimpulsive.[23] Examples of time criteria for defining the impulsivity of the suicide attempt in clinical studies include five minutes,[24] 10 minutes,[25] 20 minutes,[26] one hour,[27] two hours,[28] and 24 hours.[29]

Williams et al. found that 40% of suicide attempt survivors in two large consecutive series contemplated suicide for less than five minutes before the attempt.[24] In a study of 82 patients referred to a psychiatric hospital following a suicide attempt, almost half reported that the time between the first current thought of suicide and the actual attempt was 10 minutes or less.[25] Another study, based on interviews with suicide attempt survivors, found that two thirds considered suicide for less than an hour before the attempt.[27] In a study of 30 survivors of self-inflicted gunshot wounds treated at an urban trauma center, most or all of whom would have died without treatment, more than half reported having suicidal thoughts for less than 24 hours.[30] The National Violent Injury Statistics System reported that 61% of suicide victims had not previously disclosed an intent to commit suicide and that a precipitating event occurred within two weeks of the suicide for 36% of them.[31] The impulsivity of suicide is sometimes so intense and so fleeting that it has been called an "accident of the mind,"[32] one that may take a life

as quickly and unexpectedly as a motor vehicle accident.

## RESTRICTION OF ACCESS TO LETHAL MEANS OF SUICIDE

Suicidal ideation may quickly pass and remain unfulfilled if the means of suicide is not easily available. For a person in a suicidal state of mind, problem-solving skills are likely to be poor,[33] rendering it difficult to process a detailed consideration of alternative means of suicide when the initial choice is unavailable. Examples of means restriction followed by declines in suicide rates include pesticide restriction in Asian countries,[7] barbiturate restriction in Australia,[34] reduced availability of coal gas in the United Kingdom,[35] limits on access to analgesics in the United Kingdom,[36] installation of safety fences at high-risk jump sites (e.g., the Empire State Building, Eiffel Tower, and Sydney Harbor Bridge),[37] and restriction of access to firearms in many countries.[8] A systematic review of the evidence in suicide prevention studies concluded that means restriction prevented suicides.[7] A more recent review concluded that "limiting access to methods is one of the suicide prevention efforts with the most robust supporting evidence."[8(p1631)]

There appears to be a prevailing belief in the inevitability of suicide that would argue against the effectiveness of means restriction. According to this view, a person determined to commit suicide is likely to substitute one method for another ("means substitution") or delay suicide until a time when a means is readily available.[38] However, there is now a large body of evidence suggesting that means restriction not only reduces suicides by that method but also reduces overall suicide rates.[39,40]

Means substitution, when it does occur, does not seem to overwhelm the benefits of means restriction. When a highly lethal method (e.g., firearms) is not easily available, the substituted method (e.g., drug overdose) may be far less lethal, thereby increasing chances for survival.

## GUNS AND SUICIDE

In a survey of 36 wealthy nations, the United States was unique in having the highest overall firearm mortality rate and the highest proportion of suicides by firearms.[41] Guns are used for more suicides in the United States each year than for homicides (17 352 vs 12 632, respectively, in 2007).[6] There is strong evidence that access to firearms, whether from household availability or a new purchase, is associated with increased risk of suicide.[8,42-45] The risk of suicide by guns is far higher in states with high rates of gun ownership than in those with low ownership rates.[46] The increased risk of suicide applies not only to the gun owner but to others living in a household with guns. One study[47] found that adults who have recently purchased a handgun are at increased risk of suicide by gun within a week of gun purchase, with the increase in risk persisting for at least six years. That study[47] and others[48] suggest that some gun purchases are made specifically with the intent of suicide.

Gun availability in the household is associated with risks and benefits. The risks include accidental or intentional injury to one's self or family members, whereas the benefits include protection against home intruders and deterrence of crime.[49] A recent review of the scientific literature concluded that in contemporary American society, the health risk of having a gun in the household outweighs the benefits, with compelling evidence linking gun availability to

EOR252

violent crime, accidental injury and death, and suicide.[49]

## RESTRICTION OF ACCESS TO FIREARMS

Restriction of lethal means in the United States has focused on firearms because of their ease of access, common usage, and high mortality rate in suicide attempts. Strategies to reduce the risk of impulsive suicides by firearms have included at least two approaches: safe gun storage and regulations for purchasing guns. Storing unloaded guns in a locked place and storing ammunition separately in a locked place have been associated with a protective effect for suicide among children, adolescents, and adults.[50,51] Bans on firearm purchases for individuals at high risk for suicide, such as those with mental illness, substance abuse, or history of domestic violence, are desirable and might reduce suicides. However, criteria for identifying "prohibited persons" vary by state and are often limited to those with documented serious incidents (e.g., enforced hospitalization, felony conviction). Bans of this type, while helpful, are likely to identify only a small portion of those at risk.[46] Uniform restrictions preventing immediate access to a gun can allow time for a "cooling off" period during which the suicidal impulse may pass. A requirement for firearm safety training can delay access to a weapon for non–gun owners intending to harm themselves or others, and at the same time provide an opportunity for those who are not themselves at risk to learn about safe gun storage, thereby protecting vulnerable individuals.

Legislation restricting firearm ownership has been associated with a reduction in firearm suicide rates in many countries, including Austria,[52] Brazil,[53] Canada,[54] Australia,[55] New Zealand,[56] the United Kingdom,[57] and the United States.[58] In the United States, overall suicide rates are lower in states with restrictive firearm laws (e.g., waiting periods, safe storage requirements, minimum age of 21 years for handgun purchase) than in those with few restrictions.[59] The potential benefit of restricting access to firearms has been evaluated in models that estimate the effect on mortality rates.[60,61] In the United States, such a model predicted that 8551 lives might have been saved from suicides avoided each year during the study period 1999 through 2004, assuming that suicide rates in each of four national regions (Northeast, South, Midwest, and West) matched that of the region (Northeast) with the lowest rate.[61] The Northeast was the region with the most restrictive firearm legislation and lowest availability of firearms. One study used a binomial regression model to empirically assess the impact of firearm regulation on male suicides in the United States, using state-level data for the years 1995 through 2004.[45] The study found that firearm regulations that reduced overall gun availability had a significant deterrent effect on male suicide, with permit requirements and bans on sales to minors being the most effective of the regulations analyzed.

There are limitations in interpreting data on means restriction. Establishing causality between an intervention and outcomes is challenging because of factors that include the complexity of suicidal behavior, heterogeneity of study designs, methodological constraints, confounder effects, variability in statistical analysis, and limited funding for large, well-designed prospective studies. There is no guarantee that measures that work in Massachusetts (suicide rate = 11.56 per 100 000) will be effective in Wyoming (suicide rate = 32.29 per 100 000).[45] Differences in regional cultures and demographics (e.g., rural vs urban) might be important to suicidality and the choice of means. Firearm restrictions might be expected to have a greater impact on male suicides than female, since a gun is the means of suicide for more men than women.[62] A waiting period of seven days could be life-saving when an urge to commit suicide passes within one hour and a gun is not available in the household, but might not be helpful if the suicidal impulse continues for two weeks. Secure household storage of guns might be effective in preventing suicide by a child but not for the adult gun owner.

## PREVENTION OF SUICIDE: A CALL TO ACTION

Suicide is an extraordinarily complex and counterintuitive human behavior. Suicide prevention strategies involve the identification and modification of known risk factors. Considering the impulsive nature of many suicides, the strong association of guns and suicide in the United States, and compelling empirical evidence that restriction of access to firearms reduces suicide risk, suicide prevention strategies should include restriction of access to firearms, especially handguns.

In accordance with the medical evidence, we recommend a waiting period for purchasing handguns with a requirement for a permit or license that includes firearm safety training. For a suicidal person who does not already own a handgun, a delay in the purchase of one allows time for suicidal impulses to pass or diminish. Safe gun storage for all households delays or prevents access to a gun for a suicidal person living with a gun owner. Federal laws restricting the sale of handguns and handgun ammunition to minors should be implemented and enforced in all states. Firearms should not be sold to "prohibited persons" at high risk of harming themselves and others. Some states already mandate such measures. An opportunity to survive a transient suicidal impulse should be provided to individuals in all states.

The political, philosophical, and constitutional objections to firearm regulations, even those as modest as suggested here, cannot be minimized. Some would like to remove all firearm restrictions. We believe that reasonable people with diverse perspectives on firearm regulations have an imperative to discuss the benefits, risks, and responsibilities of firearm ownership, and to take action to minimize the risks. Different lengths of waiting periods and variations of permit or license requirements may have different levels of effectiveness depending on the locality and the population at risk. Well-designed long-term studies can evaluate these requirements so that appropriate regulatory modifications can be made in the future. However, meaningful regulations to restrict access to handguns are needed now, before more lives are unnecessarily lost. The public health benefit of preventing deaths due to impulsive suicide far outweighs the minimal inconvenience to those who do not intend to harm themselves or others. ◼

### About the Authors

E. Michael Lewiecki is with the Department of Internal Medicine, University of New Mexico School of Medicine, and the New Mexico Clinical Research & Osteoporosis

■ ORIGINAL CONTRIBUTION

# Homicide and Suicide Rates Associated With Implementation of the Brady Handgun Violence Prevention Act

Jens Ludwig, PhD

Philip J. Cook, PhD

**Context** In February 1994, the Brady Handgun Violence Prevention Act established a nationwide requirement that licensed firearms dealers observe a waiting period and initiate a background check for handgun sales. The effects of this act have not been analyzed.

**Objective** To determine whether implementation of the Brady Act was associated with reductions in homicide and suicide rates.

**Design and Setting** Analysis of vital statistics data in the United States for 1985 through 1997 from the National Center for Health Statistics.

**Main Outcome Measures** Total and firearm homicide and suicide rates per 100 000 adults (≥21 years and ≥55 years) and proportion of homicides and suicides resulting from firearms were calculated by state and year. Controlling for population age, race, poverty and income levels, urban residence, and alcohol consumption, the 32 "treatment" states directly affected by the Brady Act requirements were compared with the 18 "control" states and the District of Columbia, which had equivalent legislation already in place.

**Results** Changes in rates of homicide and suicide for treatment and control states were not significantly different, except for firearm suicides among persons aged 55 years or older (−0.92 per 100 000; 95% confidence interval [CI], −1.43 to −0.42). This reduction in suicides for persons aged 55 years or older was much stronger in states that had instituted both waiting periods and background checks (−1.03 per 100 000; 95% CI, −1.58 to −0.47) than in states that only changed background check requirements (−0.17 per 100 000; 95% CI, −1.09 to 0.75).

**Conclusions** Based on the assumption that the greatest reductions in fatal violence would be within states that were required to institute waiting periods and background checks, implementation of the Brady Act appears to have been associated with reductions in the firearm suicide rate for persons aged 55 years or older but not with reductions in homicide rates or overall suicide rates. However, the pattern of implementation of the Brady Act does not permit a reliable analysis of a potential effect of reductions in the flow of guns from treatment-state gun dealers into secondary markets.

*JAMA. 2000;284:585-591* www.jama.com

THE BRADY HANDGUN VIOLENCE Prevention Act,[1] implemented in February 1994, provides an unusual opportunity to conduct a systematic evaluation of a national system of background checks and waiting periods for the purchase of handguns from federally licensed firearms dealers (FFLs). The intent of the legislation was to interrupt sales of firearms to persons who are legally prohibited from purchasing them. A total of 18 states and the District of Columbia already met requirements, but dealers and law enforcement officials in the other states ("treatment" states) had to institute new more stringent procedures. The result is a sort of natural experiment, with 1 group of states in the change or treatment condition and the no-change states serving as "controls."

The population directly affected by the Brady Act is residents of treatment states aged 21 years or older who sought to purchase a handgun from an FFL. (Those <21 years have been legally barred from making such purchases since 1968). Some may have intended to shoot themselves or someone else and changed their minds during the 5-day waiting period mandated by the Brady Act. Some of those with felony records may have had no specific intent, but because they were stopped

For editorial comment see p 616.

from purchasing a handgun by the background check were discouraged from obtaining one and hence were not in a position to shoot someone later when the occasion arose. The result of the Brady act may thus be to reduce shootings, including firearm suicides and homicides, by adult handgun buyers in the treatment states. It is also possible that the Brady Act has the additional consequence of reducing the flow of guns from treatment-state FFLs into the *secondary gun market*, defined as all gun transfers that do not involve an FFL,[2] which in turn may reduce gun

Author Affiliations are listed at the end of this article.
Corresponding Author and Reprints: Jens Ludwig, PhD, Georgetown Public Policy Institute, Georgetown University, 3600 N St NW, Suite 200, Washington, DC 20007 (e-mail: ludwigj@gunet.georgetown.edu).

©2000 American Medical Association. All rights reserved.



EOR254

HOMICIDE AND SUICIDE RATES AFTER THE BRADY ACT

**Figure 2.** Firearm Homicide Rates Among Adults and Juveniles in Treatment vs Control States, 1985-1997



Results are based on calculations of unadjusted mortality rates using vital statistics data. Definition of treatment and control states provided in "Methods" section. Dashed vertical line indicates implementation of the Brady Act (February 1994).

shows the pattern of homicide and suicide rates (from all causes, and isolating deaths from firearms) over time for the United States holding the values of the explanatory variables described above constant at their 1985 values. The results of this time-series analysis suggest that homicide and suicide rates to victims of all ages began to decline in the United States overall before the Brady Act went into effect in 1994. When we reestimated equation 1 including the lagged homicide or suicide rate as an explanatory variable in an attempt to control for unmodeled factors, we obtained similar results (data not shown).

FIGURE 2 shows actual (unadjusted) disaggregated firearm-homicide trends for the treatment and control states for juvenile victims (<21 years) and adult victims (≥21 years). The trends in rates of juvenile gun homicide for the treatment and control states diverged even before the Brady Act went into effect. In 1993, the difference in juvenile gun homicide rates between the treatment and control states was 2.27 per 100 000, nearly triple the 1985 difference (0.82). On the other hand, for adult victims, the

trends in firearm homicides (Figure 2) and firearm suicides (data not shown) in the treatment and control states track each other quite closely during the period before the Brady legislation. These results indicate that the key assumption underlying our estimation procedure in equation 2 is met for adult homicide and suicide rates but not for juvenile homicide rates or, by extension, homicide rates to victims of all ages (which includes juveniles). In what follows we focus on presenting the results of estimating equation 2 using data for adult victims.

For victims aged 21 years or older, none of the differences between the treatment and control states in any of the homicide or suicide measures are statistically significant at the traditional 95% level (TABLE 1).

On the other hand, firearm suicides to victims aged 55 years or older declined by 0.92 per 100 000 population (95% confidence interval [CI], −1.43 to −0.42) in the treatment states relative to the control states, equal to about 6% of the gun suicide rate to those aged 55 years or older in the control states during the pe-

riod after the Brady legislation. We also observed a statistically insignificant increase in nongun suicides to this population (0.38 per 100 000; 95% CI, −0.04 to 0.80), a reduction in the proportion of suicides with a firearm of −2.2% (95% CI, −3.9 to −0.5), and a modest (though not statistically significant) reduction in the overall suicide rate (−0.54 per 100 000; 95% CI, −1.27 to 0.19).

The general pattern of results is not sensitive to whether we had estimated either a log-linear or negative-binomial model. The results are also similar when we excluded the years 1993 and 1994 from our analytic sample, dropped atypical and influential control states such as New York and California from the sample, or dropped the few control states that had experienced a change in background-check or waiting-period regulations between 1990 and 1994 (data not shown).

However, we found that the reduction in firearm suicides among older residents is limited to those treatment states that experienced changes in both waiting period and background-check requirements. There are no statistically significant changes in any of our homicide or suicide measures when we compared the control states with the partial-treatment states that had experienced changes in background-check regulations but not in waiting periods (TABLE 2). Conversely, the full-treatment states that also had experienced increases in the waiting period for handgun purchases had a reduction in firearm suicides to older residents equal to −1.03 per 100 000 (95% CI, −1.58 to −0.47) relative to control states.

## COMMENT

Our analyses provide no evidence that implementation of the Brady Act was associated with a reduction in homicide rates. In particular, we find no differences in homicide or firearm homicide rates to adult victims in the 32 treatment states directly subject to the Brady Act provisions compared with the remaining control states.

The evaluation strategy used herein was based on the assumption that the greatest reductions in homicide rates

©2000 American Medical Association. All rights reserved.

EOR255

HOMICIDE AND SUICIDE RATES AFTER THE BRADY ACT

treatment states.[27,28] However, in 26 of the 32 treatment states, the majority of guns used in crimes were first purchased from a gun dealer within the same state.[24] Unfortunately there is no direct evidence that enables us to determine whether the Brady Act has had a greater effect on secondary gun markets in the treatment or in the control states.

If implementation of the Brady Act were associated with a reduction in homicide rates of similar magnitude in control states as in treatment states, our comparisons of treatment and control-state trends would have failed to detect it. Although changes in both treatment and control states would be reflected in principle in the nationwide homicide rate, we are wary about associations derived from a single-data series for the United States overall because of the difficulty in ruling out alternative explanations for changes in the trend line. Even our formal time-series model is a weak substitute for having a reliable control group.

Our findings are generally consistent with most of the previous evaluations of state-level background-check and waiting-period laws.[29-31] For example, 1 analysis of would-be handgun purchasers in California[32] suggests that background checks may slightly reduce gun misuse. Although Californians who were denied purchase of a handgun due to a felony-conviction record had fewer violent-crime arrests than those who were permitted to purchase a handgun despite a record of 1 or more felony arrests, the follow-up arrest rates for both groups were fairly low, and only 3% of these violent-crime arrests were for homicide. If we project the results of this study to the 44 000 applicants who were denied their application to purchase a handgun in 1996 in treatment states,[33] the result is a prediction of just 8 fewer homicides. Such an association is too small to be identified with state-level vital statistics data.

The only previous study of the association between homicide and the national Brady Act found a statistically

insignificant reduction in the murder rate of 2.3% in the treatment states compared with control states, and statistically significant increases in rape and aggravated assault equal to 3.9% and 3.7%, respectively.[34] Our evaluation improves on this earlier work by using 4 years, rather than 10 months, of post-program crime data. We also focus on violent crimes among adults rather than among victims of all ages. Because homicides among juvenile victims have followed different trends in the treatment and control states even before the Brady Act went into effect, comparisons of treatment and control states using data on victims of all ages (which include juveniles) are likely to be biased.

Our findings do not imply that screening FFL (or primary-market) gun sales is of no consequence for gun crime. Even before the Brady Act went into effect, federal law required FFLs to record the identity of each handgun buyer. Since this paperwork provides law enforcement with the means of tracing guns used in crimes back to the original purchaser, screening may have deterred most convicted felons from shopping for guns in the primary market in treatment states even before background checks and waiting periods were mandated by the Brady Act.

More importantly, the effects of primary-market gun regulations may depend on the extent to which the secondary market in guns is regulated. Secondary-market sales account for about 40% of the approximately 10 million gun transfers in the United States each year[2,4] and are the source for the large majority of guns obtained by juveniles and criminals.[2,35-37] The secondary market in guns, which is currently almost completely unregulated, is thus an enormous loophole that limits the effectiveness of primary-market regulations.[38]

Although our study detected no reduction in homicide rates in treatment states compared with control states, we found that suicide rates for persons aged 55 years or older were reduced in the treatment states. The estimated association between the Brady

Act treatment and gun suicide rates among persons aged 55 years and older is equal to −0.92 per 100 000 (95% CI, −1.43 to −0.42), or about 6% of the gun suicide rate among this age group in the control states after the Brady Act had become law.

However, we did not detect an association of the Brady Act with overall suicide rates. We find some signs of an offsetting increase in nongun suicides to those aged 55 years or older, which makes the reduction in the total suicide rate smaller than the reduction in gun suicides. Neither the increase in nongun suicides nor the decrease in suicides from all causes are statistically significant at the conventional 95% level, though the overall pattern of findings is consistent with theories of "weapon substitution."[39]

That the countervailing increase in nongun suicides appears to be of a smaller magnitude than the reduction in gun suicides suggests that either some people aged 55 years or older are deterred from attempting suicide when the effective price of acquiring firearms increases or there is a "weapon instrumentality" effect for suicide (ie, firearms are more lethal than other commonly used methods of attempting suicide, such as poisoning, which was the second most frequent method [behind guns] for suicide among those aged 65 years and older in the United States from 1990 through 1996).[40]

Finally, the federally required waiting period was eliminated as a result of a sunset provision in the Brady Act. Since December 1, 1998, FFLs have been required to conduct an instant check of would-be buyers through a nationwide system managed by the Federal Bureau of Investigation. Our analysis finds that the association with firearm suicides among persons aged 55 years or older was limited to those states that changed both their background-check and waiting-period requirements. These findings suggest that the shift away from waiting periods could increase the firearm suicide rate (and potentially the overall suicide rate) among older US citizens.

©2000 American Medical Association. All rights reserved.

# Self-Inflicted Gunshot Wounds:
## Lethality of Method Versus Intent

Linda G. Peterson, M.D., McKim Peterson, M.D., Gregory J. O'Shanick, M.D.,
and Alan Swann, M.D.

*The authors studied 30 patients treated at an urban trauma center for self-inflicted gunshot wounds, most or all of which would have been fatal without emergency treatment. About half the patients had used alcohol or drugs immediately before wounding themselves, and slightly more than half had experienced interpersonal conflict just before the incident. Thirteen of the 30 were women. Only nine were given diagnoses of major depressive episode or dysthymia; none of the patients had written suicide notes. These data indicate that the reported demographic and clinical characteristics of impulsive, violent self-injury must be reexamined.*
*(Am J Psychiatry 142:228–231, 1985)*

Great controversy exists concerning the prediction of self-destructive behavior, an important function of consulting psychiatrists when they evaluate serious self-inflicted injuries caused by firearms. Determination of future suicidal risk in such instances has traditionally emphasized the lethality of the method (1, 2). Previous studies of completed suicide have reported a robust relationship between gun use, male sex, advancing age, and high risk for suicide (3, 4). Traditional formulations of suicide risk have held that the most lethal suicide attempts are planned, while impulsive suicide attempts are considered to be less lethal, often only "gestures." Recent evidence has suggested that the relationship should be reevaluated and that the demographics of individuals who make violent suicide attempts may also be changing (1, 2, 5). We therefore studied the characteristics of patients treated for self-inflicted gunshot wounds at a major urban trauma center.

Received Oct. 25, 1983; revised March 21, 1984; accepted April 23, 1984. From the Consultation-Liaison Service and the Department of Psychiatry, University of Texas Medical School at Houston. Address reprint requests to Dr. Linda Peterson, Department of Psychiatry, University of Massachusetts Medical School, 55 Lake Avenue North, Worcester, MA 01605.
Supported by NIMH grant MH-37836.
The authors thank Ms. Karen Kadrovach for her help in initiating this study and Ms. Susan Stoltje for her help in preparing the manuscript.

Copyright © 1985 American Psychiatric Association.

## METHOD

Hospital policy states that all patients seen in the emergency room for, or admitted to the hospital with, self-inflicted wounds of any type are to be evaluated by the psychiatric consultation service. We reviewed all such consultations taking place over an 18-month period. Self-inflicted gunshot wounds were defined as any injury resulting from the patient's use of a firearm regardless of the patient's stated intent. We recorded the type of weapon used, the location of the wound, the patient's age, sex, race, and marital status, the psychiatric diagnosis, and the circumstances surrounding the incident; the results are shown in table 1. Psychiatric diagnoses were made according to *DSM-III*. The data were analyzed for intragroup differences as well as against other comparable data found in the literature.

## RESULTS

Thirty patients (17 men and 13 women) with self-inflicted gunshot wounds were evaluated, accounting for 25% of all self-injuries seen in the emergency room during that period. They ranged in age from 17 to 5 years, with a mean (±SD) of $28.9 \pm 11.1$ years. Twenty-seven were white, one was black, and two were Hispanic. All were native Texans. Of the 30, 12 were married, 11 were single, five were divorced, and two were separated at the time of injury. All wounds were to the head, chest, or abdomen; damaged areas included the brain, heart, lungs, liver, stomach, intestine, and kidneys. None were extremity wounds or skin wounds. The mean (±SD) age of patients with head wounds ($34.3 \pm 13.6$ years) was significantly greater than that of patients with either chest or abdominal wounds ($26.2 \pm 8.8$ years), $t=2.06$, $df=28$, $p=.6$ two-tailed). No other significant intergroup differences were observed on the basis of wound location.

Fifteen of the patients had used drugs or alcohol within 24 hours before the wounding, and 18 patients had experienced an interpersonal conflict during that period. We found no significant differences in age, mental status, or wound location relative to alcohol use or interpersonal conflict. Alcoholic patients had no greater prevalence of alcohol use 24 hours before

PETERSON, PETERSON, O'SHANICK, ET AL

TABLE 1. Characteristics of 30 Patients Treated for Self-Inflicted Gunshot Wounds

| Patient | Sex | Marital Status | Age (years) | Race | Location of Wound | Psychiatric Diagnosis | Drug or Alcohol Use | Interpersonal Conflict or Physical Illness[a] |
|---|---|---|---|---|---|---|---|---|
| 1 | F | Single | 19 | White | Abdomen | Deferred | None | May not have been self-inflicted |
| 2 | M | Separated | 27 | White | Abdomen | Alcoholism | Alcohol | Marital problems |
| 3 | F | Married | 27 | White | Abdomen | Personality disorder | Alcohol | Claimed wound was an accidental result of argument |
| 4 | F | Married | 29 | White | Head | Major depressive disorder | Possible alcohol use | Patient had murdered her son |
| 5 | M | Single | 23 | White | Abdomen | Deferred | Alcohol; hydromorphone; marijuana | None |
| 6 | M | Married | 33 | White | Head | Adjustment reaction with depression | Amphetamines; alcohol | None |
| 7 | F | Single | 31 | Hispanic | Abdomen | Deferred | Possible alcohol use | Claimed wound was an accident; had problems with a lesbian relationship |
| 8 | M | Divorced | 24 | White | Head | Major depressive episode; alcohol abuse | Alcohol | None |
| 9 | M | Single | 18 | White | Chest | Adjustment reaction with depression | None | Breakup with girlfriend |
| 10 | M | Married | 27 | Hispanic | Head | Adjustment reaction with depression | Alcohol | Wife's infidelity |
| 11 | M | Married | 27 | White | Abdomen | Adjustment reaction with depression; alcohol abuse | Alcohol | Physical problems and problems with personal relationship |
| 12 | F | Divorced | 42 | White | Head | Major depressive episode | None | Fight with boyfriend |
| 13 | F | Divorced | 40 | White | Abdomen | Major depressive disorder | None | None |
| 14 | M | Single | 24 | White | Abdomen | Major depressive episode; alcohol abuse | Alcohol or drugs | None |
| 15 | M | Divorced | 52 | White | Abdomen | Major depressive episode | Alcohol | Relationship problems |
| 16 | F | Single | 17 | White | Abdomen | Adjustment reaction with depression | Alcohol | 2-year history of seizures |
| 17 | M | Single | 21 | White | Head | Major depressive episode | Phenobarbital | Argument |
| 18 | M | Married | 25 | White | Abdomen | Adjustment reaction with depression | None | None |
| 19 | F | Divorced | 24 | White | Head | Mixed personality disorder | Drugs | Argument |
| 20 | F | Single | 19 | White | Abdomen | Adjustment reaction with depression | Carisoprodol | Argument |
| 21 | M | Married | 31 | Black | Abdomen | Schizophrenia | None | None |
| 22 | F | Married | 25 | White | Chest | Adjustment reaction with depression | None | Relationship problems |
| 23 | M | Married | 67 | White | Head | Adjustment reaction with depression; alcoholism | None | Family argument; physical problems |
| 24 | M | Married | 42 | White | Head | Manic-depression | None | None |
| 25 | F | Married | 38 | White | Chest | Adjustment reaction with depression | Diazepam | Argument; pain |
| 26 | F | Single | 19 | White | Abdomen | Deferred | Possible alcohol use | Breakup with boyfriend; unemployment |
| 27 | M | Married | 22 | White | Chest | Adjustment reaction with depression; alcohol abuse | Alcohol | Marital problems; wanted to get out of the army |
| 28 | M | Single | 18 | White | Chest | Adjustment reaction with depression | History of methaqualone and cocaine abuse | Fight with girlfriend |
| 29 | F | Single | 22 | White | Chest | Major depressive episode | None | Relationship problems |
| 30 | M | Separated | 34 | White | Head | Major depressive episode | Alcohol | Breakup of marriage |

[a]Conflict took place within 24 hours before the suicide attempt.

EOR258

03/07/2014  13:33     1                        VPRP                                 PAGE  09/10

SELF-INFLICTED GUNSHOT WOUNDS

wounding themselves than did patients with other diagnoses. Twelve patients were diagnosed as having adjustment reaction with depressed mood, nine as having a major depressive episode or dysthymia, six as having alcohol or drug addiction, two as having personality disorder, one as having bipolar disorder, and one as having schizophrenia. Diagnosis was deferred for four patients. Only four patients had serious physical illness. Two had a past history of suicide attempts. None had written suicide notes.

