# EXHIBIT C

*Adam Winkler*

# GUNFIGHT

*The Battle over the Right to Bear Arms in America*

## ADAM WINKLER

CALIF. ATTY. GENL
LIBRARY
JAN 22 2014
LOS ANGELES

W. W. Norton & Company

New York · London

Copyright © 2011 by Adam Winkler

All rights reserved
Printed in the United States of America
First Edition

For information about permission to reproduce selections from this book,
write to Permissions, W. W. Norton & Company, Inc.,
500 Fifth Avenue, New York, NY 10110

For information about special discounts for bulk purchases, please contact
W. W. Norton Special Sales at specialsales@wwnorton.com or 800-233-4830

Manufacturing by Courier Westford
Book design by Lovedog Studio
Production manager: Anna Oler

Library of Congress Cataloging-in-Publication Data

Winkler, Adam.
Gunfight : the battle over the right to bear arms
in america / Adam Winkler.
    p. cm.
Includes bibliographical references and index.
ISBN 978-0-393-07741-4 (hardcover)
1. Firearms—Law and legislation—United States—History.
2. Gun control—United States. 3. United States. Constitution.
2nd Amendment. I. Title.
    KF3941.W56 2011
    344.730'533—dc22
                                                      2011014429

W. W. Norton & Company, Inc.
500 Fifth Avenue, New York, N.Y. 10110
www.wwnorton.com

W. W. Norton & Company Ltd.
Castle House, 75/76 Wells Street, London W1T 3QT

1 2 3 4 5 6 7 8 9 0

Winkler, Adam
Gunfight : the battle over the
to bear arms in America

*To Melissa, for her enduring inspiration;
and to Danny, for her smile.*

x

The longstanding effort to balance gun rights with gun control was just one of many surprising discoveries I made while researching this book. I also found that race and racism have played a central role in the evolution of gun law. America's founders strictly prohibited slaves and even free blacks from owning guns, lest they use them for the same purpose the colonists did in 1776: to revolt against tyranny. America's most notorious racists, the Ku Klux Klan, which was formed after the Civil War, made their first objective the confiscation of all guns from newly freed blacks, who gained access to guns in service to the Union Army. In the twentieth century, gun control laws were often enacted after blacks with guns came to be perceived as a threat to whites. Ironically, it was conservatives like Ronald Reagan—still a hero to the members of the National Rifle Association—who promoted new restrictions on guns.

Indeed, the gun rights movement so familiar to modern-day Americans is a relatively new phenomenon, even though the ability of individuals to bear arms is one of our oldest constitutional rights. For much of its history, the NRA, which was founded in 1871 by a former reporter for a newspaper not known for its sympathy for gun rights, the *New York Times*, supported rather extensive gun control laws. When a wave of laws requiring a license to carry a concealed weapon swept the nation in the 1920s and 1930s, leaders of the NRA were closely involved with the drafting of the bills, which they then lobbied state governments to adopt. It wasn't until the 1970s that the NRA became the political powerhouse committed to a more extreme view of gun rights we know today.

What I learned about the Second Amendment was unexpected too. For all the attention paid to whether that ambiguously-worded provision guarantees individuals a right to own guns or just protects states' right to form militias, the right to bear arms has never rested primarily on the U.S. Constitution. The vast majority of states—forty-three as of this printing—protect the right of individuals to bear arms in their own state constitutions, meaning most Americans would enjoy the right regardless of the Second Amendment. And while my research led me to conclude that the NRA was correct in reading the

Second Amendment to guarantee an individual right to bear arms, I was startled to discover that it was only recently that the NRA made the Second Amendment the heart of its mission. Although long a supporter of law-abiding individuals' access to firearms, the NRA for most of its history ignored the Second Amendment.

It was my desire to share these discoveries, which shatter so many of the myths of America's gun culture, that led me to write *Gunfight*.

in the gun debate reaches different conclusions, but they begin with the same premise: we can't have both an individual right to own guns and gun control. We must choose one or the other.