DISCUSSION

The patients described in this study resemble neither the "average" drug overdoser nor the "typical" completed suicide. The lack of suicide notes or other preparation and the fact that more than half the patients reported having had suicidal thoughts for less than 24 hours suggest a high degree of impulsivity. In spite of this, patients used highly lethal means in their self-destructive behavior. The age range and sex distribution also distinguish this population. Their age (median=26 years, mean=28.9±11.1 years) makes them older than most overdose victims, but younger than successful suicides (6). Most suicide attempters are women (the male/female ratio ranges from 1:2 to 1:4) whereas most completed suicides are men (male/female ratio ranges from 2:1 to 4:1). In this sample of violent attempters, there were fewer women (13 out of 30) than in studies of patients who overdose, but more women than are seen among completed suicides, especially in Texas where the male/female ratio for completed suicides is 4:1.

Tuckman and Youngman (7) suggested that the demographic and diagnostic characteristics of patients with the most serious self-inflicted injuries would most closely resemble those of successful suicide patients. In Texas, those who successfully commit suicide predominantly are older men (data from state department of health, 1980). On the basis of these considerations, we predicted a correlation among abdominal wounds, younger age, female sex, and more benign psychiatric diagnosis (low lethality) and among head wounds, advanced age, male sex, alcoholism, and depression (high lethality). However, of the above associations, we found only that patients with head wounds were significantly older than those with other wound locations.

The high rate of firearm use (25% of all self-inflicted injuries seen in the emergency room) is also atypical of similar groups of probable suicide attempts. Local surveys indicate that one in five cars on the road during the day, and one in three cars at night, contain loaded firearms. Ready availability of this method to the impulsive individual may account for the high rate of self-inflicted gunshot wounds, as noted by Boyd (2) in a recent review of adolescent suicide.

In a study of completed suicides, Taylor and Wicks (8) noted a higher use of firearms by women in western cities and suggested that the influence of race on suicide method was regionally linked. Consistent with Taylor and Wicks' findings, most patients in our sample were white. Also, the percentage of women using firearms was 43%, similar to that Taylor and Wicks reported in Phoenix.

A potentially biasing element in our study is the patient composition of our trauma center. The hospital is a private institution with a predominantly white clientele. However, the trauma center, by virtue of its air ambulance service, treats almost all the life-threatening injuries within a 150-mile radius. As many of our patients' wounds were life threatening (e.g., puncture of the left ventricle, disrupted abdominal aorta, pneumothorax) the race bias is less likely to be attributable to socioeconomic status. The virtual absence of Hispanic and black patients in this sample is of note in light of the large Hispanic and black populations in the community. Census data in 1980 show the population to be 43% white, 27% black, 18% of Spanish origin, and 12% other races. Regional ethnic bias in choice of method may again be the determining factor.

The sequence of events preceding the self-inflicted wounds in our sample consistently involved proximal substance use and interpersonal conflict. Although this pattern is not atypical among overdose victims (9), the medical seriousness of these patients' injuries is unusual for the "impulsive" attempter.

The relationship between lethality of attempt, the demographic characteristics of attempters versus completers, and future risk is controversial (7). One study (10) has claimed that this relationship is not a useful concept and found that the most lethal attempt correlated weakly with eventual attempted or successful suicide. Our anecdotal evidence supports this idea. Many patients in our sample admitted that while they had originally expected to die, they were glad to be alive and would not repeat the self-destructive behavior despite the continued presence of significant medical, psychological, and social problems. Longitudinal follow-up is currently in progress to address this risk. To date, none of these patients have died or attempted suicide in the 2 years since they wounded themselves.

In conclusion, this group of patients with serious self-inflicted gunshot wounds appears to represent a mixture of people who might have been successful suicides without the helicopter service and people who were like other impulsive suicide attempters but who, for cultural reasons, chose firearms to make their attempts. Further study of this group must include comparison with other suicide attempters and completers. Important data about the relationship of method and future lethality, as well as better delineation of biopsychosocial factors in suicidal behavior, may emerge from such studies and aid in defining more specific intervention strategies. Impulsive suicide attempts are often viewed casually, but this group may represent a particularly lethal type of impulsive individual.

The question of whether the self-inflicted gunshot

EOR259

03/07/2014  13:33    1                       VPRP                                    PAGE  10/10

wounds in this study would have been lethal without the current technology that helped these patients survive is not easily answered. Certainly their wounds were life threatening; however, by design or fortuitous circumstances, these patients quickly sought help.

### REFERENCES

1. Davis RA: Female labor force participation, status integration and suicide, 1950–1969. Suicide Life Threat Behav 11:111–123, 1981
2. Boyd JI: The increasing rate of suicide by firearms. N Engl J Med 308:872–898, 1983
3. Robins E, Murphy GE, Wilkinson RH, et al: Some clinical considerations in the prevention of suicide based on a study of 134 successful suicides. Am J Public Health 49:888–899, 1959
4. Dorpat TL, Ripley HS: A study of suicide in the Seattle area. Compr Psychiatry 1:349–359, 1960
5. Farmer RDT: Suicide by different methods. Postgrad Med J 55:775–779, 1979
6. Weissman MM: The epidemiology of suicide attempts, 1960–1971. Arch Gen Psychiatry 30:737–746, 1974
7. Tuckman J, Youngman WF: Suicide risk among persons attempting suicide. Public Health Rep 78:585–587, 1963
8. Taylor MC, Wicks JW: The choice of weapons: a study of methods of suicide by sex, race, and region. Suicide Life Threat Behav 10:142–149, 1980
9. Trautman E: The suicidal fit: a psychobiologic study on Puerto Rican immigrants. Arch Gen Psychiatry 5:76–83, 1961
10. Card JJ: Lethality of suicidal methods and suicide risk: two distinct concepts. Omega 5:37–45, 1974

# Fraud and Abuse of Government Medical Benefit Programs by Psychiatrists

Gilbert Geis, Ph.D., Paul Jesilow, Ph.D., Henry Pontell, Ph.D., and Mary Jane O'Brien, M.A.

*Government rosters of physicians suspended from the Medicare and Medicaid programs because of fraud and abuse indicate that psychiatrists form a disproportionately large segment of the total. Of the factors contributing to this situation, the most notable is that because psychiatrists charge for time rather than for services, they are more readily apprehended if they violate the rules. The authors speculate on whether in fact psychiatrists break the law more than physicians in other specialties or whether the statistics are purely artifactual.*
(Am J Psychiatry 142:231–234, 1985)

Received Oct. 3, 1983; revised March 13 and May 4, 1984; accepted June 6, 1984. From the University of California, Irvine; and Indiana University, Bloomington. Address reprint requests to Dr. Geis, Program in Social Ecology, University of California, Irvine, CA 92717.

Supported by grant 82-IJ-CX-0035 from the National Institute of Justice, U.S. Department of Justice. The views expressed are those of the authors and do not necessarily reflect the position of the Department of Justice.

The authors thank Carol Wyatt for typing help and William Grenner for assistance with interviewing.

Copyright © 1985 American Psychiatric Association.

Psychiatrists constitute a particularly large proportion of the medical practitioners in the United States who are sanctioned because of fraud or abuse of government medical benefit programs. There are about 378,000 practicing physicians in the country; of these, approximately 8% are psychiatrists (1). From the advent in 1967 of Medicare and Medicaid, the nation's major health benefit programs, through 1982, 147 physicians were suspended from participation in these programs because of fraudulent and abusive practices (Health Care Financing Administration, monthly reports of suspensions, 1977–1982). Checking the names of suspended doctors with state licensing boards and the *American Medical Directory*, we found that psychiatrists represented 18.4% of that total (N=27). The largest proportion of the total suspensions has involved general family practitioners (27%), but this is approximately the same as their proportion in the practitioner population. The same is true for the three specialties that follow psychiatry in proportions of the total suspensions: general surgery (11%), internal medicine (7.5%), and obstetrics/gynecology (7%).

Fraud and abuse have never been clearly differentiated by government authorities in regard to suspension policies (2). In general, fraud relates to a criminal offense that involves "intent" on the part of the

231

EOR260



**Pergamon**

Aggression and Violent Behavior, Vol. 4, No. 1, pp. 59–75, 1999
Copyright © 1998 Elsevier Science Ltd
Printed in the USA. All rights reserved
1359-1789/99/$–see front matter

PII S1359-1789(97)00057-8

# THE RELATIONSHIP BETWEEN FIREARMS AND SUICIDE: A REVIEW OF THE LITERATURE

## Matthew Miller and David Hemenway

### Harvard School of Public Health

**ABSTRACT.** *Suicide rates are affected by many factors—psychiatric, biological, familial and situational. This paper focuses on one potential risk factor for completed suicide in the United States—the availability of firearms. Whether the availability of firearms might increase the rate of attempted suicide is not examined. This article is not an exhaustive review of every existing firearm-related suicide study. Rather, it provides a detailed review of the most commonly cited, representative, and thorough empirical studies in the published peer-reviewed literature relating firearms and suicide, focusing largely on the United States. The empirical studies reviewed are grouped according to whether the unit of analysis is the individual (e.g., case-control studies) or a population (e.g., ecological studies) and further divided depending on whether the analysis uses cross-sectional or time-series (longitudinal) data. We begin with a very brief overview of the suicide problem in the United States.* © 1998 Elsevier Science Ltd

**KEY WORDS.** Suicide, firearms, guns

## SUICIDE IN THE UNITED STATES

AMONG INDUSTRIALIZED NATIONS, the overall suicide rate in the United States (19 per 100,000 population for men and 4 per 100,000 population for women in 1993) falls roughly in the middle (Moscicki, 1995). However, suicides among younger persons are relatively high in the United States: for children under 15 years of age, the overall suicide rate in the U.S. is twice that of the average of other industrialized countries, largely due to a firearm-related suicide rate that is 11 times that of the average of other industrialized nations (Morbidity and Mortality Weekly Report, 1997).

The age-adjusted suicide rate in 1993 (adjusted to the traditional standard of the 1940 U.S. population) was 11 per 100,000 population, similar to the age-adjusted death rate from AIDS (14) and diabetes (12), higher than leukemia (8), but much lower than heart disease (148) or cancer (133) (Morbidity and Mortality Weekly Report, 1996). Although

Correspondence should be addressed to David Hemenway, PhD, Harvard School of Public Health, 677 Huntington Ave., Boston, MA 02115; E-mail: hemenway@hsph.harvard.edu.

AG000571

*Silvester v. Harris*

the risk of suicide increases with age, relative to most life threatening diseases, suicide disproportionately affects younger people. For 5- to 24-year-olds, suicides account for 12% of all deaths, third only to motor vehicle crashes (28%) and homicides (21%) (Morbidity and Mortality Weekly Report, 1996).

While suicide attempts are more frequent in women, completed suicides are higher in men. Women attempt suicide roughly three times as often as men; yet, more than four times as many men actually kill themselves (Morbidity and Mortality Weekly Report, 1996). Peak rates of suicide differ by race and gender: for white men suicide rates peak in mid-life and again in the very old, and for white women rates peak in mid-life; for nonwhite men and women, rates peak in early adulthood (Moscicki, 1995). Overall, suicide rates are higher for whites than for nonwhites.

In addition to age, gender, and race, other demographic variables including marital status, income, and unemployment influence suicide rates. The strongest individual risk factor for attempting suicide is having a psychiatric or a substance abuse disorder. However, although over 90% of suicides are associated with some mental or addictive disorder (Brent, Perper, & Allman, 1987; Rich, Young, & Fowler, 1986), it has not been possible to identify in advance those individuals who will actually go on to commit suicide (Goldstein, Black, Nasrallah, & Winokur, 1991).

## GUN SUICIDE IN THE UNITED STATES

In the United States, more people kill themselves with guns than with all other methods combined (U.S. National Center for Health Statistics, 1997). In 1996, there were approximately 30,000 suicide deaths, of which 60% were caused by guns (U.S. National Center for Health Statistics, 1997). The number of suicides (29,790) exceeded the number of homicides (21,340), and the number of gun suicides (18,140) exceeded the number of gun homicides (15,230) (U.S. National Center for Health Statistics, 1997).

Men use guns more frequently than do women when committing suicide. Guns accounted for 66% of male suicides in 1993 compared to 41% of female suicides. Still, guns are the single most common means used by women who kill themselves: in 1993, 41% used a gun, 35% used poison, 13% used hanging or strangulation, and 11% used other methods (U.S. National Center for Health Statistics, 1993).

Among methods of suicide, firearms are one of the most lethal. For example, a study in Canada found that 92% of gun attempts resulted in death, compared to 78% of attempts using carbon monoxide or hanging; 67% of drowning attempts, and 23% of intentional drug overdoses (Chapdelaine, Samson, & Kimberly, 1991).

## GUN OWNERSHIP AND STORAGE IN THE U.S.

The United States has more guns in civilian hands than any developed country, almost one gun for every man, woman and child. Males, whites, and residents of the South and the Rocky Mountain states are more likely than others to own a gun (Chapdelaine et al., 1991).

It is not only the total arsenal of guns that distinguishes the United States but that so many of the guns are handguns, owned for personal pleasure or protection. Blendon, Young, and Hemenway (1996) analyzed national survey data and found that although the percentage of American households with at least one gun declined from 48 to 41% over the past two decades, the percentage of households with a handgun rose from 20%

AG000572

*Silvester v. Harris*

in 1973 to 25% in 1994. The primary reason people own shotguns and rifles is for hunting and target shooting; the primary reason that people own handguns is for self-protection.

A 1994 national survey of gun owners found that 21% store a gun both loaded and unlocked, and that in 14% of gun owning homes with children, a gun is stored both loaded and unlocked (Hemenway, Solnick, & Azrael, 1995). This finding is consistent with other recent survey data (Cook & Ludwig, 1996).

## THE SUICIDE-GUN CONNECTION

Many suicides appear to be the result of impulsive behavior. Individuals who take their own lives often do so when confronting a severe but temporary crisis (Seiden, 1977). Impulsive behavior is a particular problem among potential youth suicides. A higher risk to teens is consistent with the notion that they are more likely to act impulsively and therefore are more likely to be affected by the means at hand (Rich et al., 1986).

There appears to be an alcohol-gun-suicide connection, especially among adolescents. For example, in a study of 10- to 19-year-old residents in Allegheny County, Pennsylvania, Brent et al. (1987) found that 46% of suicide victims from 1978–1983 had detectable blood alcohol levels and that suicide victims who used firearms were 4.9 times more likely to have been drinking than those who used other methods of suicide.

The impulsive nature of many gun related suicide attempts is attested to by studies of survivors. For example, in a study of 18 cases of men who survived a self-inflicted intentional gunshot wound to the face, subsequent attempts were uncommon (Chapdelaine et al., 1991). In another study of self-inflicted gunshot wounds which were considered fatal without emergency medical treatment, none of the 30 attempters had written a suicide note, and more than half reported having suicidal thoughts for less than 24 hours. With 2 years of follow-up, none of the 30 had attempted suicide or died (Peterson, Peterson, O'Shanick, & Swann, 1985).

Suicidal individuals are often ambivalent about killing themselves, and the risk period is transient. Reducing the availability of lethal instruments during this period may prevent suicide. Psychiatric and penal institutions have long recognized the importance, in all age groups, of restricting access to lethal means of suicide for newly admitted and potentially suicidal inmates.

An independent association appears to exist between personal characteristics and the method of suicide used, even after adjustment for ease of access to the means of committing suicide (Fischer, Comstock, Monk, & Sencer, 1993). Such a finding suggests an imperfect substitutability among methods. Restriction of access to a frequently used and lethal means of suicide may, therefore, reduce total completed suicides. Not only may other readily available methods be less effective, they may also be less acceptable and so not used.

The suggestion is that factors other than intent matter, and that some potential suicides will not substitute any means, or as-lethal means, if a common and lethal method of suicide is made less available. Some evidence indicates that availability and symbolic factors affect the choice of suicide method and location (Seiden, & Spence, 1983) and thus that intent is not immutable and that acting on that intent is not acontextual. On the other hand, the direct empirical evidence of substitution of suicide methods when non-firearm means have been restricted is provocative but equivocal (Boor, 1981; Brown, 1979; Oliver & Hetzel, 1973; Sainsbury, 1986).

AG000573

*Silvester v. Harris*

Kleck (1991) used the same data but assumed that the suicide rate was an endogenous variable. The notion seems to be that suicide rates affect gun legislation which affect gun density. However, the first link of this chain of reasoning appears incorrect. No one else seems to believe that suicide rates have been an important impetus for gun restrictions, and Kleck presents no persuasive evidence on this point. Kleck uses the two-stage least squares technique to correct for the supposed reverse causation. He provides little information about the first stage results, and in the second stage, finds no correlation between the instrumental variable for gun density and total suicides. However, because of his flawed assumption, this finding seems irrelevant.

Many, but certainly not all, authors who have used the strictness of gun control laws as a proxy for handgun availability find an association between this measure and total suicide rates.

Lester and Murrell (1982) analyzed state suicide rate data for the years 1960 and 1970. They created a Guttman scale of handgun strictness by scaling the 1968 handgun laws of each of the 48 contiguous states of the United States based on the following characteristics: (1) Is a license or permit required to purchase a handgun?; (2) Are handgun sales reported to the police?; (3) Is a license required to sell handguns at retail?; (4) Is a permit or license required to keep a handgun at home or at a place of business?; (5) Is a permit or license required to carry a handgun concealed on one's person?; (6) Is there a minimum age requirement for purchasing or receiving a handgun?; and (7) Is there a waiting period between purchase and delivery? Each state was then assigned a number from 0 to 7 representing the strictness of its handgun control statute (0 = no controls on gun sales, 7 = maximum control). After the Guttman index was created, they used a multidimensional scaling procedure of existing handgun control laws to divide the laws into three generic types: restrictions on gun sellers, on gun buyers, and on gun carrying. Gun suicide was affected by restrictions on both the buying and selling of guns, but not by carrying laws. Suicide rates by other methods were not affected by any of the restrictions. Overall, states with tougher handgun laws had lower overall suicide rates. No other independent variables were taken into account in this study.

In similar study by the same authors, Lester and Murrell (1986) again created a Guttman index of handgun statute strictness but did not further divide the laws into generic types. They found that states with stricter handgun statutes had lower suicide rates in 1960 and 1970 and less of an increase in the suicide rate from 1960 to 1970. As in the previous study, no other independent variables were included in the analysis.

Lester (1987b) updated the results from the 1982 study by using suicide rates in the 48 contiguous states for the year 1980 and by including church attendance, itself related to suicide rates, as an independent variable. Findings were similar to previous reports by this author: suicide rates were lower in states where handgun laws were stricter.

In an extension of these studies, Lester (1988) used data derived from Wright, Rossi, and Daly (1983) on the extent of gun ownership in each of nine major geographical regions of the United States from 1959–1977. For each region, data on the strictness of handgun control laws were obtained (see Lester & Murrell 1986) and averaged for that region. Suicide rates were obtained for 1970. Partial correlation coefficients controlling for the strictness of the handgun control laws in the regions were calculated and showed that regions with a greater extent of gun ownership had a higher rate of suicide by firearms and a lower rate by other means with no statistically significant effect on overall suicide rates. Using a backward multiple regression model (that may well have suffered from problems with colinearity) and entering into the model gun ownership, divorce rate, median age, percentage of urban residents and percentage of blacks in the population, showed that the strictness of handgun laws (as well as divorce rate and percentage of

AG000581

*Silvester v. Harris*

*M. Miller and D. Hemenway*

blacks in the population) was a contributing factor to the prediction of suicide rates. As acknowledged by the author, the backward multiple regression model is "of limited meaningfulness with only nine regions."

Boor and Bair (1990) investigated the association between handgun control laws and suicide rates in the 50 United States using suicide rate data from 1985 and controlling for gender, age, race, urbanization, population density, rates of change of population, divorce, crime, and unemployment. Two independent variables for each state were created, one pertaining to the restrictiveness of a state's handgun purchasing laws and the other to the restrictiveness of a state's handgun selling laws. Each state was assigned a value of 0 to 3 for its selling laws (one point for each of the following state requirements: a mandatory waiting period, an automatic forwarding of records of sale to the government, and a license to carry requirement). Each state was also assigned a independent value of 0 to 3 points for its purchasing requirements (a requirement to obtain a license to buy, a requirement to register all handguns, and a requirement for ownership ID cards). A multiple regression analysis controlling for the SES variables mentioned above found that suicide rates were significantly lower in states with stringent firearm control laws, as those laws affect both buyers and sellers of handguns.

Medoff and Magaddino (1983) used suicide and SES statistics for states in 1970 and controlled for age, unemployment and their interaction (e.g., the effects of unemployment may be greater on older age groups), religion, income, and a dummy variable for "social stability" (California, Nevada, Oregon, and Washington rank near the top for divorce, alcoholism, abortion, and lowest in total church attendance). Firearm license to purchase or waiting period to purchase laws were found to reduce the rate of white male suicides aged 20 to 64 by 3 suicides per 100,000 population. Using an index to measure the degree of overall firearm control in a state, the states with the most restrictive laws compared to those with the least restrictive laws had an excess of suicide mortality of 4 per 100,000 population. Comparing the six states that were identified by the NRA as having the most restrictive gun control laws to the rest of the country, there was a decrease of approximately 3 suicides per 100,000 population in the states with the most restrictive laws.

In the previously discussed study of cities by Kleck and Patterson (1993) in which suicide rate was assumed to be an exogenous variable, the requirement to possess a license in order to sell firearms reduced total as well as firearm-related suicide rates. When Kleck used dummy variables for each of 19 gun control laws, rather than a single overall proxy for firearm restrictions, the only gun control law that influenced overall suicide rate was that requiring a state or local license to be a gun dealer. However, the number of observations do not provide sufficient power to test for the expected small effect of each individual gun control measure on overall suicide rates, and there may be problems of multicollinearity among the 19 control variables. When Kleck reduced the model to include four gun control variables (owner licenses, purchase permits, handgun possession bans, and bans on sale of "Saturday Night Specials"), notably not including the strongest variable associated with the overall suicide rate (requiring owners to possess handgun licenses) he concluded that the gun control variables 'may' reduce total suicide. Only verbal summary estimates of an effect (no/maybe/yes), not the quantitative estimates themselves, were presented. Finally, when an index variable for gun control laws was used, Kleck reverted to treating this variable as endogenous, which is a flawed assumption.

Sommers (1984) conducted an early regression analysis of the effect of gun control laws on firearm-suicide in the 48 continental United States using 1970 vital statistics data on suicide by firearms and controlling for divorce and unemployment rates, sex, and race. Four dummy variables were used to represent a state's firearm control laws (whether there was a dealer licensing law, a license to carry law, a license to purchase law, and a

AG000582

*Silvester v. Harris*

waiting period to purchase law). The combined contribution of the four gun control dummies to the regression was measured by a partial R2 and subjected to an *F*-test for significance. Overall, state gun control laws were associated with a decrease in firearm-related suicide.

In a follow-up on Sommers' study, Yang and Lester (1991) extended Sommers analysis to 1980, and examined the total suicide rate as well as the *firearm*-suicide rate. They included divorce and unemployment as independent variables and used five binary variables instead of four to characterize the strictness of state gun control laws (license to purchase, to sell, to own, to carry and whether or not gun sales were reported to police). Both overall suicide rates and firearm suicide rates were significantly lower in states with stricter gun control laws.

## Longitudinal Studies

A problem with time series analyses is that so many factors are changing over time that it is difficult to disentangle their effects. The longitudinal studies examining effects of gun control laws on suicide use simple before and after comparisons, often with control areas, but do not control for changes in other variables. A handful of longitudinal studies have purported to examine the effects of gun control laws. A Canadian study (Carrington & Moyer, 1994) and a U.S. study (Loftin, McDowall, Wiersema, & Talbert, 1991) provide suggestive evidence of a reduction in suicide following stringent firearms regulations.

In 1978, Canada imposed tighter restrictions on gun ownership. Handguns were virtually outlawed. Those people who already possessed unregistered guns were required to present them for registration or turn them in. A nationwide educational campaign about safe use and storage of firearms was also undertaken.

A number of time series studies examined the effects of this legislation on suicide rates. The earliest and most abbreviated of these studies, by Rich, Young, Fowler, Wagner, and Black (1990), compared unadjusted means and trends of suicide rates for the 5 years before and after the 1978 law, and found that although the percentage of suicides by guns decreased after the 1978 law, there was a countervailing increase in suicide by leaping that completely offset the decline by shooting. A time series regression model was also used to examine changes in the rate of suicide. The suicide rate was increasing prior to the 1978 law and plateaued after the law; the differences in slopes was not statistically significant ($p = .13$).

A more detailed and extended study, by Carrington and Moyer (1994), compared the suicide rates for 12 years before and after the law. Using aged-adjusted rates, they found not only that the upward suicide trend was reversed, but that the mean suicide rate fell significantly, from 11.7 to 10.6 per 100,000. The decrease in the mean (age-adjusted) suicide levels during the post legislation period had been masked by an increase in the raw rates due to an increase in the population of the more suicide-prone age groups. Carrington and Moyer also found a one-time drop, immediately after the legislation, in both the firearm and total suicide rates but not in the non-firearm suicide rate. Firearm suicides, which accounted for 30% of suicides before the legislation, accounted for only 26% of suicides after the law (p < .001).

Using graphs, but no statistical analysis, Mundt (1990), asserted that there were parallel secular trends in firearm violence rates in both the U.S. in Canada; and that the 1978 Canadian legislation therefore had no demonstrable effect. However, Hung (1993) showed that the trends in the two countries were not similar and that decreases in firearm violence were much steeper in Canada after the Canadian legislation.

Lester and Leenaars (1993, 1994) also rejected Mundt's conclusions and provided an

AG000583

*Silvester v. Harris*

analysis supporting the findings of Carrington and Moyer. They showed that in the 8 years prior to the legislation, the firearm suicide rate and the overall suicide rate were increasing, as was the percentage of suicides using firearms. For the 8 years after the legislation, the suicide rate by firearms decreased while the suicide rate by all other methods did not change (though it did show a non-significant trend downward).

In 1980, gun legislation was implemented in South Australia which required the licensing of all gun owners. Snowdon and Harris (1992) analyzed means but not trends and reported a fall in the South Australia firearm suicide rate after the law. At the same time, firearm suicides in the other four larger States were rising. There were increases in suicide by other methods in all five States, but total suicides were not compared, and the effect of the legislation on total suicide rates was not provided.

In Queensland Australia, the *weapons act* 1990 required owners of long guns to purchase a license from the police, had a 28-day "cooling-off" period, and applicants were also required to sit for a safety test. The law went into effect in 1992. Cantor and Slater (1995) examined the suicide rates by age, sex, and method for metropolitan and provincial cities and rural areas in the 2 years before (1990–1991) and the 2 years after (1992–1993) the legislation. No other confounders were included in the analysis and trends in the rate of suicide before and after the legislation were not presented. The age and sex adjusted mean annual firearm suicide rate declined significantly in metropolitan and provincial city areas after the legislation (from 3.6 to 2.3 per 100,000, and from 5.2 to 3.1 per 100,000, respectively) but not in rural areas. No estimate of overall suicide rate was provided. The statistically significant decline observed in the metropolitan and provincial areas were largely driven by the decline in suicides by men 15–29 years of age.

In 1976, the District of Columbia adopted a very restrictive handgun law. Loftin et al. (1991) conducted a time series analysis covering the years 1968 through 1987 and found that the adoption of the law coincided with an abrupt and sustained decline in the suicide rate by firearms of 23% ($p = .005$). There were no parallel increases in suicide from non-firearm related methods, nor were there similar declines in firearm suicide rates in the adjacent metropolitan areas of Maryland and Virginia (to which the legislation did not apply). The abruptness of the localized decline in the rate of suicide (as well as homicide) after the law went into effect is curious in that it had generally been presumed that the law would have a more gradual impact.

Rich et al. (1990) presented data on suicide rates in San Diego, CA, where a limited gun control law was implemented in 1969 which sought to prohibit possession of guns by persons with mental disorders. However, the study examined suicides that occurred in the early 1980s, more than a decade after the targeted gun control law was implemented, and no standard for comparison was provided. No conclusions can be drawn concerning the effect of the law on the availability of firearms or on suicide.

One time-series directly compared gun availability and suicide rates. Clarke and Jones (1989), examined aggregate national data for the United States over the years 1959–1984. Gun availability was measured by responses to Gallop and NORC polls. A major problem is that survey data were missing for half the years, and more important, that the variability in measured gun ownership over time appears primarily due to differences in the samples and methodologies used by Gallop and NORC. The null finding of no statistical relationship between handgun ownership and overall suicide rates could well be due solely to measurement error. No other factors were held constant.

## CONCLUSION

The best empirical evidence concerning the possible association between gun availability and suicide currently comes from the case-control studies. The results of these studies

AG000584

*Silvester v. Harris*

Special Article

# MORTALITY AMONG RECENT PURCHASERS OF HANDGUNS

GAREN J. WINTEMUTE, M.D., M.P.H., CARRIE A. PARHAM, M.S., JAMES JAY BEAUMONT, PH.D., MONA WRIGHT, M.P.H.,
AND CHRISTIANA DRAKE, PH.D.

**ABSTRACT**

*Background* There continues to be considerable controversy over whether ownership of a handgun increases or decreases the risk of violent death.

*Methods* We conducted a population-based cohort study to compare mortality among 238,292 persons who purchased a handgun in California in 1991 with that in the general adult population of the state. The observation period began with the date of handgun purchase (15 days after the purchase application) and ended on December 31, 1996. The standardized mortality ratio (the ratio of the number of deaths observed among handgun purchasers to the number expected on the basis of age- and sex-specific rates among adults in California) was the principal outcome measure.