THE HISTORY and tradition of the right to bear arms in the United States tell a different story. Gun rights and gun control are not only compatible; they have lived together since the birth of America. Despite the controversy over the meaning of the Second Amendment, Americans have always had the right to keep and bear arms as a matter of state constitutional law. Today, nearly every state has such a provision in its own constitution, clearly protecting an individual right unattached to militia service. In fact, it is one of the oldest, most firmly established rights in America—regardless of the Second Amendment.

At the same time, we've also always had gun control. The founding fathers instituted gun control laws so intrusive that no self-respecting member of today's NRA board of directors would support them. Early Americans denied the right to gun ownership even to law-abiding people if they failed a political test of loyalty to the Revolution. The founders also declared that free white men were members of the militia and, as such, were forced to appear with their guns at public "musters" where government officials would inspect the weapons and register them on public rolls. When pressing public necessity demanded it, the founding fathers were also willing to impress guns from law-abiding citizens, even if those citizens were left without guns to defend themselves from a criminal attack.

Unlike the unreasonable right to bear arms promoted by extremists in the gun debate, a reasonable right to bear arms has always been available to Americans—one that balances gun rights with gun control. Although the precise equilibrium has always been in flux, changing in response to the times, the story of guns in America is about regulation and right. We don't have to choose between fully automatic machine guns and water pistols. The history of guns in

America shows that we can take a middle course, recognizing the rights to bear arms and the legitimacy of many forms of gun control. This book shows how generations of Americans have struggled to find the proper balance between gun rights and regulation—and highlights how gun control, not just guns, transformed and shaped the American identity. When seen from this angle, much of what people commonly believe about guns is revealed to be wrong or incomplete.

America, it is often said, has a gun culture. It is less well recognized, however, that America also has a gun *control* culture. The frontier towns of the Wild West, where Hollywood tells us shootouts were common at high noon, in reality had extensive gun control and little gun violence. Town ordinances in the famous gun havens of the West, places like Tombstone, Arizona, and Dodge City, Kansas, required newcomers to hand their guns over to the sheriff or leave them with their horses at the stables on the outskirts of town. You are certain to see more gunfights in a two-hour movie about the Wild West than you would have seen in a year on the dusty streets of Deadwood, South Dakota.

When the nuanced history of gun rights and gun control is examined, odd contradictions and startling surprises abound. The South, today a bastion of strong gun rights, was the region where some of the earliest, most burdensome gun control laws in American history were first enacted. In many ways, the gun control laws of the South in the nineteenth century were stricter than those of the same states today. Surprisingly, many of those early laws were designed not to keep guns out of the hands of blacks but to reduce violence among white men. To be sure, like so much in America, gun rights and gun control have also been tainted by racism. Few people realize it, but the Ku Klux Klan began as a gun control organization; after the Civil War, the Klan and other violent racist groups sought to reaffirm white supremacy, which required confiscating the guns blacks had obtained for the first time during the conflict. To prevent blacks from fighting back, the night riders set out to achieve complete black disarmament. In the 1960s, race was also central to a new wave of gun control laws, which were backed by liberals and even some conservatives, like Ronald Reagan.

"probably the most influential living American constitutional scholar"—weighed in on the side of Kates and Levinson. "I've gotten an avalanche of angry mail from apparent liberals who said, 'How could you?'" Tribe noted. "But as someone who takes the Constitution seriously, I thought I had a responsibility to see what the Second Amendment says, and how it fits."[37]

Levinson's article drew attention not simply because he was a liberal, although that certainly enhanced the story. Between 1983, when Kates's article was published, and 1989, when Levinson's came out, the gun issue had exploded onto the national political scene. In the 1988 presidential election, the NRA actively campaigned against the gun control supporter Michael Dukakis, running ads in twenty states featuring Charlton Heston and distributing "Defeat Dukakis" bumper stickers. Despite an early two-digit lead in the polls, Dukakis lost the election to George H. W. Bush, and political analysts pointed to guns as one of the primary reasons. Dukakis's running mate, Senator Lloyd Bentsen of Texas, blamed the loss on "the incredible effect of gun control." In the West and South, Bentsen lamented, "we lost a lot of Democrats on peripheral issues like gun control and the pledge" of allegiance. As another commentator said, "the gun issue turned what might have been a very close election into an electoral landslide."[38]