*Results* In the first year after the purchase of a handgun, suicide was the leading cause of death among handgun purchasers, accounting for 24.5 percent of all deaths and 51.9 percent of deaths among women 21 to 44 years old. The increased risk of suicide by any method among handgun purchasers (standardized mortality ratio, 4.31) was attributable entirely to an excess risk of suicide with a firearm (standardized mortality ratio, 7.12). In the first week after the purchase of a handgun, the rate of suicide by means of firearms among purchasers (644 per 100,000 person-years) was 57 times as high as the adjusted rate in the general population. Mortality from all causes during the first year after the purchase of a handgun was greater than expected for women (standardized mortality ratio, 1.09), and the entire increase was attributable to the excess number of suicides by means of a firearm. As compared with the general population, handgun purchasers remained at increased risk for suicide by firearm over the study period of up to six years, and the excess risk among women in this cohort (standardized mortality ratio, 15.50) remained greater than that among men (standardized mortality ratio, 3.23). The risk of death by homicide with a firearm was elevated among women (standardized mortality ratio at one year, 2.20; at six years, 2.01) but low among men (standardized mortality ratio at one year, 0.84; at six years, 0.79).

*Conclusions* The purchase of a handgun is associated with a substantial increase in the risk of suicide by firearm and by any method. The increase in the risk of suicide by firearm is apparent within a week after the purchase of a handgun and persists for at least six years. (N Engl J Med 1999;341:1583-9.)
©1999, Massachusetts Medical Society.

HANDGUN ownership is common in the United States; 16 to 19 percent of the population (26 to 30 percent of men and 7 to 8 percent of women) own a handgun.[1-3] Handguns are acquired more frequently for self-defense than for all other reasons combined.[3] The wisdom of keeping a firearm for protection remains a subject of active debate. Estimates of the frequency with which firearms are used for self-defense range from fewer than 100,000 to 2.5 million instances per year.[4,5] Defensive use of firearms is not rare; the true frequency is probably between 200,000 and 500,000 instances annually.[6]

Nevertheless, access to handguns may actually increase the risk of violent death. The presence of a handgun in the home has been associated with an increased risk of suicide by means of a firearm among adults in general,[7,8] women,[9] and adolescents[10] and has also been associated with an increased risk of homicide.[8,9,11] These data were gathered in case–control studies that were geographically limited. Only one study related the risk of death to personal ownership of handguns.[8] Another case–control study, conducted in New Zealand, where handgun ownership is tightly regulated, found no association between access to firearms and the overall risk of suicide among men.[12]

We report the results of a large, population-based cohort study of the risk of death among persons who have recently purchased a handgun. Our study population comprised the 238,292 persons who purchased handguns from licensed firearm dealers in California in 1991. We compared the mortality in this group with that in the general adult population of California from 1991 through 1996 to determine whether recent purchasers of handguns were at increased risk for death by suicide or homicide, whether by means of a firearm or another method, or were at increased risk for death by other causes.

## METHODS

A roster of all persons who purchased handguns from licensed firearm dealers in California in 1991 was provided by the California

From the Violence Prevention Research Program, University of California, Davis. Address reprint requests to Dr. Wintemute at the Violence Prevention Research Program, University of California, Davis, Medical Center, 2315 Stockton Blvd., Sacramento, CA 95817.

Downloaded from www.nejm.org by GAREN J. WINTEMUTE on October 20, 2003.
Copyright © 1999 Massachusetts Medical Society. All rights reserved.



EOR268

*Silvester v. Harris*

AG000591

The New England Journal of Medicine

Department of Justice. Records included each purchaser's full name, date of birth, address, and date of application for handgun purchase.

California law required completion of an application for handgun purchase, followed by a 15-day waiting period, during which time criminal records were searched for offenses disqualifying the applicant from purchase and a search was conducted for records of mental illness or incapacity as determined by a court. Felons, persons under 21 years of age, and certain others are prohibited from purchasing handguns under long-standing federal and state statutes. A 1991 California law also prohibited persons with convictions for common violent misdemeanors (such as simple assault and brandishing a firearm) from purchasing firearms.

Information on deaths from 1991 through 1996 was obtained from the state's automated mortality file (the Death Statistical Master File). Tentative matches between handgun purchasers and persons listed in the mortality file were made according to last name and date of birth. Data with respect to other variables were then compared to confirm a tentative match.

The sex of handgun purchasers was not supplied by the California Department of Justice but was determined for 98.5 percent of handgun purchasers by comparing their names with sex-specific frequency tabulations of first and middle names for persons who died in California from 1989 through 1996 (derived from the mortality file) or who were born in the United States or Canada in 1994 or 1995.[18] Data on race or ethnic background were not available.

The observation period with respect to mortality among handgun purchasers began 15 days after the date of the purchase application (the first day after the required waiting period, referred to as the day of purchase for purposes of this study) and ended on December 31, 1996. Results were calculated for the first year after handgun purchase and for the entire period of observation. Since purchases occurred throughout 1991, first-year results were determined by making comparisons with average annual statewide mortality rates for 1991 and 1992 combined.

The risk of death was calculated in terms of the standardized mortality ratios, with adjustment for age, sex, or both, with the general adult population of the state as the reference group. Mortality rates for the general population were calculated by dividing the average annual number of deaths during a given period by the population at the midpoint of that period, as estimated by extrapolation from the 1990 census[19] to the projected population of the state in 2000.[16] Since we examined data for an entire population, confidence intervals were not calculated.

Crude rates of suicide by means of firearms among handgun purchasers were calculated as the number of deaths by this means during a given period, divided by the number of person-years at risk during that period; rates for periods of less than one year were annualized. For comparison, rates for the adult population of the state were calculated as described above, with adjustment for age and sex.

## RESULTS

As compared with the general adult population, the 238,292 purchasers of handguns in California in 1991 included a far greater proportion of men (Table 1). Nearly half (49.2 percent) of the handgun purchasers (but only 36.4 percent of the state population) were 34 years old or younger; in contrast, just 3.5 percent of handgun purchasers (but 15.0 percent of the state population) were 65 years old or older.

Suicide by any method was the leading cause of death among handgun purchasers in the first year after handgun purchase; it accounted for 24.5 percent of all deaths in this cohort (Table 2). Suicide by means of a firearm (188 of 857 deaths) ranked second among all causes of death, after heart disease (207 deaths) and ahead of cancer (160 deaths). Among all

**TABLE 1. DEMOGRAPHIC CHARACTERISTICS OF THE 238,292 PERSONS WHO PURCHASED HANDGUNS IN CALIFORNIA IN 1991 AND OF ALL ADULTS IN CALIFORNIA IN 1991.\***

| CHARACTERISTIC | HANDGUN PURCHASERS | ADULTS IN CALIFORNIA |
|---|---|---|
| | percent | |
| Sex | | |
| Male | 88.0 | 49.1 |
| Female | 12.0 | 50.9 |
| Age (yr) | | |
| 21–24 | 15.8 | 9.5 |
| 25–34 | 33.4 | 26.9 |
| 35–44 | 24.9 | 22.9 |
| 45–54 | 15.2 | 14.9 |
| 55–64 | 7.1 | 10.9 |
| 65–74 | 2.9 | 8.9 |
| ≥75 | 0.6 | 6.1 |

\*Because of rounding, percentages do not always sum to 100.

**TABLE 2. ONE-YEAR MORTALITY FROM SUICIDE AMONG PERSONS WHO PURCHASED HANDGUNS IN CALIFORNIA IN 1991 AS COMPARED WITH THE AVERAGE ANNUAL MORTALITY FROM SUICIDE AMONG ALL ADULTS IN CALIFORNIA IN 1991 AND 1992.\***

| VARIABLE | HANDGUN PURCHASERS | ADULTS IN CALIFORNIA |
|---|---|---|
| | percent (no./total no.) | |
| Suicides by firearm (in relation to all suicides) | | |
| Men | 91.1 (164/180) | 58.7 (1577/2686) |
| Women | 80.0 (24/30) | 29.7 (245/826) |
| Total | 89.5 (188/210) | 51.9 (1822/3512) |
| Suicides by firearm (in relation to all deaths) | | |
| Men | 21.0 (164/780) | 1.6 (1577/99,432) |
| Women | 31.2 (24/77) | 0.2 (245/99,187) |
| Total | 21.9 (188/857) | 0.9 (1822/208,619) |
| Suicides (in relation to all deaths) | | |
| Men | 23.1 (180/780) | 2.5 (2686/99,432) |
| Women | 39.0 (30/77) | 0.8 (826/99,187) |
| Total | 24.5 (210/857) | 1.7 (3512/208,619) |

\*Since handgun purchases occurred throughout 1991, first-year comparisons were made to average annual statewide mortality for 1991 and 1992 combined.

adults in California in 1991 and 1992, suicide ranked ninth among all causes of death and accounted for 1.7 percent of all deaths. There were, on average, 1822 suicides by firearms annually in California during 1991 and 1992, of which 10.3 percent were committed by persons who had purchased handguns in 1991. The percentage of all suicides that were committed with firearms and the percentage of all deaths that were suicides, whether committed with firearms

Downloaded from www.nejm.org by GAREN J. WINTEMUTE on October 20, 2003.
Copyright © 1999 Massachusetts Medical Society. All rights reserved.

AG000592

Silvester v. Harris

EOR269

MORTALITY AMONG RECENT PURCHASERS OF HANDGUNS

or by any method, were substantially higher among persons who had recently purchased a handgun than in the adult population of the state (Table 2).

Suicide by means of a firearm accounted for 31.2 percent of all deaths during the first year among women who purchased handguns, as compared with only 0.2 percent of all deaths among all women in California in 1991 and 1992. Women 21 to 44 years old made up 75.4 percent of all women who purchased handguns. Among these younger women, more than half of those who died during the first year (51.9 percent) had committed suicide, and 37.0 percent had committed suicide with use of a firearm. Among all women 21 to 44 years old in California in 1991 and 1992, 6.5 percent of those who died had committed suicide, and 2.8 percent had committed suicide with a firearm.

Information about the type of firearm was available for 116 (61.7 percent) of all suicides by firearm among persons who had purchased handguns within the preceding year; handguns had been used in 114 (98.3 percent) of these suicides. The type of firearm was available for 2401 (65.9 percent) of all 3643 suicides by firearm among adults in California in 1991 and 1992; of these suicides, 1750 (72.9 percent) involved handguns.

After adjustment for age and sex, handgun purchasers, as compared with the general adult population during the same period, were at substantially greater risk for suicide in the first year after a handgun purchase (standardized mortality ratio, 4.31), and the increase was attributable entirely to the substantial excess mortality from suicide by firearm (standardized mortality ratio, 7.12) (Table 3). Women who purchased handguns were at particularly high risk for suicide with a firearm (standardized mortality ratio, 38.71). The excess risk of suicide by any method and of suicide by firearm declined slightly for purchasers until the age of 44, rose thereafter, and was highest for those 75 years old or older.

The rate of suicide by firearm among handgun purchasers was greatest immediately after the purchase and declined thereafter (Fig. 1). Two purchasers committed suicide by means of a firearm during the 15-day waiting period, before the observation period began, and 48 did so during the first 2 weeks after the waiting period ended. The rate for the first week after purchase was 644 per 100,000 person-years, 57 times as high as the adjusted statewide rate (11.3 per 100,000 persons per year). Of all handgun purchasers who committed suicide by firearm during the six-year observation period, 25.0 percent of women and 13.7 percent of men did so within a month after buying their handguns.

Forty-two purchasers of a handgun were murdered in the first year after their purchase; firearms were involved in 40 (95 percent) of these cases. Homicide by means of a firearm accounted for 4.7 percent

TABLE 3. STANDARDIZED MORTALITY RATIOS FOR SUICIDE AND HOMICIDE AMONG HANDGUN PURCHASERS IN THE FIRST YEAR AFTER HANDGUN PURCHASE IN 1991, AS COMPARED WITH AVERAGE ANNUAL MORTALITY FROM SUICIDE AND HOMICIDE AMONG ALL ADULTS IN CALIFORNIA IN 1991 AND 1992.*

| CHARACTERISTIC | SUICIDE | | | HOMICIDE | | |
|---|---|---|---|---|---|---|
| | ALL METHODS | FIRE-ARMS | OTHER METHODS | ALL METHODS | FIRE-ARMS | OTHER METHODS |
| Total† | 4.31 | 7.12 | 0.99 | 0.70 | 0.87 | 0.14 |
| Sex‡ | | | | | | |
| Male | 3.85 | 6.36 | 0.76 | 0.66 | 0.84 | 0.07 |
| Female | 16.13 | 38.71 | 4.84 | 1.83 | 2.20 | 1.41 |
| Age (yr)§ | | | | | | |
| 21–24 | 3.98 | 6.16 | 0.84 | 0.70 | 0.81 | 0.00 |
| 25–34 | 3.76 | 6.58 | 0.81 | 0.65 | 0.83 | 0.00 |
| 35–44 | 3.45 | 5.98 | 1.11 | 0.42 | 0.62 | 0.00 |
| 45–54 | 4.21 | 6.82 | 1.09 | 0.87 | 1.08 | 0.55 |
| 55–64 | 5.07 | 7.84 | 0.63 | 2.19 | 2.60 | 1.67 |
| 65–74 | 7.76 | 9.36 | 3.28 | 4.76 | 10.53 | 0.00 |
| ≥75 | 15.00 | 20.88 | 0.00 | 0.00 | 0.00 | 0.00 |

*Since handgun purchases occurred throughout 1991, first-year comparisons were made to average annual statewide mortality for 1991 and 1992 combined.

†Values have been adjusted for age and sex.

‡Values have been adjusted for age.

§Values have been adjusted for sex.

of all deaths in this cohort. In the state as a whole during 1991 and 1992, firearms were involved in 70.5 percent of homicides, and homicide by firearm accounted for 1.2 percent of all deaths. After adjustment for age, homicide by firearm accounted for fewer deaths than expected among male handgun purchasers (standardized mortality ratio, 0.84) but more deaths than expected among women (standardized mortality ratio, 2.20) (Table 3).

Among men who purchased a handgun, there were fewer deaths than expected from heart disease (standardized mortality ratio, 0.78), cancer (0.67), unintentional injury (0.67), and all causes (0.73) in the first year after the purchase of a handgun. Mortality from all causes among women was greater than expected (standardized mortality ratio, 1.09), though there were fewer deaths than expected from heart disease (standardized mortality ratio, 0.78), cancer (0.47), and unintentional injury (0.46). For women 21 to 44 years of age, the standardized mortality ratio for death from all causes was 1.53. In both cases, the entire increase in the risk of death from all causes could be accounted for by the excess number of deaths from suicide by firearm.

The rate of suicide by firearm among handgun purchasers remained greater than the rate in the general population throughout follow-up (Fig. 2). Standardized mortality ratios for suicide by all methods and for suicide by firearm were lower than those for the first year after purchase but remained high; those for

Downloaded from www.nejm.org by GAREN J. WINTEMUTE on October 20, 2003.
Copyright © 1999 Massachusetts Medical Society. All rights reserved.

EOR270

AG000593

Silvester v. Harris

# Firearms and Suicide

DAVID A. BRENT

*Division of Child and Adolescent Psychiatry, Western Psychiatric Institute and Clinic, Pittsburgh, Pennsylvania, USA*

ABSTRACT: The evidence linking firearms in the home to risk for suicide is reviewed. These data come from epidemiological, case-control, quasiexperimental, and prospective studies. The convergent finding from this wide range of studies is that there is a strong relationship between firearms in the home and risk for suicide, most firmly established in the United States.

KEYWORDS: Firearms; Risk of suicide; Adolescent suicide; Gun control legislation

## EPIDEMIOLOGICAL STUDIES

Epidemiological studies have consistently shown that firearms are the most common method of suicide for all demographic groups in the United States.[1] The dramatic increase in the American youth suicide rate since 1960 is attributable primarily to an increase in suicide by firearms[2,3] (see FIGS. 1 and 2). In one study of youth suicide in Allegheny County from 1960 to 1983, the rate of suicide by firearms increased 330%, but the rate of suicide by other means only increased 150%.[4] The more recent increase in the suicide rate by African-American males is also attributable primarily to an increase in suicide by firearms.

There is evidence of a relationship between the increasing prevalence of alcohol abuse in adolescents over this period of time and the increase in suicide by firearms. First, the proportion of youthful suicide victims who were drinking at the time of the suicide has increased dramatically over the two decades beginning in 1960.[4,5] In turn, those youths who were drinking at the time of their suicide were much more likely to use a gun than were youths who were not drinking.[4,6,7] This finding is consistent with the observation that alcohol and illicit drug abuse in the home greatly increases the risk of violent death, including suicide.[8] Furthermore, these findings suggest that the increase in

Address for correspondence: David A. Brent, M.D., Division of Child and Adolescent Psychiatry, Western Psychiatric Institute and Clinic, 3811 O'Hara Street, Suite 112, Pittsburgh, PA 15213. Voice: 412-624-5172; fax: 412-624-7997.

brentda@msx.upmc.edu

225



AG000598

*Silvester v. Harris*

**TABLE 1. Case-control studies: guns in the home and method of suicide**

| | Brent et al.[6] | Kellermann et al.[12] | Beautrais et al.[9] |
|---|---|---|---|
| Use of gun if kept in home | 87.8% | 88% | 33% |
| Use of gun if not kept in home | 18.8% | 6% | 0.5% |
| Guns in home and firearms and method (odds ratio) | 31.1 | 69.5 | 107.9 |
| Firearms and alcohol use (odds ratio [95% confidence interval]) | 7.3 | — | — |
| Bought gun within 2 weeks of suicide | — | 3% | — |

guns in the home and suicide. Two American studies of adolescent suicides, with referred suicide attempters and nonattempter psychiatric patients as controls, found an odds ratio in the range of 2–3.[10,11] In studies comparing suicides to a community sample of controls and adjusting for potentially confounding variables such as psychopathology, guns were four to five times more likely to be found in the home of suicide victims than in the homes of community controls.[6,12] It is of interest that firearms variables were unrelated to parental or adolescent psychopathology and therefore appear to convey risk relatively independently of these other important risk factors.[6,11] In the New Zealand study, the odds of association were in the predicted direction but escaped statistical significance (odds ratio [OR] = 1.4). Beautrais et al.[9] speculated that the paucity of firearms in the homes in New Zealand, along with the relative rarity of firearms use as a method of suicide, mitigated against finding an association. These results, at variance with American studies, indicate that cultural factors can clearly moderate the relationship between gun availability and risk for suicide.

While there is a relationship between guns in the home and suicide regardless of method of storage, type, or number of guns, these firearms-related variables do appear to modify risk substantially. There is a gradient of risk, with higher odds of association for handguns vs. long guns, loaded vs. unloaded guns, and unlocked vs. locked guns[6,12] (see TABLE 2). There appears to be some interaction with demographic factors, at least in adolescents, insofar as long guns convey an increased risk to males but not to females and handguns convey a particularly increased risk to females.[6] Furthermore, in adolescents long guns but not handguns convey an increased risk in rural areas (ORs 4.5 vs. 1.0), whereas in urban areas this situation is reversed, with handguns conveying a much higher risk than long guns (ORs 5.6 vs. 1.3).[6]

In the American studies, guns in the home are associated with suicide in both males and females (TABLE 3). In fact, firearms are the first choice as a method of suicide for both males and females, notwithstanding females' lower absolute rates. As noted above, handguns are particularly closely associat-

AG000601

*Silvester v. Harris*

TABLE 2. Risk of suicide in the home in relation to various patterns of gun ownership[a]

| Variable | Adjusted odds ratio | 95% Confidence interval |
|---|---|---|
| Type of guns in the home | | |
| One or more handguns | 5.8 | 3.1–4.7 |
| Long guns only | 3.0 | 1.4–6.5 |
| No guns in the home | 1.0 | — |
| Loaded guns | | |
| Any gun kept loaded | 9.2 | 4.1–20.1 |
| All guns kept unloaded | 3.3 | 1.7–6.1 |
| No guns in the home | 1.0 | |
| Locked guns | | |
| Any guns kept unlocked | 5.6 | 3.1–10.4 |
| All guns kept locked up | 2.4 | 1.0–5.7 |
| No guns in the home | 1.0 | — |

[a]Abstracted from Kellermann et al.[12]

TABLE 3. Guns in the home and suicide (odds ratio): gender

| | Any | Long gun | Handgun | Loaded |
|---|---|---|---|---|
| Brent et al.[6] | | | | |
| Male | 4.0[a] | 2.3 | 4.0[a] | 4.0 |
| Female | 1.5 | 0.8 | 9.0[a] | 1.0 |
| Kellerman et al.[12] | | | | |
| Male | 6.4[a] | — | — | — |
| Female | 3.3[a] | — | — | — |

[a]95% confidence interval excludes 1.0.

ed with suicide in females, whereas long guns are more often used by males.[6,13] Beautrais et al.[9] found absolutely no relationship between firearms in the home and suicide in males, with the modest association that was noted coming from the relatively small female subsample.

In the one study that focused on the entire life span, it appears that the association between suicide and firearms in the home is strong across all age groups but was particularly high in the 24 and younger group (ORs 10.4 vs. 4.0–7.2 for those 25 and older).[12] In a comparison of risk factors for older (≥ 16 years) and younger adolescent suicide victims, it was found that young-

AG000602

Silvester v. Harris

more restrictive gun control laws in Canada.[17] In fact, the overall suicide rates were quite similar in the two cities, albeit with a higher proportion of firearms suicides in Seattle. However, the suicide rate among 15–24-year olds was 40% higher in Seattle, attributable almost entirely to a 10-fold higher rate of suicide by firearms in that city. Therefore, these results suggest that the greater availability of firearms is particularly deleterious for younger people, consistent with the above-noted case-control studies that have found a higher odds ratio and greater population-attributable risk for suicide due to firearms for younger populations.[12,13]

One study examined the relationship between the overall rate of suicide and the percentage of households with a gun in the home in 14 Western countries and found a strikingly strong correlation ($\rho = 0.52$).[16] While international comparisons are always fraught with difficulties due to variabilities in methods for certification of suicide, these findings do support a relationship between method availability and suicide and suggest that method substitution does not override the overall impact on suicide rate.

Several studies have examined correlations between different aspects of firearms control legislation—such as the requirement for a waiting period, requirement for licensing, and restricted availability based on psychiatric and/or criminal records—and the suicide rate.[18–20] All of these studies have shown an inverse relationship between the restrictiveness of firearms legislation and the overall suicide rates, using American states as the unit of analysis. Although there was some evidence of method substitution, the overall impact on the suicide rate was still favorable. Lester also noted in one study[19] that the prevalence of gun ownership, rather than the strictness of gun control laws per se, was the best predictor of overall suicide rates. Boor and Bair took these statistical analyses further[18] by adjusting for other sociodemographic factors that may differ between states and at the same time may be related to the suicide rate and still found a significant inverse correlation between the restrictiveness of gun control laws and the overall suicide rate (correlation coefficents −.25 to −.48). Therefore, within the limitations of correlational analyses of ecological data, these results are consistent with the view that greater restrictiveness of firearms legislation is associated with a lower overall suicide rate.

Four studies have examined the impact of changes in firearms legislation upon the suicide rates. Two examined the impact of the same law, but over shorter[21] and longer[22] periods of time, respectively. The results of neither study show an impact of legislation upon the suicide rate. A third study examined the impact of legislation on the suicide rate in Washington, D.C., documented significant change, and compared these trends to those in adjoining areas where no such legislative initiatives had taken place.[23] Finally, another study, conducted in Australia, found a positive impact of restrictive gun leg-

AG000605

Silvester v. Harris

Case: 14-16840, 03/25/2015, ID: 9472628, DktEntry: 24-3, Page 213 of 278

did not occur to any substantial degree, and an overall decline in the suicide rate prevailed.

The impact of firearms legislation on suicide was examined in Queensland, Australia.[24] In this legislation, both current and prospective owners of long guns were required to obtain a license. In addition, new applicants were required to wait 28 days prior to obtaining their gun (a "cooling off period") and were required to pass a safety test. The suicide rate by firearms declined among men in metropolitan areas and in provincial cities, but not in rural areas. This effect was most notable among individuals under the age of 30. However, method substitution occurred in all regions but the provincial cities, where overall suicide rates did decline. Two limitations of the study are the absence of a control community, where no change in legislation had occurred, and the brevity of the observation (only 1 year pre- and postlegislation).

## PROSPECTIVE STUDIES

Wintemute et al.[25] examined the standardized mortality rates (SMRs) of purchasers of handguns in California, who are registered by state law. In 1991, 238,292 purchasers of handguns were registered, and the standardized mortality ratios for suicide were examined for the 6 years after the initial purchase. The SMRs due to suicide were increased for the entire 6-year period of observation, although the risk for suicide declined exponentially with the



**FIGURE 4.** Rates of suicide by firearm within the first year after purchase among persons who purchased handguns in California in 1991. *Horizontal line* indicates age- and sex-adjusted average annual rate of suicide by firearm in California in 1991 and 1992 (11.3 per 100,000 persons per year). (Abstracted from Wintemute et al.[25])

AG000607



**FIGURE 5.** Rates of suicide by firearm during the 6 years after purchase among persons who purchased handguns in California in 1991. *Horizontal line* indicates age- and sex-adjusted average annual rate of suicide by firearm in California from 1991 through 1996 (10.7 per 100,000 persons per year). (Abstracted from Wintermute *et al.*[25])

time after the purchase. For example, in the first week, month, and year after the purchase of a handgun, the suicide rates by firearms were elevated 57-, 30-, and 7-fold over the expected rate, respectively, although even at 6 years after the purchase, the rates were still about double the expected rate (see FIGS. 4 and 5). This effect was observed both across the life span and in both sexes, although it was more pronounced in the young and among women. The latter finding is consistent with women's more specific use of handguns for suicide.[6,13] The extremely high rate of suicide right after purchase is consistent with the purchase of firearms for the purpose of committing suicide. This appears to be contradictory to Kellermann *et al.*'s observation[12] that only around 3% of all suicides are committed with guns purchased within the past 2 weeks. The findings in this study indicate only that *if a gun is purchased, it is often purchased for the purpose of committing suicide*. Most of the suicides that occurred among these purchasers occurred more than 2 weeks after the purchase, with the risk for suicide remaining elevated for the entire 6-year period of observation.

## CONCLUSIONS AND RECOMMENDATIONS

The convergent evidence from epidemiological, case-control, quasiexperimental, and prospective studies is that there is a relationship between gun availability in the home and completed suicide by firearms. In the United

AG000608

*Silvester v. Harris*

States, firearms are by far the most common method of completed suicide, and the prevalence of firearm suicide is closely correlated with firearm ownership rates in international comparisons.[1,16] Case-control studies indicate that firearms are much more likely to be in the homes of suicide completers than the homes of controls and that if a gun is in the home, it is highly likely to be used as the method of suicide.[6,9–12] Handguns, compared to long guns; loaded guns, compared to unloaded guns; and unlocked guns, compared to locked guns are all more closely associated with suicide.[6,12] The risk conveyed by the availability of guns may be particularly high among adolescents and young adults.[12,13,17] The firearm suicide rate and in general the overall suicide rate are related to the strictness of gun control laws and the prevalence of gun ownership.[16,18–20] Quasiexperimental studies suggest that greater restrictiveness in gun control laws is associated with declines in firearm suicide, sometimes without compensatory method substitution (e.g., Ref. 23). Finally, one prospective study indicates that the risk of suicide among handgun purchasers is markedly elevated, especially in the first year after purchase.[25] Therefore, method restriction, either on a case-by-case basis or via population methods, may substantially reduce the rate of suicide, particularly in the United States, where suicide by firearms is the most common method for both males and females. A "cooling-off" period may avert suicide by those who purchase handguns for the purpose of committing suicide.

With regard to case-based approaches to method restriction, remarkably little is known about the efficacy of standard approaches. For example, only two studies have examined the impact of firearms counseling on the parents of youth at risk for suicide. In one study, the parents of suicide attempters were counseled about the danger of having firearms in the home; 5/8 of the parents either removed the guns or stored them in a more secure manner.[26] In a study of depressed adolescents who entered a randomized psychotherapy clinical trial, only 27% of the parents who reported having guns in the home at intake removed the guns on follow-up.[27] Therefore, it is unwise to assume that providing recommendations on removal of firearms from the home will automatically result in compliance. One factor that may have led to noncompliance with recommendations in the above-cited study was the insistence that the gun, which may have been kept for protection, be removed. A compromise recommendation to improve the security of gun storage might have been more favorably received.[28] In addition, it is important that the clinician be aware of who owns the gun, since it is often the non–gun-owning parent who brings the child to the clinic. This being the case, the non–gun-owning parent may underestimate the number, type, and method of storage of firearms in the home and may not be able to persuade the spouse of the need to take action. Furthermore, in the above-noted study 18% of households that initially had no guns in the home eventually acquired them.[27] Therefore, it is

AG000609

*Silvester v. Harris*

# Firearms Laws and the Reduction of Violence
## A Systematic Review

Robert A. Hahn, PhD, MPH, Oleg Bilukha, MD, PhD, Alex Crosby, MD, MPH, Mindy T. Fullilove, MD, Akiva Liberman, PhD, Eve Moscicki, ScD, MPH, Susan Snyder, PhD, Farris Tuma, ScD, Peter A. Briss, MD, MPH, Task Force on Community Preventive Services

## Overview

The Task Force on Community Preventive Services (the Task Force) is conducting systematic reviews of scientific evidence about diverse interventions for the prevention of violence, and resulting injury and death, including, among others, early childhood home visitation,[1,2] therapeutic foster care,[3] the transfer of juveniles to the adult justice system, school programs for the teaching of prosocial behavior, and community policing. This report presents findings about the effectiveness of firearms laws in preventing violence. Studies of the following firearms laws were included in the review: bans on specified firearms or ammunition; restrictions on firearms acquisition; waiting periods for firearms acquisition; firearms registration; licensing of firearms owners; "shall issue" carry laws that allow people who pass background checks to carry concealed weapons; child access prevention laws; zero tolerance laws for firearms in schools; and combinations of firearms laws.