Some historians, like Jack Rakove, winner of a Pulitzer Prize, continued to argue that the Second Amendment was only about protecting militias. Others, like Saul Cornell and David Konig, rejected the traditional militia theory and argued that, while the amendment did guarantee an individual right, it was only a right to serve in militias. These latter scholars likened the right to keep and bear arms to jury service: more a civic duty than a libertarian right rooted in personal self-defense. These accounts emphasized the paucity of explicit discussions in the founding era about the importance of guns for protection against ordinary criminals.[39]

Yet the vast majority of the Second Amendment scholarship published since Don Kates first wrote his groundbreaking article made it increasingly seem that there was a standard model for the Second

Amendment, as there was for human evolution. "The resurgence of academic interest in the Second Amendment," Clark Neily observed, produced a body of scholarship that could neither be ignored nor dismissed by opponents of the individual-rights model—or, it turns out, by the federal courts."[40]

* * *

IN THE Revolutionary Era, gun laws were strict. Because there was no standing army, the national defense depended upon an armed citizenry capable of fighting off invading European powers or hostile Native tribes. With national defense becoming too important to leave to individual choice or the free market, the founders implemented laws that required all free men between the ages of eighteen and forty-five to outfit themselves with a musket, rifle, or other firearm suitable for military service. It didn't matter whether someone didn't like guns or already had a shotgun good for hunting birds. Every man of age was legally mandated to acquire a militarily useful gun. This mandate was enforced at "musters," public gatherings held several times a year where every person eligible for militia service was required to attend, military gun in hand. At the musters, government officials would inspect people's guns and account for the firearms on public rolls—an early version of gun registration.[41]

In some states, like New Hampshire and Rhode Island, government officials conducted door-to-door surveys of gun ownership in the community. In case of an attack, the government needed to know where the guns necessary to mount a defense were. If the government decided that a privately owned gun was needed, the founding fathers used a temporary form of gun confiscation known as "impressment" to seize the gun from its owner. Ten of the thirteen colonies impressed privately owned firearms for the war effort against England. Impressed guns would eventually be returned to their owners, but the seizure itself might leave the owner without a firearm to defend himself against an ordinary criminal attack. To the founding fathers, leaving an individual without a gun to defend himself was

immaterial in light of the public need for that firearm. Guns were privately owned, but, in a sense, they were assets to be used if necessary for the public good.

The Revolutionary-era militia laws alone amount to a set of onerous gun laws that few modern-day gun rights advocates would ever accept. Imagine the outcry if Massachusetts announced that every gun owner of a certain age was required to appear with his or her guns at a public gathering where government officials would inspect the weapons and register them on state rolls.

The founders believed that ordinary people should have guns and that government shouldn't be allowed to completely disarm the citizenry. Yet their vision was certainly not that of today's gun rights hard-liners, who dismiss nearly any gun regulation as an infringement on individual liberty. Although the fact is rarely discussed in the individual-rights literature, the founding generation had many forms of gun control. They might not have termed it "gun control," but the founders understood that gun rights had to be balanced with public safety needs.

Government efforts to enhance public safety by regulating guns are as old as guns themselves. Credit—or blame—for inventing the first gun is often given to a Franciscan monk named Berthold Schwarz, who lived in Germany in the late 1200s and early 1300s. The exact dating of the invention is far from certain. Explosive powder goes back nearly a thousand years earlier. The Chinese reportedly had a handheld device made of bamboo that used gunpowder to shoot arrows in the 1100s. Guns, however, began to appear in Europe in the first decades of the 1300s, and laws restricting weapons quickly followed. In 1328, England enacted the Statute of Northampton, which provided that "no man great nor small, of what condition soever he be," shall "come before the King's justices, or other of the King's ministers doing their office, with force and arms" or "ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers. . . upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure." The law was intended mainly to limit traditional arms, like swords and knives, which were

far more numerous at the time, but it applied equally to Berthold Schwarz's new invention.[42]