The Task Force found the evidence available from identified studies was insufficient to determine the effectiveness of any of the firearms laws reviewed singly or in combination. A finding that evidence is insufficient to determine effectiveness means that we do not yet know what effect, if any, the law has on an outcome—not that the law has no effect on the outcome. This report describes how the reviews were conducted, gives detailed information about the Task Force's findings, and provides information about research gaps and priority areas for future research.

From the Epidemiology Program Office (Hahn, Bilukha, Snyder, Briss) and National Center for Injury Prevention and Control (Crosby), Centers for Disease Control and Prevention, Atlanta, Georgia; Department of Psychiatry and Public Health, Columbia University (Fullilove), New York, New York; National Institute of Justice (Liberman), Washington, DC; National Institute of Mental Health (Moscicki, Tuma), Bethesda, Maryland

Address correspondence and reprint requests to: Robert A. Hahn, PhD, MPH, Senior Scientist, Violence Prevention Review, Community Guide Branch, Centers for Disease Control and Prevention, 1600 Clifton Road, MS E-90, Atlanta, GA 30333. E-mail: RHahn@cdc.gov.

## Introduction

Although rates of firearms-related[a] injuries in the United States have declined since 1993, they remained the second leading cause of injury mortality in 2001, the most recent year for which complete data are available.[4] Of 29,573 firearms-related deaths in 2001—an average of 81 per day—16,869 (57.0%) were suicide; 11,671 (39.5%) were homicide or legal intervention (e.g., homicide by police); 802 (2.7%) were unintentional; and 231 (0.8%) were of undetermined circumstances. In 1998, for each firearm-related death, 2.1 nonfatal firearm-related injuries were treated in emergency departments.[5] It is estimated that 24.3% of all violent crimes—murder, aggravated assault, rape, and robbery—committed in 2001 (a total of 1,430,693) were committed with a firearm.[6] Rates of firearm-related homicide, suicide, and unintentional death in the United States exceed those of 25 other high-income nations (i.e., 1996 GNP ≥US$9636 per capita) for which data are available (Figure 1).[7] The cost of firearm-related violence in the United States is estimated to be approximately $100 billion per year.[8]

Approximately 4.5 million new (i.e., not previously owned) firearms are sold each year in the United States, including 2 million handguns. In addition, estimates of annual secondhand firearms transactions range from 2 to 4.5 million.[9,10] Further, it is estimated that approximately 0.5 million firearms are stolen annually.[10] Thus, the estimated total number of firearms transactions ranges from 7 to 9.5 million per year, of which between 47% and 64% are new firearms.

New firearms can be sold legally only by federal firearms licensees (FFLs); FFL transactions comprise the primary market.[10] FFLs are required to comply with the Permanent "Brady Law" (P.L. 103-159, Title XVIII, Section 922(t)) and initiate background checks to investigate whether would-be purchasers violate federal or state purchasing requirements (e.g., people convicted of a felony must be excluded). In the "secondary market" of firearms not sold by FFLs, private citizens

---

[a] A firearm is a weapon (e.g., handgun, rifle, or shotgun) in which a shot is propelled by gunpowder.

0749-3797/05/$–see front matter
doi:10.1016/j.amepre.2004.10.005

AG000703

Silvester v. Harris

suicide, but not for homicide; however, the suicide substitution effect is relatively minor: an increase of 3.0% in non-gun suicide, compared with the firearm-specific suicide decline of 8.6%.

Other effects. Restrictions may facilitate the identification and capture of wanted persons.[56] Background checks may also act as a deterrent to application by people prohibited from purchasing weapons. However, we found no evidence of this or of whether denied applicants subsequently acquired firearms by other means (e.g., from the secondary market). One potential harm is false positives; that is, people falsely reported as having a restriction, who may subsequently be stigmatized and mistakenly denied a firearm.

Conclusion. According to the *Community Guide* criteria,[22] the available evidence is insufficient to determine the effect of firearms acquisition restrictions on public health and criminal violence, because of a small number of available studies, limitations in their design and execution, and variability in the direction and statistical significance of findings. The only restriction for which study design suitability and execution met our criteria was the misdemeanor conviction restriction; in this instance, the effect was in the expected direction, but was not statistically significant, and we were thus unable to draw a conclusion. Further research is needed to evaluate the effects of acquisition restriction laws on violence, other health-related outcomes, and related health and social effects.

## Waiting Periods for Firearms Acquisition

Waiting periods for firearms acquisition require a specified delay between application for and acquisition of a firearm. This requirement is usually imposed to allow time to check the applicant's background or to provide a "cooling-off" period for people at risk of committing an impulsive crime or suicide. In addition to background checks, waiting periods can be combined with other provisions, such as a requirement for safety training.

The Interim Brady Handgun Violence Prevention Act, a federal law that went into effect in 1994, mandated a background check and a 5-day waiting period for handgun purchasers. In 1998, the 5-day waiting period required by the Interim Brady Law expired, and was replaced by a mandatory, computerized National Instant Criminal Background Check System (required not only for handguns, but for all firearms purchases), allowing dealers to sell the firearm if the FBI reported no adverse evidence to the dealer within 3 days of application. However, many states have their own provisions mandating longer waiting periods for handgun or long firearm purchases or both. Reports on the number of states with waiting periods for handgun purchases vary from 10 (National Rifle Association

Table 4. Waiting periods for firearm acquisition: descriptive information about included studies

|  | Studies (n) |
| --- | --- |
| Studies meeting inclusion criteria | 7[17,50,65–67] |
| Studies excluded, limited design or execution quality | 0 |
| Qualifying studies | 7[17,50,65–67] |
| Designs of included studies |  |
| Time series with concurrent comparison group | 2[50,64] |
| Before and after, no concurrent comparison group | 1[63] |
| Cross-sectional | 4[17,65–67] |
| Outcomes reported in included studies |  |
| Homicide | 6[17,50,64–67] |
| Aggravated assault | 5[17,64–67] |
| Robbery | 5[17,64–67] |
| Rape | 2[17,64] |
| Suicide | 6[17,65–67] |
| Unintentional firearm-related injury death | 3[17,64,66] |

website: *www.nra.org*) to 15[67] to 19[62], with waiting periods ranging from 2 days (in Alabama, Nebraska, South Dakota, and Wisconsin) to 6 months (in New York).[61]

Review of evidence: effectiveness. Our search identified seven studies on the effects of waiting periods on violent outcomes.[17,50,63–67] Descriptive information about execution, design suitability, and outcomes evaluated in these studies is provided in Table 4. Details of the seven independent qualifying studies are available at the website (*www.thecommunityguide.org/violence*). One study[63] was conducted in Queensland, Australia; the remaining studies were conducted in the United States.

Among the seven qualifying studies, five[17,63,65–67] were of lowest design suitability, and two[50,64] were of greatest design suitability; all seven studies had fair execution. One study[64] presented the effectiveness results as a mathematical function of the length of waiting period; for purposes of this review, we calculated an effect estimate for a 5-day waiting period (as required by the Interim Brady Law).

Of six studies that evaluated the effects of waiting periods on homicide, four[17,65–67] had least suitable designs. Results were mixed: three point estimates showed a reduction in homicide, two showed an increase (one study with results for 2 decades, the 1960s and 1970s), and none of these findings were statistically significant. Two studies[66,67] found that results were not statistically significant without providing either size or direction of the effect.

Six studies evaluated effects of waiting periods on suicide. One study[63] evaluated the effect of waiting periods for long firearm purchase, one[50] for handgun purchase (under the Interim Brady Law 5-day waiting period), and four[17,64,66,67] for both long firearm and handgun purchases. Two[17,63] studies presented data

AG000714

*Silvester v. Harris*

EOR279

that allowed the calculation of relative percentage change in suicide rates; one[17] found a small (0.5%) increase and one[68] a small (2.9%) decrease in total suicides. Two[50,64] studies reported only absolute changes in suicide rates without data on baseline rates, which did not allow calculation of relative percent change. One study reported decreases in firearm suicide rates among children (aged 0 to 14 years) and adolescents[64] (aged 15 to 19 years), and the second study reported a decrease in both firearm-related and total suicide rates among adults (aged ≥21 years).[50] However the second study's decrease was statistically significant only in a subsample of people aged ≥55 years, and only for firearm-related suicide.[50] Two studies[66,67] reported that results were not significant, without providing either size or direction of the effect.

Evidence of the law's effects on aggravated assault, robbery, rape, and unintentional firearm-related injury death were inconsistent in direction, with six of the effect estimates indicating an increase, five indicating a decrease, and none being statistically significant.

Comparison of the effect on suicide of a 28-day waiting period for long firearms (in Queensland, Australia)[68] with a 5-day waiting period for handguns (associated with the Interim Brady Law)[50] indicated a greater effect associated with the longer waiting period for firearm-related suicide, but not for total suicide.

Several studies,[17,50,68] for which both firearm and non-firearm effect estimates were available, suggested the presence of a partial substitution effect for suicide, in which decreases in firearm-related suicide are offset, but at substantially lower levels, by increases in non-gun suicide. No such substitution effects were found for homicide, aggravated assault, or robbery.

**Other effects.** It has also been asserted[60] that waiting periods may give criminals (who may be more likely to acquire firearms by illegal means and avoid the waiting period) an advantage in obtaining firearms over law-abiding citizens (who may lack means of self-defense during the waiting period). However, there is no evidence for or against this hypothesis. One study[64] reported inconsistent effects of waiting periods on property crime; it found an increase in burglary and a decrease in larceny and auto theft.

**Conclusion.** According to the *Community Guide* criteria,[22] the evidence is insufficient to determine the effectiveness of waiting periods for the prevention of suicide, homicide, aggravated assault, robbery, rape, and unintentional firearm-related injury death, because of the small number of available studies, limitations in the design and execution of available studies, and effects that are inconsistent in direction or fail to reach statistical significance. Further research is needed to evaluate the effects of waiting period laws on violence, other health-related outcomes, and associated health and social effects.

**Firearms Registration and Licensing of Firearm Owners**

Registration requires that a record of the owners of specified firearms be created and retained.[68] Licensing requires an individual to obtain a license or other form of authorization or certification that allows the purchase or possession of a firearm.[68] Licensing and registration requirements are often combined with other firearms regulations, such as safety training or safe storage requirements.

The registration practices of states and the federal government vary widely.[69] Recorded information may be retained by a specified recorder, such as by federal firearms licensees; such records may be accessible under specified circumstances, such as criminal investigations. In some states, recorded information is kept in centralized registries. The Firearm Ownership Protection Act of 1986 specifically precludes the federal government from establishing and maintaining a national registry of firearms and their owners. Likewise, there are no current federal firearms licensing requirements or provisions for individual purchasers. However, several states have laws that require the licensing of firearm owners or registration of firearms, and recorded information is kept in centralized registries. For example, licensing of handgun owners is required in 17 states and the District of Columbia.[6] Statewide handgun registration laws currently exist in four states. Licensing and registration may serve as instruments for the control of illegal firearms ownership, transfer, and use,[56,70] and might also deter illegal acquisition and use.

**Review of evidence: effectiveness.** Our search identified five studies[17,65–67,71] on the effects of licensing on violent outcomes, two[17,71] of which also report on the effects of registration. One study[17] was based on data collected in 1979 to 1981, one[65] on data collected in the 1960s and 1970s, one[66] on data collected in 1978, and one[67] on data collected in 1969–1970; one[71] assessed firearms retrieved from crimes during a 1-year period (1997–1998). All five studies were of least suitable (cross-sectional) design and had fair execution. Descriptive information about execution quality, design suitability, and outcomes evaluated in these studies is provided in Table 5, and at the *Community Guide* website (*www.thecommunityguide.org/violence*). Details of the four independent qualifying studies are also available at the website.

Evidence of the effects of licensing and registration on diverse study outcomes was inconsistent, with eight of the effect estimates showing increases in violence, and eight showing decreases. (One study had data on three outcomes each for 1960 and 1970.) Two studies[56,67] reported that results were statistically nonsignif-

AG000715

*Silvester v. Harris*

EOR280

1
2
3
4
5                    **UNITED STATES DISTRICT COURT**
6                    **EASTERN DISTRICT OF CALIFORNIA**
7

| | |
|---|---|
| 8   **JEFF SILVESTER, BRANDON COMBS, THE CALGUNDS FOUNDATION, INC., a non-profit organization, and THE SECOND AMENDMENT FOUNDATION, INC., a non-profit organization,** | **CASE NO. 1:11-CV-2137 AWI SAB** |

8   **JEFF SILVESTER, BRANDON COMBS, THE CALGUNDS FOUNDATION, INC.,**
9   **a non-profit organization, and THE SECOND AMENDMENT**
10  **FOUNDATION, INC., a non-profit organization,**
11
12                  **Plaintiffs**
13        **v.**
14  **KAMALA HARRIS,  Attorney General of California, and DOES 1 to 20,**
15                  **Defendants**

**CASE NO. 1:11-CV-2137 AWI SAB**

**PRETRIAL ORDER**

**Motions In Limine Hearing and Trial Confirmation:**
            **MARCH 11, 2014**
            **1:30 p.m., Courtroom 2**

**Trial:  MARCH 25, 2014**
            **8:30 a.m., Courtroom 2**

**RULES OF CONDUCT**

16
17        The pretrial conference was held on February 3, 2014.   The trial in this matter is set for
18  March 25, 2014.  The parties currently estimate that the trial shall take eight court days or less.
19  **I.  Jurisdiction and Venue**
20        This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331,
21  1343, 2201, 2201, and 42 U.S.C. § 1983.
22  **II.  Trial**
23        This matter shall be tried as a bench trial without a jury.
24  **III.  Facts**
25        **A.  Undisputed Facts**
26        (a) At all relevant times, one effect of the Waiting Period law has been that all California
27  residents lawfully purchasing firearms must wait a minimum of 10 days between applying to
28  purchase the firearms and receiving delivery of them (unless the purchasers are statutorily exempt

1  from the waiting period);

2      (b) At all relevant times, Plaintiff Jeff Silvester ("Silvester") has owned at least one

3  firearm;

4      (c) At all relevant times, Brendon Combs ("Combs") has owned at least one firearm.

5  **B.  Disputed Facts**

6  Plaintiffs submit the following disputed facts:

7      (a) The DOJ needs at least 10-days to conduct every background check;

8      (b) A minimum 10-day "cooling off" period is necessary;

9      (c)  Requirement to wait 10-days deprives Plaintiffs of the use, custody, control and ability

10  to defend self, family and home; it mandates a brief window of 20 days from which Plaintiffs must

11  return to obtain physical possession of property that Plaintiffs already own;

12      (d) Plaintiffs are forced to incur expenses including: opportunity costs to engage in

13  business and other activities during the each and every time Plaintiffs have to make a second trip

14  to the licensed firearm dealer to take possession, custody and control of each firearm, lost

15  opportunity to purchase firearms due to an inability to make a second trip, additional shipping

16  expenses, additional dealer transfer fees, increased firearm prices due to lack of local competition,

17  additional fuel costs, additional wear and tear on Plaintiffs' vehicles necessary for a return trip to

18  the licensed dealer to retrieve a firearm Plaintiffs already own, and additional costs of having to

19  resubmit a DROS application due to scheduling conflicts preventing Plaintiffs from returning to

20  the store to retrieve the firearm within the temporary window of availability.

21  Defendant submits the following disputed facts:

22      1.  Whether Silvester has lacked a firearm with which to defend himself in his home, at any

23  relevant time.

24      2.  Whether Combs has lacked a firearm with which to defend himself in his home, at any

25  relevant time.

26      3.  Whether Silvester has, by law, been unable to have sufficient firearm weaponry with

27  which to defend himself in his home, at any relevant time.

28      4.  Whether Combs has, by law, been unable to have sufficient firearm weaponry with

1  which to defend himself in his home, at any relevant time.

2      5.   Whether Silvester has been unduly burdened or merely inconvenienced by the Waiting

3  Period Law in acquiring firearms.

4      6.   Whether Combs has been unduly burdened or merely inconvenienced by the Waiting

5  Period Law in acquiring firearms.

6      7.   Whether the ability of most people to acquire firearms very quickly, i.e., within about

7  10 days of deciding to obtain them, was historically understood to be within the scope of the

8  Second Amendment to the U.S. Constitution.

9      8.   Whether the State of California ("California"), through its Bureau of Firearms ("BOF"),

10  could complete, and communicate to interested persons, the results of statutorily-required

11  background checks on prospective firearms purchasers, who previously have been through the

12  waiting period imposed by the Waiting Period Law for other firearms purchases, essentially

13  instantaneously after BOF receives the prospective purchasers' Dealer Record of Sale ("DROS")

14  applications for the current proposed purchases.

15      9.   Whether California's rates of firearm-related deaths, with the Waiting Period Law, can

16  be legitimately compared to the same types of rates in other U.S. states that do not have waiting-

17  period laws affecting purchases of firearms.

18      10.  How California's rates of firearm-related deaths, with the Waiting Period Law,

19  compare to the same types of rates in other U.S. states that do not have waiting-period laws

20  affecting purchases of firearms.

21      11.  Whether it is possible to determine accurately what effects, if any, "cooling off"

22  periods affecting firearms purchases have on rates of firearm-related deaths.

23      12.  What effects, if any, cooling-off periods affecting firearms purchases have on rates of

24  firearm-related deaths.

25      13.  Whether the California Legislature arbitrarily and/or irrationally selected 10 days, as

26  opposed to some other period of time, as the current waiting period in the Waiting Period Law.

27      14.  What other rationales and facts justify the 10-day waiting period in the Waiting Period

28  Law.

## C.  Disputed Evidentiary Issues

Plaintiffs submit the following disputed facts:

(a) Plaintiffs will dispute Defendants' request for judicial notice of studies, books or other evidence pertaining to the effectiveness of the "cooling off period;"

(b) Plaintiffs will object to the introduction of any expert witness testimony as neither of the parties have disclosed, received written reports or deposed experts.

(c) Plaintiffs reserve the right to tender rebuttal experts if the Defendants tender any lay opinion testimony based on their status as a government agency;

(d) Plaintiffs will attempt to exclude any studies that the Defendant attempts to admit into evidence related to the issue of the necessity of the 10-day waiting period.

Defendant submits the following disputed facts:

(1) whether certain witnesses have personal knowledge and experiences making them competent to testify as to certain facts and/or opinions;

(2) which party bears the burden of proof with respect to bolstering or undermining the rationales and justifications for the Waiting Period Law;

(3) whether it is appropriate for the Court to take judicial notice of certain materials reflecting, positively or negatively, on the rationales and justifications for the Waiting Period Law. If there are such disputes, and they are significant, they probably should be resolved by written motions in limine.

## D.  Special Factual Information

None.


## IV.  Relief Sought

Plaintiffs request judgment entered in their favor against Defendants as follows:

(a) An order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons who receive action notice of the injunction, from enforcing Penal Code sections 26815 and 27540 as against those persons that may lawfully possess and acquire a firearm and possess proof of firearms possession or ownership in their name within the

1   State of California from enacting, publishing, promulgating, or otherwise enforcing  policies,

2   rules, or procedures prohibiting or otherwise restricting the immediate delivery of firearms to

3   plaintiffs and individuals similarly situated (i.e., persons in possession of a current Certificate of

4   Eligibility and/or a license to carry a concealed firearm) upon completion of a background check

5   at the point of sale indicating that they may own, possess and acquire firearms;

6          (b) Attorney fees and costs pursuant to 42 U.S.C. section 1988;

7          (c) Declaratory relief consistent with the injunction;

8          (d) Costs of suit; and

9          (e) Any other relief as the Court deems just and appropriate.

10         The Attorney General seeks to have Plaintiffs' prayer for injunctive and any other relief

11   denied in full.

12   **V.  Points of Law**

13         A.  Plaintiffs' Contentions

14         Point of Law 1:  California Penal Code § 26815 and § 27540, which imposes a 10-day

15   waiting period between the purchase and delivery of a firearm, violates the Second Amendment

16   facially and as applied to individuals who: (1) are not prohibited from acquiring or possessing

17   firearms, and (2) who currently possess registered firearms and/or who hold certain valid state

18   licenses that require the successful passage of background checks.

19         Point of Law 2: The eighteen exceptions to the 10-day waiting period violate the

20   Fourteenth Amendment's Equal Protection Clause.

21         Relevant cases and statutes:

22   (1) The Second Amendment of the United States Constitution;

23   (2) The Fourteenth Amendment of the United State Constitution;

24   (3) 18 U.S.C. § 922(a)(3);

25   (4) 28 U.S.C. §§ 1331, 1343, 1391, 2201;

26   (5) 42 U.S.C. §§ 1983, 1988;

27   (6) The Brady Handgun Prevention Act (Pub.L. 103-159, 107 Stat. 1536);

28   (7) California Penal Code §§ 11106, 16520, 18900, 21740, 26150, 26185, 26195, 26815, 26950,

26955, 26960, 26965, 26970, 27000, 27005, 27050, 27055, 27060, 27065, 27100, 27105, 27110,
27115, 27120, 27125, 27130, 27135, 27140, 27540, 27600, 27605, 27610, 27615, 27650, 27665,
27655, 27660, 27665, 27670, 27700, 27705, 27710, 27715, 27720, 27725, 27735, 27740, 27743,
27745, 27750, 28200, 28220, 28255, 29800, 29900, et seq., 30000, et seq. 30500, et seq., 32650,
et seq. 32700, 33300;

(8) California Code of Regulation § 4036(b);

(9) California Welfare and Institutions Code §§ 8100 an 8103;

(10) 56 UCLA L. Rev. 1343, 1376 (2009);

(11) California Assembly Bill 500;

(12) Board of Trustees v. Fox, 492 U.S. 469, 480, 491 U.S. at 782-83 (1980);

(13) Citizens United v. FEC, 538 U.S. 310, 130 S. Ct. 876, 898 (1996);

(14) City of Cleburne v. Cleburne Living Ctr., 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996);

(15) Clark v. Jeter, 286 U.S. 570, 624-25 (1988);

(16) District of Columbia v. Heller, 554 U.S. 570, 630 (2008);

(17) Mcdonald v. Chicago, 130 S. Ct. 3020, 3036 (2010);

(18) Nordlinger v. Hahn, 505 U.S. 1,10 (1992);

(19) Planned Parenthood v. Casey, 833 U.S. 833, 873-74 (1992);

(20) Ward v. Rock Against Racism, 434 U.S. 781, 791 (1989);

(21) Zablocki v. Redhail, 434 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d. 313 (1986);

(22) Romer v. Evans, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996);

(23) Shapiro v. Thomspon, 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969);

(24) Anderson v. City of Hermosa Beach, 621 F.3d 1051 (9th Cir. 2010);

(25) Barns-Wallace v. City of San Deigo, 704 F.3d 1067, 1084 (9th Cir. 2013);

(26) Ezell v. Chicago, 651 F.3d 684 (7th Cir. 2011);

(27) Fantasyland Video, Inc. v. County of San Deigo, 505 F.3d 996, 1004 (9th Cir. 2007);

(28) Kasler v. Lockyer, 23 Cal.4th 472 (2000);

(29) Moore v. Madigan, 702 F.3d 933 (9th Cir. 2012);

(30) Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms and Explosives, 700 F.3d

1    185, 194-95 (5th Cir. 2012);

2    (31) Nissan Fire and Marine Ins. Co. v. Fritz Cos., 201 F.3d 1099, 1105-6 (9th Cir. 2000).

3    (32) Nordyke v. King, 681 F.3d 1041, 1043 (9th Cir. 2012) (en banc.);

4    (33) Reed v. Town of Gilbert, 707 F.3d 1057, 1074 n.16 (9th Cir. 2013);

5    (34) Silveira v. Lockyer, 312 F.3d 1052, 1087 (9th Cir. 2002);

6    (35) Stop H-3 Ass'n v. Dole, 870 F.2d 1419, 1429 n.18 (9th Cir. 1989);

7    (36) U.S. v. Chester, 628 F.3d 673, 680 (4th Cir. 2010);

8    (37) U.S. v. Decastro, 682 F.3d 160, 164 (2d Cir. 2012);

9    (38) U.S. v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010);

10   (39) U.S. v. Reese, 627 F.3d 792, 800-01 (10th Cir. 2010);

11   (40) People v. Bickston, 91 Cal.App3d.Supp. 29 (1979);

12   (41) U.S. v. Chovan, No. 11-50107, 2013 WL 6050914, 735 F.3d 1127 (C.A. 9 (Cal.) Nov. 18,

13   2013).

14        B.  Defendants' Contentions

15        Issue No. 1:  Whether the Waiting Period Law unconstitutionally burdens the historically

16   understood Second Amendment right of people who must go through the waiting period in

17   connection with firearms acquisition transactions, after having previously gone through the

18   waiting period in connection with other firearms acquisition transactions in California.

19        Points of Law for Issue No. 1:  The Waiting Period Law imposes at most an inconvenience

20   or a minor burden on people in acquiring firearms, and does not have constitutional significance.

21   The Second Amendment right was not historically understood to mean that people could acquire

22   firearms essentially instantaneously.  Sources of law:  See, e.g., McDonald v. Chicago, 130 S.Ct.

23   3020 (2010); District of Columbia v. Heller, 554 U.S. 570 (2008); Burdick v. Takushi, 504 U.S.

24   428 (1992); Zablocki v. Redhail, 434 U.S. 374 (1978); Town of Lockport v. Citizens for

25   Community Action at Local Level, Inc., 430 U.S. 259 (1977); Burns v. Fortson, 410 U.S. 686

26   (1973); People of State of N.Y. v. O'Neill, 359 U.S. 1 (1959); Ala. State Fed. of Labor, Local

27   Union No. 103 v. McAdory, 325 U.S. 450 (1945); Robinson v. Marshall, 66 F.3d 249 (9th Cir.

28   1995); U.S. ex rel. Madden v. Gen. Dynamics Corp., 4 F.3d 827 (9th Cir. 1993); Karlin v. Foust,

1    188 F.3d 446 (7th Cir. 1999) Dittus v. Cranston, 186 Cal. App. 2d 837 (1960).

2

3    Issue No. 2:  If the Waiting Period Law is found to burden the Second Amendment right,

4    in the way just discussed, what level of heightened scrutiny the Court should use in evaluating the

5    constitutionality of the Waiting Period Law, based on how close the Waiting Period Law comes to

6    the core of the Second Amendment right, and the severity of the burden on the right.

7    Points of Law for Issue No. 2:  If heightened scrutiny is called for in evaluating the

8    Waiting Period Law, the level of scrutiny should be a permissive form of intermediate scrutiny,

9    close to rational-basis review, and certainly not strict scrutiny.  Because the Waiting Period Law

10   does not confiscate or otherwise affect firearms that people, such as the individual plaintiffs

11   herein, already lawfully have, the Waiting Period does not come close to the core Second

12   Amendment right.  Because the Waiting Period Law merely delays, for a short time, people's

13   acquisition of firearms, the burden of the law is not severe.  Sources of law:  See, e.g., cases cited

14   above, as well as United States v. Chovan, 735 F.3d 1127 (9th Cir. 203); Fantasyland Video, Inc.

15   v. Cnty. of San Diego, 505 F.3d 996 (9th Cir. 2007); Coyote Publ'g v. Miller, 598 F.3d 592 (9th

16   Cir. 2010); Ass'n of Nat'l Advertisers, Inc. v. Lungren, 44 F.3d 726 (9th Cir. 1994); Drake v.

17   Filko, 724 F.3d 426 (3d Cir. 2013); Peterson v. Martinez, 707 F.3d 1197 (10th Cir. 2013); Heller

18   v. District of Columbia, 670 F.3d 1244 (D.C. Cir. 2011); Ezell v. City of Chicago, 651 F.3d 684

19   (7th Cir. 2011); United States v. Masciandaro, 638 F.3d 458 (4th Cir. 2011); United States v.

20   Marzzarella, 614 F.3d 85 (3d Cir. 2010); United States v. White, 593 F.3d 1199 (11th Cir. 2010);

21   Young v. Hawaii, 911 F. Supp. 2d 972 (D. Haw. 2012); Doe v. Wilmington Housing Auth., 880 F.

22   Supp. 2d 513 (D. Del. 2012).

23   Issue No. 3:  If the Waiting Period Law is found to burden the Second Amendment right,

24   in the way just discussed, whether there is a sufficient relationship or "fit" between the Waiting

25   Period Law and California's objective of minimizing firearm violence and thereby increasing

26   public safety.

27   Points of Law for Issue No. 3:  If heightened scrutiny is called for in evaluating the

28   Waiting Period Law, the 10-day waiting period will be justifiable because of the time needed to

1   complete meaningful background checks and investigations of prospective firearms purchasers,

2   and the efficacy of "cooling off" periods in helping to achieve California's compelling interest in

3   public safety.  Sources of law:  See, e.g., cases cited above, as well as United States v. Call, 874 F.