After gun control was abused by James II, the English Bill of Rights adopted in his wake didn't put an end to regulation of guns. Although that bill recognized the right to bear arms, the right was clearly limited. It applied only to Protestants, and even they were merely allowed guns "suitable to their conditions and as allowed by law." Soon after the English Bill of Rights was adopted, Parliament passed a law restricting the stockpiling of weapons by Catholics, whom the Protestant majority thought untrustworthy.[43]

Gun safety regulation was commonplace in the American colonies from their earliest days. The threat of hostile Native tribes led to government policies on gun ownership and use. In 1611, Governor Lord De La Warr of Virginia—after whom the state of Delaware is named—responded to a drawn-out battle with the Powhatan by ordering that all of the Jamestown settlers' muskets were officially part of the colony's public arsenal. By the end of that century, Massachusetts and Connecticut had both outlawed "matchlocks"—an early type of gun with a mechanism to ignite the firearm's gunpowder, freeing the shooter from having to lower the burning wick by hand—because they weren't effective enough in confrontations with the Natives. More dependable was the "wheel lock," an invention of Leonardo da Vinci that, like a modern-day lighter, used the rotation of a small wheel pressed against a flint to throw off sparks. In numerous colonies, governments used their regulatory authority to require men to carry guns to church and public meetings in order to, as a 1643 law in Connecticut explained, "prevent or withstand such sudden assaults as may be made" by Natives. Colonial laws frequently barred gun owners from selling firearms to the Natives. The right to bear arms in the colonial era was not a libertarian license to do whatever a person wanted with a gun. When public safety demanded that gun owners do something, the government was recognized to have the authority to make them do it.[44]

Selective disarmament was well within that authority, at least in the view of the founding fathers. They supported forcible disarma-

Case: 14-16840, 03/25/2015, ID: 9472629, DktEntry: 25-4, Page 8 of 12

ment of slaves, free blacks, and people of mixed race out of fear that these groups would use guns to revolt against slave masters. Even if free blacks and people of mixed race were completely law-abiding, they were prohibited from owning or carrying guns. Certain states were more liberal, like Virginia, where an 1806 law permitted "every negro or mulatto" who wasn't a slave to own a gun. Even here, however, they had to obtain permission from local officials, who had complete discretion over whether to grant the request.[45]

American colonists didn't bar only racial minorities from having guns. White people, too, were the target of gun control. Before the Revolution, at least one colony, Maryland, passed a law barring Catholics from possessing firearms. Other colonial governments prohibited any white person unwilling to affirm his allegiance to the British Crown from collecting firearms. Then, when the political winds shifted, people who didn't support the Revolution were ordered to turn over their guns. Only those prepared to swear their loyalty to the cause were entitled to keep and bear arms. The Loyalists disarmed by these rules, like those in Pennsylvania, weren't criminals or traitors who took up arms on behalf of the British. They were ordinary citizens exercising their fundamental right to freedom of conscience.[46]

The number of people eligible for disarmament by founding-era gun control was considerable. In some states, slaves and free blacks far outnumbered the white population. Some historians estimate that Loyalists opposed to the Revolution constituted up to 40 percent of the white population. Adding these groups together leaves only a small minority of people who fully enjoyed the right to keep and bear arms. The founders didn't think government should have the power to take away everyone's guns, but they were perfectly willing to confiscate weapons from anyone deemed untrustworthy—a category so broadly defined that it included a majority of the people.[47]

The burdensome militia laws and the disarmament of select groups were not the only forms of gun control in early America. The pressures to implement gun control in urban areas were intense even back then. Some cities and states adopted equivalents of today's "safe storage" laws. In several places, laws required that gunpowder

be stored on the top floor of a building. The explosive power, which was being sold at the time by a start-up company named DuPont, was considered a safety hazard. In South Carolina before the Revolution, safe storage requirements were imposed on slave owners, who were required to keep their firearms locked up. Just as modern-day laws seek to prevent children from gaining access to guns, southern states sought to ensure that slaves couldn't get hold of a firearm.[48]