4   Supp. 2d 969 (D. Nev. 2012); Peruta v. County of San Diego, 758 F. Supp. 2d 1106 (S.D. Cal.

5   2010); Jackson v. Dep't of Justice, 85 Cal. App. 4th 1334 (2001).

6      Issue No. 4:  Whether the statutory exemptions to the Waiting Period Law differentiate

7   between people in ways that are impermissible under the Fourteenth Amendment's Equal

8   Protection Clause.

9      Points of Law for Issue No. 4:  The exemptions serve to tailor the Waiting Period Law and

10   thus bolster its constitutionality.  The exemptions all have sufficient justifications.  Sources of

11   Law:  See, e.g., cases cited above, as well as Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009); Vacco v.

12   Quill, 521 U.S. 793 (1995); Miller v. Johnson, 515 U.S. 900 (1995); Fed. Commc'ns Comm'n v.

13   Beach Commc'ns, Inc., 508 U.S. 307 (1993); Minnesota v. Clover Leaf Creamery Co., 449 U.S.

14   456 (1981); Kahawaiolaa v. Norton, 386 F.3d 1271 (9th Cir. 2005); Giano v. Senkowski, 54 F.3d

15   1050 (2d Cir. 1995); Rivkin v. Dover Tp. Rent Leveling Bd., 671 A.2d 567 (N.J. 1996).

16      Issue No. 5:  If the Court determines that the Waiting Period Law or its exemptions are

17   unconstitutional, in whole or in part, what remedy should the Court fashion.

18      Points of Law for Issue No. 5:  If the Court determines that the Waiting Period Law is

19   unconstitutional under the Second Amendment, the Court should outline its concerns and give the

20   California Legislature guidance and time to reformulate the law to address the concerns.  If the

21   Court determines that an exemption is unconstitutional, the Court should invalidate the exemption

22   only.  Sources of Law:  See, e.g., cases cited above, as well as Regan v. Taxation With

23   Representation of Wash., 461 U.S. 540 (1983);  Am. Power & Light Co. v. Sec. and Exch.

24   Comm'n, 329 U.S. 90 (1946); Sec. Ins. Co. of Hartford v. Kevin Tucker & Assocs., Inc., 64 F.3d

25   1001 (6th Cir. 1995); Vote Choice, Inc. v. DiStefano, 4 F.3d 26 (1st Cir. 1993).

26

27   **VI.  Abandoned Issues**

28      None.

## VII.  Witnesses

The following is a list of witnesses that the parties expect to call at trial, including rebuttal and impeachment witnesses.  NO WITNESS, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE CALLED AT TRIAL UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS ORDER SHOULD BE MODIFIED TO PREVENT "MANIFEST INJUSTICE."  Fed. R. Civ. P. 16(e); Local Rule 16-281(b)(10).

### A.  Plaintiffs' Witnesses

1. Jeff Silvester
2. Brendon Combs
3. Gene Hoffman
4. Alan Gottlieb

### B.  Defendants' Witnesses

1. Stephen Lindley
2. Steve Buford
3. Blake Graham
4. Mitch Matsumoto
5. Donnette Orsi
6. Rick Lopes (possibly)
7. Karen Milami (possibly)
8. Jeff Silvester (possibly)
9. Brandon Coombs (possibly).

## VIII.  Exhibits

The following is a list of documents or other exhibits that the parties expect to offer at trial. NO EXHIBIT, OTHER THAN THOSE LISTED IN THIS SECTION, MAY BE ADMITTED UNLESS THE PARTIES STIPULATE OR UPON A SHOWING THAT THIS ORDER SHOULD BE MODIFIED TO PREVENT "MANIFEST INJUSTICE."  Fed. R. Civ. P. 16(e); Local Rule 16-281(b)(11).

**A.  Plaintiffs' Exhibits**

AB497 Processing Alternative Feasibility Study – Report of Findings, State of California Department of Justice Division of Law Enforcement, May 1991.

Plaintiffs may use discovery responses and documents produced by Defendants.

Plaintiffs may use the Armed Persons With Mental Illness Report produced by the California State Auditor October 2013.

Depending on how the Court rules on the evidentiary issues raised by Defendants, Plaintiff may introduce:  Legislative history of Cal. Penal Code sections 12010, 12011, 12021, 12021.1, 12071, 12076, 12078, 21740, 26950, 26955, 26960, 26965, 26970, 27000, 27050, 27055, 27060, 27065, 27100, 27105, 27110, 27715, 27120, 27125, 27130, 27135, 27140, 27600, 27605, 27610, 27615, 27650, 27655, 27660, 27665, 27670, 27700, 27705, 27710, 27720, 27715, 27725, 27730, 27735, 27740, 27750, 28220, 29800, 29805, 29810, 29815, 29820, 29825, 29830, 29855, 29900, 30000, and 30005.

**B.  Defendants' Exhibits**

-- Discovery Documents

Documents disclosed in discovery with Bates numbers AG000001-765, AG000827-990, AG001244-351, AG001491-78, AG001643-58, and AG001755-26

-- Legislative History

Legislative history of Cal. Penal Code sections 12010, 12011, 12021, 12021.1, 12071, 12076, 12078, 21740, 26950, 26955, 26960, 26965, 26970, 27000, 27050, 27055, 27060, 27065, 27100, 27105, 27110, 27715, 27120, 27125, 27130, 27135, 27140, 27600, 27605, 27610, 27615, 27650, 27655, 27660, 27665, 27670, 27700, 27705, 27710, 27720, 27715, 27725, 27730, 27735, 27740, 27750, 28220, 29800, 29805, 29810, 29815, 29820, 29825, 29830, 29855, 29900, 30000, and 30005

Legislative history of Cal. Bus. & Prof. Code sections 7583.23, 7583.24, 7583.25, 7583.27, 7583.29, 7583.32, 7583.37, 7583.45, 7596.3, 7596.4, 7596.7, 7596.8, 7596.81, and 7596.83

Legislative history of Cal. Code of Civil Procedure section 527.9

Legislative history of Cal. Fam. Code section 6389

-- Court Filings

Goodin, <u>Brief for English/American Historians as Amicus Curiae [Etc.]</u>, in *McDonald v. City of Chicago* (2010)

Bogus, <u>Brief of Amici Curiae Jack N. Rakove [Etc.]</u>, in *District of Columbia v. Heller* (2008)

Webster, <u>Declaration of Daniel Webster</u>, in *Jackson v. City and County of San Francisco* (2012)

-- Books

Bogus, ed., <u>The Second Amendment in Law and History</u> (2002)

Cooley, <u>Constitutional Limitations</u> (1868)

Cornell, <u>A Well-regulated Militia</u> (2008)

Cornell and Kozuskanich, <u>The Second Amendment on Trial</u> (2013)

Fox, <u>Will to Kill</u> (2011)

Hawke, <u>Everyday Life in Early America</u> (1989)

Larkin, <u>The Reshaping of Everyday Life: 1790-1840</u> (1989)

Nisbet, ed., <u>The Gun Control Debate:  You Decide</u> (1990)

Rakove, Original Meanings (1997)

Russell, Guns on the Early Frontiers (2005)

Sellers, The Market Revolution (1994)

Spitzer, Gun Control:  A Documentary and Reference Guide (2009)

Spitzer, The Politics of Gun Control, 5th Ed. (2012)

Uviller and Merkel, The Militia and the Right to Arms (2003)

Webster and Vernick, eds., Reducing Gun Violence in America (2013)

Winkler, Gun Fight:  The Battle Over the Right to Bear Arms in America (2013)

-- Government and NGO Reports

California Department of Justice, Crime and Delinquency in California (Various Years)

California Department of Justice, Daily DROS Tactical Reports (many issues; 2013)

California Department of Justice, Dealer Record of Sale Statistics (Various Years)

California Department of Justice, Firearms Prohibiting Categories (2012)

California Department of Justice, Report on Firearms Used in the Commission of Crimes (Various Years)

1    California State Auditor, <u>Armed Persons with Mental Illness</u> (2013)

2

3    Centers for Disease Control, <u>Injury Fact Book</u> (2006)

4

5    Federal Bureau of Investigation, <u>Crime in the United States</u> (Various Years)

6

7    Federal Bureau of Investigation, <u>National Instant Criminal Background Check System (NICS)</u>

8    <u>Operations</u> (2011)

9

10   Federal Bureau of Investigation, <u>NICS Point of Contact States & Territories</u> (2008)

11

12   Office of the U.S. President, <u>Now is the Time; The President's Plan to Protect Our Children and</u>

13   <u>our Communities by Reducing Gun Violence</u> (2013)

14

15   Legal Community Against Violence, <u>Model Laws for a Safer America</u> (2012)

16

17   U.S. Department of Justice, <u>Draft Report on Systems for Identifying Felons Who Attempts to</u>

18   <u>Purchase Firearms; Notice and Request for Comment, in Federal Register</u> (1989)

19

20   Violence Policy Center, <u>States with High Gun Ownership and Weak Gun Laws Lead Nation in</u>

21   <u>Gun Deaths</u> (2013)

22

23   <u>-- Scholarly Articles</u>

24   Bangalore, et al, <u>Gun Ownership and Firearm-related Deaths, in American Journal of Medicine</u>

25   (2013)

26

27   Brent and Bridge, <u>Firearms Availability and Suicide, in American Behavioral Scientist</u> (2003)

28

Blodgett-Ford, The Changing Meaning of the Right to Bear Arms, in Seton Hall Constitutional Law Journal (1995)

Cantor and Slate, The Impact of Firearm Control Legislation on Suicide in Queensland: Preliminary Findings, in Medical Journal of Australia (1995)

Carrington and Moyer, Gun Control and Suicide in Ontario, in American Journal of Psychiatry (1994)

Cornell, The Ironic Second Amendment, in Albany Law Review (2008)

Cornell and De Dino, A Well Regulated Right: The Early American Origins of Gun Control, in Fordham Law Review (2004)

Cozzolino, Gun Control:  The Brady Handgun Violence Prevention Act, in Seton Hall Legislative Journal (1992)

Daponde, New Residents and Collectors Must Register Out-of-state Handguns, in McGeorge Law Review (1998)

de Moore, et al., Survivors of Self-inflicted Firearm Injury: A Liaison Psychiatry Perspective, in Medical Journal of Australia (1994)

Frierson, Women who Shoot Themselves, in Hospital Community Psychiatry (1989)

Frierson and Lippmann, Psychiatric Consultation for Patients with Self-inflicted Gunshot Wounds, in Psychosomatics (1990)

Hahn, et al., <u>Firearms Laws and the Reduction of Violence: A Systematic Review</u>, in American Journal of Preventive Medicine (2005)

Lewiecki, <u>Suicide, Guns, and Public Policy</u>, in American Journal of Public Health (2013)

Ludwig and Cook, <u>Homicide and Suicide Rates Associated with Implementation of the Brady Handgun Violence Prevention Act</u>, in Journal of the American Medical Association (2000)

Miller and Hemenway, <u>The Relationship Between Firearms and Suicide:  A Review of the Literature</u>, in Aggression and Violent Behavior (1998)

Novak, <u>Why the New York State System for Obtaining a License to Carry a Concealed Weapon Is Unconstitutional</u>, in Fordham Urban Law Journal (1988)

Peterson, et al., <u>Self-Inflicted Gunshot Wounds:  Lethality of Method Versus Intent</u>, in American Journal of Psychiatry (1985)

Vigdor and Mercy, <u>Do Laws Restricting Access to Firearms by Domestic Violence Offenders Prevent Intimate Partner Violence?</u>, in Evaluation Review (2012)

Volokh, <u>Implementing the Right to Keep and Bear Arms for Self-defense:  An Analytical Framework and a Research Agenda</u>, in UCLA Law Review (2009)

Warner, <u>Firearm Deaths and Firearm Crime After Gun Licensing in Tasmania, presented at the Third National Outlook Symposium on Crime</u>, Canberra, Australia (1999)

Winkler, <u>Heller's Catch 22</u>, in UCLA Law Review (2009)

1  Wintemute, et al., <u>Mortality Among Recent Purchasers of Handguns</u>, in New England Journal of

2  Medicine (1999)

3

4  Wintermute, <u>Subsequent Criminal Activity Among Violent Misdemeanants Who Seek to Purchase</u>

5  <u>Handguns; Risk Factors and Effectiveness of Denying Handgun Purchase</u>, in Journal of the

6  American Medical Association (2001)

7

8  Wright, et al., <u>Effectiveness of Denial of Handgun Purchase to Persons Believed to be at High</u>

9  <u>Risk for Firearm Violence</u>, in American Journal of Public Health (1999)

10

11  Zeoli and Webster, <u>Effects of Domestic Violence Policies, Alcohol Taxes, and Police Staffing</u>

12  <u>Levels on Intimate Partner Violence</u>, in Injury Prevention (2010)

13

14  <u>--  Magazine and Newspaper Articles</u>

15  Amar and Amar, <u>Guns and the Constitution:  Telling the Right Constitutional Story</u>, in FindLaw –

16  Legal Commentary (2001)

17

18  Cornell, <u>The Second Amendment You Don't Know</u>, in New York Daily News (2012)

19

20  Emberton, <u>The Real Origin of America's Gun Culture</u>, in History News Network (2013)

21

22  Ifill, <u>7-day Wait for Gun Purchases Hits Crucial Obstacle in House</u>, in New York Times (1991)

23

24  Koerner, <u>Californians Buying Guns at Record Rate</u>, in Orange County Register (2012)

25

26  Leger, <u>Obama Demand Could End Research Blackout into Gun Violence</u>, in USA Today (2013 )

27

28  Marois<u>, California's Gun Repo Men Have a Nerve-racking Job</u>, in Businessweek (2013)

Platt, <u>New York Banned Handguns 100 Years Ago… Will We Ever See that Kind of Gun Control Again?</u>, In History News Network (2011)

Pugh, <u>Baltimore Gun Violence Summit Conclude with Recommendations</u>, in McClatchy DC (2013)

Richman, <u>California's Gun Background-Check System Could Be National Model</u>, in San Jose Mercury News (2013)

Robinson, <u>Delay for Buying Guns OK'd by Legislature</u>, in San Jose Mercury News (1991)

Sweeney and Cornell, <u>All Guns Are Not Created Equal</u>, in The Chronicle Review (2013)

Winkler, <u>The Secret History of Guns</u>, in Atlantic (2001

**IX. Discovery Documents To Be Used At Trial**

Plaintiffs may offer discovery responses provided by Defendants.

The Attorney General does not presently expect to offer any discovery materials at trial, assuming that all deposed witnesses will be available at trial, and that there is no need to use interrogatory responses or deposition transcripts in place of live witness or to impeach live witnesses.

**X. Further Discovery or Motions**

<u>Plaintiffs contend:</u>

Defendants may request that the Court take judicial notice of certain studies pertaining to the effectiveness of the "cooling off period." Plaintiffs will object to any request for judicial notice of said studies. Plaintiffs will likely challenge the admissibility of studies attempted to be

1   used by Defendants.

2   <u>Defendants contend:</u>

3    When the discovery period in this case was open, and before briefing on the motion for

4   summary judgment was completed, there was no binding case law suggesting that the Attorney

5   General would have to proffer any evidence, much less expert-witness evidence, of the historical

6   understanding of the Second Amendment or the efficacy of the Waiting Period Law in achieving

7   California's objective of minimizing firearm violence and thereby increasing public safety.  Under

8   established case law, the Waiting Period Law enjoyed the usual strong presumption of

9   constitutionality, with the burden on Plaintiffs to disprove the constitutionality of the law.

10  Although the Attorney General continues to believe that Plaintiffs bear the ultimate burden of

11  proof here, recent case law, as interpreted by the Court, raises the question of whether the Court

12  will expect the Attorney General to proffer any evidence and/or expert-witness evidence on these

13  issues.  (See, e.g., Chovan, supra.)  The Attorney General believes that if she bears the burden of

14  proof on these issues, there is sufficient competent evidence of which the Court may and should

15  take judicial notice, such that the Attorney General will meet that burden.  However, if Court

16  expects the Attorney General to produce expert-witness evidence on these topics, and judicial

17  notice will not be taken of other relevant evidence, then the Attorney General may need to have

18  expert-witness discovery reopened and seeks the Court's guidance on this issue.

19

20  **XI.  Stipulations**

21   None at this time.

22

23  **XII.  Amendments/Dismissals**

24   Plaintiff Michael Poeschl has been dismissed from this case.

25

26  **XIII.  Settlement Negotiations**

27   Because Plaintiffs seek to invalidate, at least partially, the Waiting Period Law, and the

28  Attorney General must enforce and not compromise that law, settlement negotiations and/or a

1   court settlement conference will be unlikely to lead to resolution of this case.

2

3   **XIV.  Agreed Statement**

4        None at this time.

5

6   **XV.  Separate Trial Of Issues**

7        Plaintiffs believe the issues should not be tried separately.

8   The Attorney General believes that it is advisable and feasible to try first the issue of whether the

9   Waiting Period Law imposes a burden on Plaintiffs' Second Amendment right.  If the Court finds

10   that there is no such burden, then the inquiry ends and the case is over.  The Court is not inclined

11   at this time to order a separate trial of issues.

12

13   **XVI.  Impartial Experts - Limitation Of Experts**

14        Neither party has disclosed experts, received expert reports or deposed experts.  The

15   Plaintiffs believe that retained experts should be excluded from trial and lay opinion testimony

16   should be severely restricted. The parties do not favor having impartial experts appointed in this

17   matter.

18

19   **XVII.  Attorneys' Fees**

20        Plaintiffs request attorney fees and costs pursuant to 42 U.S.C. § 1988 and cost of suit.

21

22   **XVIII.  Further Trial Preparation**

23        **A.  Final Witness List**

24        The parties are ordered to file and serve their final list of witnesses by March 20, 2014.

25   Additionally, at that time Plaintiffs shall disclose the order of witnesses so that Defendant will be

26   prepared for cross-examination.

27        Except upon the showing set forth above in section VII, a party may not add witnesses to

28   the final list of witnesses, or to any other updated witness list, who are not disclosed in this Order

1   in Section VII.

2   **B.  Trial Briefs**

3          The parties are directed to file and serve a Trial Brief by March 10, 2014.  Local Rule 16-

4   285.  The parties need not include in the Trial Brief any issue that is adequately addressed in a

5   motion in limine, or in an opposition brief to a motion in limine.  Any response to a Trial Brief

6   shall be filed and served by March 18, 2014.

7   **C.  Duty of Counsel to Pre-Mark Exhibits**

8          The parties are ordered to confer no later than February 18, 2014, for purposes of pre-

9   marking and examining each other's exhibits.  All joint exhibits must be pre-marked with numbers

10  preceded by the designation JT/-- (e.g., JT/1, JT/2).  All of Plaintiffs' exhibits shall be pre-marked

11  with numbers.  All of Defendants' exhibits shall be pre-marked with letters.

12         1.  Counsel shall create four (4) complete, legible sets of exhibits in binders as follows:

13                 (a) Two sets of binders to be delivered to Courtroom Clerk Harold Nazaroff March

14                 20, 2014, one for use by the Courtroom Clerk and the other for the court; and

15                 (b)  One set for each counsel's own use.

16                 If the parties desire, they may have a fifth set of binders to be used for the purposes

17                 of questioning witnesses.

18         2.  Counsel are to confer and make the following determination with respect to each

19  proposed exhibit to be introduced into evidence, and to prepare separate indexes - one listing joint

20  exhibits, and one listing each party's separate exhibits:

21                 (a)  Duplicate exhibits, i.e., documents which both sides desire to introduce into

22                 evidence, shall be marked as a joint exhibit, and numbered as directed above.  Joint

23                 exhibits shall be listed on a separate index, and shall be admitted into evidence on

24                 the motion of any party, without further foundation.

25                 (b)  As to exhibits that are not jointly offered, and to which there is no objection to

26                 introduction, those exhibits will likewise be appropriately marked, e.g., Plaintiffs'

27                 Exhibit 1 or Defendants' Exhibit A, and shall be listed in the offering party's index

28                 in a column entitled "Admitted In Evidence."  Such exhibits will be admitted upon

1    introduction and motion of the party, without further foundation.

2    (c)  Those exhibits to which the only objection is a lack of foundation shall be

3    marked appropriately, e.g., Plaintiffs' Exhibit 2 - For Identification, or Defendants'

4    Exhibit B - For Identification, and indexed in a column entitled "Objection

5    Foundation."

6    (d) Remaining exhibits as to which there are objections to admissibility not solely

7    based on a lack of foundation shall likewise be marked appropriately, e.g.,

8    Plaintiffs' Exhibit 3 - For Identification or Defendants' Exhibit C - For

9    Identification, and indexed in a third column entitled "Other Objection" on the

10   offering party's index.

11   3.  Each separate index shall consist of the exhibit number or letter, a brief description of

12   the exhibit, and the three columns outlined above, as demonstrated in the example below:

13                              INDEX OF EXHIBITS

14

| EXHIBIT # | DESCRIPTION | ADMITTED IN EVIDENCE | OBJECTION FOUNDATION | OTHER OBJECTION |
|-----------|-------------|----------------------|----------------------|-----------------|

17   Two sets of the completed joint index and the separate indexes shall be delivered to the

18   Courtroom Clerk with the two sets of binders.

19   The court has no objection to counsel using copies.  However, the copies must be legible.

20   If any document is offered into evidence that is partially illegible, the court may sua sponte

21   exclude it from evidence.

22   **D.  Discovery Documents**

23   By March 20, 2014, each party shall file a list of all discovery documents the party intends

24   to use at trial.  The list shall indicate whether each discovery document has previously been lodged

25   with the Clerk.  If the discovery document has not been previously lodged, the party shall so lodge

26   the document with the Courtroom Clerk by March 20, 2014.

27   **E.  Motions In Limine Hearing and Briefing Schedule**

28   The hearing for motions in limine will be held on March 11, 2014.  In addition to

1   addressing any filed motions in limine, at that time the court will also settle, to the extent possible,

2   any other matter pertaining to the conduct of the trial.

3        Counsel are expected to be fully cognizant of the legal issues involved in the case by the

4   date of the hearing for motions in limine.

5        By 4:00 p.m. on February 18, 2014, all motions in limine, with supporting points and

6   authorities, shall be filed and served either personally or by facsimile upon opposing counsel.

7        By 4:00 p.m. on March 3, 2014, opposition to any motion in limine shall be filed and

8   served either personally or by facsimile upon opposing counsel.  If a party does not oppose a

9   motion in limine, that party shall file and serve in the same manner a Statement of Non-Opposition

10  to that motion in limine.

11       By 4:00 p.m. on March 7, 2014, any reply to an opposition shall be filed and served either

12  personally or by facsimile upon opposing counsel.  Because the court will need time to prepare for

13  the hearing on March 11, 2014, the court is not inclined to consider late reply briefs.

14       **F.  Morning Conferences During Trial**

15       During the trial, it is the obligation of counsel to meet with the court each morning to

16  advise the court and opposing counsel as to what documents are proposed to be put into evidence

17  that have not previously been admitted by stipulation, court order, or otherwise ruled upon.  The

18  court will rule on those documents, to the extent possible, prior to the commencement of trial each

19  day.  If the ruling depends upon the receipt of testimony, the court will rule as requested upon the

20  receipt of such testimony.

21       The court shall consider any other legal matter at morning conferences as well.

22       **G.  Use Of Videotape and Computers**

23       Any party wishing to use a videotape for any purpose during trial shall lodge a copy of the

24  videotape with the Courtroom Clerk by 4:00 p.m. on Thursday, March 20, 2014.  If a written

25  transcript of audible words on the tape is available, the court requests that the transcript be lodged

26  with the court, solely for the aid of the court.

27       If counsel intends to use a laptop computer for presentation of evidence, they shall contact

28  the courtroom deputy at least one week prior to trial.  The courtroom deputy will then arrange a

1   time for counsel to bring the laptop to the courtroom, and meet with a representative of the

2   Information and Technology Department and receive a brief training session on how counsel's

3   equipment interacts with the court's audio/visual equipment.  If counsel intends to use

4   PowerPoint, the resolution should be set no higher than 1024 x 768 when preparing the

5   presentation.

6         **H.  Order of Witnesses**

7         In order to make the trial operate efficiently and smoothly, each counsel has the continuing

8   obligation to advise opposing counsel as to what witnesses he or she intends to call twenty-four

9   (24) hours prior to calling that witness.

10

11  **XIX.  Objections to Pretrial Order**

12        Any party may, within ten (10) calendar days after the date of service of this order, file and

13  serve written objections to any of the provisions of this order.  Local Rule 16-283.  Such objection

14  shall specify the requested corrections, additions or deletions.

15

16  **XX.  Rules of Conduct During Trial**

17        **A.  General Rules**

18        1.  All participants in the trial shall conduct themselves in a civil manner.  There shall be

19  no hostile interchanges between any of the participants.

20        2.  All oral presentations shall be made from the podium, unless otherwise permitted by the

21  court.

22        **B.  Opening Statements**

23        1.  Counsel may, but are not required, to make an opening statement in this bench trial.

24        2.  Counsel may use visual aids in presenting the opening statement.  However, any

25  proposed visual aids shall be shown to opposing counsel before opening statement.

26        **C.  Case in Chief**

27        1.  Counsel shall have his/her witnesses readily available to testify so that there are no

28  delays in the presentation of evidence to the trier of fact.

2.  At the close of each trial day, counsel shall disclose his/her anticipated witnesses and order of presentation for the next day, so that any scheduling or evidentiary issues may be raised at that time.

**D.  Witnesses**

1.  Before approaching a witness, counsel shall secure leave of court to approach the witness.

2.  Before approaching a witness with a writing, counsel shall first show the writing to opposing counsel.

**E.  Exhibits**

1.  All exhibits shall be marked and identified in accordance with the instructions in the Pretrial Order.

2.  The court usually will conduct an on the record review of the exhibits that have been admitted in evidence at the conclusion of each party's case in chief and after each party has rested its entire case.

**G.  Objections**

1.  No speaking objections or arguments are permitted.  Counsel shall state the specific legal ground(s) for the objection, and the court will rule based upon the ground(s) stated.  The court will permit counsel to argue the matter at the next recess.

2.  The court will not assume that any objection made also implies with it a motion to strike an answer that has been given.  Therefore, counsel who has made an objection, and who also wishes to have an answer stricken, shall also specifically move to strike the answer.

FAILURE TO COMPLY WITH ALL PROVISIONS OF THIS ORDER MAY BE GROUNDS FOR THE IMPOSITION OF SANCTIONS, INCLUDING POSSIBLE DISMISSAL OF THIS ACTION OR ENTRY OF DEFAULT, ON ANY AND ALL COUNSEL AS WELL AS ON ANY PARTY WHO CAUSES NON-COMPLIANCE WITH THIS ORDER.

1

2     IT IS SO ORDERED.

3     Dated:   February 3, 2014

                                        SENIOR  DISTRICT  JUDGE

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   KAMALA D. HARRIS, State Bar No. 146672
    Attorney General of California
2   PETER K. SOUTHWORTH, State Bar No. 160522
    Supervising Deputy Attorney General
3   JONATHAN M. EISENBERG, State Bar No. 184162
    Deputy Attorney General
4     300 South Spring Street, Suite 1702
    Los Angeles, CA  90013
5   Telephone:  (213) 897-6505
    Fax:  (213) 897-1071
6     E-mail:  Jonathan.Eisenberg@doj.ca.gov
    *Attorneys for Defendant Kamala D. Harris, Attorney*
7   *General of California*

8

9                   IN THE UNITED STATES DISTRICT COURT

10                 FOR THE EASTERN DISTRICT OF CALIFORNIA

11                            FRESNO DIVISION

12

13   **JEFF SILVESTER, MICHAEL POESCHL,**      1:11-cv-02137-AWI-SKO
     **BRANDON COMBS, THE CALGUNS**
14   **FOUNDATION, INC., a non-profit**        **DEFENDANT CALIFORNIA**
     **organization, and THE SECOND**          **ATTORNEY GENERAL KAMALA D.**
15   **AMENDMENT FOUNDATION, INC., a**         **HARRIS'S ANSWER TO FIRST**
     **non-profit organization,**              **AMENDED COMPLAINT**
16
                                  Plaintiffs,  Action Filed:  December 23, 2011
17
                   v.
18

19   **KAMALA HARRIS, Attorney General of**
     **California (in her official capacity), and**
20   **DOES 1 to 20,**

21                                Defendants.

22

23

24

25

26

27

28

1    Defendant Kamala D. Harris, Attorney General of California (the "Attorney General"),

2    answers the February 24, 2012 first amended complaint ("FAC") of plaintiffs Jeffrey Silvester,

3    Michael Poeschl, Brandon Combs, The CalGuns Foundation, Inc., and The Second Amendment

4    Foundation, Inc. (collectively, "Plaintiffs"), as follows:

5                                    **SUBSTANTIVE ANSWER**

6        1.    Answering enumerated paragraph no. 1 of Plaintiffs' FAC, the Attorney General

7    ADMITS that the allegations of the paragraph summarize the allegations of the FAC, but

8    otherwise DENIES the allegations of the paragraph.

9        2.    Answering enumerated paragraph no. 2 of Plaintiffs' FAC, the Attorney General, for

10   lack of sufficient knowledge or information, DENIES the allegations of the paragraph.

11       3.    Answering enumerated paragraph no. 3 of Plaintiffs' FAC, the Attorney General, for

12   lack of sufficient knowledge or information, DENIES the allegations of the paragraph.

13       4.    Answering enumerated paragraph no. 4 of Plaintiffs' FAC, the Attorney General, for

14   lack of sufficient knowledge or information, DENIES the allegations of the paragraph.