When public safety demanded it, the founding fathers were willing to go even further. In Boston, city leaders determined that the combustibility of gunpowder posed such a danger that all loaded firearms had to be kept out of buildings. A law from 1783 imposed a fine on "any person" who "shall take into any dwelling-house, stable, barn, out-house, ware-house, store, shop, or other building, within the town of Boston, any . . . fire-arm, loaded with, or having gunpowder." A second provision of the law effectively prohibited keeping a loaded firearm even in one's own home: "all . . . fire-arms . . . of any kind, that shall be found in any dwelling-house . . . or other building, charged with, or having in them any gun-powder, shall be liable to be seized" and forfeited. Given how time-consuming the loading of a gun was in those days, these two provisions imposed a significant burden on one's ability to have a functional firearm available for self-defense in the home. Yet there is no record of anyone's complaining that this law infringed the people's right to keep and bear arms. Even though the inspiration for this law was prevention of fires, not, say, protecting children from accidental shootings, the lesson remains the same: pressing safety concerns led Bostonians to effectively ban loaded weapons from any building in the city.[49]

The individual-rights literature that arose in the wake of Don Kates's article featured countless confident claims that gun control was a modern, twentieth-century invention. The facts suggest otherwise. The founding fathers had numerous gun control laws, that responded to the public safety needs of their era. While our own public safety needs are different and require different responses, the basic idea that gun possession must be balanced with gun safety laws was one that the founders endorsed.

immaterial in light of the public need for that firearm. Guns were privately owned, but, in a sense, they were assets to be used if necessary for the public good.

The Revolutionary-era militia laws alone amount to a set of onerous gun laws that few modern-day gun rights advocates would ever accept. Imagine the outcry if Massachusetts announced that every gun owner of a certain age was required to appear with his or her guns at a public gathering where government officials would inspect the weapons and register them on state rolls.

The founders believed that ordinary people should have guns and that government shouldn't be allowed to completely disarm the citizenry. Yet their vision was certainly not that of today's gun rights hard-liners, who dismiss nearly any gun regulation as an infringement on individual liberty. Although the fact is rarely discussed in the individual-rights literature, the founding generation had many forms of gun control. They might not have termed it "gun control," but the founders understood that gun rights had to be balanced with public safety needs.

Government efforts to enhance public safety by regulating guns are as old as guns themselves. Credit—or blame—for inventing the first gun is often given to a Franciscan monk named Berthold Schwarz, who lived in Germany in the late 1200s and early 1300s. The exact dating of the invention is far from certain. Explosive powder goes back nearly a thousand years earlier. The Chinese reportedly had a handheld device made of bamboo that used gunpowder to shoot arrows in the 1100s. Guns, however, began to appear in Europe in the first decades of the 1300s, and laws restricting weapons quickly followed. In 1328, England enacted the Statute of Northampton, which provided that "no man great nor small, of what condition soever he be," shall "come before the King's justices, or other of the King's ministers doing their office, with force and arms" or "ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers . . . upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure." The law was intended mainly to limit traditional arms, like swords and knives, which were

far more numerous at the time, but it applied equally to Berthold Schwarz's new invention.[42]

After gun control was abused by James II, the English Bill of Rights adopted in his wake didn't put an end to regulation of guns. Although that bill recognized the right to bear arms, the right was clearly limited. It applied only to Protestants, and even they were merely allowed guns "suitable to their conditions and as allowed by law." Soon after the English Bill of Rights was adopted, Parliament passed a law restricting the stockpiling of weapons by Catholics, whom the Protestant majority thought untrustworthy.[43]