15       5.    Answering enumerated paragraph no. 5 of Plaintiffs' FAC, the Attorney General, for

16   lack of sufficient knowledge or information, DENIES the allegations of the paragraph.

17       6.    Answering enumerated paragraph no. 6 of Plaintiffs' FAC, the Attorney General, for

18   lack of sufficient knowledge or information, DENIES the allegations of the paragraph.

19       7.    Answering enumerated paragraph no. 7 of Plaintiffs' FAC, the Attorney General, for

20   lack of sufficient knowledge or information, DENIES the allegations of the paragraph.

21       8.    Answering enumerated paragraph no. 8 of Plaintiffs' FAC, the Attorney General

22   ADMITS the allegations of the paragraph.

23       9.    Answering enumerated paragraph no. 9 of Plaintiffs' FAC, the Attorney General

24   ADMITS that she is the Attorney General of California, that she has the duties and obligations of

25   the holder of that office, and that she has been sued in her official capacity in the present case, but

26   DENIES the other allegations of the paragraph.

27       10.   Answering enumerated paragraph no. 10 of Plaintiffs' FAC, the Attorney General, for

28   lack of sufficient knowledge or information, DENIES the allegations of the paragraph.

1

1    11.    Answering enumerated paragraph no. 11 of Plaintiffs' FAC, for lack of sufficient

2    knowledge or information, DENIES the allegations of the paragraph.

3    12.    Answering enumerated paragraph no. 12 of Plaintiffs' FAC, the Attorney General

4    ADMITS the allegations of the paragraph.

5    13.    Answering enumerated paragraph no. 13 of Plaintiffs' FAC, the Attorney General

6    ADMITS that this Court generally has subject-matter jurisdiction over the allegations of the FAC,

7    but, for lack of sufficient knowledge or information, with respect to each of the plaintiffs

8    specifically, DENIES the other allegations of the paragraph.

9    14.    Answering enumerated paragraph no. 14 of Plaintiffs' FAC, the Attorney General

10    ADMITS that this Court is a proper venue for this action, but DENIES the other allegations of the

11    paragraph.

12    15.    Answering enumerated paragraph no. 15 of Plaintiffs' FAC, the Attorney General

13    ADMITS that the paragraph contains the words of the Second Amendment to the U.S.

14    Constitution, but DENIES that the paragraph states those words with the same capitalization that

15    the Second Amendment uses.

16    16.    Answering enumerated paragraph no. 16 of Plaintiffs' FAC, the Attorney General

17    understands the paragraph as making assertions of law (not fact), and, on that basis, contends that

18    no answer is required.

19    17.    Answering enumerated paragraph no. 17 of Plaintiffs' FAC, the Attorney General

20    understands the paragraph as making assertions of law (not fact), and, on that basis, contends that

21    no answer is required.

22    18.    Answering enumerated paragraph no. 18 of Plaintiffs' FAC, the Attorney General

23    understands the paragraph as making assertions of law (not fact), and, on that basis, contends that

24    no answer is required.

25    19.    Answering enumerated paragraph no. 19 of Plaintiffs' FAC, the Attorney General

26    understands the paragraph as making assertions of law (not fact), and, on that basis, contends that

27    no answer is required.

28

2

1   20.   Answering enumerated paragraph no. 20 of Plaintiffs' FAC, the Attorney General

2   ADMITS that California has certain "waiting periods" applicable to certain deliveries of firearms,

3   as stated in Cal. Penal Code sections 26815(a) and 27540, but DENIES the other allegations of

4   the paragraph.

5   21.   Answering enumerated paragraph no. 21 of Plaintiffs' FAC, the Attorney General

6   ADMITS that California has certain waiting periods applicable to certain deliveries of firearms,

7   as stated in Cal. Penal Code sections 26815(a) and 27540, but DENIES the other allegations of

8   the paragraph.

9   22.   Answering enumerated paragraph no. 22 of Plaintiffs' FAC, the Attorney General

10  ADMITS that the paragraph contains some of the words of Cal. Penal Code section 26815(a), but

11  DENIES that the paragraph states those words with the same punctuation that Cal. Penal Code

12  section 26815(a) uses.

13  23.   Answering enumerated paragraph no. 23 of Plaintiffs' FAC, the Attorney General

14  ADMITS that the paragraph contains some of the words of Cal. Penal Code section 27540, but

15  DENIES that the paragraph states those words with the same punctuation that Cal. Penal Code

16  section 27540 uses.

17  24.   Answering enumerated paragraph no. 24 of Plaintiffs' FAC, the Attorney General

18  understands the paragraph as making assertions of law (not fact), and, on that basis, contends that

19  no answer is required.

20  25.   Answering enumerated paragraph no. 25 of Plaintiffs' FAC, the Attorney General

21  ADMITS that there are some statutory exceptions to the waiting periods set forth in Cal. Penal

22  Code sections 26815(a) and 27540, but DENIES the other allegations of the paragraph.

23  26.   Answering enumerated paragraph no. 26 of Plaintiffs' FAC, the Attorney General

24  understands the paragraph as making assertions of law (not fact), and, on that basis, contends that

25  no answer is required.

26  27.   Answering enumerated paragraph no. 27 of Plaintiffs' FAC, the Attorney General

27  understands the paragraph as making assertions of law (not fact), and, on that basis, contends that

28  no answer is required.

3

28.    Answering enumerated paragraph no. 28 of Plaintiffs' FAC, the Attorney General understands the paragraph as making assertions of law (not fact), and, on that basis, contends that no answer is required.

29.    Answering enumerated paragraph no. 29 of Plaintiffs' FAC, the Attorney General understands the paragraph as making assertions of law (not fact), and, on that basis, contends that no answer is required.

30.    Answering enumerated paragraph no. 30 of Plaintiffs' FAC, the Attorney General understands the paragraph as making assertions of law (not fact), and, on that basis, contends that no answer is required.

31.    Answering enumerated paragraph no. 31 of Plaintiffs' FAC, the Attorney General understands the paragraph as making assertions of law (not fact), and, on that basis, contends that no answer is required.

32.    Answering enumerated paragraph no. 32 of Plaintiffs' FAC, the Attorney General understands the paragraph as making assertions of law (not fact), and, on that basis, contends that no answer is required.

33.    Answering enumerated paragraph no. 33 of Plaintiffs' FAC, the Attorney General understands the paragraph as making assertions of law (not fact), and, on that basis, contends that no answer is required.

34.    Answering enumerated paragraph no. 34 of Plaintiffs' FAC, the Attorney General understands the paragraph as making assertions of law (not fact), and, on that basis, contends that no answer is required.

35.    Answering enumerated paragraph no. 35 of Plaintiffs' FAC, the Attorney General understands the paragraph as making assertions of law (not fact), and, on that basis, contends that no answer is required.

36.    Answering enumerated paragraph no. 36 of Plaintiffs' FAC, the Attorney General understands the paragraph as making assertions of law (not fact), and, on that basis, contends that no answer is required.

4

1

2

3

37.   Answering enumerated paragraph no. 37 of Plaintiffs' FAC, the Attorney General understands the paragraph as making assertions of law (not fact), and, on that basis, contends that no answer is required.

4

5

6

38.   Answering enumerated paragraph no. 38 of Plaintiffs' FAC, the Attorney General understands the paragraph as making assertions of law (not fact), and, on that basis, contends that no answer is required.

7

8

9

39.   Answering enumerated paragraph no. 39 of Plaintiffs' FAC, the Attorney General understands the paragraph as making assertions of law (not fact), and, on that basis, contends that no answer is required.

10

11

12

40.   Answering enumerated paragraph no. 40 of Plaintiffs' FAC, the Attorney General understands the paragraph as making assertions of law (not fact), and, on that basis, contends that no answer is required.

13

14

15

41.   Answering enumerated paragraph no. 41 of Plaintiffs' FAC, the Attorney General understands the paragraph as making assertions of law (not fact), and, on that basis, contends that no answer is required.

16

17

18

42.   Answering enumerated paragraph no. 42 of Plaintiffs' FAC, the Attorney General understands the paragraph as making assertions of law (not fact), and, on that basis, contends that no answer is required.

19

20

21

43.   Answering enumerated paragraph no. 43 of Plaintiffs' FAC, the Attorney General understands the paragraph as making assertions of law (not fact), and, on that basis, contends that no answer is required.

22

23

44.   Answering enumerated paragraph no. 44 of Plaintiffs' FAC, the Attorney General ADMITS the allegations of the paragraph.

24

25

45.   Answering enumerated paragraph no. 45 of Plaintiffs' FAC, the Attorney General ADMITS the allegations of the paragraph.

26

27

46.   Answering enumerated paragraph no. 46 of Plaintiffs' FAC, the Attorney General ADMITS that over the years the lengths of the waiting periods set forth in Cal. Penal Code

28

5

1   sections 26815(a) and 27540 and predecessor or related laws have varied, but DENIES the other

2   allegations of the paragraph.

3       47.    Answering enumerated paragraph no. 47 of Plaintiffs' FAC, the Attorney General

4   ADMITS the allegations of the paragraph.

5       48.    Answering enumerated paragraph no. 48 of Plaintiffs' FAC, the Attorney General

6   understands the paragraph as making assertions of law (not fact), and, on that basis, contends that

7   no answer is required.

8       49.    Answering enumerated paragraph no. 49 of Plaintiffs' FAC, the Attorney General

9   DENIES the allegations of the paragraph.

10       50.    Answering enumerated paragraph no. 50 of Plaintiffs' FAC, the Attorney General

11   understands the paragraph as making assertions of law (not fact), and, on that basis, contends that

12   no answer is required.  To the extent that the paragraph makes implications about the relationship

13   between federal gun laws and California gun laws, the Attorney General DENIES that such

14   federal legislation precludes California's regulation of firearms.

15       51.    Answering enumerated paragraph no. 51 of Plaintiffs' FAC, the Attorney General

16   understands the paragraph as making assertions of law (not fact), and, on that basis, contends that

17   no answer is required.  To the extent that the paragraph makes implications about the relationship

18   between federal gun laws and California gun laws, the Attorney General DENIES that such

19   federal legislation precludes California's regulation of firearms.

20       52.    Answering enumerated paragraph no. 52 of Plaintiffs' FAC, the Attorney General

21   understands the paragraph as making assertions of law (not fact), and, on that basis, contends that

22   no answer is required.

23       53.    Answering enumerated paragraph no. 53 of Plaintiffs' FAC, the Attorney General, for

24   lack of sufficient knowledge or information, DENIES the allegations of the paragraph.

25       54.    Answering enumerated paragraph no. 54 of Plaintiffs' FAC, the Attorney General

26   ADMITS that "NICS" is "located at the FBI's Criminal Justice Information Services Division in

27   Clarksburg, West Virginia," and that California "maintains [its] own background check system,"

28   but, for lack of sufficient knowledge or information, DENIES that NICS "provides fully service

6

1  to FFLs in 30 states, five U.S. territories, and the District of Columbia," and DENIES the other

2  allegations of the paragraph.

3      55.    Answering enumerated paragraph no. 55 of Plaintiffs' FAC, the Attorney General, for

4  lack of sufficient knowledge or information, DENIES the allegations of the paragraph.

5      56.    Answering enumerated paragraph no. 56 of Plaintiffs' FAC, the Attorney General, for

6  lack of sufficient knowledge or information, DENIES the allegations of the paragraph.

7      57.    Answering enumerated paragraph no. 57 of Plaintiffs' FAC, the Attorney General, for

8  lack of sufficient knowledge or information, DENIES the allegations of the paragraph.

9      58.    Answering enumerated paragraph no. 58 of Plaintiffs' FAC, the Attorney General, for

10  lack of sufficient knowledge or information, DENIES the allegations of the paragraph.

11      59.    Answering enumerated paragraph no. 59 of Plaintiffs' FAC, the Attorney General, for

12  lack of sufficient knowledge or information, DENIES the allegations of the paragraph.

13      60.    Answering enumerated paragraph no. 60 of Plaintiffs' FAC, the Attorney General, for

14  lack of sufficient knowledge or information, DENIES the allegations of the paragraph.

15      61.    Answering enumerated paragraph no. 61 of Plaintiffs' FAC, the Attorney General

16  ADMITS that the California Department of Justice has established and maintains an online

17  database referred to in the California Penal Code as the "Prohibited Armed Persons File," but

18  understands the rest of the paragraph as making assertions of law (not fact), and, on that basis,

19  contends that no further answer is required.

20      62.    Answering enumerated paragraph no. 62 of Plaintiffs' FAC, the Attorney General

21  DENIES the allegations of the paragraph.

22      63.    Answering enumerated paragraph no. 63 of Plaintiffs' FAC, the Attorney General

23  DENIES the allegations of the paragraph.

24      64.    Answering enumerated paragraph no. 64 of Plaintiffs' FAC, the Attorney General, for

25  lack of sufficient knowledge or information, DENIES the allegations of the paragraph concerning

26  Plaintiffs' ownership of and access to firearms, and whether a California agency has recorded

27  possession of any such firearms, and DENIES the other allegations of the paragraph.

28

7

65. Answering enumerated paragraph no. 65 of Plaintiffs' FAC, the Attorney General understand the paragraph as being a summary of prior paragraphs and not requiring a separate substantive answer.

66. Answering enumerated paragraph no. 66 of Plaintiffs' FAC, the Attorney General understands the paragraph as making assertions of law (not fact), and, on that basis, contends that no answer is required.

67. Answering enumerated paragraph no. 67 of Plaintiffs' FAC, the Attorney General DENIES the allegations of the paragraph.

68. Answering enumerated paragraph no. 68 of Plaintiffs' FAC, the Attorney General DENIES the allegations of the paragraph.

69. Answering enumerated paragraph no. 69 of Plaintiffs' FAC, the Attorney General DENIES the allegations of the paragraph.

70. Answering enumerated paragraph no. 70 of Plaintiffs' FAC, the Attorney General understand the paragraph as being a summary of prior paragraphs and not requiring a separate substantive answer.

71. Answering enumerated paragraph no. 71 of Plaintiffs' FAC, the Attorney General DENIES the allegations of the paragraph.

**SEPARATE AND ADDITIONAL DEFENSES**

<u>FIRST SEPARATE AND ADDITIONAL DEFENSE</u>

1. Plaintiffs, and each of them, have failed to state a claim upon which relief can be granted.

<u>SECOND SEPARATE AND ADDITIONAL DEFENSE</u>

2. Plaintiffs, and each of them, should be barred from pursuing or obtaining relief in this case on the grounds of estoppel.

<u>THIRD SEPARATE AND ADDITIONAL DEFENSE</u>

3. Plaintiffs, and each of them, should be barred from pursuing or obtaining relief in this case on the grounds of laches.

8

FOURTH SEPARATE AND ADDITIONAL DEFENSE

4.　Plaintiffs, and each of them, have failed to join to this case at least one indispensable party.

FIFTH SEPARATE AND ADDITIONAL DEFENSE

5.　Plaintiffs, and each of them, lack standing to pursue this case.

**PRAYER FOR RELIEF**

Answering Plaintiffs' FAC's prayer for relief, the Attorney General DENIES that any preliminary or permanent injunction against the Attorney General (or any defendant in this case) should be entered in this case, that any declaratory or other relief should be given to Plaintiffs, or any of them, in this case, or that Plaintiffs, or any of them, should recover attorney fees or any costs of pursuing this lawsuit.

The Attorney General prays, instead, as follows:

1.　This case should be dismissed with prejudice;

2.　Plaintiffs, including each of them individually, should garner no relief in this case;

3.　Plaintiffs, including each of them individually, should take nothing by this case;

4.　Plaintiffs, including each of them individually, should be ordered to and should reimburse the Attorney General for her costs of suit;

5.　This Court should grant such other and further relief to the Attorney General as the Court deems just and proper.

Dated:　March 15, 2012　　　　　　　　　　Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California
PETER K. SOUTHWORTH
Supervising Deputy Attorney General


*/s/ Jonathan M. Eisenberg*
JONATHAN M. EISENBERG
Deputy Attorney General
*Attorneys for Defendant Kamala D. Harris,*
*Attorney General of California*

60748119.docx

9

1  Jason A. Davis (Calif. Bar No. 224250)
   Davis & Associates
2  30021 Tomas St., Suite 300
   Rancho Santa Margarita, CA 92688
3  Tel 949.310.0817/Fax 949.288.6894
   E-Mail: Jason@CalGunLawyers.com
4
   Donald E.J. Kilmer., Jr. (Calif. Bar. No. 179986)
5  Law Offices of Donald Kilmer
   A Professional Corporation
6  1645 Willow Street, Suite 150
   San Jose, CA 92125
7  Tel 408.264.8489/Fax 408.564.8487
   E-Mail: Don@DKLawOffice.com
8
9  Attorneys for Plaintiffs
10
11              IN THE UNITED STATES DISTRICT COURT
12               EASTERN DISTRICT OF CALIFORNIA
13

| 14 | JEFF SILVESTER, MICHAEL POESCHL, | Case No: 1:11-CV-02137 |
|----|----------------------------------|------------------------|
| 15 | BRANDON COMBS, THE CALGUNS FOUNDATION,  INC. a non-profit | **FIRST AMENDED COMPLAINT** |
| 16 | organization, and THE SECOND AMENDMENT FOUNDATION, INC., a non- | 42 U.S.C. §§ 1983, 1988 |
| 17 | profit organization, | |
| 18 |                Plaintiffs, | SECOND AMENDMENT |
| 19 |         vs. | FOURTEENTH AMENDMENT |
| 20 | KAMALA HARRIS, Attorney General of California (in her official capacity), and DOES | |
| 21 | 1 TO 20, | |
| 22 |                Defendants. | |
| 23 | | |

24
25
26
27
28

# FIRST AMENDED COMPLAINT

**COMES NOW** the Plaintiffs, JEFF SILVESTER, MICHAEL POESCHL, BRANDON COMBS, THE CALGUNS FOUNDATION, INC., and THE SECOND AMENDMENT FOUNDATION, INC. by and through undersigned counsel, and complain of the Defendants as follows:

## INTRODUCTION

1. Plaintiffs challenge the State of California's ten-day waiting periods for firearm acquisitions facially and as applied to individuals who lawfully already have at least one firearm registered in their name with the State of California. Said challenge is asserted as being in violation of the Second Amendment and the Fourteenth Amendment of the United States Constitution.

## THE PARTIES

2. Plaintiff JEFFREY SILVESTER ("SILVESTER") is a natural citizen of the United States, residing in Kings County, California. SILVESTER is an owner of a handgun that is registered in the State of California's Automated Firearms Systems ("AFS") database. SILVESTER also possesses a valid License to Carry ("LTC") pursuant to Penal Code section 26150, *et seq*.

3. Plaintiff MICHAEL POESCHL ("POESCHL") is a natural citizen of the United States, residing in Orange County, California. POESCHL is an owner of a handgun that is registered in the State of California's AFS database.

4. Plaintiff BRANDON COMBS ("COMBS") is a natural citizen of the United States, residing in the Madera County, California. COMBS is an owner of a handgun that is registered in the State of California's AFS database. COMBS also possesses a valid California Certificate of Eligibility, which constitutes an ongoing and real-time background check. 11 C.C.R. §4036(b).

5. Plaintiff THE CALGUNS FOUNDATION, INC. ("CGF") is a non-profit organization incorporated under the laws of California with its principal place of business in San Carlos, California. The purposes of CGF include supporting the California firearms community by

1   promoting education for all stakeholders about California and federal firearm and ammunition

2   laws, rights and privileges, and defending and protecting the civil rights of California gun

3   owners.  The purposes of CGF also include the protection of the rights of citizens to have

4   firearms for the lawful defense of their families, persons, and property, and to promote public

5   safety and law and order.  CGF represents these members and supporters, which includes

6   SILVESTER, POESCHL, COMBS, and others who possess firearms registered in their names

7   with the State of California.  CGF brings this action on behalf of itself and its supporters, who

8   possess all the indicia of membership.

9        6.   CGF is in the practice of informing and assisting local jurisdictions on constitutional

10  issues relating to firearm regulations.   For example, CGF has created and developed flowcharts

11  designed to simplify California's complex semiautomatic firearms and carry license laws.  CGF

12  has also developed a program to promote and educate the public on each of the California

13  counties' carry license policies and practices.  Additionally, CGF promotes educational events

14  with firearms related attorneys and experts to provide information to the public, including law

15  enforcement.  CGF has expended resources to that end.

16       7.   Plaintiff SECOND AMENDMENT FOUNDATION, INC., ("SAF") is a non-profit

17  membership organization incorporated under the laws of Washington with its principal place of

18  business in Bellevue, Washington.  SAF has over 650,000 members and supporters nationwide,

19  including SILVESTER, POESCHL, and COMBS.  SAF represents these members and

20  supporters, and others who possess firearms registered in their names with the State of

21  California.  The purpose of SAF includes education, research, publishing and legal action

22  focusing on the Constitutional right to privately own and possess firearms, and the consequences

23  of gun control.  SAF has expended resources to that end.  SAF brings this action on behalf of

24  itself and its members.

25       8.   Collectively, SILVESTER, POESCHL, COMBS, CGF and SAF are referred to

26  hereinafter as "Plaintiffs."

27       9.   Defendant KAMALA HARRIS ("HARRIS") is the Attorney General of the State of

28  California and is obligated to supervise her agency and comply with all statutory duties under

1  California law.  She is charged with enforcing, interpreting and promulgating regulations

2  regarding the transfer of firearms under California law, including California's ten-day waiting

3  period.  HARRIS responsible for executing and administering California's laws, customs,

4  practices, and policies at issue in this lawsuit. Defendant HARRIS is sued in her official

5  capacity.

6      10. At this time, Plaintiffs are ignorant of the names of any additional individuals responsible

7  for implementing or enforcing the ten-day waiting periods.  Plaintiffs therefore name these

8  individuals as DOE Defendants and reserve the right to amend this Complaint when their true

9  names are ascertained.

10     11. Furthermore, if and when additional persons and entities are discovered to have assisted

11  and/or lent support to the enforcement alleged herein, Plaintiffs reserve the right to amend this

12  Complaint to add those persons and/or entities as Defendants.

13     12. Collectively, HARRIS and DOES are referred to hereinafter as "Defendants."

14                          **JURISDICTION AND VENUE**

15     13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. sections

16  331, 1343, 2201, 2201, and 42 U.S.C. section 1983.

17     14. Venue lies in this Court pursuant to 28 U.S.C. section 1391.

18                          <u>**STATEMENT OF FACTS**</u>

19                          *Second Amendment in the Home*

20     15. The Second Amendment to the United States Constitution states that: "A well regulated

21  Militia, being necessary to the security of a free State, the right of the people to keep and bear

22  arms, shall not be infringed."

23     16. In 2008, the United States Supreme Court held that the District of Columbia's

24  requirement that permitted firearms within the home, but required that said firearms in the home

25  be kept inoperable made "it impossible for citizens to use [firearms] for the core lawful purpose

26  of self-defense and is hence unconstitutional." *District of Columbia v. Heller*, 554 U.S. 570, 630

27  (2008).

28     17. In 2010, the United States Supreme Court held that "the Second Amendment right to

keep and bear arms" is "fundamental to our scheme of ordered liberty" and, therefore, incorporated against the states through the Due Process Clause of the Fourteenth Amendment. *McDonald v. Chicago*, 130 S. Ct. 3020, 3036 (2010).

18. At a minimum, the Second Amendment guarantees individuals a fundamental right to possess fully functional handguns in the home.  The handguns whose possession is protected by the Second Amendment are those of a kind that are or would be in common use by law-abiding people for lawful purposes.

19. Corollary to the Second Amendment guarantee of an individual's fundamental right to possess handguns in the home is the ability to acquire said handguns for possession.

20. California, however, has placed restrictions on the access to and delivery of firearms – generally subjecting firearm purchasers to a minimum ten-day ban on the delivery of firearms from a dealer to a consumer regardless of whether the individual is already known by the Defendants to both be permitted to possess firearms and to actually be registered within the State of California as an owner of a firearm.

*California's Ten-Day Waiting Period Laws*

21. California currently requires all firearm purchases to be subjected to a ten-day waiting period wherein a purchaser is prohibited from receiving his or her firearm that he or she has paid for or has otherwise received title to until ten-days after the purchaser has completed the necessary transfer paperwork with a licensed California firearms retailer.

22. Specifically, Penal Code 26815(a) states:

> No firearm shall be delivered . . . [w]ithin 10 days of the application to purchase, or, after notice by the department pursuant to Section 28220, within 10 days of the submission to the department of any correction to the application, or within 10 days of the submission to the department of any fee required pursuant to Section 28225, whichever is later.

23. Similarly, Penal Code section 27540 states:

> No dealer . . . shall deliver a firearm to a person as follows: . . . [w]ithin 10 days of the application to purchase, or, after notice by the department pursuant to Section 28220, within 10 days of the submission to the department of any correction to the application, or within 10 days of the submission to the department of any fee required pursuant to Section 28225, whichever is later.

24. Neither of these two provisions can be construed to apply solely to the first purchase of a firearm and are therefore unconstitutional in all applications.  These provisions apply regardless of whether the first firearm purchased by Plaintiffs and associational Plaintiffs' members was purchased not as protection for the home, but for one of many other alternatives, including: (1) as a personal protection firearm for the business; (2) a pistol for target practice and match competitions; (3) a pistol for carrying pursuant to a LTC thereby leaving the home undefended in the absence of the LTC holder; (4) a rifle for use in hunting or shooting sports; or (5) otherwise deemed insufficient for personal protection in the home by the purchaser afterwards.

*Exemptions to the Ten-Day Waiting Periods*

25. The ten-day waiting periods have multiple exemptions.

26. First, the ten-day waiting periods do not apply to certain law enforcement transactions. Penal Code §§26950, 27050, 27055, 27060, 27065 (exempting §26815); §§27600, 27605, 27610, 27615, and 27650 (exempting §27540).

27. Second, the ten-day waiting periods generally do not apply to a dealer who delivers a firearm other than a handgun at an auction or similar event.  Penal Code §§26955 (exempts from §26815); §27655 (exempts from §27540).

28. Third, the ten-day waiting periods generally do not apply to dealer-to-dealer transfers of firearms.  Penal Code §§27110 and 27125 (exempts from §26815); §§27710, and 27725 (exempts from §27540).

29. Fourth, the ten-day waiting periods generally do not apply to transfers of firearms by a dealer to him or herself.  Penal Code §§26960 and 27130 (exempts from §26815); §§27660 and 27730 (exempts from §27540.)

30. Fifth, the ten-day waiting periods generally do not apply to transactions between or to importers and manufacturers of firearms.  Penal Code §27100 (exempts from §26815); §27700 (exempts from §27540).

31. Sixth, the ten-day waiting periods generally do not apply to persons who have a "short barrel rifle" or "short barrel shotgun" permit pursuant to Penal Code section 33300.  Penal Code §§26965 and 21740 (exempts from §26815); §§27665 and 27740 (exempts from §27540).

32. Seventh, the ten-day waiting periods generally do not apply to persons who have an "assault weapons" permit pursuant to Penal Code section 30500, *et seq.*  Penal Code §21740 (exempts from §26815); §27740 (exempts from §27540).

33. Eighth, the ten-day waiting periods generally do not apply to persons who have a "machinegun" permit pursuant to Penal Code section 32650 *et seq.*  Penal Code §§26965 and 27140 (exempts from §26815); §§27665 and 27740 (exempts from §27540).

34. Ninth, the ten-day waiting periods generally do not apply to persons who have a "machinegun" license pursuant to Penal Code section 32700.  Penal Code §26965 (exempts from §26815); § 27665 (exempts from §27540).

35. Tenth, the ten-day waiting periods generally do not apply to persons who have a "destructive device" permit pursuant to Penal Code section 18900.  Penal Code §26965 (exempts from §26815); §27665 (exempts from §27540).

36. Eleventh, the ten-day waiting periods generally do not apply to persons with curio and relic collector's licenses issued by the Bureau of Alcohol, Tobacco, Firearms and who have a valid Certificate of Eligibility issued by the California Department of Justice *and only when purchasing curio and relic firearms*.  Penal Code §26970 (exempts from §26815); §27670 (exempts from §27540).

37. Twelfth, the ten-day waiting periods generally do not apply to transactions regarding firearms serviced or repaired by a gunsmith.  Penal Code §27105 (exempts from §26815); §27705 (exempts from §27540).

38. Thirteenth, the ten-day waiting periods generally do not apply to dealer sales to persons residing out-of-state.  Penal Code §27115 (exempts from §26815) and §27715 (exempts from §27540).

39. Fourteenth, ten-day waiting periods do not apply to deliveries to wholesalers.  Penal Code §27120 (exempts from §26815); §27720 (exempts from §27540).

40. Fifteenth, ten-day waiting periods generally do not apply to loans by dealers who operate target facilities.  Penal Code §27135 (exempts from §26815); §27735 (exempts from §27540).

41. Sixteenth, the ten-day waiting periods generally do not apply to certain loans of firearms

1    for use as props.  Penal Code §27000 (exempts from §26815); §27745 (exempts from §27540).

2    42. Seventeenth, the ten-day waiting periods generally do not apply to loans to consultants or

3    evaluators.  Penal Code §27005 (exempts from §26815); §27750 (exempts from §27540).

4    43. Eighteenth, the ten-day waiting periods generally do not apply to lawful transactions

5    involving cane guns, firearms that are not immediately recognizable as firearms, undetectable

6    firearms, wallet guns, unconventional pistols, and zip guns.  Penal Code §21740 (exempts from

7    §26815); §27740 (exempts from §27540).