Gun safety regulation was commonplace in the American colonies from their earliest days. The threat of hostile Native tribes led to government policies on gun ownership and use. In 1611, Governor Lord De La Warr of Virginia—after whom the state of Delaware is named—responded to a drawn-out battle with the Powhatan by ordering that all of the Jamestown settlers' muskets were officially part of the colony's public arsenal. By the end of that century, Massachusetts and Connecticut had both outlawed "matchlocks"—an early type of gun with a mechanism to ignite the firearm's gunpowder, freeing the shooter from having to lower the burning wick by hand—because they weren't effective enough in confrontations with the Natives. More dependable was the "wheel lock," an invention of Leonardo da Vinci that, like a modern-day lighter, used the rotation of a small wheel pressed against a flint to throw off sparks. In numerous colonies, governments used their regulatory authority to require men to carry guns to church and public meetings in order to, as a 1643 law in Connecticut explained, "prevent or withstand such sudden assaults as may be made" by Natives. Colonial laws frequently barred gun owners from selling firearms to the Natives. The right to bear arms in the colonial era was not a libertarian license to do whatever a person wanted with a gun. When public safety demanded that gun owners do something, the government was recognized to have the authority to make them do it.[44]

Selective disarmament was well within that authority, at least in the view of the founding fathers. They supported forcible disarma-

ment of slaves, free blacks, and people of mixed race out of fear that these groups would use guns to revolt against slave masters. Even if free blacks and people of mixed race were completely law-abiding, they were prohibited from owning or carrying guns. Certain states were more liberal, like Virginia, where an 1806 law permitted "every negro or mulatto" who wasn't a slave to own a gun. Even here, however, they had to obtain permission from local officials, who had complete discretion over whether to grant the request.[45]

American colonists didn't bar only racial minorities from having guns. White people, too, were the target of gun control. Before the Revolution, at least one colony, Maryland, passed a law barring Catholics from possessing firearms. Other colonial governments prohibited any white person unwilling to affirm his allegiance to the British Crown from collecting firearms. Then, when the political winds shifted, people who didn't support the Revolution were ordered to turn over their guns. Only those prepared to swear their loyalty to the cause were entitled to keep and bear arms. The Loyalists disarmed by these rules, like those in Pennsylvania, weren't criminals or traitors who took up arms on behalf of the British. They were ordinary citizens exercising their fundamental right to freedom of conscience.[46]

The number of people eligible for disarmament by founding-era gun control was considerable. In some states, slaves and free blacks far outnumbered the white population. Some historians estimate that Loyalists opposed to the Revolution constituted up to 40 percent of the white population. Adding these groups together leaves only a small minority of people who fully enjoyed the right to keep and bear arms. The founders didn't think government should have the power to take away everyone's guns, but they were perfectly willing to confiscate weapons from anyone deemed untrustworthy—a category so broadly defined that it included a majority of the people.[47]

The burdensome militia laws and the disarmament of select groups were not the only forms of gun control in early America. The pressures to implement gun control in urban areas were intense even back then. Some cities and states adopted equivalents of today's "safe storage" laws. In several places, laws required that gunpowder

be stored on the top floor of a building. The explosive power, which was being sold at the time by a start-up company named DuPont, was considered a safety hazard. In South Carolina before the Revolution, safe storage requirements were imposed on slave owners, who were required to keep their firearms locked up. Just as modern-day laws seek to prevent children from gaining access to guns, southern states sought to ensure that slaves couldn't get hold of a firearm.[48]

When public safety demanded it, the founding fathers were willing to go even further. In Boston, city leaders determined that the combustibility of gunpowder posed such a danger that all loaded firearms had to be kept out of buildings. A law from 1783 imposed a fine on "any person" who "shall take into any dwelling-house, stable, barn, out-house, ware-house, store, shop, or other building, within the town of Boston, any . . . fire-arm, loaded with, or having gun-powder." A second provision of the law effectively prohibited keeping a loaded firearm even in one's own home: "all . . . fire-arms . . . of any kind, that shall be found in any dwelling-house . . . or other building, charged with, or having in them any gun-powder, shall be liable to be seized" and forfeited. Given how time-consuming the loading of a gun was in those days, these two provisions imposed a significant burden on one's ability to have a functional firearm available for self-defense in the home. Yet there is no record of anyone's complaining that this law infringed the people's right to keep and bear arms. Even though the inspiration for this law was prevention of fires, not, say, protecting children from accidental shootings, the lesson remains the same: pressing safety concerns led Bostonians to effectively ban loaded weapons from any building in the city.[49]