8                         *Calculation of the Ten-Day Waiting Period*

9    44. For the majority of individuals who are subject to the ten-day waiting period for the

10   purchase or transfer of a firearm, it is calculated as ten (10) 24-hour periods from the date *and*

11   *time* of the submission of the Dealer Record of Sale ("DROS") information to the California

12   Department of Justice.

13                       *The Legislative Intent of the Ten- Day Waiting Period*

14   45. California has had a waiting period regarding the delivery of firearms since 1923.[1]

15   46. Though the original waiting period was merely a ban on the delivery of firearms on the

16   same day, there have been multiple changes to the term of the waiting period, extending from

17   less than one (1) day to as many as fifteen (15) days.

18   47. Today the waiting period in California is ten days.[2]

19   48. The alleged reasoning behind the different waiting period varies.  At least one case

20   (*People v. Bickston* (*1979*) 91 Cal. App. 3d Supp. 29) described the legislative intent behind the

21   _____

22   [1] Applying solely to handguns, California's first waiting period is stated as follows: "No pistol or

23   revolver shall be delivered (a) On the same day of the application for the purchase . . . ."  1923

24   Cal. AB 263.

25   [2] In 1990, the 15-day waiting period for long guns was shortened to its current ten-day term.

26   1990 Cal AB 497.  In 1996, the 15-day waiting period for handguns was shortened to its current

27   ten-day term.  1996 Cal. SB 671.

28

1    dynamic nature of the waiting period.  *Bickston* states as follows*:*

2         The court's research discloses some legislative history that throws some light on the
     Legislature's intentions in enacting section 12072.  This section was originally enacted in
3         1953 and provided [. . .] that "in no event shall such firearm be delivered to the purchaser
     upon the day of the application for the purchase thereof. . . . [A] 1955 amendment also
4         extended the waiting period to three days.  The section was next amended in 1965
     whereby the waiting period was again extended to five days.  The last amendment was in
5         1975 wherein the waiting period was extended to 15 days.  *Thus it appears that an*
     *original intent to provide at least an overnight cooling off period from "application for*
6         *the purchase" was supplemented over the years with additional time to allow the*
     *Department of Justice to investigate the prospective purchaser of the weapon.*

7

8    *Id*. (Emphasis added.)

9    *Ten Days  To Allow The Department of Justice to Investigate Prospective Purchasers and To*

10        *Allow Repeat Purchasers To "Cool Off" Is An Infringement*

11        49. Ten days to allow the Department of Justice to investigate prospective purchasers and to

12   allow repeat purchasers to "cool off" is an infringement on the purchaser's fundamental right to

13   keep and bear arms in their home.

14        50. The need for balance between processing a requisite background check and preserving

15   the individual's right to acquire firearms for the home in a timely manner has already been made

16   on a federal level.  The Brady Handgun Violence Prevention Act (Pub.L. 103-159, 107 Stat.

17   1536) is an Act of the United States Congress that, for the first time, instituted federal

18   background checks on firearm purchasers in the United States as well as a federally mandated

19   five-day waiting period.

20        51. The Brady Bill provided that, in 1998, the five-day waiting period for handgun sales

21   would be replaced by an instant computerized background check that involved no waiting

22   periods.  Specifically, the National Instant Criminal Background Check System, or NICS, is

23   stated to be about saving lives and protecting people from harm—by not letting firearms fall into

24   the wrong hands. It also ensures the *timely* transfer of firearms to eligible gun buyers.

25        52. Mandated by the Brady Handgun Violence Prevention Act of 1993 and launched by the

26   FBI on November 30, 1998, NICS is used by Federal Firearms Licensees (FFLs) to *instantly*

27   determine whether a prospective buyer is eligible to buy firearms.

28        53. More than 100 million such checks have been made in the last decade, leading to more

1   than 700,000 denials.

2      54. NICS, located at the FBI's Criminal Justice Information Services Division in Clarksburg,

3   West Virginia, provides full service to FFLs in 30 states, five U.S. territories, and the District of

4   Columbia.  California voluntarily opted out of the NICS instant background check and maintains

5   their own background check system with an extended ten-day waiting period against purchasers

6   of firearms in California, including Plaintiffs herein.

7   *California's Enforcement of the Ten-Day Waiting Period*

8      55. Plaintiffs already have firearms, but seek to have additional firearms for protection of

9   themselves and their families, *inter alia*, within the home pursuant to their Second Amendment

10  right to "keep and bear *arms.*" (Emphasis added to note the use of the plural.)

11     56. Plaintiffs have lawfully purchased a handgun within the State of California or can

12  otherwise demonstrate proof of ownership and lawful possession of said firearms.  For example,

13  some firearms are registered in the California Automated Firearms System database pursuant to,

14  *inter alia,* Penal Code section 28200, *et seq.*  In purchasing their firearms, Plaintiffs were already

15  once subjected to the ten-day waiting period prior to physically receiving their firearms.  As a

16  result of the ten-day waiting period, Plaintiffs were obligated to endure a ten-day ban on the

17  acquisition of their constitutionally protected firearms and incur additional expense by being

18  forced to make a second visit to the firearms dealer that sold Plaintiffs their firearms.

19     57. COMBS and other holders of valid California Certificates of Eligibility represented by

20  CGF and SAF are, *per se*, not in a class of persons described within  Penal Code sections 29800,

21  *et seq.*, 29900, *et seq.*, or Welfare and Institutions Code sections 8100 or 8103, or Title 27 Part

22  178.32 of the Code of Federal Regulations.  11 C.C.R. §4036(b).

23     58. In other words, COMBS and other holders of a valid California Certificate of Eligibility

24  represented by CGF and SAF are known by the State of California, at all times certified, to not

25  be prohibited from possessing firearms under federal or state law.

26     59. Additionally, as a holder of a valid license to carry pursuant to Penal Code section 26150

27  *et seq.*  SILVESTER and other such holders represented by CGF and SAF are, *per se*, not in a

28  class of persons described in Penal Code sections 29800, *et seq.*, 29900, *et seq.* or Welfare and

1   Institutions Code 8100 or 8103.  Penal Code section 26195(a)-(b).

2       60. In other words, SILVESTER and other holders of a valid license to carry pursuant to

3   Penal Code section 26150, *et seq*. represented by CGF and SAF are not prohibited from

4   possessing firearms under federal or state law and may often be armed with a loaded concealed

5   firearm, including while purchasing firearms for which they are subjected to a ten-day ban on

6   possessing.

7       61. The Attorney General has established and maintains an online database known as the

8   Prohibited Armed Persons File ("PAPF").  The purpose of the file is to cross-reference persons

9   who have ownership or possession of a firearm as indicated by a record in the Consolidated

10  Firearm Information System ("CFIS") and who, subsequent to the date of that ownership or

11  possession of a firearm, fall within a class of persons who are prohibited from owning or

12  possessing a firearm.  Penal Code §30000, *et seq*.

13      62. The information contained in the PAPF is immediately available for the purpose of

14  determining if persons are armed and prohibited from possessing firearms.  Penal Code §30000,

15  *et seq*.

16      63. Conversely, the PAPF is also immediately available for the purpose of determining if

17  persons are armed and not prohibited by the very nature of the individual not appearing in the

18  PAPF.

19      64. Plaintiffs already own and have access to their own firearms.  In all instances, Plaintiffs

20  are recorded by the state as being in possession of at least one firearm.  Plaintiffs seek to

21  purchase additional firearms whose possession for the purposes of self-defense in the home is

22  protected by the Second Amendment.  Penal Code sections 26815 and 27540 unnecessarily

23  require an additional ten-day waiting period for each subsequent firearm transaction, thus barring

24  Plaintiffs from acquiring and using their own firearms protected by the Second Amendment

25  during the ten-day period following their purchase, as well as causing them to incur additional

26  expenses, travel, and time lost resulting from the otherwise unnecessary return to the dealer to

27  accept delivery.

28  / / /

**COUNT I**
**RIGHT TO KEEP AND BEAR ARMS**
**U.S. CONST., AMENDS.II AND XIV, 42 U.S.C. §1983**

65. Paragraphs 1 through 64 are incorporated as though fully stated herein.

66. The Second Amendment, which applies against Defendants by operation of the Fourteenth Amendment, secures the right to possess firearms in the home.

67. Penal Code sections 26815 and 27540, as well as Defendants' enforcement of the same prohibit, substantially interfere with, inhibit access to, and infringe upon the right to possess firearms in the home for those individuals represented by CGF and SAF, including Plaintiffs and improperly impede gun ownership itself.

68. Penal Code sections 26815 and 27540 render access to firearms for use in the home materially more difficult to obtain, by requiring multiple visits to the firearms retailer, increasing the expense of purchasing a firearm, and, more importantly, barring access to and possession of constitutionally protected firearms by Plaintiffs – leaving no sufficient alternative avenues for obtaining firearms for self-defense purposes during the ten-day waiting period.

69. By maintaining and enforcing a set of laws banning Plaintiffs access to firearms whose possession is protected by the Second Amendment, Defendants are propagating customs, policies, and practices that violate the Second Amendment to the United States Constitution, facially and as applied against the individual plaintiffs in this action, thereby harming plaintiffs in violation of U.S.C. section 1983.  The Second Amendment applies to the states, including California, through the Fourteenth Amendment.  Plaintiffs are therefore entitled to declaratory, preliminary, and permanent injunctive relief against the improper customs, policies, and practices.

**COUNT II**
**EQUAL PROTECTION VIOLATIONS**
**U.S. CONST., AMENDS.II AND XIV, 42 U.S.C. §1983**

70. Paragraphs 1 through 69 are incorporated as though fully stated herein.

71. Defendants' policies and enforcement of Penal Code sections 26815 and 27540 violate Plaintiffs' rights to equal protection under the law as guaranteed by the Fourteenth Amendment to the United States Constitution, in that Defendants allow some people, such as destructive device collectors, movie prop houses, auction purchasers, "consultants-evaluators," and others,

1  instant access to firearms, which instant access is denied to Plaintiffs and the general public.

2  Such misapplication of the law is arbitrary, capricious, irrational, and makes unjustifiable

3  distinctions between those individuals that Defendants deign to exclude from immediate delivery

4  of firearms and those they do not.  Defendants are thereby propagating customs, policies, and

5  practices that violate the Fourteenth Amendment to the United States Constitution, facially and

6  as applied against the individual plaintiffs in this action, thereby harming Plaintiffs in violation

7  of 42 U.S.C. section 1983.  Plaintiffs are therefore entitled to declaratory, preliminary and

8  permanent injunctive relief against continued enforcement and maintenance of Penal Code

9  section 27540 subdivision (a) and Defendants' unconstitutional customs, policies, and practices.

10  **PRAYER FOR RELIEF**

11  Plaintiffs request judgment be entered in their favor against Defendants as follows:

12  1.  An order preliminarily and permanently enjoining Defendants, their officers, agents,

13  servants, employees, and all persons in active concert or participation with them who receive

14  actual notice of the injunction, from enforcing Penal Code sections 26815 and 27540 as against

15  those persons that may lawfully possess and acquire a firearm and possess proof of firearm

16  possession or ownership in their name within the State of California and from enacting,

17  publishing, promulgating, or otherwise enforcing any polices, rules, or procedures prohibiting or

18  otherwise restricting the delivery of firearms to said individuals within ten-days of applying for

19  the purchase of any firearms;

20  2.  Attorney fees and costs pursuant to 42 U.S.C. section 1988;

21  3.  Declaratory relief consistent with the injunction;

22  4.  Costs of suit; and

23  5.  Any other relief as the Court deems just and appropriate.

24  Date: February 24, 2011,                    Respectfully submitted,
25                                              Davis & Associates
                                                /s/ Jason A. Davis
26                                              Jason A. Davis
27                                              Jason@CalGunLawyers.com
                                                Attorneys for plaintiffs
28

**U.S. District Court**
**Eastern District of California – Live System (Fresno)**
**CIVIL DOCKET FOR CASE #: 1:11–cv–02137–AWI–SKO**

| | |
|---|---|
| Silvester, et al. v. Harris, et al. | Date Filed: 12/23/2011 |
| Assigned to: District Judge Anthony W. Ishii | Date Terminated: 08/25/2014 |
| Referred to: Magistrate Judge Sheila K. Oberto | Jury Demand: None |
| Case in other court:  Ninth Circuit, 14–16840 | Nature of Suit: 440 Civil Rights: Other |
| Cause: 28:1331 Federal Question: Other Civil Rights | Jurisdiction: Federal Question |

| Date Filed | # | Docket Text |
|---|---|---|
| 01/12/2015 | 141 | ORDER of USCA as to 137 Notice of Appeal filed by Kamala D. Harris: *Appellant's motion to stay the district court's August 25, 2014 order pending appeal is granted. The briefing schedule established previously remains in effect.* (Hellings, J) (Entered: 01/13/2015) |
| 01/12/2015 | 140 | MINUTE ORDER: (Text Entry Only) signed by District Judge Anthony W. Ishii on 1/12/2015; In light of the 9th Circuit granting Defendant's motion to stay the district court's August 25, 2014 order pending appeal, the Further Status Conference set for 2/9/2015, before District Judge Anthony W. Ishii is ORDERED VACATED. (Gaumnitz, R) (Entered: 01/12/2015) |
| 12/24/2014 | 139 | TRANSCRIPT of Proceedings held on 12/15/2014, TELEPHONIC STATUS CONFERENCE, before District Judge Anthony W. Ishii, filed by Court Reporter Gail Thomas, Phone number 559–266–0609 E–mail gthomascrr@sbcglobal.net. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction must be filed within 5 court days. Redaction Request due 1/15/2015. Redacted Transcript Deadline set for 1/26/2015. Release of Transcript Restriction set for 3/26/2015. (Thomas, G) (Entered: 12/24/2014) |
| 12/19/2014 | 138 | APPEAL PROCESSED to Ninth Circuit re 137 Notice of Appeal filed by Kamala D. Harris. Notice of Appeal filed *12/19/2014*, Complaint filed *12/23/2011* and Appealed Order / Judgment filed *11/20/2014*. Court Reporter: *G. Thomas*. *Fee Status: Paid on 12/19/2014 in the amount of $505.00* (Attachments: # 1 Appeal Information) (Verduzco, M) (Entered: 12/19/2014) |
| 12/19/2014 | 137 | NOTICE of APPEAL by Kamala D. Harris as to 123 Order on Motion to Amend the Judgment,, Order on Motion to Stay,. (Filing fee $ 505, receipt number 0972–5666432) (Chang, Peter) (Entered: 12/19/2014) |
| 12/17/2014 | 136 | ORDER on Plaintiffs' 108 Motion for Attorneys' Fees, signed by District Judge Anthony W. Ishii on 12/17/2014. (IT IS HEREBY ORDERED that: 1. Plaintiffs motion for attorneys fees is GRANTED in the amount of 192,073.00; and 2. Plaintiffs motion for costs is GRANTED in the amount of $2,006.45 ($1,434.16 + $572.29).) (Gaumnitz, R) (Entered: 12/17/2014) |
| 12/16/2014 | 135 | RESPONSE by Kamala D. Harris to 130 Brief. (Chang, Peter) (Entered: 12/16/2014) |
| 12/15/2014 | 134 | MINUTES (Text Only) for proceedings held before District Judge Anthony W. Ishii: STATUS CONFERENCE held on 12/15/2014. Court and Counsel discussed status of case, Court will proceed unless there is a ruling from the 9th Circuit or an order to stay. Defendant may file a Response to Plaintiff's 130 Supplemental Brief re 108 Motion for Attorneys Fees by the close of business on 12/16/2015; After the response is filed the matter is deemed submitted for decision on the papers pursuant to Local Rule 230(g). Parties to meet and confer then file an updated status report by 2/2/2015. **Further Status Conference set for 2/9/2015, at 02:00 PM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii.** The parties may appear telephonically by coordinating a conference call (either through an operator or on an internal phone system). After all parties appearing telephonically are on one line, please call Judge Ishii's chambers at (559) 499–5660 at the time of the hearing. Advise Courtroom |

| | | Deputy Renee Gaumnitz at rgaumnitz@caed.uscourts.gov who will be appearing by phone and provide a contact number of the party who is initiating the conference call. Plaintiff's Counsel Bradley Benbrook and Stephen Duvernay telephonically present. Defendant's Counsel Peter Chang present. Court Reporter/CD Number: G. Thomas. (Gaumnitz, R) (Entered: 12/15/2014) |
|---|---|---|
| 12/12/2014 | 133 | TRANSCRIPT REQUEST by Kamala D. Harris for proceedings held on March 25, 26, 27, 2014 and August 15, 2014 before Judge Anthony W. Ishii, (Chang, Peter) (Entered: 12/12/2014) |
| 12/12/2014 | 132 | NOTICE of Errata by Kamala D. Harris re 125 Status Report. (Chang, Peter) (Entered: 12/12/2014) |
| 12/09/2014 | 131 | DECLARATION of Stephen Duvernay re 130 Brief. (Benbrook, Bradley) (Entered: 12/09/2014) |
| 12/09/2014 | 130 | BRIEF *Supplemental Brief Re Attorneys' Fees Re Post Trial Motions and Fee App* by Calguns Foundation, Inc., Brandon Combs, Jeff Silvester, The Second Amendment Foundation, Inc.. (Benbrook, Bradley) (Entered: 12/09/2014) |
| 12/03/2014 | 129 | ORDER Permitting Plaintiffs to Submit Additional Evidence Regarding Attorney's Fees, signed by District Judge Anthony W. Ishii on 12/3/2014. (IT IS HEREBY ORDERED that: 1. Plaintiffs will file supplemental briefing and evidence regarding attorneys fees for the time spent on post–trial motions and for the fee application as soon as possible, but no later than December 10, 2014; and 2. Defendant may file a response to Plaintiffs supplemental briefing within seven (7) days of service of Plaintiffs supplemental briefing and evidence.)(Gaumnitz, R) (Entered: 12/03/2014) |
| 12/03/2014 | 128 | DECLARATION of Kilmer, Duvernay in SUPPORT OF 108 MOTION for ATTORNEY FEES . (Kilmer, Donald) (Entered: 12/03/2014) |
| 12/02/2014 | 127 | MINUTE ORDER: (Text Entry Only) The hearing set 12/8/2014 on the pending 108 Motion for Attorneys Fees is **ORDERED VACATED;** the matter is submitted for decision on the papers pursuant to Local Rule 230(g). The Status Conference set 12/8/2014 is **CONTINUED to 12/15/2014, at 02:00 PM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii.** The parties may appear telephonically by coordinating a conference call. After all parties appearing telephonically are on one line, please call Judge Ishii's chambers at (559) 499–5660 at the time of the hearing. Advise Courtroom Deputy Renee Gaumnitz at rgaumnitz@caed.uscourts.gov who will be appearing by phone and provide a contact number of the party who is initiating the conference call. Minute Order signed by District Judge Anthony W. Ishii on 12/2/2014.(Gaumnitz, R) (Entered: 12/02/2014) |
| 12/01/2014 | 126 | REPLY by Calguns Foundation, Inc., Brandon Combs, Jeff Silvester, The Second Amendment Foundation, Inc. re 108 MOTION for ATTORNEY FEES , 115 Minute Order,, Set/Reset Deadlines and Hearings, 124 Opposition to Motion. (Kilmer, Donald) (Entered: 12/01/2014) |
| 12/01/2014 | 125 | JOINT STATUS REPORT by Kamala D. Harris. (Chang, Peter) (Entered: 12/01/2014) |
| 11/24/2014 | 124 | OPPOSITION by Kamala D. Harris to 108 MOTION for ATTORNEY FEES . (Attachments: # 1 Request for Judicial Notice, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E)(Eisenberg, Jonathan) (Entered: 11/24/2014) |
| 11/20/2014 | 123 | ORDER on Defendant's 114 Motion to Stay and 110 Motion to Alter Judgment, signed by District Judge Anthony W. Ishii on 11/20/2014. (IT IS HEREBY ORDERED that: 1. Defendant's motion to stay (Doc. No. 114) is DENIED; and 2. Defendant's motion to alter judgment (Doc. No. 110) is DENIED.) (Gaumnitz, R) (Entered: 11/20/2014) |
| 11/04/2014 | 122 | MINUTE ORDER: (Text Entry Only) The hearing set 11/10/2014 on the pending 114 Motion to Stay and 110 Motion to Alter or Amend the Judgment is **ORDERED VACATED;** the motions are submitted for decision on the papers pursuant to Local Rule 230(g). Minute Order signed by District Judge Anthony W. Ishii on 11/4/2014. (Gaumnitz, R) (Entered: 11/04/2014) |
| 11/03/2014 | 121 | REPLY by Kamala D. Harris re 114 MOTION to STAY re 106 Findings of Fact & Conclusions of Law, Set/Reset Deadlines and Hearings, Terminate Civil Case,,, 107 Judgment, 110 MOTION to AMEND the JUDGMENT amending 106 Findings of |

| | | Fact & Conclusions of Law, Set/Reset Deadlines and Hearings, Terminate Civil Case,,, 107 Judgment *re Paragraph 7 of Order and Judgment*. (Attachments: # 1 Declaration of Stephen J. Lindley (Supplemental))(Eisenberg, Jonathan) (Entered: 11/03/2014) |
|---|---|---|
| 10/27/2014 | 120 | OPPOSITION by Calguns Foundation, Inc. to 114 MOTION to STAY re 106 Findings of Fact & Conclusions of Law, Set/Reset Deadlines and Hearings, Terminate Civil Case,,, 107 Judgment, 110 MOTION to AMEND the JUDGMENT amending 106 Findings of Fact & Conclusions of Law, Set/Reset Deadlines and Hearings, Terminate Civil Case,,, 107 Judgment *re Paragraph 7 of Order and Judgment*. (Benbrook, Bradley) (Entered: 10/27/2014) |
| 10/20/2014 | 119 | ASSOCIATION of ATTORNEY: Added attorney Stephen Duvernay for Calguns Foundation, Inc.,Stephen Duvernay for Brandon Combs,Stephen Duvernay for Jeff Silvester,Stephen Duvernay for The Second Amendment Foundation, Inc.. (Kilmer, Donald) (Entered: 10/20/2014) |
| 10/20/2014 | 118 | ASSOCIATION of ATTORNEY: Added attorney Bradley A. Benbrook for Calguns Foundation, Inc.,Bradley A. Benbrook for Brandon Combs,Bradley A. Benbrook for Jeff Silvester,Bradley A. Benbrook for The Second Amendment Foundation, Inc.. (Kilmer, Donald) (Entered: 10/20/2014) |
| 10/07/2014 | 117 | ORDER of USCA as to 111 Notice of Appeal filed by Kamala D. Harris. *Appellate proceedings other than mediation shall be held in abeyance pending the district courts resolution of the motion to amend the judgment.* (Marrujo, C) (Entered: 10/07/2014) |
| 10/06/2014 | 116 | MINUTE ORDER: (Text Entry Only) Due to the availability of the Court and the press of business, Defendants 114 Motion to Stay and 110 Motion to Alter or Amend the Judgment previously set for 10/27/2014, have been **CONTINUED to 11/10/2014, at 01:30 PM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii.** Minute Order signed by District Judge Anthony W. Ishii on 10/6/2014. (Gaumnitz, R) (Entered: 10/06/2014) |
| 10/03/2014 | 115 | MINUTE ORDER: (Text Entry Only) Hearing on the 108 Motion for Attorney's Fees previously set for 12/15/2014, has been **ADVANCED to 12/8/2014, at 01:30 PM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii.** Minute Order signed by District Judge Anthony W. Ishii on 10/3/2014. (Gaumnitz, R) (Entered: 10/03/2014) |
| 09/29/2014 | 114 | MOTION to STAY re 106 Findings of Fact & Conclusions of Law, Set/Reset Deadlines and Hearings, Terminate Civil Case,,, 107 Judgment by Kamala D. Harris. Motion Hearing set for 10/27/2014 at 01:30 PM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii. (Attachments: # 1 Memorandum of Points and Authorities in Support of Stay Motion, # 2 Declaration of S. Lindley (from Mtn. to Amend Judgment), # 3 Declaration of M. St. Pierre (from Mtn. to Amend Judgment))(Eisenberg, Jonathan) (Entered: 09/29/2014) |
| 09/25/2014 | 113 | USCA CASE NUMBER 14–16840 for 111 Notice of Appeal filed by Kamala D. Harris. (Martin–Gill, S) (Entered: 09/25/2014) |
| 09/25/2014 | 112 | APPEAL PROCESSED to Ninth Circuit re 111 Notice of Appeal filed by Kamala D. Harris. Notice of Appeal filed *9/24/2014*, Complaint filed *12/23/2011* and Appealed Order / Judgment filed *8/25/2014*. Court Reporter: *G. Thomas*. *Fee Status: Paid on 9/24/2014 in the amount of $505.00* (Attachments: # 1 Appeal Information) (Jessen, A) (Entered: 09/25/2014) |
| 09/24/2014 | 111 | NOTICE of APPEAL by Kamala D. Harris as to 106 Findings of Fact & Conclusions of Law, Set/Reset Deadlines and Hearings, Terminate Civil Case,,, 107 Judgment. (Filing fee $ 505, receipt number 0972–5532477) (Eisenberg, Jonathan) (Entered: 09/24/2014) |
| 09/22/2014 | 110 | MOTION to AMEND the JUDGMENT amending 106 Findings of Fact & Conclusions of Law, Set/Reset Deadlines and Hearings, Terminate Civil Case,,, 107 Judgment *re Paragraph 7 of Order and Judgment* by Kamala D. Harris. Motion Hearing set for 10/27/2014 at 01:30 PM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii. (Attachments: # 1 Declaration Stephen J. Lindley, # 2 Declaration Marc St. Pierre)(Chang, Peter) (Entered: 09/22/2014) |

| 09/09/2014 | 109 | NOTICE to RESCHEDULE HEARING on 108 MOTION for ATTORNEY FEES : Motion Hearing set for 12/15/2014 at 01:30 PM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii. (Otten, Victor) (Entered: 09/09/2014) |
|---|---|---|
| 09/08/2014 | 108 | MOTION for ATTORNEY FEES by Calguns Foundation, Inc., Brandon Combs, Michael Poeschl, Jeff Silvester, The Second Amendment Foundation, Inc.. Motion Hearing set for 12/16/2016 at 10:00 AM in 8th floor courtroom (JFM) before District Judge Anthony W. Ishii. (Attachments: # 1 Affidavit Bill of Costs, # 2 Declaration Declaration of Victor Otten, # 3 Declaration Declaration of Jason Davis, # 4 Declaration Declaration of Don Kilmore, # 5 Notice Notice of Motion for Fees and Costs, # 6 Exhibit Plaintiffs' Exhibit 1, # 7 Exhibit Plaintiffs' Exhibit 2, # 8 Exhibit Plaintiffs' Exhibit 3, # 9 Exhibit Plaintiffs' Exhibit 4, # 10 Exhibit Plaintiffs' Exhibit 5, # 11 Exhibit Plaintiffs' Exhibit 6)(Otten, Victor) (Entered: 09/08/2014) |
| 08/25/2014 | 107 | JUDGMENT dated *8/25/2014* in favor of Plaintiff and against Defendant pursuant to order signed by District Judge Anthony W. Ishii on 8/22/2014. (Lundstrom, T) (Entered: 08/25/2014) |
| 08/25/2014 | 106 | FINDINGS of FACT and CONCLUSIONS of LAW signed by District Judge Anthony W. Ishii on 8/22/2014. Judgment to be entered in favor of Plaintiff and against Defendant. (Status Conference set for 12/8/2014 at 01:30 PM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii). (Lundstrom, T) (Entered: 08/25/2014) |
| 08/20/2014 | 105 | TRANSCRIPT of Proceedings held on 8/15/2014, CLOSING ARGUMENTS, before District Judge Anthony W. Ishii, filed by Court Reporter Gail Thomas, Phone number 559–266–0609 E–mail gthomascrr@sbcglobal.net. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction must be filed within 5 court days. Redaction Request due 9/11/2014. Redacted Transcript Deadline set for 9/22/2014. Release of Transcript Restriction set for 11/20/2014. (Thomas, G) (Entered: 08/20/2014) |
| 08/15/2014 | 104 | MINUTES (Text Only) for proceedings held before District Judge Anthony W. Ishii: BENCH TRIAL completed on 8/15/2014. Closing arguements by counsel. Matter stands submitted. Plaintiffs Counsel D. Kilmer present. Defendants Counsel J. Eisenberg, P. Chang present. Court Reporter/CD Number: G. Thomas. (Nazaroff, H) (Entered: 08/15/2014) |
| 08/12/2014 | 103 | NOTICE to Parties Regarding Consideration of Laws and ORDER for Docket Correction, signed by District Judge Anthony W. Ishii on 8/12/14. (Verduzco, M) (Entered: 08/12/2014) |
| 07/22/2014 | 102 | ORDER on Motion to File an Amicus Curiae Brief 101 , signed by District Judge Anthony W. Ishii on 7/22/14: *Center's motion is DENIED*. (Hellings, J) (Entered: 07/22/2014) |
| 07/21/2014 | 101 | MOTION Amicus Curiae Brief in Support of Defendant Kamala Harris by Brady Center to Prevent Gun Violence. Attorney O'Hanlon, Neil R. added. (O'Hanlon, Neil) (Entered: 07/21/2014) |
| 07/15/2014 | 100 | OBJECTIONS by Defendant Kamala D. Harris to 98 Response. (Eisenberg, Jonathan) (Entered: 07/15/2014) |
| 07/09/2014 | 99 | MINUTE ORDER: Due to calendar conflicts of the court and the concurrence of counsel the closing arguments set for 7/21/14 are continued to 8/15/2014 at 10:00 AM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii.) signed by District Judge Anthony W. Ishii on 7/9/14. (Nazaroff, H) (Entered: 07/09/2014) |
| 06/30/2014 | 98 | RESPONSE by Calguns Foundation, Inc., Brandon Combs, Jeff Sylvester, The Second Amendment Foundation, Inc. to 89 Trial Brief. (Attachments: # 1 Exhibit A)(Kilmer, Donald) (Entered: 06/30/2014) |
| 06/30/2014 | 97 | TRIAL EXHIBIT *(Contingent Rebuttal)* by Calguns Foundation, Inc., Brandon Combs, Jeff Sylvester, The Second Amendment Foundation, Inc..(Kilmer, Donald) (Entered: 06/30/2014) |