The individual-rights literature that arose in the wake of Don Kates's article featured countless confident claims that gun control was a modern, twentieth-century invention. The founding fathers had numerous gun control laws of their era. While our own public safety needs are different and require different responses, the basic idea that gun possession must be balanced with gun safety laws was one that the founders endorsed.

part of the story behind the law. New York's gun problem was often blamed on immigrants who brought with them to America a fondness for pocket pistols and habit of using them at the slightest provocation. One provision of the Sullivan law barred aliens from carrying guns in public, though unlike aliens in numerous other states, those in New York were allowed to keep handguns at home. Other provisions were framed neutrally but applied by police chiefs discriminatorily against immigrants—in that era, a phenomenon hardly unique to gun control.[58]

The motivations behind the Sullivan law were, however, far more tangled than simple racism. Everything about Big Tim's political career suggests that he wanted to help, not hurt, immigrants—if for no other reason than his own continued political success. He was an immigrant himself, from one of the many Irish families that joined the dense concentration of German, Jewish, Irish, Italian, Chinese, and Greek newcomers who filled lower Manhattan. Sullivan's political influence over the years was due largely to his appeal to immigrant communities. He was famous for serving free Christmas dinners to the poor and dispossessed of the Bowery; thousands came every year, and Sullivan never turned anyone away. Each summer he organized popular community festivals in his district, where downtrodden constituents would feast on chowder, chicken, and beer while enjoying music, parades, and pie-eating contests. Big Tim thought gun control was necessary not to disarm immigrants, but to make those in his district safer from what he called "the tough men, the men who tote guns and use them far too frequently."

Moreover, the main provisions of the Sullivan law applied to all civilians regardless of where they hailed from. New York's gun problem was not limited to immigrants. Guns, especially handguns, were involved in an alarming number of incidents. In 1901, William McKinley became the third U.S. president to be assassinated when, during a visit to Buffalo, he was shot by a pistol-bearing anarchist—that era's brand of terrorist. In 1910, a disgruntled city employee used a pistol to shoot the popular mayor of New York City, William Jay Gaynor, at point-blank range. Although Gaynor survived, the inci-

dent was captured in a photograph that was especially disheartening to Americans. It showed the wounded mayor stumbling, blood all over his face and coat as he was being helped by another man. That other man was Robert Todd Lincoln, the only living son of the first U.S. president to be assassinated.[59]

Although political assassinations made the most headlines, gun violence was being felt by ordinary citizens too. In 1911, the New York City chief medical examiner reported that gun-related murders had jumped 50 percent the preceding year. "This city is like a wild Western town. The gun men rule," he wrote. Although this statement, as we've seen, exaggerated gun violence in frontier towns, the coroner's recommendation of "severe measures for the regulation of the indiscriminate sale and carrying of firearms" was influential. Across the country, reformers, including John Wanamaker, the nation's leading merchant, and John D. Rockefeller, began pushing for gun control legislation. A 1925 article in the *American Bar Association Journal*, entitled "Legislatures and the Pistol Problem," reported that a "current of public opinion is setting against the right of individuals to possess and carry freely revolvers capable of being concealed, and there is strong police sanction of this opinion." Enhancing public safety by regulating guns was of a piece with the progressive ferment that pushed for minimum-wage laws, child labor laws, and food quality legislation.[60]