| 06/30/2014 | 96 | RESPONSE by Kamala D. Harris to 93 Memorandum,. (Eisenberg, Jonathan) (Entered: 06/30/2014) |
|---|---|---|
| 06/30/2014 | 95 | RESPONSE by Kamala D. Harris to 91 Proposed Order. (Eisenberg, Jonathan) (Entered: 06/30/2014) |
| 06/30/2014 | 94 | OPPOSITION by Defendant Kamala D. Harris to 92 Objections. (Chang, Peter) (Entered: 06/30/2014) |
| 06/16/2014 | 93 | MEMORANDUM by Calguns Foundation, Inc., Brandon Combs, Jeff Sylvester, The Second Amendment Foundation, Inc. in Support of Proposed Findings of Fact and Conclusions of Law Submitted by Plaintiffs re 91 Proposed Order filed by Jeff Sylvester, Brandon Combs, Calguns Foundation, Inc., The Second Amendment Foundation, Inc.. (Kilmer, Donald) (Entered: 06/16/2014) |
| 06/16/2014 | 92 | OBJECTIONS by Plaintiffs Calguns Foundation, Inc., Brandon Combs, Jeff Sylvester, The Second Amendment Foundation, Inc.. (Kilmer, Donald) (Entered: 06/16/2014) |
| 06/16/2014 | 91 | PROPOSED ORDER re Findings of Fact and Conclusions of Law After Bench Trial by Calguns Foundation, Inc., Brandon Combs, Jeff Sylvester, The Second Amendment Foundation, Inc.. (Kilmer, Donald) (Entered: 06/16/2014) |
| 06/16/2014 | 90 | REQUEST for JUDICIAL NOTICE by Kamala D. Harris in re 89 Trial Brief, 88 Proposed Findings of Fact. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit)(Eisenberg, Jonathan) (Entered: 06/16/2014) |
| 06/16/2014 | 89 | TRIAL BRIEF by Kamala D. Harris.(Eisenberg, Jonathan) (Entered: 06/16/2014) |
| 06/16/2014 | 88 | PROPOSED FINDINGS of FACT by Kamala D. Harris.(Eisenberg, Jonathan) (Entered: 06/16/2014) |
| 04/10/2014 | 87 | TRANSCRIPT of Proceedings held on 3/27/2014, COURT TRIAL, DAY 3, before District Judge Anthony W. Ishii, filed by Court Reporter Gail Thomas, Phone number 559–266–0609 E–mail gthomascrr@sbcglobal.net. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction must be filed within 5 court days. Redaction Request due 5/1/2014. Redacted Transcript Deadline set for 5/12/2014. Release of Transcript Restriction set for 7/10/2014. (Thomas, G) (Entered: 04/10/2014) |
| 04/10/2014 | 86 | TRANSCRIPT of Proceedings held on 3/26/2014, COURT TRIAL, DAY 2, before District Judge Anthony W. Ishii, filed by Court Reporter Gail Thomas, Phone number 559–266–0609 E–mail gthomascrr@sbcglobal.net. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction must be filed within 5 court days. Redaction Request due 5/1/2014. Redacted Transcript Deadline set for 5/12/2014. Release of Transcript Restriction set for 7/10/2014. (Thomas, G) (Entered: 04/10/2014) |
| 04/10/2014 | 85 | TRANSCRIPT of Proceedings held on 3/25/2014, COURT TRIAL, DAY 1, before District Judge Anthony W. Ishii, filed by Court Reporter Gail Thomas, Phone number 559–266–0609 E–mail gthomascrr@sbcglobal.net. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction must be filed within 5 court days. Redaction Request due 5/1/2014. Redacted Transcript Deadline set for 5/12/2014. Release of Transcript Restriction set for 7/10/2014. (Thomas, G) (Entered: 04/10/2014) |
| 03/27/2014 | 84 | MINUTES (Text Only) for proceedings held before District Judge Anthony W. Ishii: BENCH TRIAL THIRD DAY held on 3/27/2014. Witnesses, Blake Graham and Stephen Lindley testify. Exhibits admitted. Parties rest. Transcripts to be submitted to counsel no later than April 21, 2014. The parties shall file Proposed Findings of Fact and COnclusions of Law by June 16, 2014. Any opposition shall be filed by June 30, 2014. Closing argument is set for July 21, 2014 at 1:30 pm Plaintiffs Counsel D. Kilmer, V. Otten present. Defendants Counsel J. Eisenberg, P. Chang present. Court |

| | | Reporter/CD Number: G. Thomas. (Nazaroff, H) (Entered: 03/28/2014) |
|---|---|---|
| 03/27/2014 | 82 | NOTICE *Re: Exhibits* by Calguns Foundation, Inc., Brandon Combs, Jeff Sylvester, The Second Amendment Foundation, Inc.. (Kilmer, Donald) (Entered: 03/27/2014) |
| 03/26/2014 | 83 | MINUTES (Text Only) for proceedings held before District Judge Anthony W. Ishii: BENCH TRIAL SECOND DAY held on 3/26/2014. Witnesses Steven Buford, Donnette Orsi, Gilbert Matsumoto and Blake Graham testify. Exhibits admitted. Court recess to 3/27/14 at 9:00 a.m. Plaintiffs Counsel V. Otten, D. Kilmer present. Defendants Counsel P. Chang, J. Eisenberg present. Court Reporter/CD Number: G. Thoma. (Nazaroff, H) (Entered: 03/27/2014) |
| 03/26/2014 | 80 | NOTICE *of Plaintiffs' Withdrawal of Objections to Certain Exhibits Offered by Defendants* by Calguns Foundation, Inc., Brandon Combs, Jeff Sylvester, The Second Amendment Foundation, Inc.. (Kilmer, Donald) (Entered: 03/26/2014) |
| 03/25/2014 | 81 | MINUTES (Text Only) for proceedings held before District Judge Anthony W. Ishii: BENCH TRIAL FIRST DAY held on 3/25/2014. Opening statements. Witnesses Jeff Silvester, Brandon Combs, Gene Hoffman sworn and testify. Court recess to 3/26/14 at 9:00 a.m. Plaintiffs Counsel D. Kilmer, V. Otten present. Defendants Counsel J. Eisenberg, P. Chang present. Court Reporter/CD Number: G. Thomas. (Nazaroff, H) (Entered: 03/26/2014) |
| 03/25/2014 | 79 | OBJECTIONS by Plaintiffs Calguns Foundation, Inc., Brandon Combs, Jeff Sylvester, The Second Amendment Foundation, Inc. to 78 Request for Judicial Notice. (Kilmer, Donald) (Entered: 03/25/2014) |
| 03/24/2014 | 78 | REQUEST for JUDICIAL NOTICE by Kamala D. Harris. Attorney Nguyen, Kim Le added. (Attachments: # 1 Exhibit Defendant Exhibit List)(Nguyen, Kim) (Entered: 03/24/2014) |
| 03/21/2014 | 77 | ORDER on stipulation regarding testimony of Alan Gottlieb signed by District Judge Anthony W. Ishii on 3/21/14. (Nazaroff, H) (Entered: 03/21/2014) |
| 03/20/2014 | 76 | WITNESS LIST by Calguns Foundation, Inc., Brandon Combs, Jeff Sylvester, The Second Amendment Foundation, Inc..(Kilmer, Donald) (Entered: 03/20/2014) |
| 03/20/2014 | 75 | STIPULATION and PROPOSED ORDER for Depo TX in Lieu of Testimony: Gottlieb by Calguns Foundation, Inc., Brandon Combs, Jeff Sylvester, The Second Amendment Foundation, Inc.. (Kilmer, Donald) (Entered: 03/20/2014) |
| 03/20/2014 | 74 | OBJECTIONS by Defendant Kamala D. Harris to 69 Trial Brief. (Chang, Peter) (Entered: 03/20/2014) |
| 03/20/2014 | 73 | WITNESS LIST by Kamala D. Harris.(Chang, Peter) (Entered: 03/20/2014) |
| 03/20/2014 | 72 | NOTICE OF LODGING DOCUMENT IN PAPER by Kamala D. Harris: Certified Copies of Deposition Transcripts. (Eisenberg, Jonathan) (Entered: 03/20/2014) |
| 03/18/2014 | 71 | TRIAL BRIEF by Kamala D. Harris.(Chang, Peter) (Entered: 03/18/2014) |
| 03/18/2014 | 70 | OBJECTIONS by Plaintiffs Calguns Foundation, Inc., Brandon Combs, Jeff Sylvester, The Second Amendment Foundation, Inc. to 65 Trial Brief. (Kilmer, Donald) (Entered: 03/18/2014) |
| 03/18/2014 | 69 | TRIAL BRIEF by Calguns Foundation, Inc., Brandon Combs, Jeff Sylvester, The Second Amendment Foundation, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Kilmer, Donald) (Entered: 03/18/2014) |
| 03/12/2014 | 67 | ORDER ON MOTIONS IN LIMINE (Docs. 51, 53, 54, 55, 56 ), Signed by District Judge Anthony W. Ishii on 3/12/2014. (Arellano, S.) (Entered: 03/12/2014) |
| 03/11/2014 | 68 | MINUTES (Text Only) for proceedings held before District Judge Anthony W. Ishii: IN COURT HEARING on Motions in Limine held on 3/11/2014. Court to issue order. Plaintiffs Counsel V. Otten, D. Kilmer present. Defendants Counsel J. Eisenberg, P. Chang present. Court Reporter/CD Number: G. Thomas. (Nazaroff, H) (Entered: 03/13/2014) |

| 03/10/2014 | 66 | TRIAL BRIEF by Calguns Foundation, Inc., Brandon Combs, Jeff Sylvester, The Second Amendment Foundation, Inc..(Kilmer, Donald) (Entered: 03/10/2014) |
| 03/10/2014 | 65 | TRIAL BRIEF by Kamala D. Harris.(Eisenberg, Jonathan) (Entered: 03/10/2014) |
| 03/07/2014 | 64 | REPLY by Jeff Sylvester re 62 Opposition to Motion. (Attachments: # 1 PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO MOTION IN LIMINE RE BURDENS OF PROOF)(Otten, Victor) (Entered: 03/07/2014) |
| 03/07/2014 | 63 | REPLY by Calguns Foundation, Inc., Brandon Combs, Jeff Sylvester, The Second Amendment Foundation, Inc. re 59 Opposition to Motion. (Kilmer, Donald) (Entered: 03/07/2014) |
| 03/03/2014 | 62 | OPPOSITION by Kamala D. Harris to 55 MOTION IN LIMINE *RE BURDENS OF PROOF*. (Chang, Peter) (Entered: 03/03/2014) |
| 03/03/2014 | 61 | OPPOSITION by Kamala D. Harris to 56 MOTION IN LIMINE *TO EXCLUDE DOCUMENTS*. (Attachments: # 1 Declaration of Peter H. Chang, # 2 Exhibit 1)(Chang, Peter) (Entered: 03/03/2014) |
| 03/03/2014 | 60 | RESPONSE by Calguns Foundation, Inc., Brandon Combs, Jeff Sylvester, The Second Amendment Foundation, Inc. to 51 MOTION IN LIMINE . (Kilmer, Donald) (Entered: 03/03/2014) |
| 03/03/2014 | 59 | OPPOSITION by Kamala D. Harris to 54 MOTION IN LIMINE *TO EXCLUDE OPINION EVIDENCE*. (Attachments: # 1 Declaration of Peter H. Chang, # 2 Exhibit 1)(Chang, Peter) (Entered: 03/03/2014) |
| 03/03/2014 | 58 | STATEMENT of NON–OPPOSITION by Kamala D. Harris to 53 MOTION to PROCEED IN FORMA PAUPERIS MOTION IN LIMINE *TO EXCLUDE WITNISSES*. (Chang, Peter) (Entered: 03/03/2014) |
| 02/19/2014 | 57 | NOTICE *OF ERRATA* by All Plaintiffs re 54 MOTION IN LIMINE *TO EXCLUDE OPINION EVIDENCE*, 53 MOTION to PROCEED IN FORMA PAUPERIS MOTION IN LIMINE *TO EXCLUDE WITNISSES*, 55 MOTION IN LIMINE *RE BURDENS OF PROOF*. (Otten, Victor) (Entered: 02/19/2014) |
| 02/18/2014 | 56 | MOTION IN LIMINE *TO EXCLUDE DOCUMENTS* by Jeff Sylvester. Motion Hearing set for 3/11/2014 at 01:30 PM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii. (Otten, Victor) (Entered: 02/18/2014) |
| 02/18/2014 | 55 | MOTION IN LIMINE *RE BURDENS OF PROOF* by Jeff Sylvester. Motion Hearing set for 3/11/2014 at 01:30 PM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii. (Otten, Victor) (Entered: 02/18/2014) |
| 02/18/2014 | 54 | MOTION IN LIMINE *TO EXCLUDE OPINION EVIDENCE* by Jeff Sylvester. Motion Hearing set for 3/11/2014 at 01:30 PM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii. (Otten, Victor) (Entered: 02/18/2014) |
| 02/18/2014 | 53 | MOTION to PROCEED IN FORMA PAUPERIS, MOTION IN LIMINE *TO EXCLUDE WITNISSES* ( Motion Hearing set for 3/11/2014 at 01:30 PM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii.) by Jeff Sylvester. (Otten, Victor) (Entered: 02/18/2014) |
| 02/18/2014 | 52 | DECLARATION of Jonathan M. Eisenberg in SUPPORT OF 51 MOTION IN LIMINE . (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Chang, Peter) (Entered: 02/18/2014) |
| 02/18/2014 | 51 | MOTION IN LIMINE by Kamala D. Harris. Motion Hearing set for 3/11/2014 at 01:30 PM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii. (Chang, Peter) (Entered: 02/18/2014) |
| 02/18/2014 | 50 | NOTICE of APPEARANCE by Peter H. Chang on behalf of Kamala D. Harris. Attorney Chang, Peter H. added. (Chang, Peter) (Entered: 02/18/2014) |
| 02/04/2014 | 48 | PRETRIAL ORDER, signed by District Judge Anthony W. Ishii on 2/3/14:*Motions In Limine Hearing and Trial Confirmation Hearing set for 3/11/2014 at 01:30 PM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii; Bench Trial set for 3/25/2014 at 08:30 AM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii.* (Hellings, J) (Entered: 02/04/2014) |

| 02/03/2014 | 49 | MINUTES (Text Only) for proceedings held before District Judge Anthony W. Ishii: PRETRIAL CONFERENCE held on 2/3/2014. The Court set the following motions schedule: Motions filed by 2/18/2014; Opposition filed by 3/3/2014; Replies due by 3/7/2014; **Motion Hearing set for 3/11/2014 at 01:30 PM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii.** Plaintiffs Counsel Victor Otten present. Defendants Counsel Jonathan Eisenberg present. Court Reporter/CD Number: Gail Thomas. (Figueroa, O) . (Entered: 02/05/2014) |
|---|---|---|
| 01/23/2014 | 47 | NOTICE *of Errata* by Kamala D. Harris re 45 Pretrial Statement. (Attachments: # 1 Appendix Amended/Corrected Exhibit List)(Eisenberg, Jonathan) (Entered: 01/23/2014) |
| 01/23/2014 | 46 | MINUTE ORDER: Due to a Calendar Conflict the Pretrial Conference currently set for 1/29/2014 is continued to 2/3/2014 at 01:30 PM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii. Personal appearance by counsel is mandatory. signed by District Judge Anthony W. Ishii on 1/23/14. (Nazaroff, H) (Entered: 01/23/2014) |
| 01/22/2014 | 45 | PRETRIAL STATEMENT by Plaintiff Jeff Sylvester. (Attachments: # 1 AG Attachment)(Otten, Victor) (Entered: 01/22/2014) |
| 12/09/2013 | 44 | ORDER on Defendant's Motion for Summary Judgment 31 , signed by District Judge Anthony W. Ishii on 12/6/13: *Defendant's Motion for Summary Judgment is DENIED*. (Hellings, J) (Entered: 12/09/2013) |
| 11/25/2013 | 43 | SUPPLEMENT by Calguns Foundation, Inc. re 34 Opposition to Motion. (Otten, Victor) (Entered: 11/25/2013) |
| 11/01/2013 | 42 | RESPONSE by Jeff Sylvester to 37 Reply. (Otten, Victor) (Entered: 11/01/2013) |
| 11/01/2013 | 41 | NOTICE *OF ERRATA* by All Plaintiffs. Attorney Otten, Victor John added. (Attachments: # 1 Exhibit Errata to Sylvester interrogatory responses, missing page 7)(Otten, Victor) (Entered: 11/01/2013) |
| 10/26/2013 | 40 | NOTICE *of Errata* by Kamala D. Harris re 37 Reply. (Eisenberg, Jonathan) (Entered: 10/26/2013) |
| 10/25/2013 | 39 | DECLARATION of Victor Otten in OPPOSITION TO 31 MOTION for SUMMARY JUDGMENT. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Otten, Victor) (Entered: 10/25/2013) |
| 10/24/2013 | 38 | ORDER Vacating October 28, 2013 Hearing signed by District Judge Anthony W. Ishii on 10/23/2013. (Flores, E) (Entered: 10/24/2013) |
| 10/22/2013 | 37 | REPLY by Kamala D. Harris re 31 MOTION for SUMMARY JUDGMENT. (Attachments: # 1 Statement Objections to Plaintiffs' Separate Statement)(Eisenberg, Jonathan) (Entered: 10/22/2013) |
| 10/22/2013 | 36 | STIPULATION and ORDER to Extend by One Day the Reply–Brief Deadline on Kamala Harris' Motion for Summary Judgment (Doc. 35 ), Signed by District Judge Anthony W. Ishii on 10/18/2013. Filing deadline: 10/22/2013. (Arellano, S.) (Entered: 10/22/2013) |
| 10/17/2013 | 35 | STIPULATION and PROPOSED ORDER for One–Day Deadline Extension Re: MSJ Reply Brief re 32 Opposition to Motion, 31 MOTION for SUMMARY JUDGMENT, 34 Opposition to Motion, 33 Opposition to Motion by Kamala D. Harris. (Eisenberg, Jonathan) (Entered: 10/17/2013) |
| 10/16/2013 | 34 | OPPOSITION by Calguns Foundation, Inc. to 31 MOTION for SUMMARY JUDGMENT. (Otten, Victor) (Entered: 10/16/2013) |
| 10/15/2013 | 33 | OPPOSITION by Calguns Foundation, Inc. to 31 MOTION for SUMMARY JUDGMENT. (Otten, Victor) (Entered: 10/15/2013) |
| 10/15/2013 | 32 | OPPOSITION by Calguns Foundation, Inc. to 31 MOTION for SUMMARY JUDGMENT. (Otten, Victor) (Entered: 10/15/2013) |
| 09/25/2013 | 31 | MOTION for SUMMARY JUDGMENT by Kamala D. Harris. Motion Hearing set for 10/28/2013 at 01:30 PM in Courtroom 2 (AWI) before District Judge Anthony W. Ishii. (Attachments: # 1 Points and Authorities, # 2 Declaration, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Proof of Service)(Eisenberg, Jonathan) (Entered: |

| | | 09/25/2013) |
|---|---|---|
| 06/24/2013 | 30 | ORDER SUBSTITUTING ATTORNEY. Added attorney Victor John Otten for The Second Amendment Foundation, Inc., in place of Jason Davis, signed by Magistrate Judge Sheila K. Oberto on 6/24/13. (Hellings, J) (Entered: 06/25/2013) |
| 06/24/2013 | 29 | ORDER SUBSTITUTING ATTORNEY. Added attorney Victor John Otten for Jeff Sylvester, in place of Jason Davis, signed by Magistrate Judge Sheila K. Oberto on 6/24/13. (Hellings, J) (Entered: 06/25/2013) |
| 06/24/2013 | 28 | ORDER SUBSTITUTING ATTORNEY. Added attorney Victor John Otten for Brandon Combs, in place of Jason Davis, signed by Magistrate Judge Sheila K. Oberto on 6/24/13. (Hellings, J) (Entered: 06/25/2013) |
| 06/24/2013 | 27 | ORDER SUBSTITUTING ATTORNEY. Added attorney Victor John Otten for The Calguns Foundation, Inc., in place of Jason Davis, signed by Magistrate Judge Sheila K. Oberto on 6/24/13. (Hellings, J) (Entered: 06/25/2013) |
| 06/21/2013 | 26 | CLERKS NOTICE TO Jason Davis: (TEXT ENTRY ONLY) The docket indicates that you docketed proposed orders 22 23 24 & 25 (Substitution of Attorneys). Please also submit the documents in Word or WordPerfect format to Judge Oberto's order box, skoorders@caed.uscourts.gov for signature. (Gaumnitz, R) (Entered: 06/21/2013) |
| 06/20/2013 | 25 | SUBSTITUTION of ATTORNEY – PROPOSED, submitted by Brandon Combs. (Davis, Jason) (Entered: 06/20/2013) |
| 06/20/2013 | 24 | SUBSTITUTION of ATTORNEY – PROPOSED, submitted by The Calguns Foundation, Inc.. (Davis, Jason) (Entered: 06/20/2013) |
| 06/20/2013 | 23 | SUBSTITUTION of ATTORNEY – PROPOSED, submitted by The Second Amendment Foundation, Inc.. (Davis, Jason) (Entered: 06/20/2013) |
| 06/20/2013 | 22 | SUBSTITUTION of ATTORNEY – PROPOSED, submitted by Jeff Sylvester. (Davis, Jason) (Entered: 06/20/2013) |
| 04/23/2013 | 21 | STIPULATION of DISMISSAL *of Plaintiff Michael Poeschl* by Michael Poeschl. (Attachments: # 1 Proof of Service Proof of Service of Stipulated Dismissal of Michael Poeschl)(Davis, Jason) (Entered: 04/23/2013) |
| 04/18/2013 | 20 | **ORDER** *GRANTING* STIPULATION for Protective Order. Order signed by Magistrate Judge Sheila K. Oberto on 4/18/2013. (Timken, A) (Entered: 04/18/2013) |
| 04/12/2013 | 19 | STIPULATION and PROPOSED ORDER for Protective Order by Brandon Combs, Michael Poeschl, Jeff Sylvester, The Calguns Foundation, Inc., The Second Amendment Foundation, Inc.. (Attachments: # 1 Proof of Service Proof of Service of Stipulated Protective Order)(Davis, Jason) (Entered: 04/12/2013) |
| 12/10/2012 | 18 | MINUTE ORDER: ***TEXT ENTRY ONLY*** At the agreement of Counsel, the Mid–Discovery Status Conference set 12/13/2012, at 9:30am in Courtroom 7 before Magistrate Judge Sheila K. Oberto is ORDERED VACATED. Minute Order signed by Magistrate Judge Sheila K. Oberto on 12/10/2012. (Gaumnitz, R) (Entered: 12/10/2012) |
| 12/07/2012 | 17 | NOTICE of CHANGE of ADDRESS by Jason Andrew Davis. (Davis, Jason) (Entered: 12/07/2012) |
| 12/07/2012 | 16 | JOINT STATUS REPORT by Brandon Combs, Michael Poeschl, Jeff Sylvester, The Calguns Foundation, Inc., The Second Amendment Foundation, Inc.. (Davis, Jason) (Entered: 12/07/2012) |
| 05/15/2012 | 15 | SCHEDULING ORDER: signed by Magistrate Judge Sheila K. Oberto on 5/15/2012. Non–Dispositive Motions filed by 9/25/2013. Dispositive Motions filed by 10/30/2013, Pretrial Conference set for 1/29/2014 at 08:30 AM in Courtroom 2 (AWI) before Chief Judge Anthony W. Ishii. Bench Trial (7 Days) set for 3/25/2014 at 08:30 AM in Courtroom 2 (AWI) before Chief Judge Anthony W. Ishii (Kusamura, W) (Entered: 05/15/2012) |
| 05/15/2012 | 14 | MINUTES (Text Only) for proceedings held before Magistrate Judge Sheila K. Oberto: TELEPHONIC SCHEDULING CONFERENCE held on 5/15/2012. Court to |

| | | issue Order with Schedule. Plaintiffs Counsel J. Davis Defendants Counsel J. Eisenberg (Kusamura, W) (Entered: 05/15/2012) |
|---|---|---|
| 05/04/2012 | 13 | JOINT SCHEDULING REPORT by Brandon Combs, Michael Poeschl, Jeff Sylvester, The Calguns Foundation, Inc., The Second Amendment Foundation, Inc.. (Davis, Jason) (Entered: 05/04/2012) |
| 04/10/2012 | 12 | NOTICE of CHANGE of ADDRESS by Jason Andrew Davis. (Davis, Jason) (Entered: 04/10/2012) |
| 03/15/2012 | 11 | ANSWER to 10 Amended Complaint by Kamala D. Harris.(Eisenberg, Jonathan) (Entered: 03/15/2012) |
| 02/24/2012 | 10 | FIRST AMENDED COMPLAINT against Kamala D. Harris by Jeff Sylvester, Michael Poeschl, The Calguns Foundation, Inc., The Second Amendment Foundation, Inc., Brandon Combs.(Davis, Jason) (Entered: 02/24/2012) |
| 02/14/2012 | 9 | STIPULATION and ORDER *EXTENDING* Defendants' time to respond to complaint. Order signed by Magistrate Judge Sheila K. Oberto on 2/14/2012. (Timken, A) (Entered: 02/14/2012) |
| 02/09/2012 | 8 | STIPULATION and PROPOSED ORDER for Extending Defendants' Time to Respond to Complaint by Kamala D. Harris. Attorney Eisenberg, Jonathan Michael added. (Eisenberg, Jonathan) (Entered: 02/09/2012) |
| 01/25/2012 | 7 | SUMMONS RETURNED EXECUTED: California Department of Justice served on 1/24/2012, answer due 2/14/2012. (Davis, Jason) (Entered: 01/25/2012) |
| 01/25/2012 | 6 | SUMMONS RETURNED EXECUTED: Kamala D. Harris served on 1/24/2012, answer due 2/14/2012. (Davis, Jason) (Entered: 01/25/2012) |
| 12/27/2011 | 5 | CIVIL NEW CASE DOCUMENTS ISSUED; Initial Scheduling Conference set for 5/15/2012 at 09:30 AM in Courtroom 7 (SKO) before Magistrate Judge Sheila K. Oberto. (Attachments: # 1 Consent Form, # 2 VDRP Form) (Hellings, J) (Entered: 12/27/2011) |
| 12/27/2011 | 4 | SUMMONS ISSUED as to *Kamala D. Harris* with answer to complaint due within *21* days. Attorney *Jason Andrew Davis* *Davis and Associates* *27281 Las Ramblas, Suite 200* *Mission Viejo, CA 92691*. (Hellings, J) (Entered: 12/27/2011) |
| 12/27/2011 | 3 | SUMMONS ISSUED as to *California Department of Justice* with answer to complaint due within *21* days. Attorney *Jason Andrew Davis* *Davis and Associates* *27281 Las Ramblas, Suite 200* *Mission Viejo, VA 92691*. (Hellings, J) (Entered: 12/27/2011) |
| 12/23/2011 | | RECEIPT number #CAE100017341 $350.00 fbo Jeff Sylvester by Jeff Sylvester on 12/23/2011. (Flores, E) (Entered: 12/23/2011) |
| 12/23/2011 | 1 | COMPLAINT against All Defendants by JEFF SYLVESTER, MICHAEL POESCHL, THE CALGUNS FOUNDATION, INC., THE SECOND AMENDMENT FOUNDATION, INC., BRANDON COMBS. (Attachments: # 1 Civil Cover Sheet)(Davis, Jason) (Entered: 12/23/2011) |

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name: **Silvester, Jeff et al. v. Kamala D. Harris**
No.: **14-16840**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

On <u>March 25, 2015</u>, I served the attached:

**DEFENDANT-APPELLANT'S EXCERPTS OF RECORD VOLUMES 1 & 2**

by placing a true copy thereof enclosed in a sealed envelope in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

Bradley A. Benbrook
Stephen M. Duvernay
Benbrook Law Group, PC
400 Capitol Mall, Suite 1610
Sacramento, CA 95814-2248

Donald E.J. Kilmer, Jr.
Law Offices of Donald Kilmer
1645 Willow Street, Suite 150
San Jose, CA 95125

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>March 25, 2015</u>, at San Francisco, California.

| V. Sanchez | |
|---|---|
| Declarant | Signature |

SA2014118559
41251459.doc