The U.S. Revolver Association, a pro-gun organization formed, like the NRA, to promote marksmanship and competitive shooting, proposed in 1923 a Revolver Act for states to adopt. Under this proposal, civilians would have to obtain a permit to carry a concealed weapon. Anyone who committed a crime while in possession of a handgun would receive an extra five years in prison, and noncitizens would be prohibited from possessing handguns entirely. Gun dealers would have to deliver to police detailed records of all handgun sales. The proposal also included a one-day waiting period that meant dealers could not deliver a handgun to the purchaser until the day after the sale. While these last two types of gun control—turning over records of sales to the police and waiting periods—are vigorously opposed by

gun rights advocates today, the Revolver Act was quickly enacted by numerous states, among them West Virginia, New Jersey, Michigan, Indiana, Oregon, California, New Hampshire, North Dakota, and Connecticut.⁶¹

The Revolver Act was the first important "model" gun control law. Around the turn of the century, lawyers and public officials increasingly saw the problems inherent in the patchwork of disparate laws in the then forty-odd states. Each state had its own set of laws and regulations. The wide variation among states bred inconsistency and confusion, especially for interstate businesses and an ever more mobile population. A movement began to promote consistency in the law among the states. In 1889, the American Bar Association resolved to work for "uniformity of the laws." Three years later, the first meeting of the National Conference of Commissioners on Uniform State Laws was held in Saratoga Springs, New York. By 1912, every state in the Union appointed commissioners to the national conference.⁶²

In the 1920s, the National Conference of Commissioners turned its attention to gun control. Charles Imlay, one of the commissioners, wrote in 1926, "That there is need of more careful regulation of the use of firearms and in particular small firearms . . . is evidenced from the daily newspaper records of crimes of violence committed with the revolver." Imlay believed that the "same exigencies which demand the regulation of the sale and use of firearms require that the laws upon the subject be uniform." Because guns are easily transported across state lines, it was vital to enact consistent regulation so that the laws of one state were not undermined by the laxer laws of its neighbors.⁶³

The model legislation endorsed by the National Conference of Commissioners was called the Uniform Firearms Act, and it borrowed liberally from the earlier Revolver Act. The Uniform Firearms Act's primary purpose was to "make it difficult for any person not a law-abiding citizen to obtain a pistol or revolver." The commissioners recommended that states require a license to have a concealed weapon in public and that a license be issued only to a "suitable person" with a "proper reason for carrying" a firearm. Dealers were to maintain

records of sales and automatically forward them to law enforcement officials. The Uniform Firearms Act also included a one-day waiting period for handgun sales, later extended to two days in a revised version of the act. Anyone who sold a handgun was to be licensed by the state and was prohibited from selling such a weapon to those convicted of crimes of violence, drug addicts, drunkards, and minors. Aliens weren't singled out and, assuming they met the ordinary standards, could possess a concealed weapon just like citizens.⁶⁴

The commissioners did not seek to get rid of all the guns. Most of the provisions of the Uniform Firearms Act applied only to handguns, which were thought to be especially prevalent in ordinary street crime. Ownership of shotguns and rifles, useful for hunting or protecting one's home from criminals, remained untouched. The commissioners were mindful of people's need to have firearms available for self-defense. The statement of principles that accompanied the act said the commissioners did not want to hamper "the facility of a law-abiding citizen to secure arms for the protection of his home."

The Uniform Firearms Act was eagerly adopted by numerous states, North and South, Alabama, Arkansas, Maryland, Montana, Pennsylvania, South Dakota, Virginia, Washington, and Wisconsin joined the states that had previously enacted the similar Revolver Act. By 1932, an article reviewing the spread of gun control legislation concluded that laws requiring a license to carry a concealed weapon "are in effect in practically every jurisdiction." Not all states adopted the Uniform Firearms Act in its totality. Some legislatures thought the model legislation went too far and supported only individual provisions. Legislatures in other states thought the act didn't go far enough. In Hawaii, Massachusetts, Michigan, West Virginia, and New Jersey, laws were passed requiring all purchasers of handguns, not just those who wanted to carry them concealed in public, to obtain a license first.⁶⁵

New York was among the few states that didn't adopt one of the model gun control laws. Although a bill incorporating the Uniform Firearms Act passed both houses of the state legislature in 1932, the governor vetoed it. He thought that the Sullivan law was more